No. 23-35174

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELIZABETH HUNTER, et al,

*Plaintiff-Appellants*,

v.

UNITED STATES DEPARTMENT
OF EDUCATION, et al,

*Defendant-Appellees*,

and

COUNCIL FOR CHRISTIAN COLLEGES
& UNIVERSITIES, et al,

*Defendant-Intervenors-Appellees,*

On Appeal from the United States District Court
for the District of Oregon
No. 6:21-cv-00474-AA
Hon. Ann Aiken

APPELLANTS' OPENING BRIEF

**Paul Carlos Southwick (OSB 095141)**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208
Portland, OR 97203
Phone: 503-806-9517
Email: paul@paulsouthwick.com

**Alletta Brenner (OSB 142844)**
**Perkins Coie LLP**
1120 NW Couch Street, 10th Floor
Portland, OR 97209
Phone: 503-727-2076
Email: abrenner@perkinscoie.com

*Attorneys for Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ......................................................2

ISSUES PRESENTED ...........................................................................2

STATEMENT OF THE CASE ...............................................................3

    A.    Title IX's religious exemption. ..........................................3

    B.    The Plaintiffs' educational experiences. ...........................6

        i.    Veronica Bonifacio Penales................................6

        ii.    Alex Duron............................................................7

        iii.    Tristan Campbell...................................................8

        iv.    Zayn Silva ............................................................8

        v.    Jonathan Jones .....................................................9

        vi.    Kalie Hargrove...................................................10

    C.    Procedural history. ...........................................................10

SUMMARY OF THE ARGUMENT ....................................................14

STANDARD OF REVIEW ..................................................................15

ARGUMENT ........................................................................................16

I.    The district court erred in concluding that Appellants' equal
protection claim fails as a matter of law................................16

    A.    Plaintiffs can plausibly plead that the Exemption is
discriminatory on its face and in effect against
LGBTQ+ students. ..........................................................17

i. The Exemption is facially discriminatory because Congress expressly directed it at students who experience sex discrimination at religious schools. ...................................................17

ii. The Exemption is discriminatory in its effect on Plaintiffs and other LGBTQ+ students. ..............................19

iii. The Exemption is discriminatory as applied to Plaintiffs and other LGBTQ+ students in the proposed class. ....................................................21

B. Plaintiffs can plausibly plead that the Exemption, as written by Congress and applied by the Department, is motivated at least in part by discriminatory animus. ....................22

C. Plaintiffs can plausibly plead that the Exemption is insufficiently tailored to the government's objective of striking a balance between protecting students from sex discrimination while allowing some discriminatory policies and practices based on religious beliefs. ..............................................29

II. The district court erred by dismissing Plaintiffs' APA claim regarding the August 2020 Final Rule for lack of standing. ...................33

A. Plaintiffs have standing to pursue their APA claim because they can satisfy Article III's standing requirements and their asserted interest is protected by Title IX. ...........................................34

i. Plaintiffs can plausibly allege they have suffered an injury in fact. ....................................35

ii. Plaintiffs can plausibly allege that their injuries are traceable to the Final Rule. ..............................37

iii. A favorable decision would redress Plaintiffs' injury. ................................................39

iv. Plaintiffs' asserted interest is within the zone of interests that Title IX is meant to protect. ..........................39

B.     Plaintiffs can plausibly allege facts showing that the Department's decision was arbitrary, capricious, and not in accordance with law.............................................................40

       i.     The Department's justification for the Final Rule ran counter to the evidence before it...........................41

       ii.    The Department overlooked important parts of the problem because by depriving students of notice, the Final Rule makes it harder to hold schools accountable and avoid discrimination. ...................41

C.     The Final Rule is unlawful because it unconstitutionally deprives students of any notice that they will be denied statutorily conferred nondiscrimination rights................................................................42

III.   The district court erred in dismissing Plaintiffs' Establishment Clause claim based on an improper test. ..........................45

CONCLUSION ....................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AE ex rel. Hernandez v. Cnty. of Tulare*,
666 F.3d 631 (9th Cir. 2012) ........................................................................15

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ........................................................................23

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) ................................................................16, 18

*Ave. 6E Invs., LLC v. City of Yuma*,
818 F.3d 493 (9th Cir. 2016) ........................................................23, 24, 29

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988) ........................................................................13

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
512 U.S. 687 (1994) ........................................................................................46

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................39

*Bly-Magee v. California*,
236 F.3d 1014 (9th Cir. 2001) ......................................................................12

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ........................................................................................32

*Bowers v. Hardwick*,
478 U.S. 186 (1986) ........................................................................................26

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*,
149 F.3d 971 (9th Cir. 1998) ........................................................................44

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979) ................................................................................17, 30

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................................................................21

*De La Cruz v. Tormey*,
    582 F.2d 45 (9th Cir. 1978) ............................................................23

*Doughtery v. City of Covina*,
    654 F.3d 892 (9th Cir. 2011) ..........................................................15

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ..........................................................40

*Firewalker-Fields v. Lee*,
    58 F.4th 104 (4th Cir. 2023) ...........................................................45

*Flores v. Morgan Hill Unified Sch. Dist.*,
    324 F.3d 1130 (9th Cir. 2003) ........................................................24

*Johnson v. Lincoln Christian Coll.*,
    501 N.E.2d 1380 (Ill. Ct. App. 1986) .............................................26

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ............................................................15, 45

*Larson v. Valente*,
    456 U.S. 228 (1982) ........................................................................47

*Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*,
    452 U.S. 18 (1981) ..........................................................................44

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) ..........................................................30

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ........................................................................15

*Liberty Univ., Inc. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ............................................................32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................35, 39

*Manzarek v. St. Paul Fire & Marine Ins.*,
    519 F.3d 1025 (9th Cir. 2008) ........................................................15

*Marsh v. Cnty. of San Diego*,
    680 F.3d 1148 (9th Cir. 2012) ........................................................43

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)......................................................................43

*McGowan v. Maryland*,
    366 U.S. 420 (1961)......................................................................47

*Menges v. Knudsen*,
    538 F. Supp. 3d 1082 (D. Mont. 2021) .......................................21

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) .......................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)........................................................................40

*Norwood v. Harrison*,
    413 U.S. 455 (1973)................................................................32, 50

*Obergefell v. Hodges*,
    576 U.S. 664 (2015)......................................................................20

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)..................................................................49

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .....................................................23

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) .....................................................13

*Pendleton v. Jividen*,
    Case No. 2:22-cv-00178, 2023 WL 2591474 (S.D.W. Va. Mar.
    21, 2023) ......................................................................................48

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)......................................................................30

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l
    Presbyterian Church*,
    393 U.S. 440 (1969)......................................................................49

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    298 F. Supp. 3d 1304 (N.D. Cal. 2018)........................................23

*Romer v. Evans*,
    517 U.S. 620 (1996)..................................................................19, 21

*Rosenbaum v. City & Cnty. of San Francisco*,
    484 F.3d 1142 (9th Cir. 2007) ...................................................22

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
    426 U.S. 696 (1976)...................................................................49

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)...................................................................35

*Tex. Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989).......................................................................46

*Torcaso v. Waskins*,
    367 U.S. 488 (1961)...................................................................46

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)...............................................................37

*United States v. United Healthcare Ins.*,
    848 F.3d 1161 (9th Cir. 2016) ...................................................13

*Ventress v. Japan Airlines*,
    603 F.3d 676 (9th Cir. 2010) .....................................................15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..............................................................19, 23

*Washington v. Davis*,
    426 U.S. 229 (1976)...................................................................16

**STATUTES**

5 U.S.C. § 702.................................................................................2

5 U.S.C. § 706(2)(A) .......................................................................40

20 U.S.C. § 1681(a)(3).............................................3, 17, 18, 46, 49

20 U.S.C. §§ 1681–1688...............................................................16

28 U.S.C. § 1291..............................................................................2

28 U.S.C. § 1331 ..........................................................................2

28 U.S.C. § 1361 ..........................................................................2

28 U.S.C. § 2201 ..........................................................................2

28 U.S.C. § 2202 ..........................................................................2

## RULES

Fed. R. App. P. 4(a)(1)(B) ...........................................................2

Fed. R. Civ. P. 12(b)(6) .............................................................15

Fed. R. Civ. P. 57 ........................................................................2

## REGULATIONS

34 C.F.R. § 106.12 .....................................................4, 5, 18, 33, 42

34 C.F.R. § 106.44 .......................................................................8

85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) ...............................................................................38, 41

85 Fed. Reg. 59,916 (Sept. 23, 2020) (to be codified at 34 C.F.R. pt. 75) ...............................................................................28, 29

