No. 23-35174

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELIZABETH HUNTER, ET AL.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellees*

AND

COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, ET AL.,
*Intervenors-Defendants-Appellees*

On Appeal from the United States District Court
for the District of Oregon
No. 6:21-cv-00474-AA; Hon. Ann L. Aiken

## BRIEF OF INTERVENOR-DEFENDANT-APPELLEE
## COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES

HERBERT G. GREY
4800 S.W. Griffith Drive
Suite 320
Beaverton, OR 97005
Telephone: (503) 641-4908
herb@greylaw.org

GENE C. SCHAERR
NICHOLAS P. MILLER
ANNIKA B. BARKDULL
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Intervenor-Defendant-Appellee*
*Council for Christian Colleges & Universities*

## DISCLOSURE STATEMENT

The Council for Christian Colleges & Universities ("CCCU") states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

November 20, 2023

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel for Intervenor-Defendant-Appellee Council for Christian Colleges & Universities*

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ................................................iv

INTRODUCTION.........................................................1

STATUTORY AUTHORITY .............................................4

ISSUES PRESENTED ...................................................5

STATEMENT ...........................................................6

SUMMARY OF ARGUMENT ..........................................8

ARGUMENT ...........................................................10

   I.   The District Court Correctly Concluded That Plaintiffs' Equal Protection Challenge to the Title IX Exemption Fails as a Matter of Law.................................................10

       A.   Plaintiffs Failed to Adequately Plead that the Religious Exemption Is Facially Discriminatory.............11

       B.   Plaintiffs Failed to Adequately Plead That the Exemption Was Motivated by Animus Toward LGBTQ+ Individuals. ......................................13

       C.   The Analogy to Racial Discrimination on Which Plaintiffs Rely Contravenes Supreme Court Precedent and the Recently Passed Federal Respect for Marriage Act. ..........................................15

       D.   The Title IX Religious Exemption Is Required by the First Amendment and RFRA—and Thus Passes Any Level of Scrutiny...........................................23

   II.   The District Court Correctly Concluded That Plaintiffs' Establishment Clause Claim Fails as a Matter of Law............28

       A.   As a Matter of Law, the Title IX Exemption Easily Satisfies the Historical Test Discussed in *Kennedy*.........29

B.     As the District Court Held, Plaintiffs' Claim Also Fails Under the *Lemon* test.................................................33

III.   The District Court Correctly Declined to Adopt Appellants' Factual Arguments About the Impact the Title IX Exemption on LGBTQ+ Students. ...........................................37

A.     The Unrebutted Record Evidence Shows That Religious Colleges with Traditional Beliefs on Sexuality and Gender Generally Offer a More Supportive Environment for Religiously Committed LGBTQ+ Students Than Do Other Schools. ....................38

B.     The Unrebutted Record Evidence Shows That Substantial Numbers of LGBTQ+ Students Seek Out and Value Schools Seeking to Adhere to Traditional Judeo-Christian Sexuality Norms...................................42

C.     Contrary Arguments on These Points by Plaintiffs and their *Amici* Improperly Attempt to Rewrite the Record. .......................................................................45

CONCLUSION ...........................................................................................47

CERTIFICATE OF COMPLIANCE.........................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Arver v. United States,*
245 U.S. 366 (1918) ................................................................ 30, 31

*Baskin v. Bogan,*
766 F.3d 648 (7th Cir. 2014) ............................................... 16

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983) ............................................................. 15, 17

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ......................................................... 18

*Bowen v. Kendrick,*
487 U.S. 589 (1988) ............................................................. 34

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ............................................................. 21

*Carson as next friend of O.C. v. Makin,*
596 U.S. 767 (2022) ............................................................. 25

*Corporation of Presiding Bishop of the Church of
Jesus Christ of Latter-Day Saints v. Amos,*
483 U.S. 327 (1987) ................................. 9, 11, 12, 23, 28, 30, 31, 34, 35

*Cutter v. Wilkinson,*
544 U.S. 709 (2005) ............................................................. 23

*Engleson v. Burlington N. R.R. Co.,*
972 F.2d 1038 (9th Cir. 1992) ............................................. 36

*Espinoza v. Mont. Dep't of Revenue,*
140 S. Ct. 2246 (2020) ......................................................... 24, 25

*Firewalker-Fields v. Lee,*
58 F.4th 104 (4th Cir. 2023)................................................ 37

*Fulton v. City of Phila.,*
141 S. Ct. 1868 (2021) ................................................. 18, 21, 24, 27, 31

*Gillete v. United States,*
401 U.S. 437 (1971) ............................................................. 30

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
    565 U.S. 171 (2012) .............................................................. 21

*Kadrmas v. Dickinson Pub. Sch.*,
    487 U.S. 450 (1988) ....................................................... 10, 23

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ......................................... 3, 29, 34, 37

*Kreisner v. City of San Diego*,
    1 F.3d 775 (9th Cir. 1993) ................................................... 34

*Larson v. Valente*,
    456 U.S. 228 (1982) ............................................................. 25

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) ............................................... 16

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ............................................................. 34

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ......................................................... 17

*McSherry v. City of Long Beach*,
    584 F.3d 1129 (9th Cir. 2009) ............................................. 36

*Mitchell v. Helms*,
    530 U.S. 793 (2000) ............................................................. 33

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) ............................................... 14

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ................................................. 16, 17, 19

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ............................................. 21, 24, 32

*Pena-Rodriguez v. Colorado*,
    580 U.S. 206 (2017) ............................................................. 16

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ................................................... 24, 27

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981) ............................................................. 25

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ............................................................. 29

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 449 (2017) ............................................................. 31

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................... 10, 13, 15

*Walz v. Tax Comm'n of N.Y.*,
  397 U.S. 664 (1970) ....................................................... 29, 30

*Williams v. California*,
  764 F.3d 1002 (9th Cir. 2014) .......................................... 33

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ............................................................. 29

**Statutes**

20 U.S.C. § 1681 ................................................................ 4, 6, 27

20 U.S.C. § 1686 .................................................................... 27

Respect for Marriage Act,
  Pub. L. No. 117-128, 136 Stat. 2305 (2022) ....................... 2, 19, 21, 22

**Other Authorities**

Letter from Russlynn Ali, Asst. Sec'y for Civ. Rts.,
  U.S. Dep't of Educ., to Colleague (Oct. 26, 2010) ................ 14

Stephanie H. Barclay,
  *The Historical Origins of Judicial Religious Exemptions*,
  96 Notre Dame L. Rev. 55 (2020) ....................................... 29

## INTRODUCTION

For fifty years, Title IX's religious exemption has protected the constitutionally guaranteed right of religious colleges and universities to fulfill their missions of providing faith-based education to all their students. Plaintiffs ask the courts for a ruling that would effectively eradicate that right. Throughout years of litigation, the District of Oregon "expended hundreds of hours to thoroughly review" the "voluminous briefing," and "approximately 400 exhibits and thousands of pages of declarations"; to consider Plaintiffs' many supplemental filings, including news articles and social science publications; and to hold a three-day evidentiary hearing. 1-ER-09, 1-ER-24. And after all of that, the district court correctly held that Plaintiffs had failed to allege the elements necessary to state a single claim. *Id.*

Title IX's religious exemption is of enormous importance to Intervenor-Defendant-Appellee the Council for Christian Colleges and Universities ("CCCU") and its member institutions. That is why CCCU intervened in this litigation—to assert and defend its members' interests in preserving that exemption. Although the Department of Education, the principal appellee, will defend each of the district court's

specific rulings, CCCU—widely recognized as one of the leading voices in higher education—appears separately in this appeal to explain in more detail three key points.