## OTHER AUTHORITIES

Ezra Gerard, *Gay Purge: The Persecution of Homosexual Students at the University of Wisconsin-Madison, 1962-1963*, UW-Madison Pub. History Project Blog (Mar. 22, 2021) ...................26

THE FEDERALIST NO. 51 (H. Lodge ed. 1908) ...................................47

Gustav Neibuhr, *Interracial Dating Ban to End at Bob Jones University*, N.Y. TIMES (Mar. 4, 2000) .........................................27

Justin McCarthy, *Gallup First Polled on Gay Issues in '77. What Has Changed*, GALLUP (June 6, 2019) ..........................................26

Kif Augustine-Adams, *Religious Exemptions to the Title IX*, 65 KANSAS L. REV. 327 (2016) ........................................................26

S. Rep. No. 100-64 (1987)....................................................................30

Suyin Haynes, *You've Probably Heard of the Red Scare, but the Lesser-Known, Anti-Gay "Lavender Scare" is Rarely Taught in Schools,* TIME (Dec. 22, 2020) ....................................................26

U.S. CONST. AMEND. I............................................................................46

## INTRODUCTION

This case is about the arbitrary and unconstitutional denial of fundamental federal legal protections for LGBTQ+ students at publicly funded colleges and universities. Instead of acting as guardians for those rights, the U.S. Department of Education (the "Department") has given free license to schools that condone and promote sex discrimination on religious grounds, singling out LGBTQ+ students and depriving them of any notice or remedy. As a result of the Department's policies and actions, hundreds of thousands of students have suffered profound harm with no recourse.

Plaintiffs filed this lawsuit to put an end to this discrimination. They alleged claims against the Department and the Acting Assistant Secretary for the Office of Civil Rights (OCR) (collectively "Defendants"), seeking remedies for the violation of (1) their due process and equal protection rights; (2) the Establishment Clause; (3) their First Amendment rights to freedom of religion, speech, assembly, and association; (4) the Administrative Procedure Act ("APA"); and (5) the Religious Freedom Restoration Act ("RFRA"). *See generally* 3-ER-516–603. The district court dismissed their claims wholesale at the pleading stage, with prejudice. 1-ER-2. Plaintiffs are asking this Court to reverse the district court's decision and remand so that they can pursue resolution of their claims on the merits.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under: (1) 28 U.S.C. § 1331, because this action arises under the First and Fifth Amendments to the U.S. Constitution, the APA and RFRA; (2) 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform their duty; (3) 5 U.S.C. § 702, as it challenges the action of a federal agency; and (4) 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57 to issue declaratory and injunctive relief. *See* 3-ER-518–19.

The district court entered judgment on January 12, 2023, granting Defendants' motion to dismiss and denying Plaintiffs' motion for preliminary injunction. Plaintiffs filed a timely notice of appeal on March 10, 2023. *See* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment.

## ISSUES PRESENTED

I.   Plaintiffs can plausibly plead that Congress and the Department intended the Exemption to deprive students who experience sex discrimination condoned by religious schools of a valuable benefit, that LGBTQ+ students like Plaintiffs are disparately impacted by the Exemption, and that the Exemption fails both rational basis and intermediate scrutiny. Did the

district court err in dismissing Plaintiffs' Fifth Amendment equal protection claim with prejudice?

II.     Plaintiffs can plausibly plead facts establishing Article III standing to challenge the August 2020 Final Rule under the APA. Did the district court err in dismissing Plaintiffs' APA claims with prejudice?

III.    The district court applied an improper and overruled test to Plaintiffs' Establishment Clause claim. Did the district court err in dismissing that claim?

## STATEMENT OF THE CASE

### A.     Title IX's religious exemption.

Congress passed Title IX of the Education Amendments Act ("Title IX") in 1972, as a follow-up to the suite of anti-discrimination protections in the Civil Rights Act of 1964 ("CRA"). Title IX prohibits sex discrimination at all educational institutions that receive federal financial assistance, but with a caveat: the law allows educational institutions "controlled by a religious organization" to obtain an exemption from the law if compliance conflicts with that religious organization's religious tenets (the "Exemption"). 20 U.S.C. § 1681(a)(3); *see also* 15-ER-3475–77. The Department's implementing regulations established a set of procedures for schools to claim the Exemption. Those regulations originally provided:

3

> An educational institution which wishes to claim the exemption set forth in paragraph (a) of this section, **shall do so** by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization.

34 C.F.R. § 106.12(b). Thus, at least according to the text of the Department's regulation, a school was required to formally request the Exemption in writing. 3-ER-584–85. For years, schools did so through this process. *Id.*

In 2013 and 2016, under the Obama administration, the Department began to enforce Title IX to protect LGBTQ+ students, and together with the Department of Justice, issued joint guidance instructing schools that Title IX prohibits discrimination based on gender identity and sexual orientation. 15-ER-3427–28. This executive action prompted a new wave of religious exemption requests. *Id.* Between 2013 and 2015, fifty-six religious colleges requested exemptions to allow them to discriminate against LGBTQ+ students. *Id.* These schools requested exemptions from many Title IX regulations, including those regarding admissions, recruiting, financial aid, counselling, housing, disciplinary procedures, health insurance and employment. *Id.* Some schools requested exemptions for sexual orientation only, some for gender identity only, and some for both. *Id.* Despite purporting to protect LGBTQ+ students, the Department was incredibly permissive in allowing these schools to claim the Exemption, and just as it had for decades, never denied an exemption request. *Id.*

4

Facing a public outcry against such discrimination, some schools that had yet to obtain exemptions sought assurances from the Department that they could do so without making a formal, public, request. *Id.* Relying on informal guidance from decades prior, the Department responded by informing schools that religiously affiliated institutions that purport to discriminate against LGBTQ+ students on religious grounds inherently possess the Exemption such that they do not need to formally claim it at all. *Id.* The wave of formal requests soon became a trickle, as schools discovered that they could now claim the Exemption without having to inform the government, the public, or prospective students. *Id.*

Yet, in 2020, the Department sought to make the Exemption even more accessible for religious schools. On May 19, 2020, the Department issued a new final rule that went into effect on August 14, 2020, that amended the Title IX regulation at 34 C.F.R. § 106.12(b) ("Final Rule"). That provision now states:

> An educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section ***may do so*** by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization. An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption. In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the

5

institution had previously sought assurance of an exemption from the Assistant Secretary.

With this change, the regulations now expressly permit schools to claim the Exemption without requesting it in writing, and even *after* a student has filed a Title IX complaint. This has emboldened schools that engage in discrimination, resulted in stigmatic harm to LGBTQ+ persons, and left students like Plaintiffs with no way of confirming whether their institution will be exempt from federal anti-discrimination laws. 3-ER-586–88. As a result, even more LGBTQ+ students are at risk of abuse, harassment, and loss of their fundamental rights. 3-ER-600.

### B. The Plaintiffs' educational experiences.

Plaintiffs' experiences illustrate the Exemption's unconstitutional application and effect on LGBTQ+ students. Each has been denied equal access to education because of sex. And nearly all has or will have a Title IX complaint denied by the Department because of the Exemption. To summarize just a few of their stories:

### i. Veronica Bonifacio Penales

Plaintiff Veronica Bonifacio Penales is a queer student at Baylor University who has been the victim of persistent harassment, including the repeated anonymous posting of anti-LGBTQ+ slurs on her dorm room door. 3-ER-528. But because of her sexual orientation, university administration refused

6

to take action to provide her with the safe educational environment guaranteed by Title IX. *Id.* After Penales filed a Title IX Complaint against her school, Baylor claimed a religious exemption from its anti-harassment obligations to LGBTQ+ students, which the Department recently granted.[1] If Veronica were a straight woman targeted with misogynist slurs instead of homophobic ones, her Title IX rights would be protected. Instead, they are denied to her solely because of her sexual orientation.

### ii.    Alex Duron

Plaintiff Alex Duron, a male ICU nurse, had his admission to a graduate nursing program at Union University rescinded only days before the start of the school year (and after he sold his car, quit his nursing job, paid his deposit, and secured graduate student housing) because he was engaged to a man. 3-ER-529–30; *see also* 2-ER-277–81. The university permits straight students to marry and

---

[1] On July 25, 2023, the Department granted Baylor University a broad exemption from harassment-related regulations. *See* Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, Dep't of Educ. to Linda A. Livingstone, Ph.D., President, Baylor Univ. (July 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/baylor-university-response-07252023.pdf; Letter from Linda A. Livingstone, Ph.D., President, Baylor Univ. to Catherine E. Lhamon, Assistant Sec'y for Civil Rights, Dep't of Educ. (May 1, 2023); https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/baylor-university-request-05012023.pdf

7

to engage in sexual relations within the context of marriage but denied an educational opportunity to Duron because of his sex. 3-ER-530.