First, as to Plaintiffs' Equal Protection claim, the district court was correct in concluding that Plaintiffs failed to adequately plead that Title IX's religious exemption discriminates against LGBTQ+ students, or that Congress acted with animus toward LGBTQ+ individuals in passing Title IX's religious exemption. The district court was also correct in declining to adopt Plaintiffs' broader equal-protection narrative, which seeks to equate traditional beliefs on sexuality and gender with racism. That narrative is belied by Supreme Court precedent and Congress's recent passage of the Respect for Marriage Act, Pub. L. No. 117-128, 136 Stat. 2305 (2022) ("RMA"). And in any event, Title IX's religious exemption is required by the First Amendment—which means the exemption survives under *any* standard of equal-protection scrutiny.

Second, the district court correctly dismissed Plaintiffs' Establishment Clause claim. Plaintiffs make much out of the district court's resting its decision on the now-outdated *Lemon* test, claiming

this Court must now send everyone—the Department, Plaintiffs, and religious colleges—back to the district court to litigate this claim under the test recently adopted by the Supreme Court in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2427–28 (2022). But whether *Lemon* was the correct test or not, remand is not warranted, because Plaintiffs cannot adequately plead an Establishment Clause claim under either test. And a government action that survives the *Lemon* test, as the district court correctly held this one does, necessarily survives the more lenient *Kennedy* test.

Finally, the district court correctly declined to adopt Plaintiffs' factual contentions about the impact of the Title IX exemption on LGBTQ+ students at religious colleges. Contrary to the narrative of Plaintiffs and their *amici*, the unrebutted evidence presented to the district court in an extensive evidentiary hearing shows that religious colleges that adhere to traditional beliefs on sexuality and gender generally offer a *more* supportive environment for their LGBTQ+ students than do other schools. Plaintiffs and their *amici* do not even engage with that evidence here, much less attempt to rebut it.

The district court, in short, should be affirmed.

3

## STATUTORY AUTHORITY

The Title IX non-discrimination standard and its accompanying religious exemption provide: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that: . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3).

## ISSUES PRESENTED

1.      Did the district court correctly hold that Plaintiffs failed to state a claim under the Equal Protection Clause?

2.      Did the district court correctly hold that Plaintiffs failed to state a claim under the Administrative Procedures Act? (This issue will be addressed by the Department.).

3.      Did the district court correctly hold that Plaintiffs failed to state a claim under the Establishment Clause?

4.      Did the district court correctly decline to adopt Plaintiffs' factual contentions about the impact of the Title IX religious exemption on LGBTQ+ students at religious colleges?

**STATEMENT**

Title IX prohibits differential treatment "on the basis of sex" in all educational programs or activities receiving federal funds. 20 U.S.C. § 1681(a). But Congress included numerous exceptions to that statute— for the military, for fraternities and sororities, for youth groups, for beauty pageants, for father-daughter and mother-son activities, for boys' and girls' conferences, for living facilities, and for religious educational institutions for which application of Title IX would be inconsistent with their faith-based tenets. 20 U.S.C. § 1681(a)(3).

Plaintiffs, a group of students and alumni of religious colleges who identify as LGBTQ+, filed a complaint (later amended) bringing claims against the Department of Education ("Department") for alleged violation of the Equal Protection Clause, Establishment Clause, First Amendment, Administrative Procedures Act, and the Religious Freedom Restoration Act. 3-ER-516–623. The Council for Christian Colleges and Universities and a group of private religious schools intervened. 7-ER-1412–62.

Plaintiffs filed a motion for a temporary restraining order, which the district court denied on August 30, 2021. 9-ER-2141–52. On

6

November 4–6, 2021, the court held an extensive evidentiary hearing on Plaintiffs' motion for a preliminary injunction. 5-ER-890–1147; 6-ER-1149–1410; CCCU-SER-3–183. After that hearing, Plaintiffs sought to amend their complaint, 2-ER-58–62, and the district court ruled on that motion at the same time it ruled on the preliminary injunction. 1-ER-3–42.

In its ruling, the district court dismissed all five counts with prejudice, denied the preliminary injunction, and denied the motion to amend the complaint since it would be futile to do so. 1-ER-3–42. The court dismissed the Equal Protection claim because the record did not show that Congress had discriminatory intent in enacting the religious exemptions to Title IX, 1-ER-25–28; the substantive due process claim as inadequately pleaded and unsupported by the record, 1-ER-28–30; the Establishment Clause claim for failing to plausibly allege a violation of the *Lemon* test, 1-ER-30–37; the First Amendment speech claim for failure to show that Title IX's religious exemption restricted speech in any manner, 1-ER-37–40; the APA claim for lack of standing, 1-ER-21–24; and the RFRA claim for failure to allege that the Department engaged in conduct that plausibly violated RFRA, 1-ER-

40–41. Plaintiffs now appeal only the dismissal of the Equal Protection, Establishment Clause, and APA claims.

## SUMMARY OF ARGUMENT

The district court correctly concluded that Plaintiffs failed to state any claim for which relief could be granted.

First, Plaintiffs' Equal Protection claim fails as a matter of law. Contrary to Plaintiffs' assertion, Title IX's religious exemption is not discriminatory on its face. Nor have Plaintiffs plausibly alleged that Congress passed that exemption out of animus toward LGBTQ+ individuals. To the contrary, history, Supreme Court precedent, and the recent passage of the federal Respect for Marriage Act show that Plaintiffs are simply wrong to analogize traditional religious beliefs and practices about sex and gender to race. And in any event, the Title IX religious exemption is required by the First Amendment, and thus passes any level of scrutiny.

Second, Plaintiffs' Establishment Clause claim also fails. To be sure, the district court applied the *Lemon* test, instead of the historic approach described in the Supreme Court's subsequent decision in *Kennedy*. But that does not warrant dragging everyone—the

8

Department of Education, the individual religious schools, CCCU, its member institutions, and current students at religious schools—through even more years of uncertainty and litigation. Whether this Court evaluates that claim under *Lemon* or the historical approach outlined most recently in *Kennedy* is of no moment, because Title IX's religious exemption clearly passes either test. In fact, even under the stricter *Lemon* test, Plaintiffs' position is squarely foreclosed by binding Supreme Court precedent such as *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338–40 (1987), which rejected Establishment Clause claims similar to that advanced by Plaintiffs.