### iii. Tristan Campbell

Plaintiff Tristan Campbell was a student at Oklahoma Baptist University who was expelled solely for publicly identifying as bisexual. 3-ER-542. Before then, Campbell was sexually assaulted on campus by a man who lived in his dorm. 3-ER-544. Title IX requires schools to protect students from sexual violence, including taking steps such as moving assault victims to safer housing and providing them with alternatives to attending classes with their assailant, but none of those protections were available to Tristan. *See, e.g.*, 34 C.F.R. § 106.44 (regulations relating to sexual harassment). Because Oklahoma Baptist had claimed an Exemption allowing it to discriminate against LGBTQ+ students like Campbell, he felt that his only choice was to stay in the closet and risk further sexual violence, or risk being outed and subjected to discipline for his identity.

### iv. Zayn Silva

Plaintiff Zayn Silva is a trans man who applied to Nyack College, which, like many religious schools, had never requested any exemption to Title IX. 3-ER-618, 620, 622. Nyack actively represented itself to prospective students as an institution open and inclusive to all, but just to be sure, Silva disclosed that he was transgender before applying. 3-ER-531–622. Silva was told by school officials that this would not pose any problem. *Id*. Yet, shortly after submitting

his application, Nyack notified him that it would not be moving forward with his application because he was "not ashamed nor repentant" of his identity. 3-ER-5231. As a result, Silva was not only deprived of his school of choice but suffered severe anxiety and depression to the point that it stalled his career path. 3-ER-623.

### v. Jonathan Jones

Plaintiff Jonathan Jones is a bisexual, non-binary, and gender fluid individual who attended Azusa Pacific University from 2017 to 2021. 3-ER-550; *see also* 4-ER-676. Like many religious schools, Azusa has taken an amorphous stance on LGBTQ+ relationships and student conduct. For example, during Jones' sophomore year, Azusa announced that it would no longer ban same-sex dating, only to reinstate the ban in response to pressure from some of its constituencies. 4-ER-677. Several months later, Azusa removed any mention of same-sex dating from its student policies. 4-ER-678. While attending Azusa, Jones experienced sex discrimination and in July 2021, Jones filed a Title IX complaint. *See* 2-ER-71. It was only after this that Azusa claimed an Exemption.[2]

---

[2] Letter from Adam J. Morris, Ph.D., President, Azusa Pacific University to Catherine E. Lhamon, Assistant Sec'y for Civil Rights, Dep't of Educ. (Nov. 9, 2022); https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/azusa-pacific-university-request-11192022.pdf.

### vi.    Kalie Hargrove

Plaintiff Kalie Hargrove is a transgender woman and military veteran who attended Lincoln Christian University from 2019 to 2021, after previously attending the university from 2009 to 2010. 2-ER-140. Although the university had a policy defining "gender modification" and "cross-dressing" as inappropriate and immoral, it did not prohibit transgender students outright. *See* 2-ER-141. But in 2021, more than a year after Hargrove had begun the process of gender transition and was well into the process of obtaining her degree, Lincoln sent her a notice stating because she had "chose[n] to identify and live as a transgender woman" she would be required to either drop her classes or face charges before the school's disciplinary committee. Faced with this choice, Hargrove was forced to transfer to another school, which ultimately delayed her ability to obtain a degree. *Id.* Because Lincoln never claimed an Exemption until after Hargrove filed a Title IX complaint in October 2021, she had no way of knowing that she lacked the protection of Title IX before then.

### C.    Procedural history.

On March 29, 2021, Plaintiffs filed a class action complaint for injunctive and declaratory relief. 1-ER-8. Before Defendants filed a responsive pleading, Plaintiffs filed their First Amended Complaint ("FAC"), 3-ER-516–850 and a couple months later, moved for a temporary restraining order ("TRO") and preliminary injunction, seeking an order enjoining Defendants and their agents

from dismissing certain Plaintiffs' Title IX complaints based on the unlawful application of the Exemption and its implementing regulations. 15-ER-3470.

Defendants moved to dismiss the FAC on August 9, 2021, arguing that Plaintiffs lacked standing and that they failed to state their first (due process and equal protection rights under the Fifth Amendment), second (Establishment Clause), third (First Amendment), and fifth (RFRA) claims. Notably, Defendants did not argue that Plaintiffs' APA claims failed as a matter of law. *See generally* 11-ER-2473–2518.

Defendants were joined by several intervenors, including the Council for Christian Colleges and Universities (CCCU) and several private religious schools who sought or received Title IX exemptions (represented by Alliance Defending Freedom) (collectively "Defendant-Intervenors"), who filed their own motion to dismiss the FAC on August 18, 2021. *See generally* 7-ER-1412–62.

On August 30, 2021, the district court denied Plaintiffs' request for a TRO, but reserved ruling on their Motion for Preliminary Injunction. *See generally* 9-ER-2141–52. The court held an evidentiary hearing on November 4–6, 2021, but did not resolve any of the parties' pending motions. *See* 1-ER-8.

While those motions were still pending, Plaintiffs proposed filing a Second Amended Complaint ("SAC") to update the case caption and make other relatively minor changes, including: adding new plaintiffs, alleging additional

facts relating to the Title IX complaints some Plaintiffs had pending with OCR, and adjusting the prayer for relief to conform to that requested in their motion for preliminary injunction. 2-ER-60; 1-ER-9. Notably, Plaintiffs did not attempt to respond to arguments Defendants, or the trial Court, raised. Rather, Plaintiffs represented that it contained the same "operative facts" as the FAC and would not affect the issues already briefed and pending before the court. 2-ER-62; *see also* 1-ER-14.

The district court did not render a decision on any of these motions until January 12, 2023. Although it found that Plaintiffs had standing to pursue their equal protection claims because their injuries were cognizable, that Defendants caused those injuries, at least in part, and that Plaintiffs' injuries would be remedied by their requested relief, the court dismissed the FAC in its entirety. 1-ER-41–42. The court held that Plaintiffs first, second, third and fifth claims for relief failed as a matter of law, and that their APA claims failed for lack of standing. 1-ER-20–24.

Despite this Court's directive that leave to amend should be granted unless the pleading *cannot possibly* be cured by the allegation of other facts, the district court denied Plaintiffs still-pending motion to amend and dismissed the FAC with prejudice. *Id.*; *see Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001); *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020)

("Dismissal of a complaint without leave to amend is improper unless it is clear, on de novo review, that the complaint could not be saved by any amendment."); *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009) (noting "extreme liberality" of Rule 15). The district court held that amendment was futile because neither the facts in the SAC, nor those raised in the supplemental briefing Plaintiffs provided to the court in July 2022 (regarding the status of certain Plaintiffs' Title IX complaints) were sufficient to cure the defects in the FAC. *See* 2-ER-9–10, 24, 29, 31, 38, 40–43.

Effectively flipping the standard for granting leave to amend on its head, the district court did not analyze any of the extensive record evidence Plaintiffs submitted (including three days of live testimony) or consider what other facts might plausibly exist and be alleged. *See id.*; *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (futility turns not on whether a cure has been *proposed*, but on whether a cure is *possible*).[3]

---

[3] In *United States v. United Healthcare Insurance*, 848 F.3d 1161 (9th Cir. 2016), the plaintiff had amended three times and proposed a further amendment when the trial court granted defendants' motion to dismiss with prejudice. *Id.* at 1171–72. This Court reversed and remanded because the plaintiff alleged at least one cognizable legal theory and never had an opportunity to address the defects that were grounds for dismissal. *Id.* Here, the district court similarly erred by myopically focusing on the allegations in the SAC and the briefs rather than on what facts Plaintiffs could conceivably add.

## SUMMARY OF THE ARGUMENT

The district court erred in multiple ways when it dismissed Plaintiffs' claims with prejudice.

*Equal Protection Claim.* The court erred in dismissing Plaintiffs' equal protection claim under the Fifth Amendment because Plaintiffs plausibly set forth facts demonstrating that the Exemption is discriminatory on its face, in effect against LGBTQ+ students, and as applied. Further, Plaintiffs allege that the Exemption, as written by Congress and implemented by the Department, is motivated, at least in part, by discriminatory animus. Finally, Plaintiffs allege facts supporting their argument that the Exemption is not adequately suited to its objective of striking a balance between preventing unlawful discrimination and allowing religious schools to maintain some discriminatory policies and practices based on religious beliefs.