Third and finally—and contrary to the narrative of Plaintiffs and their *amici*—the evidence presented to the district court shows that religious LGBTQ+ students are in fact *better* served by religious colleges that espouse traditional views regarding sex and gender than they are by other colleges. Indeed, that conclusion was established by the Plaintiffs' own experts. And, much as Plaintiffs and their *amici* might wish to ignore all that evidence (as they do in their briefs), it squarely contradicts their current attacks on the suitability of such religious

9

colleges for LGBTQ+ students who choose to attend those institutions. Plaintiffs' attempt to establish on appeal a new factual conclusion that is contrary to the unrebutted district court record is improper.

## ARGUMENT

I. **The District Court Correctly Concluded That Plaintiffs' Equal Protection Challenge to the Title IX Exemption Fails as a Matter of Law.**

Plaintiffs' challenge to the district court's dismissal of their Equal Protection claim provides no basis for reversal. To state an Equal Protection claim, a plaintiff must allege facts that, if true, would show that the challenged law is discriminatory on its face, or that it has both a disparate impact and a discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Plaintiffs fail to allege such facts. The challenged law therefore triggers only rational basis review, *see, e.g.*, *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–58 (1988), which it easily passes. And in any event, Title IX's religious exemption is not only permitted but *required* by the First Amendment, and thus passes any level of scrutiny.

A.     **Plaintiffs Failed to Adequately Plead that the Religious Exemption Is Facially Discriminatory.**

Plaintiffs begin by claiming that the religious exemption is facially discriminatory against students based on their sexuality and gender identity. Pls.' Br. 17–19. That is a shocking claim to make about an exemption that does not name *any* class of people, let alone a protected class. And each of Plaintiffs' arguments in support of that assertion fails.

Plaintiffs first assert that the exemption is facially discriminatory against a suspect class because it applies only to universities controlled by religious organizations. Pls.' Br. 17–18. But that is simply an argument that *any* religious exemption to a civil rights law necessarily discriminates against a suspect class, because all religious exemptions by their terms exempt only institutions and individuals with religious objections to some application of a statute or regulation. And this argument is plainly inconsistent with Supreme Court precedent, which makes clear that "equal protection principles" are not offended by "giving less protection" regarding religious behavior and standards to those affiliated with religious institutions than to those affiliated with secular institutions. *E.g., Amos*, 483 U.S. at 338–39.

11

Plaintiffs' argument (at 18) that the exemption is facially discriminatory because only some religious schools have tenets that conflict with Title IX is also wrong. That is simply the nature of all religious exemptions, not a mark of denominational favoritism. And again, *Amos* is dispositive: It is of no consequence that not every religious employer will use the religious exemption offered, so long as the laws "afford[] a uniform benefit to *all* religions." *Amos,* 483 U.S. at 339 (citation omitted).

Finally, Plaintiffs' argument (at 18) that the Title IX exemption is discriminatory because it involves only sex discrimination (as opposed to race, religious, and other kinds of discrimination) is equally misguided. The unavoidable implication of that expansive theory is that Congress could *never* provide religious exemptions to any law that addresses only some kinds of discrimination. Plaintiffs do not identify a single case supporting their theory, and this Court should reject it.

**B.** **Plaintiffs Failed to Adequately Plead That the Exemption Was Motivated by Animus Toward LGBTQ+ Individuals.**

Because Title IX's religious exemption is facially neutral, Plaintiffs cannot state an Equal Protection claim unless they show both (1) a disparate impact on a protected class *and* (2) that Congress was motivated by discriminatory intent in passing the exemption. *Arlington Heights*, 429 U.S. at 265. As the district court recognized, 1-ER-26, even if Plaintiffs sufficiently alleged disparate impact, they fail to assert a sufficient basis to conclude that Congress acted with discriminatory intent. In their opening brief, they have provided no information on the process by which Congress adopted the exemption, pointed to no events that would show the exemption was the product of animus, nor offered a single statement by a legislator supportive of or opposed to Title IX's religious exemption.

Instead, all that Plaintiffs offer is a generic allegation that "Congress enacted the religious exemption to permit discrimination based on sex, sexual orientation and gender identity." 3-ER-586 (¶ 601). That is insufficient to state a constitutional violation. As this Court has held, a "bald allegation of impermissible motive . . . standing alone, is

13

conclusory and is therefore not entitled to an assumption of truth."
*Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009).

Indeed, the reality is that, for several decades after its enactment, Title IX itself was not viewed as applying to sexual or gender minorities as such, and thus the religious exemption simply had no application to those groups. It was only during the Obama administration in 2010 that the federal government first began to argue that Title IX could be used to protect gender minorities.[1]

Even now, Plaintiffs point only to a generalized history of discrimination against LGBTQ+ individuals, and assert that "the Department has acted with extreme indifference" to that generalized history. Pls.' Br. 24. They offer no evidence of any animus or discriminatory intent directed against LGBTQ+ individuals by Congress itself. And, if a *general* showing of past discrimination against a group were enough to show animus by a *specific* actor, the discriminatory intent requirement of an Equal Protection claim would collapse on itself and cease to have any meaning.

---

[1] Letter from Russlynn Ali, Asst. Sec'y for Civ. Rts., U.S. Dep't of Educ., to Colleague (Oct. 26, 2010), available at https://tinyurl.com/yc54stjn.

Instead, Supreme Court precedent requires that Plaintiffs allege facts showing that Congress specifically acted based on a discriminatory motive, not merely with some awareness of discrimination perpetuated by others. *Arlington Heights*, 429 U.S. at 266–68. But Plaintiffs fail to allege facts that could plausibly support an inference of animus, and thus the district court correctly concluded that their Equal Protection claim fails. 1-ER-26.

### C. The Analogy to Racial Discrimination on Which Plaintiffs Rely Contravenes Supreme Court Precedent and the Recently Passed Federal Respect for Marriage Act.

Beyond their technical arguments, from the beginning Plaintiffs' argument that the Title IX exemption violates the Equal Protection Clause has been based on a clumsy attempt to analogize traditional Judeo-Christian views and practices related to marriage and sexuality to racism. *See, e.g.,* Pls.' Br. 32 (citing *Bob Jones Univ. v. United States,* 461 U.S. 574 (1983); 3-ER-518; 5-ER-905–06; 7-ER-1551. But that position contravenes binding Supreme Court precedent as well as the Respect for Marriage Act, which passed Congress in late 2022.