*APA Claim.* The court also erred by dismissing Plaintiffs' APA claim for lack of standing. Plaintiffs allege that the Final Rule injures students like them by depriving them of notice as to whether their schools may be exempt from Title IX. Plaintiffs also allege that their injuries are directly traceable to the Final Rule because by expressly allowing schools to claim the Exemption retroactively without requesting it in writing, it prevents students from knowing whether their schools may be exempt from Title IX such that they will be deprived of its

14

protections. An order setting aside the Final Rule and enforcing the prior rule as written would directly address this harm and prevent Plaintiffs and other students from suffering these injuries attributable to the Final Rule.

*Establishment Clause Claim.* The court erred in dismissing Plaintiffs' Establishment Clause claim by applying an improper test. The court applied the three-pronged test from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), but the Supreme Court expressly overruled that test in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022). Due to that error alone, this Court should remand. In any case, Plaintiffs plausibly allege facts showing that the Exemption and its application via the Final Rule violate the Establishment Clause under *Kennedy's* historical practices and understandings test.

Accordingly, this Court should reverse and remand.

## STANDARD OF REVIEW

This Court reviews de novo a trial court's denial or grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Manzarek v. St. Paul Fire & Marine Ins.*, 519 F.3d 1025, 1030 (9th Cir. 2008); *Doughtery v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011). This Court reviews a trial court's denial of a motion to amend a complaint for an abuse of discretion. *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012); *Ventress v. Japan Airlines*, 603 F.3d 676, 680 (9th Cir. 2010).

## ARGUMENT

## I.   The district court erred in concluding that Appellants' equal protection claim fails as a matter of law.

The district court erred in dismissing Plaintiffs' equal protection claim for a lack of allegations regarding the government's discriminatory motives and explanation as to how the Exemption fails the applicable level of scrutiny. Title IX confers a statutory benefit on all students at federally funded schools by requiring equal educational access and by providing remedies for sex-based mistreatment, harassment, and violence on campus. *See generally* 20 U.S.C. § 1681–1688. The government cannot arbitrarily and invidiously withhold this benefit from some of those students. *See Washington v. Davis*, 426 U.S. 229, 239 (1976). But that is exactly what Congress and the Department have done through the Exemption.

To analyze an equal protection challenge, a court should first identify the classifications drawn and determine whether they are similarly situated, and then select and apply the appropriate level of scrutiny. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017). Here, Plaintiffs have plausibly pleaded facts showing that the Exemption treats students who experience sex discrimination at religious schools that condone such mistreatment differently than those who do not attend such schools, that the Exemption singles out and disparately impacts LGBTQ+ students at religious schools, that Congress and the

Department were motivated at least in part by discriminatory intent, and that the Exemption fails so badly in achieving its purported objective that it is not even rationally, let alone substantially, related to the achievement of that objective. This Court should reverse and remand to allow Plaintiffs to develop the necessary record to resolve their claim on the merits. Or, if additional allegations are needed, this Court should reverse and remand to allow Plaintiffs to amend.

### A. Plaintiffs can plausibly plead that the Exemption is discriminatory on its face and in effect against LGBTQ+ students.

The Exemption is discriminatory on its face because—by its own terms—it only applies to students who experience sex discrimination at religious schools that condone such mistreatment. But even if this Court concludes otherwise, it is undeniable that the Exemption has a disparate effect on LGBTQ+ students.

### i. The Exemption is facially discriminatory because Congress expressly directed it at students who experience sex discrimination at religious schools.

The Exemption provides that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). There is no question Title IX exists for the purpose of preventing and remedying sex discrimination. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Thus, on its face, the Exemption excludes from protection those students who: (1) attend schools controlled by religious

17

organizations, and (2) experience sex discrimination of a type prohibited by Title IX but condoned or promoted by that organization's "religious tenets." *See* 20 U.S.C. § 1681(a)(3); *see also* 34 C.F.R. § 106.12(b).

If the Exemption denied the entire basket of rights that Title IX provides to all students at all religious institutions, it would more closely resemble a facially neutral rule (though it would still draw a distinction between the protections available to students at religious schools and those available to students at secular schools). But that is not the choice Congress made. Congress instead chose to draw a facial distinction between students at federally funded religious schools that condone or promote sex discrimination and students at federally funded religious (and secular) schools that do not. Similarly, by opting to broadly exempt religious schools from the requirements of Title IX whenever it conflicts with their "religious tenets," Congress chose to draw a distinction between students who experience religiously motivated sex discrimination and those who experience other forms of religiously motivated discrimination, for example, targeting race, color, or national origin. *See* 15-ER-3475–77, 3497 (noting differences between various CRA provisions compared to Title IX). Because the Exemption treats similarly situated students differently, it is subject to equal protection scrutiny. *See Ariz. Dream Act Coal.*, 855 F.3d at 966. And because the Exemption broadly denies the targeted group critical civil rights

protections irrespective of "how local or discrete the harm" and "how public and widespread the injury," it cannot withstand that scrutiny. *Romer v. Evans*, 517 U.S. 620, 631–32 (1996).

### ii. The Exemption is discriminatory in its effect on Plaintiffs and other LGBTQ+ students.

The Exemption is also subject to equal protection scrutiny due to its severe and disparate impact on Plaintiffs and other LGBTQ+ students at religious schools. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977). As this impact makes clear, the Exemption serves to single out a disfavored class—those students who are the known targets of certain forms of sex discrimination that have historically, consistently, and widely been condoned or promoted by religious educational institutions receiving federal funding—for disfavored treatment.

The district court recognized this, noting that the FAC is filled with facts showing the harmful and discriminatory way the Exemption has been applied to LGBTQ+ students. *See* 1-ER-15–17 (noting FAC is "replete with allegations" of students' unequal treatment due to the Exemption and recognizing stigmatic injuries as basis for standing). The Exemption's disparate impact on LGBTQ+ students is evident in how schools have claimed it over the years. For example, according to the Office of Civil Rights' own public records, nearly all the religious exemption requests that the Department has granted in the last ten years

have specifically targeted LGBTQ+ individuals. *See* 13-ER-2829 (HRC report); 13-ER-2692–93 (Exemption Chart).[4] This is consistent with both Plaintiffs' allegations and the record evidence showing that LGBTQ+ individuals are widely and profoundly disfavored by culturally dominant religious, social, and political groups. *See, e.g.*, 3-ER-584, 589–90 (LGBTQ+ persons are and remain "a historically despised group in America" and of schools that have claimed the Exemption to discriminate against that group, "all, or nearly all … have been institutions affiliated with the Christian faith"); *see also* 15-ER-3474–78.

The consequences for individual LGBTQ+ students at religious schools have been devastating, with some deprived of even their most fundamental personal liberties, such as the right to marry. *See generally* 3-ER-525–82 (detailing Plaintiffs' injuries), 3-ER-587–88 (describing systemic injuries to LGBTQ+ students); *see also* 15-ER-3482–83 ("[T]he 1.5 million Americans who are married to a same-sex spouse … are explicitly prohibited from attending these institutions, even though their own tax dollars help finance the institutions."); *Obergefell v. Hodges*, 576 U.S. 664, 663 (2015) (describing liberties protected by the due process clause, including right to marry someone of same sex). More broadly, the Exemption's effects of denying legal protections and placing the

---

[4] OCR maintains public copies of correspondence showing Exemption requests and the Department's responses since the 1970s on its website at: https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html

government's imprimatur on practices of invidious discrimination causes psychological harm resulting in real and serious consequences for students' health. *See* 3-ER-588; *see also* 7-ER-1657–97, 7-ER-1593–1656, and 7-ER-1559–92 (expert reports); 5-ER-1014–28 (hearing testimony describing psychological harms); 6-ER-1165–66 and 6-ER-1170–98 (same). These allegations of the Exemption's profound and disparate impacts on LGBTQ+ students are more than sufficient to support an equal protection claim.