1.    The Supreme Court has long treated race discrimination— which "implicates *unique* historical, constitutional, and institutional

concerns," *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017) (emphasis added)—differently than other types of alleged discrimination. Indeed, during the recently concluded federal litigation over same-sex marriage, many advocates and some courts had argued that the traditional Judeo-Christian opposition to same-sex marriage, and related views on sexuality in general, were simply irrational and bigoted, and thus legally (and morally) equivalent to racism. *See, e.g., Latta v. Otter*, 771 F.3d 456, 473 (9th Cir. 2014); *Baskin v. Bogan*, 766 F.3d 648, 669–70 (7th Cir. 2014). But every member of the Supreme Court disagreed with that assessment.

For example, writing for the five-Justice majority in *Obergefell v. Hodges,* 576 U.S. 644 (2015), Justice Kennedy squarely rejected that assumption. Instead, he emphasized that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises." *Id.* at 672. The Court then expressly emphasized that the "First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure

16

they have long revered." *Id.* at 679–80. The Court never would have said that about racist beliefs—even those grounded in religion. *Cf., e.g., Bob Jones Univ.,* 461 U.S. at 595 ("it cannot be said that educational institutions that, for whatever reasons, practice racial discrimination, are institutions exercising 'beneficial and stabilizing influences in community life'") (citation omitted).

Cases decided in *Obergefell*'s wake show that the Court was not just paying lip service to the First Amendment when it emphasized the protections retained by people exercising "decent and honorable" religious beliefs on sexual orientation and gender identity. In *Masterpiece Cakeshop,* for example, the Court condemned as "inappropriate" and "impermissible" several statements from the Colorado Civil Rights Commission showing hostility to a baker's religious beliefs on those issues. *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,* 138 S. Ct. 1719, 1729 (2018). And, when asked whether Philadelphia could constitutionally deny a Catholic foster care agency "an accommodation" that would let it keep serving Philadelphia's children if that agency refused, for religious reasons, to "certify same-sex couples to be foster parents due to its religious beliefs about marriage," the Court

17

unanimously and firmly said "no." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1874, 1882 (2021). Here again, the Court never would have reached those conclusions if the parties in those cases had been engaged in racial discrimination.[2]

2.     The impropriety of analogizing Judeo-Christian views of marriage and sexuality to racism was reconfirmed late last year when Congress passed the Respect for Marriage Act. There, Congress expressly found that "[d]iverse beliefs about the role of gender in marriage are held by reasonable and sincere people based on decent and honorable religious or philosophical premises. Therefore, Congress

---

[2] The high Court's concern with protecting religious beliefs and practices permeates even those cases where the intersection of religious practice and sexual-orientation/gender-identity protections is not directly at issue, but is foreseeable. For example, in *Bostock*, the Court expressed its "deep[] concern[]" that its holding reading certain sexual-orientation and gender-identity protections into Title VII could be read to "require some employers to violate their religious convictions." *Bostock v. Clayton Cnty.,* 140 S. Ct. 1731, 1753–54 (2020). But the Court then listed multiple substantive protections afforded to religious employers to help them avoid Title VII liability for religious choices and beliefs to ensure that its holding would "preserv[e] the promise of the free exercise of religion enshrined in our Constitution"—a "guarantee" that the Court wrote "lies at the heart of our pluralistic society." *Id.* at 1754. One cannot imagine the Court's providing such a roadmap for religious employers to avoid liability in a case involving race discrimination.

affirms that such people and their diverse beliefs are due proper respect." Pub. L. No. 117-128, § 2(2), 136 Stat. 2305 (emphasis added.) Congress and, through his signature, the President, thus echoed the Supreme Court's view that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises." *Obergefell*, 576 U.S. at 672. And, with this finding, the RMA garnered widespread bipartisan support—including the support of every voting Democrat in both the House and the Senate.

The inescapable conclusion from the Supreme Court's observations in *Obergefell* and subsequent decisions, and the parallel finding in the RMA, is that the Constitution can and must be understood, as the Court put it, to "ensure" that in the area of sexuality "religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered." *Id.* at 679–80. And that admonition is fundamentally at odds with Plaintiffs' narrative that religious colleges and universities that adhere to the traditional Biblical

19

understanding of marriage and sexuality can be treated like racists for equal-protection purposes.

The RMA also implicitly rejects Plaintiffs' position that the Title IX exemption is itself unconstitutional to the extent it protects traditional beliefs and practices related to marriage and sexuality. That exemption had previously been widely criticized on that ground in the press, in the courts, and before governmental agencies—by (among others) Plaintiffs and their allied advocacy organizations. *See, e.g.,* 3-ER-516 to 4-ER-851 (1st Am. Compl.); 5-ER-905–06 (Plaintiffs' opening statement at preliminary injunction hearing). And the RMA gave Congress an ideal opportunity to endorse those criticisms, on equal-protection and other grounds, if it agreed with them.

But Congress did not. Instead, it not only reaffirmed the applicability of constitutional religious-freedom rights to disagreements about marriage and sexuality, but it also reaffirmed the continued vitality of the Religious Freedom Restoration Act ("RFRA") as applied to religious schools: Section 6 of the RMA expressly reaffirms the rights of "religious *educational* institutions" and explains that "[n]othing in this Act, . . . shall be construed to diminish or abrogate a religious liberty or

conscience protection otherwise available to an individual or organization under the Constitution of the United States or Federal law." Pub. L. No. 117-128, § 6(a), (b), 136 Stat. 2305 (emphasis added). It is inconceivable that Congress would ever protect race discrimination in that manner.[3]

Finally, another provision of the RMA leaves no doubt about the continued vitality of federal constitutional and statutory protections for religious institutions seeking direct or indirect government benefits. Along with protecting those in same-sex marriages from discrimination by state actors (which religious schools are not), Section 7 of the RMA

---

[3] Congress, moreover, adopted this language with full knowledge of the way both the Constitution and RFRA have been understood to protect the religious beliefs and practices of religious institutions, even when they conflict with prevailing views on marriage and sexuality. *See, e.g., Fulton*, 141 S. Ct. at 1882; *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (Religion Clauses protect religious schools from employment discrimination suits by teachers and others who play a significant role in advancing the schools' missions); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 181 (2012) (same); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 735–36 (2014) (RFRA protects against application of the Affordable Care Act's contraceptive mandate to institutions objecting on religious grounds). These decisions likewise rebut Plaintiffs' narrative that traditional Judeo-Christian views on marriage and sexuality can properly be analogized to racism.

guarantees that principles of non-discrimination protecting same-sex marriage rights cannot deprive any entity or person, including religious ones, from "any benefit, status, or right" for which they are otherwise eligible. Pub. L. No. 117-128, § 7, 136 Stat. 2305. This section once again rejects Plaintiffs' core contention that any entity receiving federal funding must abandon its religious convictions regarding gender, sexuality, and marriage if those convictions run counter to the prevailing culture.