### iii. The Exemption is discriminatory as applied to Plaintiffs and other LGBTQ+ students in the proposed class.

Furthermore, even if the Exemption is constitutional in certain situations, it cannot be constitutionally applied to single out Plaintiffs and other LGBTQ+ students for special disfavor. *See Romer*, 517 U.S. at 635 (Equal protection violated by amendment to Colorado Constitution that imposed broad disability on LGBTQ+ people as a group); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985) (municipal zoning ordinance violated Equal Protection Clause because it "appear[ed] … to rest on an irrational prejudice against" and "negative attitudes, or fear" about those with special needs); *see also, e.g.*, *Menges v. Knudsen*, 538 F. Supp. 3d 1082, 1113 (D. Mont. 2021), *appeal dismissed as moot*, 2023 WL 2301431 (9th Cir. Mar. 1, 2023). But that is exactly what Plaintiffs allege the Department has done here. Since the Exemption only applies to a religious school to the extent its tenets are inconsistent with Title IX,

its constitutionality cannot be analyzed in isolation without reference to those underlying beliefs. Each time the Department grants an Exemption claimed in response to the filing of a Title IX Complaint by an LGBTQ+ student on the basis that their school claims a right to discriminate on religious grounds, the Department plays a role in singling out LGBTQ+ students for special disfavor, and implicitly and necessarily endorses that school's discriminatory views. 3-ER-586. This renders the Exemption unconstitutional as applied.

### B. Plaintiffs can plausibly plead that the Exemption, as written by Congress and applied by the Department, is motivated at least in part by discriminatory animus.

Although the district court recognized that even a facially neutral law can violate equal protection principles if it is discriminatory and has a disparate impact, the court nonetheless dismissed Plaintiffs' equal protection claim for failure to sufficiently allege "discriminatory motivation" and "how the religious exemption fails intermediate scrutiny." 1-ER-16–21, 25–27. This failed to sufficiently credit the well-pleaded allegations in the FAC.

To establish a reasonable inference of discriminatory purpose, a plaintiff must demonstrate that the decision-maker selected or reaffirmed a particular course of action at least in part because of its adverse effect on an identifiable group. *Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007). This does not require "that the discriminatory purpose was the *sole*

22

purpose of the challenged action, but only that it was *a* 'motivating factor.'" *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (quoting *Arlington Heights*, 429 U.S. at 266). Moreover, because "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent" resolution of such issues at the pleading stage is generally inappropriate. *Arlington Heights*, 429 U.S. at 266; *see, e.g.*, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1314–16 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part on other grounds*, 140 S. Ct. 1891 (2020).

As this Court has recognized, types of facts that can establish discriminatory intent include: "(1) statistics demonstrating a clear pattern unexplainable on [other] grounds, (2) [t]he historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant legislative or administrative history." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013) (cleaned up). Other indicators of discriminatory intent can include a longstanding pattern of severe and disparate impacts on the allegedly disfavored group, *Arce*, 793 F.3d at 977, and that legislators sought to appease a constituency known to be motivated by animus. *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504–07

23

(9th Cir. 2016); *see also, e.g.*, *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1132 (9th Cir. 2003) (holding that LGBTQ students sufficiently alleged intent based on deliberate indifference to pattern of abuse); *De La Cruz v. Tormey*, 582 F.2d 45, 47, 58 (9th Cir. 1978) (allegation that "[k]nowing that their actions resulted in women being denied access to education, defendants intentionally continued a policy and practice of thwarting all attempts to provide child care to plaintiffs" was "susceptible of an inference of intentional discrimination").

Here, Plaintiffs plead a variety of facts, which taken together, give rise to a reasonable inference of discriminatory motive on the part of Congress and the Department. For example, Plaintiffs allege that LGBTQ+ individuals, and particularly transgender individuals, have long been among the most disfavored class of individuals subjected to sex discrimination in this country, and that in the context of these widely held views, the Department has acted with extreme indifference to the harm experienced by LGBTQ+ people in its implementation of the Exemption. *See, e.g.*, 3-ER-584–85, 587–89, 597, 599; *see Ave. 6E Invs.*, 818 F.3d at 504 ("The presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views.").

24

Instead of engaging with these facts, the court faulted Plaintiffs for arguing "that when Congress enacted Title IX, protections for—or discrimination against sexual and gender minorities—were of no concern" and suggested this undercuts any inference that Congress intentionally discriminated against LGBTQ+ students with the Exemption. 1-ER-26 (citing 4-ER-883). When Plaintiffs raised this point in their briefing, it was to show how LGBTQ+ Americans were a socially despised group at the time Title IX was enacted, not to suggest that Congress lacked motivation to discriminate against them. In any case, that Congress was *not* concerned with protecting LGBTQ+ students at religious schools from discrimination is equally consistent with an intentional discrimination theory.

And to the extent this Court concludes that more is needed for Plaintiffs to state an equal protection claim, there are many facts that Plaintiffs can and would allege if permitted, including, but not limited to, that:

- Congress enacted the Exemption against a historical background in which the LGBTQ+ community was widely condemned by politicians, the dominant religions, and society at large, was demonized and criminalized by state and federal laws, and in which schools routinely

permitted harassment and other forms of violence and discrimination against LGBTQ+ students; *see* 15-ER-3477;[5]

- Congress enacted the Exemption, at least in part, to appease religious schools and colleges, and the constituencies supporting them, which have a history of policies and practices that discriminate based on race, sex, sexual orientation and gender identity; *see* 15-ER-3475–77 (describing history);[6]

- The constituencies that Congress sought to appease through the Exemption were (a) angry that Congress did not include a religious

---

[5] Ezra Gerard, *Gay Purge: The Persecution of Homosexual Students at the University of Wisconsin–Madison, 1962–1963*, UW-Madison Pub. History Project Blog (Mar. 22, 2021), https://publichistoryproject.wisc.edu/gay-purge-persecution/ ; Suyin Haynes, *You've Probably Heard of the Red Scare, but the Lesser-Known, Anti-Gay "Lavender Scare" is Rarely Taught in Schools,* TIME (Dec. 22, 2020), https://time.com/5922679/lavender-scare-history/ (describing Lavender Scare in mid-20th century); Justin McCarthy, *Gallup First Polled on Gay Issues in '77. What Has Changed*, GALLUP (June 6, 2019), https://news.gallup.com/poll/258065/gallup-first-polled-gay-issues-changed.aspx (including that only "14% believed gay people should be allowed to adopt in 1977"); *Bowers v. Hardwick*, 478 U.S. 186, 192–94 (1986) (describing history of criminalization of same-sex intimacy), *overruled by Lawrence v. Texas*, 539 U.S. 558 (2003).

[6] *See also* Kif Augustine-Adams, *Religious Exemptions to the Title IX*, 65 KANSAS L. REV. 327, 334–37 (2016) (describing opposition of BYU and others to religious exemption implementation regulations); *Johnson v. Lincoln Christian Coll.*, 501 N.E.2d 1380, 1382 (Ill. Ct. App. 1986) (gay student at religious college denied diploma because of sexual orientation and told that university would stamp "homosexuality" on his transcript as reason for dismissal).

exemption in Title VI of the Civil Rights Act, and that the IRS had adopted a policy of denying tax exempt status to religious educational institutions that discriminated based on race, which required some of them to reluctantly abandon their racist practices to qualify for federal financial assistance, and (b) they did not want to face the same situation regarding their discriminatory practices concerning women and the LGBTQ+ community; *see* 15-ER-3482;[7]

- Congress was motivated, at least in part, by a desire to permit discrimination against LGBTQ+ students when it enacted the Exemption; *see* 15-ER-3476–77 (noting widespread hostility against LGBTQ+ people when Exemption was created);

- The Department was motivated, at least in part, by a desire to permit discrimination against LGBTQ+ students when it enacted the Final Rule and in applying the Exemption to Plaintiffs' educational institutions and Title IX complaints; *cf.* 7-ER-1677–78 (Wolff report noting APA feedback to Department in May 2021);

---

[7] Gustav Neibuhr, *Interracial Dating Ban to End at Bob Jones University*, N.Y. TIMES (Mar. 4, 2000), https://archive.nytimes.com/www.nytimes.com/library/national/030400bobjones-edu.html

27

- The Department was on notice that Plaintiffs would be harmed by its application of the Exemption and by the Final Rule, but similarly sought to appease religious schools that condone and promote discrimination against LGBTQ+ individuals and their constituencies; *see* 15-ER-3440–41;

- The Department's application of the Exemption and Final Rule have encouraged, facilitated, and placed the Department's stamp of approval on Plaintiffs' educational institutions' discriminatory practices, including recently going so far as to absolve one school of liability for unlawfully allowing harassment against its LGBTQ+ students. *See* 15-ER-3500–01; *see also supra* note 1.