In short, all three branches of the federal government have now recognized that, while governments must allow and respect same-sex marriage, private individuals and institutions must also be allowed to believe, express, and live according to their own convictions regarding marriage and sexuality without losing government benefits or being subjected to official discrimination or any other governmental disability. And that conclusion is fundamentally incompatible with Plaintiffs' position that institutions seeking to follow traditional Judeo-Christian views on marriage and sexuality should be treated like racists for equal-protection (or other) purposes.

**D.    The Title IX Religious Exemption Is Required by the First Amendment and RFRA—and Thus Passes Any Level of Scrutiny.**

Because Plaintiffs failed to allege adequately that the Title IX religious exemption is facially discriminatory or that Congress enacted it with impermissible animus, it is subject only to rational basis review. *Kadrmas*, 487 U.S. at 457. It easily passes that bar. The exemption serves, and is tailored to, the same "legitimate purpose" the Supreme Court recognized in approving Title VII's religious exemption: "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. The Supreme Court has long recognized that such exemptions to anti-discrimination laws like Title IX survive constitutional scrutiny. *Id.*; *Cutter v. Wilkinson*, 544 U.S. 709 (2005).

But the exemption would even withstand intermediate or strict scrutiny, if that were required, because it serves the most compelling government interest: compliance with a fundamental right conferred by the Constitution. Where necessary to avoid unconstitutional government entanglement with religious organizations, to ensure that religious organizations are not punished for their religious character, or

23

to guarantee that religious organizations are put on equal footing with secular organizations, religious exemptions are not only permitted, but often required.[4] *See, e.g., Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *Fulton*, 141 S. Ct. at 1877–78. The Title IX religious exemption serves each of those vital purposes. And, for each of these reasons, the Constitution would require a religious exemption to Title IX even if Congress had not.

*First,* the Establishment Clause forbids the government— including courts—from constantly reviewing religious policy, administration, and governance. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). But that kind of intrusion is precisely what Plaintiffs have requested—including a request for a court-appointed, Department-funded "monitor" who would have "access to all relevant documents and information necessary" held by religious universities to "ensure compliance" with Plaintiffs'

---

[4] There are, of course, rare exceptions in which a religious exemption is not required because the law in question passes strict scrutiny. *E.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

demands. 3-ER-603. Title IX's religious exemption passes any level of scrutiny because it prevents such unconstitutional inquiries.

*Second,* the government cannot constitutionally deny students attending religious colleges access to religiously neutral, generally available public benefits simply because of their—or their school's—religious beliefs or practices. *Carson as next friend of O.C. v. Makin*, 596 U.S. 767, 785 (2022); *Espinoza*, 140 S. Ct. at 2256 (invalidating state law conditioning eligibility for "government aid" on a school's decision to "divorce itself from any religious control or affiliation"); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981) (recognizing that governments burden religion when they "den[y] … a benefit because of conduct mandated by religious belief"). After all, the Supreme Court has recognized that the Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over another"—and that "[t]his constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." *Larson v. Valente*, 456 U.S. 228, 244–45 (1982).

Invalidating the Title IX religious exemption as Plaintiffs request would violate these controlling decisions, as it would allow the government to prefer religious colleges and universities with certain views of sexuality and gender over other religious schools with contrary views. If Plaintiffs were successful, students at religious colleges that *lack* traditional or what are today "counter-cultural" policies on marriage and sexuality-related issues would be free to enjoy the benefits of federal funding. But students at institutions with traditional policies on such matters would be denied access to funding solely because they follow religious beliefs with which Plaintiffs (and many others) disagree. And, if Plaintiffs prevailed, regardless of whether a religious school had such policies, every religious school in the country would be under constant review by the Department to determine Title IX eligibility. Such a result would violate both the anti-religious discrimination and non-entanglement components of the First Amendment.

*Third,* the Exercise Clause requires the Title IX religious exemption for yet another reason. Title IX's prohibition of discrimination because of sex includes many exceptions, listed in 20

U.S.C. § 1681(a)(2)-(9) and 20 U.S.C. § 1686. Where, as here, a statute allows some secular exemptions against application of a generally applicable rule, it must also provide them, absent a compelling government interest, for religious institutions. *Tandon*, 141 S. Ct. at 1296 ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."); *Fulton*, 141 S. Ct. at 1877–78.

Here, within the Title IX framework, Congress included exemptions not only for religious universities with contrary tenets, but also for the military, historically single-sex universities, fraternities and sororities, youth groups, beauty pageants, father-daughter or mother-son activities, boys' or girls' conferences, and living facilities. *See* 20 U.S.C. § 1681(a)(2)-(9); 20 U.S.C. § 1686. If the religious exemption were struck down, these other exemptions would become prototypical examples of treating "comparable secular activity more favorably than religious exercise," and Title IX would thus violate the Free Exercise Clause for that reason alone. *Tandon*, 141 S. Ct. at 1296.

In short, these First Amendment considerations *require* the existence of the Title IX exemption or something comparable to it. That exemption therefore passes any level of constitutional scrutiny.

## II. The District Court Correctly Concluded That Plaintiffs' Establishment Clause Claim Fails as a Matter of Law.

Nor is there any merit to Plaintiffs' claim under the Establishment Clause. As the district court concluded, the Title IX religious exemption is "materially indistinguishable" from the exemption upheld in *Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987). 1-ER-36. Yet Plaintiffs seek to have that exemption struck down for violating the Establishment Clause, asserting that the exemption does not meet the historical test only recently adopted in *Kennedy*. Pls.' Br. 45–46. Failing that, Plaintiffs seek to drag religious colleges, the Department, and the courts through needless further litigation by seeking remand of a pure legal question. But the religious exemption easily passes, whether this Court applies *Kennedy* or *Lemon*.

### A. As a Matter of Law, the Title IX Exemption Easily Satisfies the Historical Test Discussed in *Kennedy*.

As to the proper test, the Supreme Court has now spoken plainly: "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)). And there is hardly a tradition in American history more longstanding than religious exemptions.

As early as 1802, Congress adopted a taxation statute that exempted churches from its normal requirements. *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 677 (1970) (citing 2 Stat. 194 (1802)). In 1813, Congress exempted religious groups from import duties. *Id.* And in that same year, a New York court recognized a clergy-penitent privilege, exempting a Catholic priest from testifying regarding the contents of a confession. *See* Stephanie H. Barclay, *The Historical Origins of Judicial Religious Exemptions*, 96 Notre Dame L. Rev. 55, 64 (2020).

Following that tradition, the Supreme Court has unequivocally rejected Establishment Clause challenges to religious exemptions to compulsory school attendance, *Wisconsin v. Yoder*, 406 U.S. 205, 234–36 (1972); exemptions for conscientious objectors to the draft, *Arver v.*

29

*United States*, 245 U.S. 366, 390 (1918); *Gillete v. United States*, 401 U.S. 437, 454 (1971); tax exemptions, *Walz*, 397 U.S. at 677; and the religious exemption to Title VII of the Civil Rights Act of 1964, *Amos*, 483 U.S. 327.