Such allegations are not only plausible but supported by evidence that is readily available. For example, the notice and comment period for the Final Rule was suffused with input from constituents that have been extremely forthright in their intent to discriminate against LGBTQ+ persons. *See, e.g.*, Direct Grant Programs, State-Administered Formula Grant Programs, 85 Fed. Reg. 59,916, 59,947 (Sept. 23, 2020) (to be codified at 34 C.F.R. pt. 75) (religious schools and organizations commenting in support of the Final Rule to "make clear" institutions can defend against discrimination allegations). Although the Department also received extensive comments and evidence from others

28

regarding how the proposed Final Rule would negatively impact the safety and well-being of LGBTQ+ students at religious institutions, including those who are victims of sexual violence, *see, e.g.*, 85 Fed. Reg. at 59,947; 85 Fed. Reg. at 59,949, it opted to ignore these grave concerns completely and failed to provide any reasoned explanation for its decision. *See* 85 Fed. Reg. at 59,948. Facts such as these are more than adequate to support an inference of discriminatory motive. *See Ave. 6E Invs.*, 818 F.3d at 504–07.

### C. Plaintiffs can plausibly plead that the Exemption is insufficiently tailored to the government's objective of striking a balance between protecting students from sex discrimination while allowing some discriminatory policies and practices based on religious beliefs.

Plaintiffs also allege facts supporting their contention that the Exemption is poorly suited to its purported objective. The district court erred in analyzing this issue in two ways. First, it failed to fully consider the threshold question of *what objective(s)* Congress intended the Exemption to achieve. Second, the court failed to credit Plaintiffs' well-pleaded allegations showing the Exemption's poor fit with that objective.

As a carveout for religious exercise in a nondiscrimination law, the purpose of the exemption is apparent on its face: striking a balance between protecting students at publicly funded schools from sex discrimination generally while allowing religious schools to maintain some discriminatory policies and

29

practices based on religious beliefs. However, that purpose must be scrutinized to determine its legitimacy and whether the Exemption is sufficiently tailored to achieve that objective considering Title IX's strong anti-discrimination imperatives. *See Cannon*, 441 U.S. at 704 (noting objectives of Title IX); *see also* S. Rep. No. 100-64, at 7, 9 (1987) (fundamental purpose of Title IX was to "end federal subsidies of such discrimination … and to make certain, in the areas of Federal funding, that taxpayer's dollars were not used to initiate or perpetuate … bias and prejudice") (cleaned up); S. Rep. No. 100-64, at 23 (stating that the exemption should be narrow lest it "open a giant loophole and lead to widespread sex discrimination in education").

The district court erred in its analysis of whether the Exemption can withstand scrutiny by ignoring Plaintiffs' many allegations showing that the Exemption, both on its face and as applied by the Department through the Final Rule, fails so fundamentally in striking that balance that it is not rationally related, let alone substantially related, to the objectives that it was purportedly designed to achieve. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) (sex-based classifications "must bear a close and substantial relationship to important governmental objectives" to withstand constitutional scrutiny); *Latta v. Otter*, 771 F.3d 456, 468 (9th Cir. 2014) (discriminatory "classifications based on sexual orientation" must be substantially related to an important

governmental objective). For example, Plaintiffs allege that the Exemption has no limit and is applied equally to any requirement of Title IX that is purported to "conflict" with a school's religious "tenets"—irrespective of how serious the harm to the student and how minimal the burden to the school's free exercise rights. 3-ER-585. Indeed, the Department has allowed schools to claim the Exemption even when the impact on the school's religious tenets would be minor, but the result is to eliminate protections for serious harms, including harassment, inability to report sexual violence, and deprivation of students' ability to marry someone of the same sex. *See supra* note 1; 2-ER-53–54. Worse, as discussed further below, the Department has implemented the Exemption in a way that deprives students of notice that Title IX's legal protections may not apply to them. This not only harms LGBTQ+ students at religious schools directly but deprives them of crucial information that could help them avoid schools that promote or condone discrimination against LGBTQ+ students. *See* 3-ER-600. And, by granting schools unfettered ability to discriminate against LGBTQ+ students and even encourage acts of sexual harassment and violence, the Exemption results in stigmatic harm to all LGBTQ+ persons. 15-ER-3504–05. Instead of striking a balance between protecting students from invidious discrimination and allowing religious liberty, the Exemption has ended up being a "giant loophole."

Defendants and intervenors make the talismanic assertion that because the Exemption purportedly promotes the free exercise of religion, it satisfies all scrutiny. 11-ER-2509–10. But the mere fact discrimination may be religiously motivated does not make it constitutionally permissible, let alone protected. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983). Like any other classification, religious exemptions must be justified in light of the purported government interest. *See, e.g.*, *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013). Here, the fit between the government's purported goals and the Exemption as its means should be particularly exacting not only because the distinction drawn targets a quasi-suspect class, but because its direct consequence is to facilitate, reinforce, and support invidious private discrimination using federal taxpayer dollars. *See Norwood v. Harrison*, 413 U.S. 455, 466 (1973) (striking down state law providing funding to private religious and secular schools that discriminated on racial grounds as unconstitutional and holding that the government "may not grant … tangible financial aid … if that aid has a significant tendency to facilitate, reinforce, and support private discrimination").

By using the Exemption to give federally funded religious schools license to exclude and discriminate against LGBTQ+ students without limit, the government has "induced, encouraged and promoted private persons to accomplish what it is constitutionally forbidden to accomplish." *Id.* at 465

32

(cleaned up). In so doing, Congress and the Department have unconstitutionally deprived LGBTQ+ students of equal protection of the laws. Therefore, because Plaintiffs have and can plausibly plead that the Exemption is discriminatory both on its face and in its impact to Plaintiffs and other LGBTQ+ students and that it fails to advance its fundamental purpose, this Court should reverse and remand.

## II. The district court erred by dismissing Plaintiffs' APA claim regarding the August 2020 Final Rule for lack of standing.

The district court similarly erred in concluding that Plaintiffs' APA claim challenging the Department's August 2020 Final Rule fails as a matter of law and that any amendment to correct deficiencies in that claim would be futile. Prior to the Final Rule, the Department's regulations provided that schools seeking an Exemption "**shall do so by submitting in writing** … a statement … identifying the provisions of this part which will conflict with a specific tenet of the religious organization." 3-ER-599 (emphasis added). And for decades, schools complied with this regulation by making written exemption requests to the Department. *See* 15-ER-3477. But the Final Rule expressly eliminated this obligation, providing instead that schools are "not required to seek assurance from the Assistant Secretary in order to assert such an exemption." 34 C.F.R. § 106.12(b). The text of the Final Rule now permits schools to claim the Exemption at any time, without a formal request and even after a Title IX complaint is filed. *See id*. Because the Final Rule violates section 706(2)(A) of the APA, Plaintiffs asked

the district court to set it aside and enforce the previous version of the rule as written.

Plaintiffs plausibly allege that the Final Rule, and the changes it made to the Department's regulatory framework for Title IX exemptions, is not only unlawful, arbitrary, and capricious, but that it has directly and concretely harmed them by depriving them of fair notice when a school may be exempt from Title IX. 3-ER-599–600.

### A. Plaintiffs have standing to pursue their APA claim because they can satisfy Article III's standing requirements and their asserted interest is protected by Title IX.

Rather than reaching the merits of Plaintiffs' well-pleaded APA claims, the district court dismissed those claims without leave to amend because it found that Plaintiff: (i) failed to sufficiently plead an injury in fact; (ii) did "not allege how any of the schools they attend are more likely to qualify for a religious exemption now, under the 2020 rules they challenge than they would have been previously"; and (iii) did not show how invalidating the 2020 rules would redress their injuries. *See* 1-ER-21–23. In arriving at those conclusions, the district court construed Plaintiffs' claims too narrowly and ignored many of their well-pleaded allegations.

34

**B.    Plaintiffs can plausibly allege they have suffered an injury in fact.**

A plaintiff can establish standing under Article III by showing: (i) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (ii) the injury is fairly traceable to the challenged conduct; and (iii) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Intangible injuries can be concrete and particularized, and an injury is "fairly traceable" so long as there is a causal connection between the injury and defendants' challenged conduct. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Moreover, when an injury is "procedural" in nature, the normal standards for redressability and immediacy are relaxed. *See Lujan*, 504 U.S. at 572 n.7.