The last example is particularly relevant here. As the district court recognized, "the religious exemption here is materially indistinguishable from that in *Amos*." 1-ER-36. Yet Plaintiffs not only fail to distinguish *Amos*; their opening brief ignores it altogether. And, as the Supreme Court recognized in *Amos*, "there is ample room for accommodation of religion under the Establishment Clause." 483 U.S. at 338.

Plaintiffs' arguments to the contrary all fall flat. For example, they assert that the Title IX exemption affords "special privileges to religious schools, preferring religion to irreligion." Pls.' Br. 46. But that is equally true of *any* religious exemption. And again, the Supreme Court rejected this weak reasoning in *Amos*, holding that "statutes that give special consideration to religious groups are [not] *per se* invalid." 403 U.S. at 338. The Court further held that, "[w]here, as here, government acts with the proper purpose of lifting a regulation that

30

burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Id.*

So too here: The only "privilege" the Title IX exemption affords religious universities is the ability to not surrender a publicly available benefit (to themselves, their students, or both) because of their religious beliefs. *Cf. Fulton*, 141 S. Ct. at 1876 (religious exercise is burdened when a religious institution is "put … to the choice of curtailing its mission or approving relationships inconsistent with its beliefs."); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017). But, as explained above, it would *violate* the First Amendment itself to require them to surrender that benefit for that reason.

Plaintiffs' assertion (at 47) that the Title IX exemption is impermissible denominational favoritism is equally flawed. Again, *any* religious exemption will apply only to those faiths whose tenets are burdened in some circumstances by the regulation at issue. Yet the Supreme Court has repeatedly upheld such exemptions, even when they come at great cost to others—for example, by exempting conscientious objectors from the draft, knowing a non-objector will be drafted in his stead. *Arver*, 245 U.S. at 389–90. Furthermore, *withholding* an

exemption would simply favor a different set of denominations—likely those sects that are larger, powerful, and more likely to hold majoritarian opinions, and thus more likely to be accommodated by default.

Plaintiffs next assert (at 48) that Title IX's exemption requires government officials to act as "ecclesiastical inquisitors" who must inquire into "religious tenets" to determine whether an exemption applies. But on that point, Plaintiffs' citation to *Our Lady* is puzzling, given that the Court in that case held that the religious school in question was *entitled* to an exemption from otherwise applicable employment laws. *Our Lady of Guadalupe*, 140 S. Ct. at 2055. And Plaintiffs have not produced any evidence that the Department has engaged in impermissible inquiries into religious tenets at any point in the last 50 years while exercising its obligation under Title IX to grant religious exemptions where warranted. In fact, although the Department requires a school seeking to invoke the exemption to explain why its religious tenets foreclose its compliance with a particular requirement of Title IX, Plaintiffs presented no evidence that the Department has ever engaged in—much less feels obligated to

engage in—the kinds of *evaluations* of religious tenets that are forbidden by the Establishment Clause. *See, e.g., Mitchell v. Helms,* 530 U.S. 793, 828 (2000) Establishment Clause prohibits government from "trolling through" and evaluating religious beliefs and practices).

In short, the challenged exemption is part of a long tradition of religious exemptions to statutory and regulatory requirements that would otherwise burden religion. Plaintiffs have offered no reason this Court or the district court could possibly strike down that exemption under *Kennedy's* "historical" approach to applying the Establishment Clause. This Court, therefore, can and should hold that the Title IX exemption comports with that approach.

## B. As the District Court Held, Plaintiffs' Claim Also Fails Under the *Lemon* test.

As the district court correctly held, Defendants would also prevail under the more demanding *Lemon* test. Under *Lemon*, a statute or regulation survives an Establishment Clause challenge if "(1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion." *Williams v. California*, 764 F.3d 1002, 1013–14 (9th Cir. 2014) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 612–

13 (1971), *abrogated by Kennedy,* 142 S. Ct. 2407). As the court below correctly reasoned, Plaintiffs' argument fails under all three prongs. 1-ER-32–33.

First, the secular legislative purpose prong aims to "prevent[] the relevant governmental decisionmaker . . . from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters." *Amos*, 483 U.S. at 335. Indeed, a statute or regulation fails this prong only "if it is motivated wholly by an impermissible purpose." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Bowen v. Kendrick,* 487 U.S. 589, 602 (1988)). And the Supreme Court already held in *Amos* that "alleviat[ing] significant governmental interference with the ability of religious organizations to define and carry out their religious missions" is a permissible legislative purpose. *Amos*, 483 U.S. at 335. The "materially indistinguishable" exemption here serves that same secular purpose. 1-ER-36. And Plaintiffs have provided no evidence that the religious exemption was motivated by any impermissible purpose, let alone wholly motivated by such a purpose.

Next, the Title IX exemption also easily passes the "primary effect" prong, which requires that the law's effect has a primary purpose that "neither advances nor inhibits religion." *Amos*, 483 U.S. at 337 (citation omitted). *Amos* makes clear that exemptions do not run afoul of this prong simply because they "*allow*[] churches to advance religion, which is their very purpose." *Id.* So too here: The religious exemption simply permits religious universities to continue to educate their students without forfeiting their religious character or violating their beliefs.

Finally, the exemption does not foster excessive government entanglement. Indeed, as the Supreme Court recognized in *Amos*, such exemptions themselves foreclose "intrusive inquiry into religious belief" by the government. *Id.* at 339. Accordingly, it "cannot be seriously contended" that such exemptions, which in fact serve the purposes of the Establishment Clause, "impermissibly entangle[] church and state." *Id.* To the contrary, they "effectuate[] a more complete separation of the two and avoid[] the kind of intrusive inquiry into religious belief" that Plaintiffs' views would inevitably require. *Id.*

In short, the Title IX religious exemption easily satisfies all three prongs of the *Lemon* test. Thus, even if the Court chooses to apply *Lemon*, the Court should affirm the district court's dismissal of this claim.

And there is no other reason to allow continued litigation of that claim. Plaintiffs are simply wrong in their contention (at 15, 45) that the district court's application of *Lemon* requires remand. Having passed the more rigorous and demanding *Lemon* test, there is no point to reconsidering the issue under the current less demanding standard. Also, because an appellate court may affirm a judgment on any grounds supported by the record, a remand is only necessary when there is a genuine issue of material fact. *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (citation omitted); *see also Engleson v. Burlington N. R.R. Co.*, 972 F.2d 1038, 1039 (9th Cir. 1992) (citation omitted). And the sole authority on which Plaintiffs rely (at 45)—an out-of-circuit case—is easily distinguishable. There, the Supreme Court granted and decided *Kennedy* after *Firewalker-Fields* had already been argued at the Fourth Circuit, affording the parties less opportunity to brief or argue the new legal standard. *Firewalker-Fields v. Lee*, 58 F.4th

36

104, 122 (4th Cir. 2023) (argued Dec. 7, 2021, decided Jan. 17, 2023);

*Kennedy,* 142 S. Ct. 2407 (argued Apr. 25, 2022, decided June 27, 2022).