Plaintiffs adequately allege that the Final Rule injured them. Over two dozen of Plaintiffs attended schools that, at least at the time, had never claimed an Exemption. *See* 10-ER-2347–48 (chart showing Exemption status). For example, Nyack University, which rejected Plaintiff Zayn Silva for being "unrepentant" about his gender identity, never claimed an Exemption and to the contrary, had statements on its website acknowledging that Title IX prohibits sex discrimination and stating that it applies to all students at Nyack. 3-ER-622. The school also did not have any written policy or position statement on gender identity. 3-ER-531–32. Because he wanted to be sure about whether Nyack

would be welcoming, Silva asked the school directly about its acceptance of transgender students and was told that it was. 3-ER-532. Nevertheless, Silva was still the target of discrimination on account of his failure to conform to sex stereotypes. *Id.* It is precisely this kind of bait and switch that Plaintiffs allege the Final Rule promotes. Had Nyack been required to claim an Exemption before engaging in such discriminatory behavior, Silva could have steered clear of that school entirely. Or, if Nyack didn't claim an Exemption and still engaged in such discrimination, Silva would at least be able to file a Title IX complaint against the school knowing that it would be reviewed and resolved in the normal course. Instead, under the Final Rule, students like Silva may never know what rights they have under Title IX until after they suffer discrimination and attempt to seek recourse. Absent any mechanism to ensure notice of Exemptions, LGBTQ+ students are more likely to enroll in, and continue attending, religiously affiliated schools that have not publicly sought an exemption to Title IX and that purport to comply with Title IX, but that later claim a right to discriminate against such students. *See* 3-ER-600.

Plaintiffs' alleged injuries are both concrete and particularized. In the absence of a previous exemption request, a student is unable to discern exactly what legal protections they have (or lack) until after they experience discrimination. As a result, Plaintiffs and other students like them have been

unable to protect themselves from a variety of direct harms, ranging from psychological distress to financial losses, and even physical violence. Facts such as these are more than adequate to give rise to standing under the law of this Circuit. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

### i. Plaintiffs can plausibly allege that their injuries are traceable to the Final Rule.

Plaintiffs' alleged notice injuries are also directly traceable to the Final Rule. Focusing narrowly on the issue of whether the Final Rule makes the Exemption more likely to be granted, the district court concluded that Plaintiffs' injuries cannot be fairly traceable to the Final Rule because the Department has long been permissive in granting Exemptions. 1-ER-22–23. But this misses the point and misreads Plaintiffs' APA claims. Plaintiffs allege that the Final Rule harms LGBTQ+ students in multiple ways, each of which is traceable to it.

First, it has emboldened schools that discriminate against LGBTQ+ students. *See* 3-ER-584–85, 587–88, 600. Second, because the Final Rule codifies the right of schools to claim the Exemption at any time, it makes schools even less likely to claim it in advance (if they do so at all). *See id.* Third, by allowing schools to lie in wait, the Final Rule necessarily deprives students of any way to guarantee what legal protections they may have under Title IX. 3-ER-600. Plaintiffs allege that because of the Final Rule, they are unable to tell whether a school has claimed, or will claim, a religious exemption until after

filing a Title IX complaint. But at that point, it is all but assured the exemption will be provided. *See* 3-ER-585 (describing Department's practice of universally granting exemptions with minimal scrutiny). And not surprisingly, that is exactly what has happened in many cases. *See, e.g.*, *supra* pp. 6–10. In this way, at least some Plaintiffs, and many other students like them, have suffered concrete and procedural injuries that are directly traceable to the Final Rule.

That the Department already had a practice of, at times, granting exemptions retroactively does not make the harm to Plaintiffs less real or traceable. As the Department itself acknowledged during the Rulemaking process, many schools did interpret the previous regulation as requiring a written request. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,031 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106) (explaining that Final Rule "eliminate[s] the requirement that religious institutions submit a written statement to the Assistant Secretary for Civil Rights to qualify for the Title IX religious exemption"). In fact, this was one of the Department's primary justifications for enacting the Final Rule. *See id.* at 30,475 (describing need for clarification to ensure schools understand a written request is not required).

The allegations in the FAC are more than adequate to establish that at least some Plaintiffs have suffered injuries traceable to the Final Rule.

38

### ii. A favorable decision would redress Plaintiffs' injury.

To establish that an alleged injury is redressable, a plaintiff must be able to show that it is "likely, as opposed to merely speculative" that a court decision will provide a remedy and prevent such harm in the future. *Lujan*, 504 U.S. at 561. An order setting aside the Final Rule and requiring that the Department revert to and *enforce* the prior language of that rule would redress Plaintiffs' injuries because educational institutions would once again be required to notify the Assistant Secretary in writing when claiming the Title IX exemption. This will afford Plaintiffs and other similarly situated individuals an ability to know in advance that an institution is claiming an exemption, and allow them to make fully informed decisions about whether to apply to, or continue attending, those institutions. The Department will also be prohibited from dismissing Plaintiffs Title IX complaints based on the Exemption in the absence of a previous written request.

### iii. Plaintiffs' asserted interest is within the zone of interests that Title IX is meant to protect.

Plaintiffs also plausibly allege facts showing that their asserted interest is "arguably within the zone of interests to be protected or regulated" by Title IX. *Bennett v. Spear*, 520 U.S. 154, 162–63 (1997). This test is "not meant to be especially demanding" and "the relevant zone of interests is not that of the APA itself, but rather 'the zone of interests to be protected or regulated by the statute

39

that [the plaintiff] says was violated.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018). Here, Plaintiffs are asking to be provided the same non-discrimination protections that Title IX guarantees all other students attending publicly funded educational institutions, or in the alternative, to at least be put on notice that they will be deprived of those protections. Plaintiffs' claim fits squarely within Title IX's zone of interests.

### iv. Plaintiffs can plausibly allege facts showing that the Department's decision was arbitrary, capricious, and not in accordance with law.

Reviewing courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Here, Plaintiffs plausibly allege that the Department's decision to implement the Final Rule was arbitrary and capricious because (i) the Department's explanation for the Final Rule was not supported by the evidence before it; (ii) the Department failed to consider important parts of the problem, and (iii) the Final Rule is itself unlawful because by allowing schools to claim exemptions in a manner that denies students notice that the critical legal protections afforded by Title IX will not be available to them, the Final Rule unconstitutionally deprives them of important statutory rights without due process. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

**v.    The Department's justification for the Final Rule ran counter to the evidence before it.**

The Department claimed that the Final Rule was necessary to avoid "confusing" and "burdensome" requirements on qualifying educational institutions. 85 Fed. Reg. at 30,477. But during the rulemaking process, the Department failed to provide a single example of an institution being confused or burdened by the prior requirement. 85 Fed. Reg. at 30,479. Nor did the Department explain how, or why, removing the simple procedural requirement of a written request would have any effect on an educational institution's ability to successfully claim an exemption. *Id.*

**vi.    The Department overlooked important parts of the problem because by depriving students of notice, the Final Rule makes it harder to hold schools accountable and avoid discrimination.**

Plaintiffs also allege that the Department overlooked important parts of the problem when it enacted the Final Rule.

First, Plaintiffs allege that the Final Rule has made it more difficult, if not impossible, for students at religiously affiliated schools to hold their educational institutions accountable for their Title IX claims. *See, e.g.*, 3-ER-588. Because 34 C.F.R. § 106.12(b) is now permissive and no longer imposes any affirmative obligation on a school to explain how or why the Exemption should apply to them, schools can simply wait until after a complaint is filed to claim it, knowing full well that the Department will grant it "to the extent the application of [Title

41

IX] would not be consistent with the religious tenets of such organization." 34 C.F.R. § 106.12(a).

Second, Plaintiffs have alleged that because the Final Rule eliminates transparency, it causes at least some students to unknowingly attend, or continue attending, institutions that believe that they can freely discriminate against their students based on sex. *See* 3-ER-600. Because religious schools can be exempted from any part of Title IX's extensive default statutory and regulatory framework, the fact that a school may be exempt is critical information, particularly for individuals who are members of historically disfavored groups such as LGBTQ+ individuals. *See* 7-ER-1502 (testimony from Acting Secretary that a religious institution can claim an exemption from any Title IX regulation). But now, instead of facilitating students' ability to make fully informed decisions about attending an educational institution before discrimination occurs, the Department forces them to wait until after they witness or experience discrimination before they can find out whether they are protected by Title IX.

### C. The Final Rule is unlawful because it unconstitutionally deprives students of any notice that they will be denied statutorily conferred nondiscrimination rights.