That problem does not exist in the present case. All that remains here is

a pure question of law—whether Plaintiffs alleged facts to support an

Establishment Clause claim. No further factual development or briefing

is required to decide that question.

## III.    The District Court Correctly Declined to Adopt Appellants' Factual Arguments About the Impact of the Title IX Exemption on LGBTQ+ Students.

Finally, as a factual matter, there is no merit to the repeated

claims[5] by the Plaintiffs and their *amici* on appeal that the Title IX

exemption generally causes harm to LGBTQ+ students who choose to

attend colleges that seek to adhere to the traditional Judeo-Christian

view of marriage and sexuality. As shown below, the unrebutted record

evidence, including extensive testimony from Plaintiffs' own expert,

shows that religious colleges with traditional Judeo-Christian beliefs on

matters of sexuality provide a very important educational alternative

---

[5] *See* Pls.' Br. 20; *see also generally* Br. of *Amici Curiae* Dr. Rachel M. Schmitz et al. In Support of Plaintiffs-Appellants and Reversal, Dkt. 24; Br. of *Amici Curiae* Dr. H. L. Himes and Dr. Theresa Stueland Kay in Support of Appellants and Reversal, Dkt. 36.

for substantial numbers of LGBTQ+ students—especially those who are committed members of a traditional Judeo-Christian faith. That record evidence further shows that substantial numbers of LGBTQ+ students actually value the opportunity to attend such an institution. Yet Plaintiffs and their *amici* simply ignore all that evidence, and instead improperly seek to rewrite the record.

### A. The Unrebutted Record Evidence Shows That Religious Colleges with Traditional Beliefs on Sexuality and Gender Generally Offer a More Supportive Environment for Religiously Committed LGBTQ+ Students Than Do Other Schools.

The extensive evidence presented at the district court's preliminary-injunction hearing showed that Plaintiffs' requested injunction would likely *harm* rather than help LGBTQ+ students—especially religiously committed LGBTQ+ students. That evidence includes several studies showing that LGBTQ+ students in general do measurably worse than their heterosexual/cis-gender peers at both religious and secular/public colleges. CCCU-SER-92–94 (Mark Regnerus Ph.D.) (exploring the ways that Dr. Meyer found that LGBTQ+ youth are struggling at even higher rates than older LGBTQ+ cohorts); CCCU-SER-94–105 (comparing the REAP study with other

studies addressing the mental health of LGBTQ+ students at religious and non-religious schools); *see also* CCCU-SER-185–97 (¶¶ 10–25) (same). However, as CCCU's testifying expert Dr. Mark Regnerus explained, in many important respects, LGBTQ+ students, at least religiously committed ones, do *better* at conservative Christian schools—that is, those with traditional Judeo-Christian beliefs on marriage and sexuality. CCCU-SER-100; *accord* CCCU-SER-184–225.

That conclusion is confirmed by the declaration testimony of CCCU president Shirley Hoogstra. As she explained in her declaration, in important respects, LGBTQ+ students fare far better at religious schools than they do at their secular, public counterparts. CCCU-SER-257–60 (¶¶ 12–17). LGBTQ+ students at secular universities report higher rates of isolation and loneliness than do their LGBTQ+ peers who attend religious universities with traditional views of sexuality. CCCU-SER-259 (¶ 15). And the data presented to the district court show that LGBTQ+ students are more likely to be physically or sexually assaulted at a secular school than they are at religious colleges. CCCU-SER-260 (¶ 17).

Dr. Regnerus agreed, testifying that "LGBT students who are in non-CCCU schools report at least as high, if not higher, rates of emotional health challenges, depression, anxiety, [and] suicidality" than their peers at religious colleges. CCCU-SER-100. He also agreed that it is only at CCCU-type institutions that LGBTQ+ students who "want[] to live a celibate lifestyle" find "support" in an understanding environment of their coreligionists who "care deeply about people and want to help them do . . . difficult things." CCCU-SER-121.

2. On this critical point of the success of religiously committed LGBTQ+ students at traditional religious schools, Plaintiffs' own expert, Dr. Joshua Wolff, agreed with Dr. Regnerus. Dr. Wolff acknowledged that religiously committed LGBTQ+ students do better at conservative Christian schools, in terms of depression, anxiety, and general adjustment, than at more progressive and "LGBT-friendly" schools that allow gay/straight alliances and more permissive behavioral standards. *See* 6-ER-1224–27.

Indeed, Dr. Wolff co-authored a 2016 study that revealed this very result. His study showed that students from conservative Christian colleges (including "evangelical" colleges) showed lower levels of anxiety

40

and depression than students at more "progressive" Christian schools that had more flexible behavioral standards and that might allow gay/straight alliance clubs. Joshua R. Wolff et al., *Sexual Minority Students in Non-Affirming Religious Higher Education: Mental Health, Outness, and Identity*, 3 Psych. of Sexual Orientation & Gender Diversity 201, 208 (2016); CCCU-SER-246. Moreover, Dr. Wolff admitted this when cross-examined on his 2016 report:

> Q. "… Students who attended other Christian schools" -- which is the category that you have the evangelicals in -- "reported significantly fewer symptoms of depression and social anxiety than students at Catholic, mainline Protestant, and Mormon NARUs6." Is that what you reported?
>
> A. Yes.

6-ER-1225.

Dr. Wolff confirmed these findings, as well as his present belief in them, later in his testimony when he recounted his view from his 2016 study that the positive outcomes for LGBTQ+ students were associated with the congruency between the

---

[6] Throughout this litigation, Plaintiffs and their experts have referred to religious schools with traditional beliefs regarding sex and gender as "non-affirming religious universities," or "NARUs." *E.g.*, 6-ER-1163.

41

school's teachings and these LGBTQ+ students' own religious beliefs, which Dr. Wolff calls "non-affirming":

> Q.  [Y]ou say, "A possible explanation for why evangelical students did not report more depressive symptoms and social anxiety than those in other schools could be that students who find non-affirming theological positions and environments congruent with their religious beliefs would likely not be distressed by them."

> A.  Sure. I stand by that statement.

6-ER-1225.

Dr. Wolff's explanation for this superiority of performance and mental health in Christian LGBTQ+ students on conservative Christian campuses is that these campuses likely provide important spiritual support for those students. As his own 2016 report explained, "religion may offer a substantial amount of comfort and source of community to many [sexual minority] individuals who find incongruence with their sexual orientation and their faith." CCCU-SER-246.