Finally, Plaintiffs plausibly plead that the Final Rule is unlawful and must be set aside because it unconstitutionally deprives them and similarly situated students of notice that they will be denied the essential protections that Title IX

provides. *See Marsh v. County of San Diego*, 680 F.3d 1148, 1157 (9th Cir. 2012) (statutory laws of general applicability can create constitutionally protected liberty interest); *see also* 3-ER-600 (alleging Final Rule deprives students of notice, increasing risk they will be harmed at schools granted Exemptions). LGBTQ+ students will and do, obtain federal loans to attend religious schools that may, or may not, discriminate against them in admissions (expelling them for a same-sex marriage or gender transition), counseling services (including requiring conversion therapy), housing (forcing a trans student out of university housing), anti-harassment protections (failing to prevent repeated use of anti-queer slurs), financial aid (rescinding scholarships, grants, and work study), or otherwise. *See generally* 3-ER-517, 529, 534, 536, 559–60, 571, 588; *see also* 15-ER-3504–05. However, because of the Final Rule, such students may not realize their lack of legal productions until after they have suffered such treatment and made a futile attempt to seek redress.

This renders the Final Rule unconstitutional because the resulting harm to students far exceeds any burden that a notice requirement would impose on either their schools or the Department. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *First*, because students like Plaintiffs undoubtedly have a strong liberty interest in being free from sex discrimination (and particularly so where fundamental rights such as the right to marry are at stake), their private interests

affected by the Department's actions in granting Exemptions is significant. *Second*, because students have no way of filing a preemptive Title IX complaint and because the Department has a longstanding practice of uniformly granting Exemptions, there are virtually no safeguards to protect LGBTQ+ students from an erroneous deprivation of their Title IX rights. On the other hand, the probable value of additional or substitute procedural safeguards, i.e., some provision of notice that would allow students to avoid schools that discriminate, is immense. *Third*, the burden on the schools (sending a letter to the Assistant Secretary) and the Department (reviewing and acting on those requests before a complaint is filed) is minimal compared to the impact on Plaintiffs and other similarly situated students. *Fourth*, providing such notice aligns with the Department's interest in protecting students at federally funded schools from sex discrimination. By instead unilaterally shifting the burden of the Exemption from the religious schools it benefits to the unsuspecting students who are the victims of the discrimination it allows, the Final Rule violates the very concept of "fundamental fairness" that lies at the heart of due process. *See Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 24 (1981); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998).

44

**III.    The district court erred in dismissing Plaintiffs' Establishment Clause claim based on an improper test.**

The district court never analyzed Plaintiffs' Establishment Clause claim using the applicable historical practices and understandings test that the Supreme Court set forth in *Kennedy v. Bremerton School District.* Nor did the parties develop the historical record necessary to apply the test. Because this Court should be a "court of review" and not a "court of first view," the "district court should have the initial responsibility of working through [Plaintiffs'] Establishment Clause challenge under *Kennedy.*" *Firewalker-Fields v. Lee*, 58 F.4th 104, 122–23 (4th Cir. 2023). This error alone warrants vacating and remanding the case to the district court to apply the historical practices and understandings test in the first instance. That should be the end of this Court's inquiry. But if the Court is inclined to apply the *Kennedy* test, Plaintiffs have stated their claim that the Exemption violates the Establishment Clause.

In place of the *Lemon* test, the Supreme Court instructed that courts should interpret the Establishment Clause "by 'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2428 (internal citation omitted). The analysis must focus on "the understanding of the Founding Fathers" and "original meaning and history." *Id.* (internal quotation marks omitted).

Here, the nature of the Exemption and this Nation's history show that the Exemption violates the First Amendment's prohibition against "an establishment

of religion." U.S. Const. amend. I. The Exemption permits religious schools to receive federal funding even if the schools discriminate against students based on gender and sexual orientation, so long as that discrimination is "consistent with the religious tenets of" the school. In contrast, secular schools that engage in such discrimination may not receive federal funding. 20 U.S.C. § 1681(a)(3). The effect of the distinction between religious and secular schools gives special privileges to religious schools, preferring religion to irreligion. The Exemption extends not only "a significant symbolic benefit to religion," but also the very real material benefit of monetary aid in the form of reduced compliance costs, immunity from civil liability, and reduced insurance premiums.

Turning to our country's history, the Supreme Court has long held that both the Free Exercise and the Establishment Clauses compel government neutrality toward religion. *See, e.g.*, *Torcaso v. Waskins*, 367 U.S. 488, 495 (1961). The government may favor "neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994). "[A] principle at the heart of the Establishment Clause" is "that government should not prefer … religion to irreligion." *Id.* at 703. The Establishment Clause thus prohibits the government from singling out religious institutions for special benefits. *See, e.g.*, *Kiryas Joel*, 512 U.S. at 705; *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989).

46

The Exemption is inconsistent with the historical understanding of the Establishment Clause because it discriminates between religious sects and is available only to *some* religious groups—those whose tenets are inconsistent with an application of Title IX. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The *Larson* Court derived this from the writings of James Madison, the author of the First Amendment:

> This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. Madison once noted: "Security for civil rights must be the same as that for religious rights. It consists in the one case in the multiplicity of interests and in the other in the multiplicity of sects." Madison's vision—freedom for all religion being guaranteed by free competition between religions—naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference. Free exercise thus can be guaranteed only when legislators—and voters—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations.

456 U.S. at 245 (quoting The Federalist No. 51, at 326 (James Madison) (H. Lodge ed. 1908)). Government policy often reflects a values decision, and government may pursue a policy for which it has a secular motivation even if that policy "happens to coincide or harmonize with the tenets of some … religions" but not others. *McGowan v. Maryland*, 366 U.S. 420, 442 (1961). But by singling out for special treatment religious schools whose tenets permit or require sex

47

discrimination, including LGBTQ+ discrimination, that is inconsistent with Title IX, the Exemption confers a valuable regulatory benefit—freedom from red tape and civil liability—on those orthodox sects favored by the legislative majorities who adopted the Exemption, while denying it to smaller, unpopular or politically unpowerful sects. Neutral religious accommodations available to all religions have been historically permitted in some context. *See Pendleton v. Jividen*, 2023 WL 2591474, at *11 (S.D.W. Va. Mar. 21, 2023) (applying *Kennedy* and holding that "religious accommodations in the prison context do not constitute the establishment of religion where they are neutral and non-coercive"), *appeal filed*, No. 23-6334 (4th Cir. Apr. 6, 2023). However, the Title IX Exemption is anything but neutral.

The Exemption also runs afoul of historical practices and understandings of the Establishment Clause because it conscripts federal employees as ecclesiastical inquisitors, charged with ascertaining the "religious tenets" of each school and determining whether a particular application of Title IX is consistent with the teachings of that denomination. *See, e.g.*, *supra* note 1 (school requesting assurance "that the belief in or practice of its religious tenets by the University or its students" would not constitute "sexual harassment"). Whether Baptist doctrine is inconsistent with protecting LGBTQ+ students from sex harassment, or whether Catholic doctrine is inconsistent with educating LGBTQ+ students, and

under what circumstances, are questions for religious leaders, not a secular government bureaucrat. *See, e.g.*, *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976) ("[R]eligious controversies are not the proper subject of civil court inquiry. . . ."). But the Exemption requires precisely such an inquiry.

The Exemption, as written, requires the Department to determine, with respect to every Title IX Complaint filed against a religious institution, whether "the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). But the Department cannot undertake that analysis—and a court cannot review that determination, in the event a lawsuit is filed—without impermissibly resolving disputes regarding "the interpretation of particular church doctrines." *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969); *see also Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020).

While some form of religious exemption to Title IX may be constitutionally permissible, the Exemption, as written, flies in the face of over half a century of Supreme Court jurisprudence. Through the Exemption, the Department funds discrimination in certain religious schools that it does not fund in secular schools or even some religious schools. The Department therefore

49

extends a special benefit to certain religious schools and expresses support for these schools' discriminatory practices. The Establishment Clause does not allow this kind of preference and aid to religion over nonreligion, particularly where the religious practice in question is discrimination in education. *See Norwood*, 413 U.S. at 469 (although "private bias is not barred by the Constitution … neither can it call on the Constitution for material aid from the State").

## CONCLUSION

For the foregoing reasons, the ruling of the district court should be reversed, and this case remanded for proceedings consistent with this Court's decision.

Date:  August 21, 2023

*/s/ Alletta Brenner*
Alletta Brenner (OSB 142844)
Perkins Coie LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209
Phone: 503-727-2076
Email: abrenner@perkinscoie.com

*Paul Carlos Southwick*
Paul Carlos Southwick (OSB 095141)
Paul Southwick Law, LLC
8532 N. Ivanhoe St. #208
Portland, OR 97203
Phone: 503-806-9517
Email: paul@paulsouthwick.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-35174

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Alletta Brenner | **Date** | August 21, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35174

I am the attorney or self-represented party.

**This brief contains** | 11,330 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Alletta Brenner | **Date** | August 21, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*