**B.  The Unrebutted Record Evidence Shows That Substantial Numbers of LGBTQ+ Students Seek Out and Value Schools Seeking to Adhere to Traditional Judeo-Christian Sexuality Norms.**

Moreover, the record evidence shows that the vast majority of LGBTQ+ students who attend religious schools—and certainly the Plaintiffs who testified below—are well-aware of those schools' sexual

42

lifestyle guidelines when they apply and enroll. CCCU-SER-261–62 (¶¶ 20–21) ("9 out of 10" LGBTQ+ students at religious schools "were aware" about their school's policies at the time of matriculation); 5-ER-958–59 (Alex Duron); 5-ER-994 (Veronica Bonifacio Penales); 5-ER-1084–85 (Audrey Wojnarowisch); 5-ER-1116–17 (Elizabeth Hunter); 5-ER-1125 (Kalie Hargrove) (explaining that she chose Lincoln Christian University because of its religious character). Despite this, given the difference in tuition costs between Christian colleges and other alternatives, those students generally choose to pay a "premium" to attend schools with traditional Judeo-Christian views and practices on sexuality. CCCU-SER-188 (¶ 9). Thus, even if some of them disagree with the school's policies on such matters, they overlook their disagreement when they decide to enroll and remain—for other reasons that are more important to them.

The record also shows that many other LGBTQ+ students, nearly a third of them by some counts, report that they affirmatively *support* what Plaintiffs call their schools' "non-LGBT-affirming" positions on sexuality. CCCU-SER-261–62 (¶ 20). For these students, the very sexual conduct policies to which Plaintiffs object are valuable—even

invaluable—because they assist this group of LGBTQ+ students in living the Christian lifestyle (including its teachings on sexuality) that they *wish* to live. CCCU-SER-116–17 (Mark Regnerus, Ph.D.) (most students enrolling in CCCU-type schools "understand it's a Christian institution, Christian-based policies, and desire the kind of environment that that college offers … There's a costly kind of obedience to it. But there's also forgiveness and the supposition of a community of support for living out difficult things."). As Dr. Regnerus explained, the interests of religious schools align perfectly with the interests of such students because helping them achieve a more mature Christianity is a "challenge that's central" to religious schools' "identity as organizations." CCCU-SER-122.

Should Plaintiffs prevail, this large group of LGBTQ+ students would be denied the opportunity to attend a school where they can integrate their personal religious beliefs and identities into the larger Christian learning community, and benefit from the comfort and support they receive there. CCCU-SER-262–63 (¶¶ 22–23); CCCU-SER-121–22 (Mark Regnerus, Ph.D.). Effectively removing that educational option—through invalidation of the Title IX exemption—would be a

44

tragic and unwarranted affront to *their* freedom to choose the educational environment they believe will best serve them.

### C. Contrary Arguments on These Points by Plaintiffs and their *Amici* Improperly Attempt to Rewrite the Record.

In their opening brief, Plaintiffs do not rebut, address, or even acknowledge any of the above evidence showing the value of religious schools to an important and substantial portion of the LGBTQ+ population. Neither do they attempt to analyze any record evidence of concrete harm to any part of the LGBTQ+ community from traditionally religious schools. Rather, Plaintiffs cursorily assert that traditional religious schools' standards caused "psychological harm resulting in real and serious consequences for students' health." Pls.' Br. 20–21. They then provide citations to nearly 200 pages of reports and hearing testimony, but with no attempt to discuss, synthesize, or even identify the evidence, the experts, or their actual conclusions. That failure is telling.

The two briefs submitted by scholars and researchers in support of Plaintiffs' case, one by a group of psychologists, another by a group of sociologists, also fail to deal with the actual evidence and testimony

presented in this case. *See* Br. of *Amici Curiae* Dr. Rachel M. Schmitz et al. In Support of Plaintiffs-Appellants and Reversal, Dkt. 24; Br. of *Amici Curiae* Dr. H. L. Himes and Dr. Theresa Stueland Kay in Support of Appellants and Reversal, Dkt. 36. The claims made in these briefs are being responded to and challenged by a group of scholars and researchers who will shortly file an amicus brief on behalf of Intervenors, which will demonstrate that virtually none of the research relied upon by Plaintiffs' *amici* actually concerns religious schools or conducts a comparison of religious and secular schools.

But the important point here is that neither of the amicus briefs supporting Plaintiffs actually discusses the expert testimony and other extensive evidence provided at the hearing below and included in the record on appeal. Nor do they address the research and results discussed above showing that, taken as a whole, traditional religious schools are a very important and even invaluable option for a substantial subset of the LGBTQ+ community.

In short, Plaintiffs and their *amici* are improperly trying to rewrite the record on an important factual issue that was litigated extensively in the court below. The Court should not let them do that.

## CONCLUSION

This litigation has gone on long enough. Plaintiffs failed to plead any cognizable claim that would justify overturning Title IX's religious exemption, which is itself constitutionally required. Plaintiffs also failed to rebut CCCU's factual showing that the Title IX exemption plays an important role in meeting the educational (and other) needs of a substantial portion of the LGBTQ+ student population. The district court was correct in dismissing Plaintiffs' claims, and this Court should affirm.

November 20, 2023                    Respectfully Submitted,

                                     *s/ Gene C. Schaerr*
                                     GENE C. SCHAERR
                                     NICHOLAS P. MILLER
                                     ANNIKA B. BARKDULL
                                     SCHAERR | JAFFE LLP
                                     1717 K Street NW, Suite 900
                                     Washington, DC 20006
                                     Telephone: (202) 787-1060
                                     gschaerr@schaerr-jaffe.com

                                     HERBERT G. GREY
                                     4800 S.W. Griffith Drive
                                     Suite 320
                                     Beaverton, OR 97005
                                     Telephone: (503) 641-4908
                                     herb@greylaw.org

                                     *Counsel for Intervenor-Defendant-*
                                     *Appellee Council for Christian*
                                     *Colleges & Universities*

48

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Circuit Rule
     32-1 because:

     ☒   this brief contains 8,505 words, excluding the parts of the
         brief exempted by Fed. R. App. P. 32(f), *or*

     ☐   this brief uses a monospaced typeface and contains _____
         lines of text, excluding the parts of the brief exempted by
         Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App.
     P. 32(a)(5) and the type style requirements of Fed. R. App. P.
     32(a)(6) because:

     ☒   this brief has been prepared in a proportionally spaced
         typeface using Microsoft Word in 14-point Century
         Schoolbook, *or*

     ☐   this brief has been prepared in a monospaced spaced
         typeface using (state name and version of word processing
         program) _____ with (state number of
         characters per inch and name of type style) _____
         _____.


November 20, 2023             */s/ Gene C. Schaerr*
                             Gene C. Schaerr

                             *Counsel for Intervenor-Defendant-*
                             *Appellee Council for Christian*
                             *Colleges & Universities*

49