**No. 23-35174**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ELIZABETH HUNTER, ET AL.,
*Plaintiffs-Appellants*,

v.

U.S. DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellees*

AND

COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, ET AL.,
*Intervenors-Defendants-Appellees*

On Appeal from the United States District Court
for the District of Oregon
No. 6:21-cv-00474-AA; Hon. Ann L. Aiken

## SUPPLEMENTAL EXCERPTS OF RECORD TO BRIEF OF INTERVENOR-DEFENDANT-APPELLEE COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES

HERBERT G. GREY
4800 S.W. Griffith Drive
Suite 320
Beaverton, OR 97005
Telephone: (503) 641-4908
herb@greylaw.org

GENE C. SCHAERR
NICHOLAS P. MILLER
ANNIKA B. BARKDULL
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Intervenor-Defendant-Appellee*
*Council for Christian Colleges & Universities*

## INDEX TO SUPPLEMENTAL EXCERPTS OF RECORD

| Document | File Date | USDC Dkt. No. | CCCU-SER No. |
|---|---|---|---|
| Transcript, Preliminary Injunction Hearing, Vol. 3, 11/08/21 | 11/24/21 | 146 | CCCU-SER-3–183 |
| Expert Declaration of Dr. Mark Regnerus | 11/02/21 | 139 | CCCU-SER-184–238 |
| Intervenor's Prel. Inj. Hr'g Ex. 6: Joshua R. Wolff et al., *Sexual Minority Students in Non-Affirming Religious Higher Education: Mental Health, Outness, and Identity,* 3 Psych. of Sexual Orientation & Gender Diversity 201 (2016) | 10/29/21 | 121-6 | CCCU-SER-239–250 |
| Expert Declaration of Shirley Hoogstra | 10/15/21 | 109-1 | CCCU-SER-251–270 |

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3                      EUGENE DIVISION

4
   ELIZABETH HUNTER, et al.,      )
5                                 )
        Plaintiffs,               )  Case No. 6:21-cv-474-AA
6                                 )
                     v.           )  Monday, November 8, 2021
7                                 )  8:00 AM
   U.S. DEPARTMENT OF EDUCATION, )
8  et al.,                        )
                                  )
9       Defendants.               )
                                  )
10                   v.           )
                                  )
11 COUNCIL FOR CHRISTIAN          )
   COLLEGES & UNIVERSITIES,       )
12 WESTERN BAPTIST COLLEGE d/b/a )
   CORBAN UNIVERSITY, WILLIAM     )
13 JESSUP UNIVERSITY, AND         )
   PHOENIX SEMINARY,              )
14                                )
        Defendants-Intervenors.   )
15 _____)

16

17

18

19              PRELIMINARY INJUNCTION HEARING

20                       VOLUME 3

21               TRANSCRIPT OF PROCEEDINGS

22          BEFORE THE HONORABLE ANN L. AIKEN

23          UNITED STATES DISTRICT COURT JUDGE

24

25

**CCCU-SER-003**

```
 1                    TELEPHONIC or VIDEO APPEARANCES

 2

 3    FOR THE PLAINTIFFS:

 4                         PAUL J.C. SOUTHWICK
                          Paul Southwick Law, LLC
 5                         8420 N Ivanhoe Street, Suite 83929
                          Portland, OR 97203
 6
                          MISHA ISAAK
 7                         Perkins Coie, LLP
                          1120 NW Couch Street, 10th Floor
 8                         Portland, OR 97209-4128

 9                         JOSEPH C. BAXTER
                          7706 SW 45th Ave., No. 76
10                         Portland, OR  97219

11

12    FOR THE DEFENDANTS:

13                         ELLIOTT M. DAVIS
                          Department of Justice, Civil Division
14                         P.O. Box 883
                          Washington, D.C. 20044
15
                          HILARIE SNYDER
16                         Department of Justice, Civil Division
                          Federal Programs Branch
17                         P.O. Box 883
                          Washington, D.C. 20044
18

19

20

21

22

23

24

25
```

**CCCU-SER-004**

```
 1                    TELEPHONIC or VIDEO APPEARANCES

 2                              (Continuing)

 3    FOR THE INTERVENOR DEFENDANTS (WESTERN BAPTIST COLLEGE, WILLIAM
      JESSUP UNIVERSITY, and PHOENIX SEMINARY):
 4
                              RYAN J. TUCKER
 5                            Alliance Defending Freedom
                              15100 N 90th Street
 6                            Scottsdale, AZ 85260

 7

 8    FOR THE INTERVENOR DEFENDANTS (COUNCIL FOR CHRISTIAN COLLEGES &
      UNIVERSITIES):
 9
                              HERBERT G. GREY
10                            Herbert G. Grey, Attorney at Law
                              4800 SW Griffith Drive, Suite 320
11                            Beaverton, OR 97005-8716

12                            GENE SCHAERR
                              Schaerr Jaffe, LLP
13                            1717 K Street NW, Suite 900
                              Washington, D.C. 20006
14
                              JOSHUA J. PRINCE
15                            Schaerr Jaffe, LLP
                              1717 K Street NW, Suite 900
16                            Washington, D.C. 20006

17                            NICHOLAS P. MILLER
                              Schaerr Jaffe, LLP
18                            1717 K Street NW, Suite 900
                              Washington, D.C. 20006
19

20

21

22    COURT REPORTER:      Kendra A. Steppler, RPR
                           United States District Courthouse
23                         405 E 8th Avenue, Room 2130
                           Eugene, OR 97401
24                         (541)431-4112

25                              *   *   *
```

1                              <u>INDEX</u>

2    <u>WITNESS</u>                                        PAGE

3     <u>RANDOLPH WILLS</u>

4    Direct Examination (Continued) by Ms. Snyder ....492
     Cross-Examination by Mr. Southwick ..............503
5    Cross-Examination by Mr. Prince ................546

6     <u>MARK REGNERUS</u>

7    Direct Examination by Mr. Schaerr ...............553
     Cross-Examination by Mr. Southwick ..............565
8    Direct Examination (Continued) by Mr. Schaerr ...573
     Cross-Examination (Continued) by Mr. Southwick ..612
9    Redirect Examination by Mr. Schaerr .............632

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Now's the time set for Civil

2    Case No. 21-474, Hunter, et al. v. U.S. Department of

3    Education, et al., for preliminary injunction hearing.  If you

4    could please introduce yourselves for the record, beginning

5    with Plaintiffs.

6          MR. SOUTHWICK:  Paul Southwick and Joseph Baxter for

7    the Plaintiffs.

8          MS. SNYDER:  Hilarie Snyder and Elliott Davis for the

9    Government Defendants.

10          MR. SCHAERR:  Gene Schaerr for the CCCU Intervenor.

11    And I'm here with Joshua Prince.  And I think Nicholas Miller

12    will be joining us later.

13          MR. TUCKER:  And Ryan Tucker on behalf of the

14    Religious School Intervenors.

15          THE COURT:  It sounds like we have pretty decent

16    connections today.  So I'm going to keep my fingers crossed

17    we're not going to have some of the difficulties we had on

18    Friday.  We have the -- your witness for the Government --

19    Mr. Willis (sic) -- is he -- there he is.  If he could just say

20    his name.

21          THE WITNESS:  Wills.

22          THE COURT:  Wills -- I'm sorry.  Mr. Wills, I wanted

23    to make sure you popped up.  I would remind you you're still

24    under oath, and we'll continue.  Go ahead.

25          THE WITNESS:  Thank you, Your Honor.

**CCCU-SER-007**

```
 1              THE COURT:  Sure.
 2              MS. SNYDER:  Thank you, Your Honor.
 3
 4                   R-A-N-D-O-L-P-H  W-I-L-L-S,
 5    having been previously sworn, testified as follows:
 6
 7                 DIRECT EXAMINATION (Continued)
 8    BY MS. SNYDER:
 9    Q    Mr. Wills, do you recall speaking on Friday about the
10    process OCR Enforcement uses to evaluate, investigate, and
11    resolve administrative complaints of discrimination?
12    A    Yes, I do.
13    Q    Do you also recall speaking on Friday about how an
14    assurance of religious exemption letter may impact that
15    process?
16    A    Yes, I do.
17    Q    I'd like to now turn your attention to the Plaintiffs in
18    this case.  You are aware that Plaintiffs, or someone on their
19    behalf, filed administrative complaints with OCR alleging
20    violations of Title IX; correct?
21    A    Yes, I'm aware of that.
22    Q    Could you please look at Government Defendant's Exhibit 3
23    in the binder in front of you?
24              MS. SNYDER:  And, Beth, if you could call that up,
25    please.
```

**CCCU-SER-008**

1  BY MS. SNYDER:

2  Q    Could you identify Exhibit 3, please?

3  A    Yes.  Exhibit 3 is a chart listing complaints filed -- 36

4  complaints that have been filed recently with OCR.  It provides

5  a description of the status of those complaints and also

6  indicates that the complainants or the individuals filing on

7  complainants' behalf are Plaintiffs in the current action in

8  front of the Court.

9  Q    Okay.  And who compiled Exhibit 3?

10 A    Exhibit 3 was compiled by Melanie Velez, who is an acting

11 enforcement director in OCR.

12 Q    And does Exhibit 3 summarize records in OCR's possession?

13 A    Yes, it does.

14 Q    Do you see on the first page -- what is Column No. 1?

15 A    Column No. 1 lists the docket number assigned to the

16 individual case.  This is OCR's docket number.

17 Q    And does Column No. 1 accurately reflect docket numbers as

18 of Friday's date?

19 A    Yes, it does.

20 Q    If you could please, what is Column 2?

21 A    Column 2 includes the name of the recipient educational

22 institution that was raised in the complaint.

23 Q    And does Column 2 accurately reflect docket numbers as of

24 Friday's date?

25 A    Yes, it does.

**CCCU-SER-009**

1   Q    If you could, please, what is Column 3?

2   A    Column 3 indicates the date that each complaint was

3   received by OCR.

4   Q    And is that column accurate as of Friday's date?

5   A    Yes, it is.

6   Q    Could you please explain what Column 4 is?

7   A    Column 4 indicates the stage in OCR's processing that each

8   complaint is currently in.

9   Q    And is Column 4 accurate as of Friday's date?

10  A    Yes, it is.

11  Q    Could you please explain what Column 5 is?

12  A    Column 5 indicates the OCR regional office to which these

13  complaints -- these various complaints -- are assigned.

14  Q    And is Column 5 accurate as of Friday's date?

15  A    Yes, it is.

16  Q    Could you please explain what Column 6 references?

17  A    Column 6 references the name of the plaintiff in the

18  instant action who is also involved as the complainant in the

19  OCR administrative action.

20  Q    And does Column 6 accurately reflect that information as

21  of Friday's date?

22  A    Yes, it does.

23  Q    Okay.  If you could, please, look at the next column,

24  Column 7.  Could you identify what Column 7 is?

25  A    Column 7 indicates whether the complainant in the OCR

1   administrative action has requested a 180-day waiver, and it

2   also indicates the status of that waiver.

3   Q    Now, you spoke on Friday a little about waivers and

4   timeliness.  Could you explain to the Court what a 180-day

5   waiver request is?

6   A    A 180-day waiver request is a request to literally waive

7   OCR's timeliness requirement.  You may recall that I testified

8   that OCR requires that complaints be filed within 180 days of

9   the last alleged act of discrimination.  When that is not the

10  case, OCR provides, under certain conditions, for granting a

11  waiver of that timeliness requirement so that the case can

12  still move forward to investigation if that is appropriate.

13  Q    Okay.  And so Column 7 then reflects whether or not a

14  particular complainant filed a waiver request; is that correct?

15  A    Yes, it does.

16  Q    And does it reflect the status of that waiver request?

17  A    It does.

18  Q    And is Column 7 accurate as of Friday's date?

19  A    Yes, it is.

20  Q    If you could, please, look at Column 8.  Could you

21  describe for the Court what that column is?

22  A    Column 8 includes entries with regard to any communication

23  or interaction that OCR has had with the complainant, slash,

24  Plaintiffs in the administrative action.

25  Q    And is Column 8 accurate as of Friday's date?

1    A    Yes, it is.

2    Q    Sorry.  Is it accurate as of Friday's date?  Does it

3    include all the communications through Friday?

4    A    I'm sorry.  This does not include -- no.  This column

5    actually is accurate as of -- immediately prior to my

6    deposition.  Since then there have been further actions taken

7    by OCR that are not reflected here.

8    Q    Okay.  So -- and your deposition was when so the Court

9    knows?

10   A    My deposition was on October 21.

11   Q    Okay.  So that column is accurate as of approximately

12   October -- or, excuse me -- as of approximately October 21st;

13   is that correct?

14   A    That's correct.

15   Q    Okay.  Is there any other edits or problems with that --

16   the accuracy of that column?

17   A    Yes.  There was -- the column, as of October 21st,

18   included an entry by the Dallas office that was incorrect.  And

19   that has been corrected.

20   Q    Okay.  So this chart reflects, then, the correct status of

21   communications with -- and interactions -- with the complainant

22   or Plaintiffs through approximately October 21st; correct?

23   A    That's correct.

24   Q    And is your understanding that, in some instances,

25   additional communications have been made subsequent to

1    October 21st.

2    A    That is my understanding.

3    Q    Okay.  Let's talk a little bit more specifically about the

4    fourth column that says "stage."

5    A    Yes.

6    Q    What stage are Plaintiffs' administrative complaints in

7    with OCR?

8    A    Plaintiffs' administrative complaints are in the

9    evaluation stage with OCR, with the exception of one complaint

10   that has been dismissed.

11   Q    Okay.  So could you explain -- you said there's one

12   exception where a complaint has been dismissed.  Could you

13   identify which complaint that is, please?

14   A    Yes.  That is Complaint Docket No. 08212212.  It was a

15   complaint filed -- one of the complaints filed against Brigham

16   Young University.

17   Q    And what is the status of that particular complaint?

18   A    That complaint is currently closed because it has been

19   dismissed.

20   Q    Do you know why it was dismissed?

21   A    Yes.  It was dismissed under one of the Case Processing

22   Manual provisions in Section 108, dismissed under Section

23   108(j), which provides that OCR must dismiss complaints where

24   OCR learns that a similar complaint has been filed -- a

25   complaint that was similar or identical allegations with same

1    operative facts have been filed in federal court or state

2    court.  And here we have an example of a filing in federal

3    court.  Which required the dismissal of this particular

4    complaint.

5    Q    So with the exception of Brigham Young complaint that you

6    identified, what stage are the remaining administrative

7    complaints in?

8    A    The remaining administrative complaints are in the

9    evaluation stage.

10             MS. SNYDER:  Beth, you can take down that exhibit.

11   BY MS. SNYDER:

12   Q    And could you just remind the Court, again, what the

13   evaluation stage means?

14   A    The evaluation stage is the stage wherein OCR determines

15   whether to either dismiss a complaint or to go forward to open

16   an investigation.  There are various considerations that OCR

17   undertakes at that stage in no particular order.  We determine

18   whether we have subject-matter jurisdiction; personal

19   jurisdiction; whether the complaint is filed timely; and, if

20   not, whether a waiver has been requested, which, of course, it

21   would be up to OCR to determine whether to grant.

22        We also determine whether this is the type of complaint

23   that going forward would necessitate OCR having a signed

24   consent form from a complainant, which we use so that we can

25   actually reveal a certain amount -- a limited amount -- of

1  personal information to a recipient, once a complaint has been

2  opened, to enable that recipient to appropriately respond to

3  whatever the allegations are.

4  Q    Is it accurate to say that the evaluation stage is the

5  first stage --

6  A    Oh.

7  Q    -- in OCR's process of considering an administrative

8  complaint?

9  A    Absolutely.

10  Q    You mentioned during your direct -- and I believe you

11  spoke a little bit about this -- that some changes were

12  implemented in September.  Has OCR's process with respect to

13  Plaintiffs' complaints -- has that been impacted at all, as a

14  result of OCR's consideration of possible process changes

15  around September 2021?

16  A    The changes that we implemented in mid-September were to

17  do with making sure we knew the complaints were filed with OCR;

18  and that regional offices reported that to headquarters; and

19  that, among other things, any action that the regional offices

20  proposed to take would actually have to come to headquarters

21  for review by headquarters and approval by the Assistant

22  Secretary.

23  Q    And in considering whether or not to make those changes,

24  did that impact at all the timeline within which OCR is

25  considering Plaintiffs' administrative complaints?

1   A     Those changes briefly impacted the timeline.  Because at

2   one point, early in the process, we directed the regional

3   offices to pause any interviews that they were arranging or had

4   already arranged going forward until we actually had spent more

5   time in headquarters determining the best and appropriate way

6   to go forward.  So there was a temporary pausing of interviews.

7   The pause has been lifted.  And, as you can see, interviews are

8   going forward.

9   Q     And do you recall when the pause was lifted?

10  A     I don't.  It was not long after we actually said, "Please

11  pause."  It may have been two weeks later.  It may have been

12  toward the end of September, beginning of October, but I don't

13  have an exact date.

14  Q     Now, who is the ultimate decision-maker on whether or not

15  to dismiss any of Plaintiffs' administrative complaints at the

16  evaluation stage?

17  A     The ultimate decision-maker on whether to dismiss any of

18  Plaintiffs' complaints -- administrative complaints -- at the

19  evaluation stage is the Assistant Secretary.

20  Q     And who is the ultimate decision-maker on whether or not

21  to open any of Plaintiffs' administrative complaints for

22  investigation?

23  A     That is likewise the Assistant Secretary.

24  Q     And just to be clear, is the Assistant Secretary the

25  decision-maker even if the religious exemption is not

**CCCU-SER-016**

1    dispositive?

2    A    Yes, it is.    Under any circumstance, the Assistant

3    Secretary will have to approve dismissals or openings.

4    Q    You testified that all but one of Plaintiffs'

5    administrative complaints are still pending with OCR; is that

6    correct?

7    A    That is correct.

8    Q    Do you know how OCR will resolve those complaints?

9    A    I do not.

10    Q    Why not?

11    A    We have a process in place for the resolution of those

12    complaints, whatever the resolution might be.    The process

13    actually begins, very importantly, at the regional office

14    level.    I would not be -- I will not even know what that is

15    until a proposal comes forward from the regional offices.    None

16    has -- with the exception of the one case that was dismissed,

17    no other proposals have come forward, to my knowledge.

18    Q    Okay.    And do you know when OCR will resolve those

19    complaints?

20    A    Likewise I do not know when they will be resolved.

21    Q    Why not?

22    A    Again, there's a process in place.    The evaluation process

23    is taking place at the regional office level.    At a certain

24    point, the regional office will make a proposal going forward.

25    I do not know when that will happen.

**CCCU-SER-017**

1    Q    Okay.  And do you know whether or not OCR will dismiss any

2    of these complaints based on the religious exemption?

3    A    I do not know that either.

4    Q    Why not?

5    A    Again, there's a process for evaluation of these

6    complaints.  The evaluation may include looking at assurances

7    of exemptions.  But it is a process.  And, as of this date, I

8    have not had any indication that a proposal's been made to

9    dismiss based on an assurance or religious exemption.

10   Q    And just to be clear, is it -- is it your decision -- is

11   it --

12   A    No.

13   Q    Is it your decision to dismiss those based on a religious

14   exemption?

15   A    No.  No.  It is not my decision.  The decision is always

16   the Assistant Secretary's.

17   Q    Okay.  And just very generally, what process will OCR --

18   excuse me -- very generally, what process will OCR Enforcement

19   use to continue to consider Plaintiffs' administrative

20   complaints?

21   A    We use the process we use in every complaint in terms of

22   the evaluation process and deciding to go forward.

23   Q    Okay.  And you say "the process you use in every

24   complaint."  Is that what you described during your testimony

25   on Friday?

1  A    It's what I described during my testimony on Friday.  It's

2  also what is set forth with a degree of specificity in OCR's

3  Case Processing Manual.

4        MS. SNYDER:  Thank you, Your Honor.  I have no

5  further direct questions.

6        THE COURT:  Thank you.  For the Plaintiffs, go ahead.

7

8                    CROSS-EXAMINATION

9  BY MR. SOUTHWICK:

10 Q    Good morning, Mr. Wills.  This is Paul Southwick.  We've

11 met each other a couple of weeks ago, if you recall, during

12 your deposition.  Thanks for being here again today.

13       You just testified that -- I'm going to paraphrase a

14 little bit.  But I think you just testified that "we use the

15 same process for every complaint."  So the same process for the

16 Plaintiffs as you would use for any other complaint, and that

17 that process is found in the OCR Processing Manual; is that

18 fair to say?

19 A    Yes, that's fair to say.

20 Q    Okay.  Can you point to me where in the OCR Process -- in

21 the OCR Processing -- sorry.  Let me make sure I'm saying this

22 right.  Can you point to me where in the OCR Case Processing

23 Manual -- so that's Government Exhibit 1 -- where it provides

24 guidance for OCR investigators in how to handle religious

25 exemption issues?

1  A    There's no specific provision in the Case Processing

2  Manual on how to handle religious exemption issues.  Similarly

3  there's no specificity in the Case Processing Manual for how to

4  handle other very specific issues that come before OCR.  There

5  are general guidelines laid out that we do consider in all

6  cases.  And certainly subject-matter jurisdiction is one of

7  those standards that we look to.

8  Q    But it's not fair to say that they're treated the same;

9  right?  Because there's an extra layer of analysis required

10  when there's a religious exemption; is that correct?

11  A    There's an extra -- the analysis of any given case will be

12  a little bit different, certainly.  But, generally speaking,

13  these are the principles, are the standards, that we look to in

14  evaluating cases.

15  Q    So if I'm the OCR investigator, and a Plaintiff's

16  complaint has shown up on my desk, where should I turn -- where

17  should I turn in this Processing Manual to find out how I'm

18  going to analyze whether or not an existing religious exemption

19  covers the allegations in this complaint or not?  Where am I

20  going to turn?

21  A    Well, you may not know that, actually, when you first

22  receive a complaint.  You may not be able to identify the

23  particular recipient as possibly an institution -- an

24  educational institution that's religious in nature.  So you

25  wouldn't necessarily know that.

1    You'd simply move forward and look at timeliness, personal

2    jurisdiction, whether a consent form is necessary.  And I think

3    we covered this on Friday.  At that point, assuming all of

4    those other basic prerequisites were met, you would issue a

5    letter opening the complaint for investigation.

6    Q    So sometimes the initial investigator might have no idea

7    of whether a religious exemption comes into play.  Fair enough.

8    In other circumstances, the initial investigator might know

9    that there is a religious exemption issue there; is that

10   correct?

11   A    That is correct.

12   Q    And in that case, that initial investigator -- from your

13   prior testimony, I believe you said that initial investigator

14   is supposed to look and -- you know, if there -- and request to

15   see if there's an assurance of exemption on file.  And if there

16   is, then that investigator is supposed to look at that

17   assurance of exemption, see what is exempted and why, and then

18   make a comparison and a determination on whether this complaint

19   sitting in front of them should be closed or open.  Is that

20   generally correct?

21   A    It -- generally, with a caveat.  They're not making the

22   final determination.  They certainly would be looking -- they

23   would speak to our Program Legal Group and determine whether,

24   as they suspected, an assurance existed.  And, if so, review

25   that assurance to determine whether the exemption actually was

1    something that is covered -- that covers the allegations of the

2    complaint.

3         But they would not be making the final determination.

4    They might, on the basis of that, determine that it appears

5    that we do not have subject-matter jurisdiction because the

6    exemption covers the allegations in the complaint, or they may

7    make a preliminary determination that it does not, in which

8    case they would be recommending that we move forward with

9    issuing a letter notification.

10   Q    So they don't make the final determination, but they make

11   the initial determination; is that correct?

12   A    They will propose a step to take.  Yes.  They will make a

13   proposed determination.

14   Q    And what kind of policy guidance, or guidance at all, does

15   OCR provide to those investigators to decide whether or not

16   certain religious tenets conflict with compliance with Title IX

17   with respect to that Title IX complaint sitting on their desk?

18   What kind of guidance do you provide?  Because the Case

19   Processing Manual doesn't say anything about it.  Have you

20   provided any guidance for your initial investigators on how to

21   make those determinations?

22   A    We've not provided any official guidance on how to make

23   those determinations.  And as you know, those determinations

24   are reviewed at numerous levels, all the way up to the final

25   level and the final decision-maker, which is the Assistant

1   Secretary.

2   Q    But another thing that can happen is that the initial

3   investigator might not know that there is an assurance of

4   exemption on file, as you suggested earlier, and, in that case,

5   they might recommend opening an investigation.  And if that is

6   affirmed by the Assistant Secretary, then an investigation

7   would be opened.  And then the complainant would be notified

8   that the investigation is opened, and the educational

9   institution would also be notified the investigation was

10  opened; is that correct?

11  A    That is correct.

12  Q    And at that point, after opening the investigation,

13  somebody could point out, "Hey, there's an assurance of

14  exemption on file."  And then the complaint could be closed at

15  that point on the basis of a preexisting assurance of

16  exemption; is that correct?

17  A    That is a possibility.  Yes, that is correct.

18  Q    And I believe that you testified earlier that, in fact,

19  after the evaluation stage, you know, then there's the opening

20  of the investigation.  And then the investigation could take

21  several months.  There could be efforts at reaching resolution.

22  The complainant could have been providing, you know, a lot of

23  time and energy providing testimony and documents to OCR, as

24  could the educational institution.  Is that fair to say that

25  sometimes these investigation processes can last several

1    months?

2    A    Yes.   Sometimes investigations can last several months.

3    Q    And so despite all of that, and even if there were several

4    months of negotiations and evidence and a lot of resources by

5    OCR and a lot of personal emotional resources from the Title IX

6    complainant, at any point during that process, even at the very

7    end, an educational institution could assert an assurance of

8    exemption.   And if OCR determines that it applies, the

9    allegations in the complaint -- everything -- would be over,

10   and the complaint would be dismissed; is that correct?

11   A    That remains a possibility.   Yes, that is correct, as a

12   possibility.

13   Q    Earlier, Mr. Wills, you testified that all of the

14   Plaintiffs' complaints are in the evaluation stage.   So I just

15   want to note that according to the Case Processing Manual --

16   so, again, Government Exhibit 1, Section 103, which is page

17   8 -- it says, "Once OCR determines pursuant to CPM Section

18   102" -- and Section 102 is whether information is subject to

19   further processing -- that it says, "Once OCR determines,

20   pursuant to CPM Section 102, that written information it has

21   received is appropriate for further processing, the information

22   is referred to as a complaint.   And OCR will assign a case

23   number to the complaint and establish a file."

24       So at the TRO stage, the Court's opinion recognized that

25   the evidence at the time of the TRO in this case was that a lot

**CCU-SER-024**

1   of the complaints had not even been assigned a case number.

2   But based on Exhibit 3 that we're looking at -- Government

3   Exhibit 3, which is the -- that chart of all the Plaintiffs'

4   complaints -- it's -- isn't it true that now all of Plaintiffs'

5   complaints have at least been assigned a case number and are at

6   the evaluation stage?  Is that correct?

7           MS. SNYDER:  Objection, Your Honor.  He's misstated

8   testimony.  The question is compound and confusing.

9           THE COURT:  Rephrase your question.  If you need to

10  break it down, break it down.

11  BY MR. SOUTHWICK:

12  Q    Dr. Wills, is it accurate to say that all of Plaintiffs'

13  complaints have at least satisfied the requirements for being

14  assigned a case number because, in fact, they have been

15  assigned a case number; is that correct?

16  A    That is correct.

17  Q    All right.  So, at this point, OCR has determined that it

18  has received written information such that it can move on to

19  further processing of the complaints; is that correct?

20  A    That is correct.

21  Q    All right.  And during your deposition, you testified --

22  well, let me back up a little bit.  So in this chart it states

23  that all of the Plaintiffs' complaints -- other than the one

24  BYU complaint that's been dismissed -- that they all remain in

25  the evaluation stage; is that accurate?

1   A    That's accurate, yes.

2   Q    And at your deposition, you testified that the average

3   time to complete the evaluation stage -- the whole evaluation

4   stage -- was 73 days.  Do you recall that testimony?

5   A    I recall that testimony.  That is a -- 73 days was the

6   average time for completion of evaluation in fiscal year 2021.

7   Q    And do you have any reason to doubt your prior testimony,

8   or does that remain accurate in your understanding -- 73 days?

9   A    That remains accurate.

10  Q    So all of the Plaintiffs' complaints, if you look at the

11  "received by" date -- you can look through each of the dates.

12  But at least for all the complaints that were filed in June and

13  July, which is the vast majority of all the complaints, we're

14  significantly beyond the 73 days; is that right?

15  A    They are beyond the 73 -- the average of 73 days.

16  Q    In fact, they're beyond 100 days; is that right?

17  A    That appears to be correct.

18  Q    And you referred to OCR taking a pause or putting a pause

19  on all of Plaintiffs' complaints.  Do you recall approximately

20  how long Plaintiffs' complaints were put on hold by OCR?

21  A    I don't recall how long they were put on hold.  My

22  recollection is it was a fairly short period of time, but it

23  was a period of time definitely.

24  Q    But that pause or that hold -- that wasn't because the

25  Plaintiffs did anything wrong filing their complaints.  That

**CCCU-SER-026**

1   was -- is that fair to say?

2   A    That is fair to say.

3   Q    All right.  So the pause -- the hold -- that was -- that

4   was OCR trying to get its ducks in order and figure out how

5   it's going to process these religious exemption issues; is that

6   right?

7            MS. SNYDER:  Objection, mischaracterizes his

8   testimony.

9            THE COURT:  Rephrase your question, please.

10  BY MR. SOUTHWICK:

11  Q    The pause or the hold that you referred to on Plaintiffs'

12  complaints -- that was the decision of OCR to subject these

13  plaintiff complaints to that hold; is that correct?

14  A    That was OCR's decision.  Yes.

15  Q    So now that the complaints have been free to resume --

16  they've all resumed the evaluation stage; is that correct?

17  None of them are still being held back; is that right?

18  A    None are being held back.  And I do want to point out that

19  the pause was simply on moving forward with interviewing

20  complainants or complainants representatives.  It did not pause

21  all work on these cases or any review of documentation that we

22  had.

23  Q    Okay.  So the pause -- the hold -- that was just on

24  interviews and the -- and what was the purpose of those

25  interviews?  Was that to gather additional information for

1   evaluation?

2   A     Yes.  Generally speaking, when we reach out to

3   complainants during the evaluation stage -- and it's not a

4   requirement to do so, as I indicated in earlier testimony --

5   it's really to clarify complaints; to understand better what

6   the allegations of the complaint are; to understand and

7   address, if appropriate, issues of timeliness and waiver.

8   They're a variety of issues we may be looking at in a

9   clarification call.

10  Q     All right.  So now that the pause is lifted, would you

11  agree -- and -- now that the pause is lifted, and it's been,

12  you know, over 100 days for most of these complaints, would you

13  agree that the investigations should, in general, be nearing

14  the completion of the evaluation stage at this point?

15            MS. SNYDER:  Objection, speculation and foundation.

16            THE COURT:  Overruled.  If he knows the answer, he

17  can give it.

18            THE WITNESS:  Mr. Southwick, would you repeat the

19  question, please?

20  BY MR. SOUTHWICK:

21  Q     Sure.  Given that the hold or the pause has been lifted,

22  and that these complaints have been filed generally more than

23  100 days ago, would you agree that, in general, these

24  complaints should be nearing the completion of the evaluation

25  stage at this point?

1   A    I can't answer whether they should be nearing the

2   completion of the evaluation stage, because I don't actually

3   know what -- other than the brief descriptions here -- what

4   state these particular complaints are in.  Some may be near

5   that stage.  Some may not yet be near that stage.  So -- which

6   is the best I can do by way of answer to your question right

7   now.

8   Q    So could these investigators just continue to sit on these

9   complaints for months and months?  Would that be acceptable to

10  you?

11          MS. SNYDER:  Objection, misstates his testimony in

12  the record.

13          THE COURT:  Rephrase --

14  BY MR. SOUTHWICK:

15  Q    I'm not misstating -- I'm not saying it was your

16  testimony, Mr. Wills.  I'm asking you --

17          THE COURT:  Excuse me.

18  BY MR. SOUTHWICK:

19  Q    You're the Director of Enforcement at OCR.

20          THE COURT:  Excuse me.

21          MR. SOUTHWICK:  Oh.

22          THE COURT:  Yeah.  Please listen when I -- I tried to

23  interrupt a minute ago.  Rephrase your question and just ask it

24  in the form of a question.

25          MR. SOUTHWICK:  Apologies, Your Honor.

BY MR. SOUTHWICK:

Q    Mr. Wills, as the Director of Enforcement at OCR, would it
be acceptable for you -- to you -- for investigators to just
continue sitting on Plaintiffs' complaints and not moving the
process of processing them along?

        MS. SNYDER:  Objection, foundation and misstates the
testimony.

        THE COURT:  Overruled.  He can answer the question if
he can answer it.

        THE WITNESS:  Mr. Southwick, I don't believe that the
investigators are sitting on these complaints.  There's -- as I
testified earlier, and as we've seen even from the earlier
Government Exhibit No. 3, there has been action taken.  There
are interactions happening with the complainants in appropriate
instance.  So I don't view them, first of all, as sitting on
these complaints at this point.

        Yes, it is our hope to move through the process of
processing complaints always as expeditiously as possible but
also with appropriate consideration to all the factors that we
have to consider before we determine whether to open a
complaint.  But I do want to stress that I do not find that
what is happening now, as far as I've been told, constitutes
sitting on these complaints.

BY MR. SOUTHWICK:

Q    Okay.  So the average time to complete the evaluation

 1   stage is 73 days.  But it's been more than 180 days.  And only

 2   one of Plaintiffs' 35 or 36 complaints have actually completed

 3   the evaluation stage; isn't that true?

 4            MS. SNYDER:  Objection, misstates the testimony.

 5            THE COURT:  Overruled.  I don't -- overruled.

 6            THE WITNESS:  Mr. Southwick, again, I would ask you

 7   to repeat the question.  Because maybe I misunderstood.  I

 8   thought I heard you say that there are complaints that are over

 9   180 days old.

10   BY MR. SOUTHWICK:

11   Q    Sorry.  If I said that, I misspoke.  I was saying 100

12   days.  What I'm asking, Mr. Wills, is out of the 35 or 36

13   complaints that we have here on Government Exhibit 3, only one

14   of them has actually made it through the evaluation stage;

15   right?

16   A    That is correct.

17   Q    Okay.  So the other 90-plus percent of complaints have not

18   completed the evaluation stage, even though it's been over 100

19   days; is that accurate?

20   A    That is accurate.

21   Q    Mr. Wills, during your deposition, do you recall us

22   looking at some of the George Fox University correspondence

23   with OCR and decisions from OCR regarding a transgender student

24   who was making a housing discrimination complaint back in 2014?

25   A    Yes, I do.

1  Q    And do you recall that after that complaint was opened for
2  investigation, George Fox University asserted a religious
3  exemption, and that the Office of Civil Rights then dismissed
4  that complaint on the basis of the religious exemption?
5  A    Yes, I recall that.
6  Q    Mr. Wills, are you familiar with that process happening
7  with respect to other LGBT students at other educational
8  institutions?
9  A    Mr. Southwick -- which process, Mr. Southwick?  The
10  process -- please just clarify that for me.
11  Q    Well, Mr. Wills, a transgender student's housing complaint
12  was dismissed by OCR on the basis of a religious exemption.
13  I'm wondering, are you familiar whether the Office of Civil
14  Rights has similarly dismissed other complaints from LGBTQ
15  students on the basis of the religious exemption to Title IX?
16  A    I believe so.  I'm just trying to recall whether the
17  complaint that I had in mind involves an LGBTQ student, which I
18  don't recall right now.  I would need to refer to an exhibit to
19  make that determination.  OCR has certainly dismissed other
20  complaints on the basis of assurance of exemption that covered
21  the allegations of the complaint.
22  Q    So yesterday -- or, excuse me -- on Friday my office
23  circulated some documents to be used for cross-examination to
24  the Court and Counsel.  I'm going to share my screen and pull
25  up some of these.  The three documents I'm going to look at

1   were attached as exhibits to a declaration in this case in the

2   briefing on the initial motion for a temporary restraining

3   order and preliminary injunction.

4        The first document that I'm pulling up here is Docket

5   No. 50-21.  And it is a correspondence between the Office of

6   Civil Rights and Spring Arbor University in -- it looks like

7   2013 -- the 2013 and 2014 time period.  Mr. Wills, have you

8   seen these documents before?

9   A   I have not.

10  Q   All right.  I'm happy to go through them.  Are you able to

11  see these, or would you like a printed copy?

12  A   I actually would like a printed copy because the screen is

13  rather far away, and it's very hard for me to read.

14  Q   Sure.

15       MR. SOUTHWICK:  Hilarie, are you able to print a copy

16  for the witness?

17       MS. SNYDER:  We are.  But you need to give us a few

18  minutes to do it.

19       MR. SOUTHWICK:  Okay.

20  BY MR. SOUTHWICK:

21  Q   Well, I'll go ahead and like to introduce these exhibits

22  so we can kind of go through that process now while we're

23  waiting for physical copies.  I'd like to introduce the exhibit

24  on my screen here as Plaintiffs' Exhibit No. 21.

25       THE COURT:  Objections?  Can everybody see it and

1   make that decision?

2          MS. SNYDER:  Your Honor, may we -- once we get the

3   hard copy, could --

4          THE COURT:  Sure.

5          MS. SNYDER:  -- we take a look then?  Thank you.  I

6   don't anticipate an objection, but I would like to see it.

7          MR. SOUTHWICK:  All right.

8   BY MR. SOUTHWICK:

9   Q   And just the three documents we're going to look at -- the

10  next one is Docket 50-20.  And this is a similar line of

11  correspondence between OCR, but this is with Liberty University

12  in 2014.  And then Docket 50-18 -- this is with BYU-Idaho and

13  the Office of Civil Rights.  These are the three documents I'd

14  like introduced as Exhibits 21, 22, and 23.

15         MS. SNYDER:  Elliott went to print them.  Do you guys

16  want to take like a two-minute break to allow that to happen?

17         THE COURT:  Let's do that.  Let's do that.

18         MR. SOUTHWICK:  All right.  Sounds good.  Thank you.

19

20         (A break was taken from 8:46 AM to 8:58 AM.)

21

22         THE COURT:  Does everybody have the copies?  Is

23  everybody back?  Go ahead and please be seated.

24         MR. SOUTHWICK:  Plaintiffs are back.

25         THE COURT:  Does everybody have copies of the

1    requested admission of the Exhibits 21, 22, and 23?

2            MS. SNYDER:  Yes, Your Honor.

3            THE COURT:  All right.  Objections?

4            MR. TUCKER:  No objection from CCCU, Your Honor.

5            MS. SNYDER:  No objections from the Government

6    Defendants, Your Honor.

7            MR. TUCKER:  This is Ryan Tucker.  No objections from

8    the Religious Schools.

9            THE COURT:  Thank you.  They will be received.

10   Continue with your cross.

11   BY MR. SOUTHWICK:

12   Q    Thank you, Dr. Wills.  So I'm going to turn to

13   Exhibit No. 21, which is the Spring Arbor University

14   correspondence.  And it looks like your lawyers had a chance to

15   provide a print-out of that.  I'll just go through this

16   document with you since you -- do you have it in front of you,

17   Mr. Wills?

18   A    I do.  Thank you.

19   Q    All right.  So the first page is stamped December 6th,

20   2013.  And this is a correspondence from OCR to the President

21   of Spring Arbor University.  Does that look correct to you?

22   A    Yes, it does.

23   Q    And the subject line says "OCR Docket No. 15-14-2006.  And

24   so this appears to be in response to an OCR Title IX Complaint;

25   is that correct?

1   A    Yes, that's correct.

2   Q    All right.  And in this correspondence, OCR recognizes

3   that on November 4th of 2013 -- so about a month prior -- OCR

4   received a complaint filed against Spring Arbor University

5   alleging sex-based discrimination against the student.  The

6   complaint alleges that the university is discriminating against

7   the student based on sex by denying him equal access to

8   university's education program and activities because -- and

9   then there are some redactions about the specific allegations.

10  Does that look accurate?

11  A    Yes, it does.

12  Q    And just so that we can kind of fill in some of the

13  missing pieces, we can tell that this is a complaint filed by

14  an LGBTQ+ student if we look down towards the last page here,

15  page 7.  On page 7, the last page of this document, which is

16  further correspondence from OCR to Spring Arbor, it states that

17  in a letter dated June 27th, 2014, OCR's Assistant Secretary

18  granted the university's request and stated in relevant part

19  that the university is exempt from the above provisions, quote,

20  "to the extent that they prohibit discrimination based on

21  gender identity or sexual orientation, or require a recipient

22  to treat students consistent with their gender identity, and

23  compliance would conflict with the controlling organization's

24  religious tenets."  Is that an accurate reading of this

25  document?

1   A     Yes, it is.

2   Q     All right.  So going back to the first page, I just wanted

3   to clarify, because of the redactions, that we are dealing with

4   an LGBTQ+ student here.  The second paragraph of page 1 talks

5   about Title IX and OCR's Enforcement.  Third paragraph says,

6   "Because OCR has jurisdiction over this allegation, and it was

7   filed timely, OCR is opening this complaint for investigation."

8        And so is it fair to say that at the time this complaint

9   was filed, OCR was processing complaints by LGBTQ students for

10  gender identity or sexual orientation discrimination?

11  A     Yes.

12  Q     All right.  And then it goes on to discuss the Title IX

13  claim.  If you go to page 2, it says that the Department is

14  opening this matter for investigation, describes the Case

15  Processing Manual processes as you've described.  Page 2 says,

16  "Going to conduct the prompt investigation."

17       And then if you look down towards the end of page 2, OCR

18  makes a request of Spring Arbor University.  And it says,

19  "Therefore, requesting that you forward the following

20  information to us within 15 calendar days."  And you asked for

21  a number of documents, including a copy of the university's

22  policies, procedure of --

23            MS. SNYDER:  Objection, Your Honor.  I hate to

24  interrupt, but I believe Counsel's testifying.

25            THE COURT:  Will you please just ask a question and

1  refer to the document that the witness can read for himself,

2  please?  Go ahead.

3          MR. SOUTHWICK:  Sure.

4  BY MR. SOUTHWICK:

5  Q    Mr. Wills, is it fair to say that this -- the first three

6  pages of this document that we're looking at demonstrates the

7  Office of Civil Rights opening up an investigation for LGBTQ

8  discrimination on behalf of the Title IX complainant at Spring

9  Arbor University?

10  A    Yes, that's fair to say that.

11  Q    Okay.  And this was -- this was at the end of 2013.  All

12  right.  And then let's look to the next -- page 4.  This is --

13  the next correspondence is from August of 2014 -- so about

14  seven or eight months later.  This is also from OCR -- same

15  case number.  And it talks about the complaint that was filed.

16          MS. SNYDER:  Again, objection, Your Honor.  Counsel's

17  testifying.

18          MR. SOUTHWICK:  I'm merely trying to provide some

19  context for the document.  I could ask --

20  BY MR. SOUTHWICK:

21  Q    Mr. Wills, have you read this document before?

22  A    I read it today.  Yes.

23  Q    All right.  Since you've already read it, is it fair to

24  say that this correspondence from August of 2014 acknowledges

25  that Spring Arbor University requested and received a religious

1    exemption from Title IX relating to sexual orientation and

2    gender identity, and specifically with respect to a number of

3    implementing regulations as described on page 6 and 7 of this

4    document?

5    A    Yes, that is accurate.

6    Q    And is it also accurate that on the basis of the religious

7    exemption granted by OCR, the student's Title IX complaint was

8    administratively closed?

9    A    Yes, that is correct.

10    Q    So similar to the transgender student at George Fox

11    University, this LGBT student at Spring Arbor University also

12    had their open Title IX complaint administratively closed on

13    the basis of the religious exemption; is that right?

14    A    That's right.

15    Q    All right.  If you could turn to Exhibit No. 22, the

16    Liberty University correspondence dated January 16th, 2014.

17    And have you had an opportunity to review this document?

18    A    I'm currently reviewing it.

19                THE COURT:  I'm going to step out a sec.

20

21            (A break was taken from 9:08 AM to 9:09 AM.)

22

23    BY MR. SOUTHWICK:

24    Q    And take your time, Mr. Wills, but just let us know when

25    you've finished your review.

1   A     I've completed my review.

2   Q     All right.  I'd just like to ask you a few questions about

3   the first -- the first few pages of this document are a

4   correspondence between Jerry Falwell, the former President of

5   Liberty University, and the Office of Civil Rights; is that

6   correct?

7   A     That is correct.

8   Q     And Jerry Falwell says that this letter grew out of a

9   November 8th, 2013, letter that it received from the District

10  of Columbia office of OCR regarding a complaint filed against

11  Liberty with the allegation that the antiabortion policy

12  discriminated against female students; is that accurate?

13  A     That is accurate.

14  Q     And then if you look down to the bottom of page 1, it says

15  that "the Department asked Liberty to formally claim a

16  religious exemption under 34 CFR 106.12 by providing the names,

17  the religious entity" -- "the names" -- it looks like there's a

18  missing "of" -- "of the religious entity that oversees the

19  university, description of specific religious tenets the

20  university believe they're inconsistent with Title IX, and

21  provisions of the Title IX regulation from which the university

22  claims an exemption."

23      Mr. Wills, is it OCR's practice to invite educational

24  institutions to formally claim religious exemptions in response

25  to Title IX complaints against those educational institutions?

A     I cannot state that that is OCR's official practice.

Q     But it is OCR's official practice now; isn't it?  Because didn't you testify earlier that now in each -- in each letter in which OCR is going to open a Title IX investigation, it in fact invites the educational institution to claim any number of exemptions, including religious exemptions to Title IX, rather than comply with the opening of the investigation; isn't that correct, Mr. Wills?

A     I have to disagree with that characterization.  The letter -- the current letter opening cases for investigation is not an invitation.  There's no specific invitatory language in that letter.  It simply informs a recipient that these exemptions and exceptions are available without even describing what they might be, and it -- and states simply if you intend -- or if the recipient intends to exercise any right under that -- under any of those sections, please notify OCR.

     But there's no inviting or "we ask you to" or "we invite you to file for an assurance," which is, at least as it's recorded here, different from the language in the letter to Robin Murphy from Liberty University.

Q     But that change in OCR's letters -- the change in OCR's letters regarding opening investigation, which provides information about exemptions that can be claimed -- I believe that you testified that language was changed in response to the Title IX complaints raising religious exemption issues that

1  were filed this year; is that correct?

2  A    That is correct.

3  Q    So --

4  A    The change of language was added, actually, as a response

5  to that.

6  Q    So, previously, OCR would not have alerted educational

7  institutions, "Look, we're opening investigation.  But you may

8  be exempt."  The prior language in the opening letters didn't

9  provide that kind of notification of exemption to educational

10 institutions; did it?

11 A    That is correct.  We did not include the current language

12 in prior letters of notification --

13 Q    So Dr. Falwell --

14 A    -- with religious exemptions.

15 Q    So Jerry Falwell -- at least his interpretation was that

16 he was asked -- at least according to this document -- and then

17 he goes on to provide that justification.  And we don't need to

18 go through all of it.  But he describes the -- Liberty

19 University and its beliefs and its governing structure.  Is

20 that a fair summary of the rest of the document?

21 A    I would say that is a fair summary of the rest of the

22 document.  Yes.

23 Q    All right.  And then in response -- so this is April

24 22nd -- so a few months later -- the Office of Civil Rights

25 responds to Mr. Falwell.  And could you summarize for the Court

1    what OCR's response to Mr. Falwell is?

2    A    Certainly.  The response of communication from the

3    Assistant Secretary for Civil Rights is essentially the

4    issuance of an assurance of exemption based on the request that

5    Reverend Falwell made in the earlier communication.

6    Q    And, in fact, OCR grants the exemption to allow Liberty

7    University to punish women who have abortions; is that correct?

8    A    I don't see anywhere in this letter a granting of allowing

9    Liberty University to punish women.  It granted the exemption

10   that was requested.

11   Q    Would you -- we could read over Liberty University's

12   request again if you'd like, but isn't it about honor code

13   violations for having abortions?  Or termination of pregnancy?

14   A    Yes, it is.

15   Q    So Liberty University was asking OCR to grant a religious

16   exemption to allow it to continue to enforce its honor code to

17   punish students who have terminated their pregnancies.

18           MS. SNYDER:  Objection, Your Honor, argumentive.  The

19   documents speak for themselves.

20           THE COURT:  Sustained.

21           MR. PRINCE:  Also relevance, Your Honor.  This is

22   Joshua Prince.

23   BY MR. SOUTHWICK:

24   Q    And the last page of this document notes that Jerry

25   Falwell actually requested an exemption from 34 CFR 106.31(b)

1   to allow the university to maintain a policy allowing for the

2   discipline of students who have an abortion.  However, OCR

3   looks like, on its own accord, said, "Well, the actual

4   provision that you want an exemption from is 34 CFR 106.40(b),"

5   and then OCR goes on to grant that exemption.  Is that a

6   correct understanding of that paragraph?

7           MS. SNYDER:  Objection, speculation and relevance.

8   BY MR. SOUTHWICK:

9   Q    Mr. Wills --

10          THE COURT:  Wait, wait, wait.  Sustained.  Move on.

11  BY MR. SOUTHWICK:

12  Q    All right.  The last document in this series I'd like to

13  ask you about, Mr. Wills, is Plaintiffs' Exhibit No. 23,

14  BYU-Idaho correspondence.  This is a four-page document.  And

15  have you had a moment to briefly review this, Mr. Wills?

16  A    I'm reviewing it right now, Mr. Southwick.

17  Q    All right.  Thank you.

18  A    I've finished reading the letter.

19  Q    Thank you, Dr. Wills.  Is it fair to say that this letter

20  is from BYU-Idaho's President to the Office of Civil Rights

21  regarding a Title IX complaint it received from a transgender

22  student?

23  A    I can infer that from reading the letter it involves

24  gender identity.  But I don't see any specific reference to a

25  particular transgender student -- unless I missed that.

1    Q    And then if you look at the bottom of page 3, it states

2    very specifically, "The complaint against BYU" --

3    A    I --

4    Q    Do you see that?

5    A    Yes, I see that.  I do.

6    Q    Okay.  So we're talking, again, about a complaint filed

7    against BYU-Idaho with the Office of Civil Rights on behalf of

8    a transgender student.  And then this is BYU-Idaho responding

9    to the Office of Civil Rights regarding that complaint; is that

10   fair to say?

11            MS. SNYDER:  Objection, foundation and speculation.

12            THE COURT:  Rephrase your question.

13   BY MR. SOUTHWICK:

14   Q    Dr. Wills, now that you've had an opportunity to review

15   this correspondence, could you describe the general nature of

16   this correspondence?

17   A    Generally speaking, this is a response by the President of

18   BYU-Idaho to a communication he received -- or Brigham Young

19   received from the Office for Civil Rights.  And in this

20   communication from the President of BYU-Idaho, the President

21   sets forth the bases for requesting a religious exemption or a

22   religious exemption with regard to the complaint filed by a

23   transgender student with the Office for Civil Rights.

24   Q    And then the letter goes on, on page 4, to reference a

25   prior religious exemption that BYU-Idaho received from the

1  Office of Civil Rights back in the 1980s; is that correct?

2  A    That's correct.  It references an exemption that was

3  assured to the predecessor institution -- Ricks College.

4  Q    And then are you aware of whether or not OCR affirmed that

5  religious exemption for BYU-Idaho in the context of this

6  complaint?

7          MS. SNYDER:  Objection.  Confusing, ambiguous

8  question.

9          THE COURT:  Overruled.

10          THE WITNESS:  I cannot say with certainty that the

11  exemption was assured with regard to this particular complaint.

12  I would have to review further documentation to make that

13  statement.

14  BY MR. SOUTHWICK:

15  Q    However, based on current OCR policies, given that

16  BYU-Idaho raised this exemption, if the -- if it had properly

17  followed OCR's guidance with respect to requesting an assurance

18  of exemption, the Office of Civil Rights would have granted

19  that exemption with respect to gender identity; is that

20  correct?

21          MS. SNYDER:  Objection, foundation and speculation.

22          THE COURT:  Sustained.

23  BY MR. SOUTHWICK:

24  Q    So, Dr. Wills, we've looked at a number of documents in

25  which LGBT students as well as at least one instance in

1   which -- a woman who had an abortion -- were trying to assert

2   their Title IX rights at federally funded educational

3   institutions by filing Title IX complaints with the Office of

4   Civil Rights.  And is it fair to say that in at least some of

5   these instances that we reviewed just now, the Office of Civil

6   Rights responded by administratively closing those students'

7   Title IX complaints; is that right?

8   A    That is correct.

9   Q    Dr. Wills, are you aware of any situation in which an

10  LGBTQ student has gone to the Office of Civil Rights for help

11  against a religious educational institution with claims of

12  discrimination where the Office of Civil Rights has actually

13  been able to help that student rather than dismissing that

14  student's complaint?

15  A    Can you rephrase the question, please?  Or just restate

16  it.  "Am I aware of" --

17  Q    Mr. Wills, are you aware of any cases in which an LGBTQ

18  student has filed a Title IX complaint for sexual orientation

19  or gender identity discrimination against an educational

20  institution, that had already received an assurance of

21  exemption or had claimed a religious exemption in the course of

22  that Title IX administrative proceeding, and where the Office

23  of Civil Rights has actually been able to help that student as

24  opposed to administratively dismissing their complaint on the

25  basis of the religious exemption?

1            MS. SNYDER:  Objection, ambiguous.

2            THE COURT:  Overruled.  If he knows the answer, he

3    can give it.  If he doesn't know the answer, he can give it as

4    well.

5            THE WITNESS:  I'm not aware of a situation where an

6    assurance of exemption has issued from the Assistant Secretary

7    that covers the allegations of a complaint filed by an LGBTQ

8    student where OCR has not dismissed the complaint for lack of

9    jurisdiction.

10   BY MR. SOUTHWICK:

11   Q    Thank you, Mr. Wills.  And during your deposition,

12   Mr. Wills, I had asked you about whether or not the religious

13   exemption restricts OCR's ability to prevent sex discrimination

14   at educational institutions that receive federal financial

15   assistance.  And do you recall that your testimony was that in

16   fact the religious exemption did restrict OCR's ability to

17   prevent sex discrimination?

18   A    Yes.  I recall my testimony.

19   Q    And do you stand by that testimony today?

20   A    I do.

21   Q    During your deposition, we reviewed some documents from

22   the -- well, I guess, now Former Acting Assistant Secretary.

23   So just to clarify, the Acting Assistant Secretary named as a

24   defendant in this lawsuit was Suzanne Goldberg.  But I believe

25   it's my understanding from your testimony on Friday that the

1  new Assistant Secretary has indeed been confirmed, and that

2  that is Catherine Lhamon; is that correct?

3  A    That is correct.

4  Q    And so the prior acting Assistant Secretary had put out a

5  number of documents.  And we reviewed one during your

6  deposition in which the Acting Assistant said that sex

7  discrimination threatens equal access for students and can

8  derail opportunities for them to learn.  And I asked whether

9  you agreed with that statement, and you said that you did

10  agree.  Do you recall that testimony?

11  A    I do recall that testimony.

12  Q    And does that remain your testimony today?

13  A    Yes, it does.

14  Q    And during your deposition, I asked you whether or not a

15  student could attend an educational institution and not know

16  whether their Title IX rights would be protected at that

17  institution, because that institution might not currently have

18  an assurance of exemption but could request one at a later

19  time.  And your testimony was that, "Yes, indeed, a student

20  could attend an institution and not know whether their Title IX

21  rights would be protected."  Is that your recollection of your

22  testimony?

23            MS. SNYDER:  Objection, speculation.

24            THE COURT:  Overruled.

25            THE WITNESS:  Yes, that's my recollection.

1    BY MR. SOUTHWICK:

2    Q    And does that remain your testimony today?

3              MS. SNYDER:  Again, objection, speculation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    BY MR. SOUTHWICK:

7    Q    During your deposition, I also asked you whether OCR can

8    investigate discriminatory policies as opposed to merely

9    discrete discriminatory acts.  And I believe that your

10   testimony was that, "Yes, OCR has subject-matter jurisdiction

11   to investigate discriminatory policies."  Is that an accurate

12   description of your testimony?

13   A    Yes, it is.

14   Q    And does that remain your testimony today?

15   A    It does.

16   Q    And during your testimony, we went over Bob Jones

17   University's student policy, which -- student conduct code --

18   which we've -- we went over with the Court with the witness

19   from Bob Jones University earlier.  And that had to do with

20   prohibitions on same-sex dating, prohibitions on transgender

21   students medically transitioning.  And I asked you whether or

22   not such a policy would be considered an unlawful policy but

23   for the religious exemption to Title IX.

24         Putting the religious exemption to Title IX aside, would a

25   general policy like that -- would OCR consider that to be

1  unlawful under Title IX?  And --

2             MS. SNYDER:  Objection, Your Honor.  Oh, sorry, Paul.

3  BY MR. SOUTHWICK:

4  Q    And I believe that your testimony at pages 223 and 224 of

5  your deposition was that "Yes, such a policy would be unlawful

6  and under OCR subject-matter jurisdiction."  Do you recall

7  whether that is an accurate description of your testimony?

8             MS. SNYDER:  Objection, compound and ambiguous

9  question.

10            THE COURT:  Overruled.

11            THE WITNESS:  I do recall that that was my testimony.

12 And under those circumstances, putting aside the issue of

13 religious exemption, OCR would open an investigation and

14 investigate a complaint that alleged that the policy was

15 violated.

16 BY MR. SOUTHWICK:

17 Q    And, Mr. Wills, are you aware that -- of the 36 Title IX

18 complaints from the Plaintiffs that are listed on Government

19 Exhibit 3 -- that approximately ten of those have been filed by

20 students who are current students at the educational

21 institutions?  Meaning they're not alumni, they weren't

22 expelled, but they are currently at educational institutions as

23 current students; are you aware of that?

24 A    I am not aware of that.

25 Q    But would you agree that for a current student who alleges

1   injuries stemming from a discriminatory policy, like the Bob

2   Jones University policy, that such a current student would be

3   stating a claim within the subject-matter jurisdiction of OCR

4   setting aside the religious exemption?

5           MS. SNYDER:  Objection, speculation.

6           THE COURT:  Overruled.

7           THE WITNESS:  Generally speaking -- and I state this

8   with a great deal of caution -- yes.  That would be something

9   that would generally move us toward opening a complaint for

10  investigation.  But, again, I do not like to speculate based on

11  hypotheticals.  I do not give advisory opinions.  I'm not

12  necessarily the complete decision-maker in every process.  But,

13  generally speaking, that would weigh in favor of opening a

14  complaint for investigation.

15  BY MR. SOUTHWICK:

16  Q    Mr. Wills, I am getting near the end of my cross.  But

17  I -- there's one -- there's one more document that I'd like to

18  ask you about from Government's -- from the Government's

19  exhibit.  And I believe that is the Smith memorandum, which --

20          MR. SOUTHWICK:  Joe, do you have the exhibit list?

21      For the Court's reference, the Plaintiffs would like to

22  turn to Government's Exhibit No. 11.

23      Oh -- yeah -- Smith; right?  Let me just make sure I've

24  got the right memorandum.  Yeah -- Smith 1989 -- so Government

25  Exhibit No. 11.

 1   BY MR. SOUTHWICK:

 2   Q     And just let me know when you've had a chance to get

 3   there, Mr. Wills, and to at least take a little review of the

 4   document.

 5   A     Yes.  I'm looking at the document right now.

 6   Q     I'm going to ask you some questions about pages 3 and 4 of

 7   Government Exhibit 11.  And it's under the section that has a

 8   headline of "Investigations of Institutions with Religious

 9   Exemptions."  So if you could particularly just take a review

10   of those paragraphs, and then let me know when you've had a

11   chance to review those.

12   A     I've finished my review of the paragraphs.

13   Q     Thank you, Mr. Wells.  So just for everyone's

14   recollection, I included Exhibit 11.  This is one of the

15   memorandums that you've testified that is part of the guidance

16   for OCR in what to do in situations where a Title IX complaint

17   comes in and there's been a religious -- an assurance of

18   religious exemption already on file.  Is that fair to say that

19   this is what this section of Exhibit 11 is about?

20          MS. SNYDER:  Objection, I think this is -- I don't

21   believe that Mr. Wells has testified about this here today.

22   Your question was -- misstates past testimony and is ambiguous.

23          MR. SOUTHWICK:  I'll rephrase.

24          THE COURT:  Go ahead.

25

BY MR. SOUTHWICK:

Q    Mr. Wills, are you familiar with Government Exhibit
No. 11?

A    I am.

Q    And, in fact, it's a document you reviewed in preparation
for your 30(b)(6) deposition; is that correct?

A    That is correct.

Q    And could you describe for the Court what this document
is?

A    This is a document from the then Acting Assistant
Secretary for Civil Rights William Smith directed to OCR senior
staff.  And it lays out Title IX religious exemption procedures
and instructions for investigating complaints at institutions
with religious exemptions.

Q    Okay.  So then let's go ahead and go to the bottom of page
3 of Exhibit 11, which has a Bates Stamp ED2.000078, and that
section about investigations of institutions with religious
exemptions.  Let me know when you've been able to find that.

A    All right.  I've located it.

Q    So the first sentence there says, "When a complaint is
filed against an institution that has already been granted a
religious exemption by OCR, the regional offices should
carefully review OCR's letter granting the exemption and the
institution's letter requesting the exemption to determine
whether the complaint allegations fall within the exemption

1   granted."

2       My question to you -- is this OCR's current practice or

3   current policy?

4   A    The current policy is for OCR -- where a religious

5   exemption assurance has been granted -- is to review the letter

6   of assurance and determine whether the exemption that has been

7   assured covers the particular allegations of the complaint.

8   Q    So the next sentence says, "The letters requesting and

9   granting the exemption will clarify the extent of the

10  exemption."  Do you agree with that assessment in terms of

11  OCR's current policy?

12  A    I do.

13  Q    All right.  Then a little bit further down, it gives an

14  example of a potentially -- it gives an example of a situation.

15  And I'll read that.  It says, "For example, if a complainant

16  alleges that an institution with a religious exemption to

17  Section 106.34 does not provide women with access to advanced

18  courses in chemistry, the regional office must determine

19  whether the institution's exemption to 106.34 addresses courses

20  in chemistry by reviewing the letters requesting and granting

21  the exemption.  The regional office's review of the religious

22  exemption file indicates that the exemption is only for those

23  courses training future ministers, which are based on religious

24  tenets limited to men, then the regional office must

25  investigate the complainant's allegations regarding access to

1    advanced chemistry courses."

2        Do you see that there in this document?

3    A    I do see that.

4    Q    So my question to you is does current OCR policy follow

5    this guidance document from Exhibit No. 11?

6    A    Yes.  This is a statement of OCR's current policy toward

7    assessment of the extent of a religious exemption.  We must do

8    that carefully.  In saying that we look to what the

9    exemption -- what provision is exempted, we must also carefully

10   assess whether it covers, completely, all of the allegations of

11   the complaint.

12       This is a perfect example of a situation where that might

13   not be the case, where the exemption really ran to -- you're

14   exempted from coursework.  Women can be excluded from certain

15   coursework that is related only to providing training for men

16   who are training for the priesthood or the ministry.  It does

17   not provide a blanket exemption for advanced chemistry courses,

18   necessarily.  It's a stock example offered here, but it's a

19   caution to the field to be very careful and deliberate in

20   determining what exactly the exemption covers and what are the

21   nature of the allegations in the complaint.

22   Q    So I'd like to refer to one of the specific examples

23   that's in this case.  And that would be Alex Duron, a plaintiff

24   who testified on day one of this preliminary injunction

25   hearing, in which he testified about having his admission

1  rescinded to a graduate nursing program because of his sexual

2  orientation.

3        So my question to you, Mr. Wills, is when OCR is

4  evaluating Mr. Duron's complaint, is it going to be asking

5  whether or not Union University -- the university he

6  attended -- whether or not Union University's religious tenets

7  regarding sexual orientation require the university to rescind

8  his admission to a graduate nursing program?  Is that the kind

9  of analysis that will be done?

10 A    I don't speak to the kind of analysis that will be done.

11 I can't speculate as to the analysis.  We will do a thorough

12 and careful analysis of each one of the complaints that we have

13 before us.  But I don't speak to what that analysis is going to

14 include, other than it will by careful, thoughtful, and

15 accurate.

16 Q    And so when the Office of Civil Rights closed the door by

17 administratively dismissing Title IX complaints, at least from

18 the transgender student at George Fox University and Spring

19 Arbor University, was OCR obligated to do an analysis of

20 whether or not those institutions' beliefs about gender and

21 gender identity required denying access to an on-campus

22 restroom to a transgender student?  Is that kind of analysis

23 being done?

24        MS. SNYDER:  Objection, speculation and ambiguous.

25        THE COURT:  Overruled.  If he can answer, he can

1    answer.

2            THE WITNESS:  I don't know what the analysis was in

3    that particular case.  So I can't answer that question with

4    specificity.  All I can do is say that the documents such as

5    they are speak for themselves.

6    BY MR. SOUTHWICK:

7    Q    But, Dr. Wills, you're going to -- you're going to have to

8    answer this question; aren't you?  Because you are the Director

9    of Enforcement at OCR; is that correct?

10           MS. SNYDER:  Objection, misstates --

11           MR. SOUTHWICK:  Let me back that up.

12           MS. SNYDER:  -- misstates the question.

13           THE WITNESS:  Yeah.

14   BY MR. SOUTHWICK:

15   Q    Dr. Wells, you are the Director of Enforcement at the

16   Office of Civil Rights; is that correct?

17   A    That's not my official title.  But, yes, for all intents

18   and purposes, I am the Director of Enforcement at OCR.

19   Q    And then along with the Assistant Secretary, you and a

20   small group of headquarters officials are going to be reviewing

21   each and every one of Plaintiffs' Title IX complaints that have

22   been filed in this action.  Whether or not the recommendation

23   is for dismissal or to open investigation, you, the Assistant

24   Secretary, and a small group of headquarters officials are

25   going to be reviewing each and every one of these complaints;

1  is that correct?

2  A    That is correct.  I can't tell you the size of that small

3  group, but, yes, this will be reviewed by a number of

4  individuals at the headquarters office, bearing in mind that

5  the final decision is only and exclusively the Assistant

6  Secretary's.

7  Q    I do apologize.  There is one last document to ask you

8  about, but it's going to be very short.  And this is Government

9  Exhibit No. 21.  And, Mr. Wills, have you seen Government

10  Exhibit 21 before?

11  A    Yes, I have.

12  Q    And can you just briefly describe this document?

13  A    Yes.  This document is a listing of each of the recipients

14  and the corresponding Plaintiffs, slash, complainants in the

15  cases that we have also where we have administrative filings in

16  OCR.  And it lists the recipients.  It lists the associative

17  plaintiffs.  And there is a central column that lists whether

18  an assurance of religious exemption letter has issued.

19  Q    All right.  And it basically shows that some of the

20  institutions attended by Plaintiffs already have assurances of

21  religious exemptions, but other institutions do not; is that

22  correct?

23  A    Yes.  As of the creation of this letter, that is true.

24  Q    And so for the students on this list who are attending

25  institutions that do not currently have an assurance of

1    religious exemption -- those students don't really have any way

2    of knowing whether or not, or to what extent, their Title IX

3    rights are going to be protected by the Office of Civil Rights;

4    is that correct?

5              MS. SNYDER:  Objection, speculation.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yeah.  They don't -- they would have no

8    way of knowing their -- at least with regard to what's listed

9    on this charge.  There's no indication that an assurance

10   exists.

11             MR. SOUTHWICK:  Thank you, Mr. Wills.  No further

12   questions from Plaintiffs.

13             THE COURT:  For the Intervenors, any questions?

14             MR. TUCKER:  No questions from the Religious Schools.

15             MR. MILLER:  You're on mute, Josh.  You're on mute.

16             THE COURT:  The individual -- again, please somebody

17   speak, because I started to hear somebody say there was no

18   objection.  Just identify yourselves for the record.  It was

19   the gentlemen with the blue tie.  There you go.

20             MR. TUCKER:  Yes.  This is Ryan Tucker, counsel for

21   the Religious School Intervenors.  I do not have any questions.

22             THE COURT:  Thank you.  Anyone else.

23             MR. MILLER:  Counsel for CCCU does have some

24   questions.  This is Nicholas Miller.  And my colleague --

25   Joshua Prince -- is having trouble with his audio it seems.

1           THE COURT:  Well, Mr. Miller, if you're going to

2    cross, go right ahead.

3           MR. MILLER:  Well, I don't have the cross.  My

4    colleague does -- Joshua Prince.

5           THE COURT:  Oh, I thought you were going to cross.

6           MR. PRINCE:  No.  It's Joshua Prince.  And he's

7    online, but he's trying to speak but cannot be heard.

8           THE COURT:  He's mute.  So...

9           MR. SOUTHWICK:  Josh, it looks like you're not muted

10   on the system.  So it might be your earbuds are not connected.

11          MR. MILLER:  Can you use your computer microphone,

12   Josh?  Disconnect the earbuds and...

13          MR. SCHAERR:  Yeah.  He's going to dial in and use a

14   phone for the audio.  Apologies, Your Honor.  We thought we had

15   this checked out earlier today.

16          THE COURT:  Technology is fickle.

17          MR. SCHAERR:  Indeed.

18          MR. PRINCE:  Hello, this is Joshua Prince.  May I be

19   heard?

20          THE COURT:  Yes.

21          MR. PRINCE:  I apologize, Your Honor.  My microphone

22   worked this morning --

23          THE COURT:  That's fine.

24          MR. PRINCE:  -- as I believe Mr. Schaerr said.

25       Mr. Wills, can you hear me?

1          THE COURT:  You're kind of muffled.  So you're going

2     to need to slow down and articulate.

3          MR. PRINCE:  Of course.  Thank you, Your Honor.

4      Mr. Wills, can you hear me?

5          THE WITNESS:  Yes, I can.

6

7                    CROSS-EXAMINATION

8     BY MR. PRINCE:

9     Q    All right.  I only have a few questions.  Thank you for

10    your time.  My first question is that you mentioned that the

11    average time that it takes to evaluate an administrative

12    complaint is around 70 days; is that correct?

13    A    That is correct.  For fiscal year 2021, it was 73 days.

14    Q    And is it fair to say that when you use the word

15    "average," it means that some complaints may take less than 70

16    days and some may take more than 70 days?

17    A    That is correct.

18    Q    And OCR handles thousands of such evaluations each year;

19    isn't that accurate?

20    A    Yes, that is accurate.

21    Q    So would it be consistent with your claim that the average

22    time to evaluate administrative claims -- to have 35 complaints

23    out of thousands take longer than the average?

24    A    I'm sorry, sir.  Could you restate that question?

25    Q    Of course.  This case involves 35 or so complaints out of

1  the thousands that OCR receives every year; is that accurate?

2  A    That is accurate.

3  Q    And would it be consistent with your claim -- that the

4  average time to evaluate such claims took around 70 days -- to

5  have this small subset take longer than the average?

6  A    That is -- yes.  That is a -- very definitely a

7  possibility, just given the fact that we wanted to ensure that

8  we approach these cases in a consistent manner.  Yes.  That may

9  take a little bit longer than average.

10 Q    Okay.  Now, to your knowledge, has OCR or the Department

11 of Education ever written a religious school's policy on

12 sexuality or gender?

13 A    To my knowledge, OCR has never written a university or an

14 institution's policy on sexuality or gender.

15 Q    Has it ever instructed such a school to draft a policy on

16 sexuality or gender, to your knowledge?

17 A    No.  It has never instructed a school to write -- or

18 guidance in writing that policy on sexuality or gender.

19 Q    Has it ever instructed students or faculty at a religious

20 school to discriminate on the basis of sexual orientation or

21 gender?

22 A    No, it has never done so.

23 Q    I want to turn quickly to Government Exhibit 1, which you

24 reviewed both in your direct examination and in your

25 cross-examination, I believe.  And I want to turn to page 12,

1  Section 109.  Do you have that before you?
2  A    Yes, I do.
3         MR. SCHAERR:  Your Honor, with apologies again,
4  Mr. Prince just texted me and said his phone connection cut
5  out, and he's dialing back in.
6         THE COURT:  All right.
7         MR. PRINCE:  This is Mr. Prince.  I apologies for
8  that.
9  BY MR. PRINCE:
10 Q    Can you hear me, Mr. Wills?
11 A    Yes, I can.
12 Q    Okay.  So I'm going to read from Section 109 on page 12.
13 It says, "OCR interprets its statutes and regulations
14 consistent with the requirements of the First Amendment, and
15 all actions taken by OCR must comport with First Amendment
16 principles."  Did I read that correctly?
17 A    Yes.  You read that correctly -- that portion of
18 Section 109.
19 Q    So is it fair to say that OCR will consider the First
20 Amendment rights of religious schools as well when determining
21 the applicability to Title IX?
22        MS. SNYDER:  Objection, outside the scope and
23 speculative.
24        THE COURT:  Sustained.
25

1    BY MR. PRINCE:

2    Q    The last document we discussed on cross-examination with

3    Mr. Southwick was Government's Exhibit 21, where some religious

4    institutions do not currently have an assurance of exemption

5    letter; is that accurate?  Do you remember that?

6    A    Yes.  According to the chart, Government Exhibit 21, at

7    least at the time the chart was created, there were some

8    institutions that did not have an assurance of religious

9    exemption letter.

10   Q    And you're familiar with the text (indiscernible) as

11   written in the statute.

12            THE COURT REPORTER:  I didn't hear that.  It cut out.

13            THE WITNESS:  Yes, I am.

14   BY MR. PRINCE:

15   Q    And if I read the exemption, it says, "This section,"

16   meaning Title IX, "shall not apply to an educational

17   institution which is controlled by a religious organization.

18   The application of this subsection would not be consistent with

19   the religious tenets of such organization."  Is that a fair

20   reading of the statute?

21   A    That's a fair reading of my understanding of that

22   particular exemption.

23   Q    Is it fair to say that the text statute does not require a

24   religious organization to seek OCR's approval before asserting

25   the exemption?

1            MS. SNYDER:  Objection, Your Honor.  I believe this

2   is outside the scope.

3            THE COURT:  Sustained.  And it's also -- it's not

4   helpful to the decision-maker, I would suggest.

5            MR. PRINCE:  Understood, Your Honor.

6   BY MR. PRINCE:

7   Q    We talked about one complaint that has been dismissed

8   under Section 108(j).  Do you remember that?

9   A    Yes, I do.

10  Q    And is it fair to say that Section 108(j) allows a person

11  whose complaint has been dismissed to refile their complaint at

12  the close of that federal case?

13  A    Yes.  There is a provision in Subsection 108(j) that under

14  certain circumstances would allow for refiling of the complaint

15  with OCR.

16  Q    Is it your understanding today that OCR dismissed its

17  complaint on the basis of the Title IX section that the student

18  could then sue the school for a violation of Title IX?

19  A    If I understand the question, is it my -- I'm sorry,

20  Mr. Prince.  Could you repeat the question for me?

21  Q    Of course.

22  A    I missed part of the first section.

23  Q    Is it your understanding -- my apologies.

24  A    I'm sorry.

25  Q    Is it your understanding if OCR dismisses a student's

1  complaint filed with OCR, that the student could then sue the

2  school for violation of Title IX, even if their complaint was

3  dismissed?

4  A    Yes, that is correct.

5  Q    And in that proceeding, is it your understanding that the

6  student would be free to argue that the Title IX exemption is

7  invalid, either in general or as applied to the student's

8  complaint?

9  A    It's my understanding, yes.

10  Q    Thank you.

11        MR. PRINCE:  Your Honor, I have no further questions

12  for this witness.

13        THE COURT:  Thank you.  Returning to the Government,

14  any redirect?

15        MS. SNYDER:  No, Your Honor.

16        THE COURT:  Thank you.  May this witness be excused?

17        MR. SOUTHWICK:  Nothing from Plaintiffs.

18        MS. SNYDER:  Nothing more from Defendant Government,

19  Your Honor.

20        MR. TUCKER:  Nothing from the Religious Schools

21  Intervenors.  This is Ryan Tucker.

22        THE COURT:  I'm assuming nothing for the other

23  Intervenor.  Could somebody respond, please?  I just want to

24  make sure everybody's been heard.  And if they're not -- if

25  we're missing somebody's connection, I just want to know.

1  Because I'm going to excuse this witness as soon as I hear from

2  the last Intervenor.

3            MR. TUCKER:  This is Ryan Tucker.  Hopefully you

4  heard me moments ago.  We have no questions for the witness.

5            THE COURT:  All right.

6       Mr. Wills, thank you so very much.  I'm sorry we took part

7  of your Friday evening.  I appreciate very much your being back

8  here today.  You're excused.  And have a good rest of the day.

9            THE WITNESS:  Thank you, Your Honor.

10            THE COURT:  For the Government, additional witnesses?

11            MS. SNYDER:  No more witnesses for the Government,

12  Your Honor.

13            THE COURT:  Thank you very much.  We'll turn to the

14  Intervenors.  And I understand there is a witness expected to

15  be called.

16            MR. SCHAERR:  Yes, Your Honor.  Intervenor CCCU would

17  like to call Dr. Mark Regnerus as an expert witness.

18            THE COURT:  And is he on the screen?  There I see a

19  new person.  If you would just speak so -- just say your name.

20            MR. REGNERUS:  Yes.  Mark Regnerus from the

21  University of Texas.

22            THE COURT:  Thank you.  And if you would raise your

23  right hand.

24

25            M-A-R-K  R-E-G-N-E-R-U-S,

1  called as a witness, having been first duly sworn, testified as

2  follows:

3

4         THE COURT:  Thank you.  For the court reporter,

5  please state your full name, spell your last, and then I'll

6  turn it over to -- I believe Mr. Schaerr's going to do the

7  direct.  Correct?

8         THE WITNESS:  Yes.

9         THE COURT:  All right.  Go ahead.

10        THE WITNESS:  My name is Mark Daniel Regnerus.  My

11  last name is spelled R-E-G-N-E-R-U-S.

12        THE COURT:  Go ahead.

13        MR. SCHAERR:  Thank you, Your Honor.

14

15                        DIRECT EXAMINATION

16  BY MR. SCHAERR:

17  Q    Dr. Regnerus, could you describe your educational

18  background?

19  A    Yes.  I was -- did college education at Trinity Christian

20  College, which at one point was a CCCU member.  I'm not sure if

21  that's still the case.  Graduated from there in 1993, followed

22  by a master's degree and a Ph.D. from the University of North

23  Carolina at Chapel Hill in the year 2000.  After that I took a

24  position at Calvin College a year before moving to the

25  University of Texas in 2002 where I've been ever since.

1   Q    Well, thank you.  In what subject did you receive your

2   Ph.D.?

3   A    Sociology.

4   Q    Okay.  And did you submit an expert report in this case?

5   A    I did.

6   Q    And let's display Exhibit 26 if we could.  I believe

7   Mr. Prince is doing that.  And, Dr. Regnerus, is Exhibit 26

8   your expert report in this case?

9   A    Yes, it appears so.

10  Q    And did you include with your report a current copy of

11  your CV?

12  A    I did.

13  Q    And is that also part of Exhibit 26?  I believe it's on

14  the screen now.  Dr. Regnerus, is this your CV on the screen?

15  A    Yes.

16  Q    Okay.  And does it appear to be part of Exhibit 26?

17  A    Looks like it.

18  Q    Okay.  Thank you.

19         MR. SCHAERR:  Your Honor, we would move the admission

20  of Exhibit 26 as the expert report of Dr. Mark Regnerus.

21         THE COURT:  Any objection?

22         MR. SOUTHWICK:  Objection -- this is Paul

23  Southwick -- objection from Plaintiffs.  I'd like to hear

24  further what Mr. Regnerus is being offered as an expert

25  witness.  Based on his report, it appears that he's an expert

1   in numerous unrelated fields.  And so I'd like to hear from the

2   Counsel's -- attorneys as to what exactly Regnerus is being

3   offered as an expert about.

4          MR. SCHAERR:  And I'm happy to do that, Your Honor.

5          THE COURT:  Then go ahead.  Please do.

6          MR. SCHAERR:  Okay.

7   BY MR. SCHAERR:

8   Q    Dr. Regnerus, tell us where you work.

9   A    Right.  I work at the University of Texas at Austin in the

10  sociology department.  I've been there 19 years.

11  Q    And what is your title?

12  A    Professor of Sociology.

13  Q    Okay.  And do you have tenure at the University of Texas?

14  A    I have tenure.  Yes.

15  Q    And when did you achieve tenure?

16  A    I think that was in 2007, or right around there.

17  Q    Okay.  And prior to that, what were your positions there?

18  A    Assistant Professor of Sociology; then Tenure Associate

19  Professor; and then, about three or four years ago, promoted to

20  full Professor.

21  Q    Okay.  And in what areas -- what are the areas that you've

22  researched and published on?

23  A    Right.  I started out as a sociologist of religion, which

24  I've come back around to that on occasion.  But around 2003 or

25  2004, I ventured into the study of relationship behavior.

```
 1   Wrote a book on religious influences on adolescent sexual
 2   behavior and attitudes and decision-making.  Kind of aged with
 3   those adolescents as they moved into young adulthood.  Wrote
 4   another book -- all four books are from Oxford -- on young
 5   adult sexual decision-making.  Moved into a little bit older
 6   phase of young adulthood.  That was the third book where I
 7   explored, to some extent -- a minority part -- how the -- what
 8   we call the sexual economics theory understands same-sex
 9   behavior and decision-making -- relationship decision-making.
10   I've written --
11            THE COURT:  Excuse me.  Excuse me.  Just for
12   purposes -- for the record, please explain what that
13   entailed -- what that research entailed.
14            THE WITNESS:  These are mostly survey-based.  I've
15   collected at least three large-scale nationally represented
16   surveys myself.  But most of these books also entail an
17   interview component.  So I kind of combine some of the
18   things -- the strengths that you have heard from on the
19   Plaintiffs' expert witnesses.  Some of them are better at
20   surveys.  Some of them are better at qualitative interviews.
21            THE COURT:  I'm more interested in --
22            THE WITNESS:  Some do both.
23            THE COURT:  I'm more interested in what are your
24   topics of coverage.
25            THE WITNESS:  In those books?
```

**CCCU-SER-072**

1              THE COURT:  No.  In that last -- you talked about

2    your most recent look at -- I believe you said sexual

3    economics.

4              THE WITNESS:  Yeah.  That was a -- that's a theory,

5    basically, that understands how -- what influences how people

6    fall in love, or not, date, have a sexual relationship

7    together, break apart, et cetera.  It's kind of a macro theory

8    more in economics than in sociology.

9    BY MR. SCHAERR:

10   Q    And, Dr. Regnerus, have you researched and published

11   articles on sexual orientation?

12   A    I have.  One was in 2012 on the adult children's outcomes

13   of -- outcomes of adult children who have grown up with a

14   parent who had been or was in a same-sex relationship.  A

15   follow-up to that, later that year, I've written an analytic

16   piece evaluating one of Dr. Meyer's colleagues on influence of

17   antigay stigma on sexual minorities' mortality, and then, more

18   recently, a forthcoming piece on attitudes about -- American

19   attitudes about transitions -- I'm sorry, not transitions --

20   transgender medicine for adolescents.

21   Q    Okay.  And have you -- have you peer-reviewed articles and

22   studies on these issues?

23   A    Yes, plenty.

24   Q    Do you have an estimate of about how many articles and

25   studies you've peer-reviewed?

1    A    Over the course of my career?

2    Q    Yes.

3    A    Probably 80 to 100.

4         THE COURT:  So I want to go back and ask a question.

5    I didn't understand and you were kind of muffled.

6         THE WITNESS:  All right.

7         THE COURT:  So the published on sexual orientation

8    first was children's outcome of parents in same-sex

9    relationships.  The second one I didn't quite understand.  I

10   understood the third one.

11        THE WITNESS:  Sure.

12        THE COURT:  What was the second one?

13        THE WITNESS:  Yeah.  The second one -- that was a

14   study -- I think it was 2017-2018 -- basically a reevaluation

15   of Dr. Mark Hatzenbuehler, who's a common coauthor with

16   Dr. Meyer.  He did an analysis of population-based data

17   connected to the National Death Index looking at how -- what he

18   called "antigay stigma" led to the -- about a dozen years of,

19   on average, lost life, basically -- diminished mortality

20   longevity among sexual minority populations in the United

21   States.

22        And I saw that, and I though that looked a little awry.

23   So we pursued an analysis of that -- could not replicate the

24   key findings -- wrote an article about that.  It was published.

25   And then, eventually, the same Journal of Social Science and

1   Medicine retracted Dr. Hatzenbuehler's article.

2             MR. SCHAERR:  Your Honor, anything further -- any

3   other questions on --

4             THE COURT:  So I just -- again, I'm just -- in terms

5   of expertise -- so the article that you published challenged a

6   thesis in an article written by Dr. Meyer that --

7             THE WITNESS:  Dr. Meyer's colleague, not Dr. Meyer.

8             THE COURT:  Whose name is what?

9             THE WITNESS:  Mark Hatzenbuehler.

10            THE COURT:  All right -- Mark Hatzenbuehler.

11            THE WITNESS:  I believe he's at Columbia or Harvard.

12            THE COURT:  And his theory was that there was

13   essentially an increase in mortality because of antigay stigma.

14            THE WITNESS:  Yeah.  So the fundamental question

15   was --

16            THE COURT:  So hold on.  Hold on.

17            THE WITNESS:  Yeah.  Sorry.

18            THE COURT:  So by "diminished mortality," it would be

19   self-harm and suicide ideation.  There was a --

20            THE WITNESS:  No.  It was just sort of the -- they

21   connected it to the National Death Index so they could track

22   when people who were participating in the survey had passed

23   away.

24            THE COURT:  So what -- I've got it.  So it's just

25   your --

1              THE WITNESS:  All --

2              THE COURT:  All moralities.  All mortalities -- car

3    accident or suicide -- got it.

4              THE WITNESS:  Absolutely.

5              THE COURT:  And so you took on that study, and you

6    could not replicate the findings.  And you published a

7    different analysis.  And, at some point thereafter, the first

8    article was withdrawn.

9              THE WITNESS:  That's correct.

10             THE COURT:  All right.  I just wanted to understand

11   that.  Thank you.

12             THE WITNESS:  Sure.

13   BY MR. SCHAERR:

14   Q    Thank you, Dr. Regnerus.  Dr. Regnerus, for which journals

15   have you done peer-reviewing of articles?

16   A    Oh, I mean, I list a whole -- I don't know -- 10-12 lines

17   of them at the end of the CV.  For this general topic, I've

18   reviewed them for American Sociological Review, American

19   Journal of Sociology -- the two best journals we have in the

20   discipline -- and Social Forces, Archives of Sexual Behavior,

21   Journal of Homosexuality, Gender & Society, and the list goes

22   on.

23   Q    Okay.  And can you briefly describe any additional

24   academic experience that you've had with sexuality issues?

25   A    Additional academic experience...

1    Q    Like perhaps teaching and advising people.

2    A    God, I've -- I've advised a variety of students over the

3    years.  Most of them have gone on to decent scholarly jobs.  I

4    teach classes -- I teach social research methods to

5    undergraduate majors.  I've had -- I've done that for a number

6    of years.  I've probably taught that 20 times.

7    Q    Mm-hm.

8    A    I've taught sociology for religion courses, and I've

9    taught sort of a unique course for freshman several years ago.

10   I think it was something like "God, Sex, and Religion."  Kind

11   of how these three things often come together in discussions

12   and in social observations.  So I consider myself having a fair

13   degree of general knowledge in this area, particularly

14   methodological knowledge in the area.

15   Q    Okay.  And when you say "in this area," are you talking

16   about the intersection between religion and sexuality issues?

17   A    Yes, and, you know, with regards to some of the

18   methodological issues that were raised in the reports.

19   Q    Okay.  And have you written any books in that area of the

20   intersection between religion and sexuality?

21   A    I would say two of the books overlap that directly.

22   Q    Mm-hm.

23   A    The first and the last.

24   Q    Okay.  And so is it fair to say that, among other things,

25   you're an expert in the sociology of religion and sexual

1  behavior?

2  A    Yeah.  That -- I think I'm probably one of -- one of

3  several in the country.  There's sort of like a -- that's

4  our -- as sociologists -- our sort of core domain.

5  Q    Okay.  Now, in preparation for your testimony today and

6  for your report, did you review anything?

7  A    Yes.  I reviewed the three expert witness reports and

8  other studies relevant to assessing those.

9  Q    And when you say "the three expert witness reports," are

10  you referring to Doctors Coley, Meyer, and Wolff?

11  A    Correct.

12  Q    And those are the Plaintiffs' experts; right?

13  A    Yes.

14  Q    And did you review any other expert reports?

15  A    Not -- you know -- not in this case.  No.

16  Q    Did you review a report from Dr. Shirley Hoogstra?

17  A    Oh, yeah.  I did review hers.

18  Q    Okay.

19  A    I'm not clear on what the status of that report is.  I

20  mean, is it an expert report?  The legal terms I don't quite

21  understand.

22  Q    Okay.  But you did review her report anyway?

23  A    I did.

24  Q    Okay.  And can you briefly just characterize the studies

25  that you -- that you reviewed in preparing your expert report

1   without necessarily naming all of them?

2   A    Characterizing the studies?

3   Q    Yes.

4   A    You know, like the survey -- like the REAP report -- I

5   took an extended look at that.  I looked at a variety of other

6   survey-based analyses that were conducted during the COVID era.

7   I took a look at the Rutgers report that Hoogstra's document

8   makes reference to, which was conducted prior to the COVID era.

9   So -- I've looked at some CDC data.  Yeah.  I kind of tried to

10  get the territory for this particular topic.

11  Q    Okay.  And your report cites a number of those studies;

12  correct?

13  A    Correct.

14  Q    And what specifically were you retained to do in this

15  case?

16  A    Primarily, I was retained to evaluate the three expert

17  witness reports and other relevant studies.

18  Q    Okay.  And what's your understanding of the core factual

19  issue that's addressed by the three Plaintiffs' expert reports?

20  A    In my estimation, the core issue is whether CCCU-type -- I

21  call them this -- CCCU-type universities or colleges and their

22  policies exacerbate emotional health problems that LGBT

23  students there experience or not.

24  Q    Okay.  And when you say "CCCU-type" school, what

25  particular kind of religious colleges are you talking about

1  there?

2  A    Right.  Well, I don't have an exact sense of who's in and

3  who's out of those things.  But they tend to be Protestant.

4  Q    Mm-hm.

5  A    They tend to be theologically conservative.  And they tend

6  to have particular policies around relationship behavior that

7  hew to more -- I guess we call them traditionally Christian

8  understandings about marriage, about the body, about the

9  distinctiveness of men and women.  Although, I strongly presume

10 that those policies in particular vary among the different

11 institutions based on their theological background -- that sort

12 of thing.

13 Q    So is it fair to say that when you refer to "CCCU-type"

14 schools, you're talking about schools that generally try to

15 adhere to the traditional Christian biblical understanding of

16 sexuality?

17 A    Yeah, insofar as we have a grasp of that.  I mean,

18 Christianity is a big tent, of course.

19 Q    Mm-hm.

20 A    But these are more theologically conservative schools,

21 which would be historically more attuned to Christian teaching

22 on this domain over the years.

23 Q    Okay.  And based on your review of the expert reports and

24 other studies in this case, and without telling me yet what

25 your opinion is, have you reached an opinion on the factual

**CCCU-SER-080**

1    issue addressed by the Plaintiffs' experts here?

2    A    Yes, I have.

3    Q    Okay.

4         MR. SCHAERR:  Well, Your Honor, based on his training

5    and experience, and his review in this case, I move that the

6    Court admit Dr. Regnerus as an expert in the sociology of

7    religion and sexual behavior.

8         MR. SOUTHWICK:  Your Honor, this is Paul Southwick

9    for Plaintiffs.  I'd like to do some cross on Mr. Regnerus'

10   qualifications in this respect.

11        THE COURT:  Fine.  Go ahead.

12

13                    CROSS-EXAMINATION

14   BY MR. SOUTHWICK:

15   Q    Mr. Regnerus, have you previously testified in a court

16   proceeding?

17   A    I have.

18   Q    And, Mr. Regnerus, did you testify -- have you testified

19   in court proceedings on behalf of parties defending same-sex

20   marriage bans?

21   A    Same-sex marriage bans?  Yes.  At least it was on -- I

22   think it was an adoption case, frankly.

23   Q    Mr. Regnerus, is that case that you're recalling the case

24   in Michigan -- a federal court case in Michigan?

25   A    Correct.

1   Q    And that would be the DeBoer v. Snyder?

2   A    That would be DeBoer v. Snyder.

3   Q    Aw, thank you.  I'm going to pull up an opinion in that

4   case.  Are you familiar with the Judge's opinion in this case?

5   A    I have read it.

6   Q    And are you familiar with the reference to your -- you

7   testified as an expert witness in that case; is that correct?

8   A    Correct.

9   Q    And --

10  A    Several of us did.

11  Q    All right.  And some of what the testimony that you

12  provided related to that -- that study that you referred to

13  from 2012 regarding same-sex parents and parenting --

14  A    Mm-hm.

15  Q    -- is that correct?

16  A    Mm-hm.  Correct.  Well -- yeah.

17  Q    And can you describe what -- the general outcome of that

18  study as you provided that testimony to the federal court?

19          MR. SCHAERR:  Your Honor, I'm going to object to this

20  line of questioning.  It really has nothing to do with his

21  testimony on the issues of this case.

22          THE COURT:  Overruled.

23          THE WITNESS:  Could you restate the question, please?

24  BY MR. SOUTHWICK:

25  Q    Mr. Regnerus, didn't you testify in federal court

1  regarding that 2012 sexual orientation and parenting study?

2  A    Yes, that's correct.

3  Q    And hasn't that study been widely criticized in academic

4  circles?

5  A    It's been widely criticized.  At the same time, it's

6  factually correct.  It has not been retracted, unlike

7  Mr. Hatzenbuehler's article I evaluated.  And it has since led

8  to a variety of studies that uphold the same conclusions that I

9  reached.  Not all of them.  Fundamentally, this domain boils

10  down to disputes about measurements and disputes about

11  analytical decision-making -- very technical stuff.

12  Q    And, Mr. Regnerus, do you stand by the methodology and

13  conclusions of that study?

14  A    I do.

15  Q    Now, Mr. Regnerus, in that case -- DeBoer v. Snyder -- I'm

16  going to read the Judge's -- the Federal Judge's opinion.

17  After you provided expert testimony, the Court states, "The

18  Court finds Regnerus' testimony entirely unbelievable and not

19  worthy of serious consideration."  Do you agree with that

20  statement, or do you disagree?

21  A    I don't agree with that statement.

22  Q    The Court goes on to describe the study and says, "The

23  Court finds this testimony unbelievable," and goes on -- it

24  states, "It's no wonder that the NFSS" -- which is a shorthand

25  for that study; is that right?

1   A    That's correct.

2   Q    "Has been widely and severely criticized by other

3   scholars, and that Regnerus' own Sociology Department at the

4   University of Texas has distanced itself from NFSS, in

5   particular, and Dr. Regnerus' views in general, and reaffirmed

6   the aforementioned American Psychological Association position

7   statement."  Is that right?

8   A    Well, the Sociology Department didn't distance itself.

9   The Sociology Department Chair, making a decision without

10  consulting the executive committee, a member of which I believe

11  I was at the time, rendered that decision, speaking so-called

12  on behalf of the Department.  But that was her opinion.

13  Q    And, in fact, the Department Chair issued a statement

14  saying, "Dr. Regnerus' work had been cited inappropriately in

15  efforts to diminish the civil rights and legitimacy of LGBTQ

16  partners and their families."  Do you recall that?

17  A    Yeah.  I believe that was part of the letter -- her

18  opinion.

19  Q    Do you agree with that assessment?

20  A    I disagree with that assessment.

21  Q    But, in fact, you continue to stand by the study.  And is

22  one of the conclusions of the study essentially that same-sex

23  parents provide suboptimal parenting environments for children?

24  A    I don't believe I said that in those words.  I believe --

25  Q    All right.  Well, could you tell us what the central

CCCU-SER-084

1   conclusions of your study were?

2   A    The central conclusions --

3            MR. SCHAERR:  Your Honor, I have to object again.

4   This is so far afield from what Dr. Regnerus is doing in this

5   case.

6            THE COURT:  It goes to his value as an expert.  And I

7   find it helpful.  And I will overrule that objection.

8            MR. SCHAERR:  Okay.

9            THE WITNESS:  All right.  So could you just repeat

10  that last question for me, please?

11  BY MR. SOUTHWICK:

12  Q    Yeah.  Mr. Regnerus, that study that was so thoroughly

13  criticized by the Court -- can you tell us what the general

14  conclusion of that study was?

15  A    Right.  I evaluated about 15 different family structure

16  types during adolescence, which is itself a challenge, because

17  American households exhibit a lot of turnover these days.  Two

18  of those household types were types where there was a mother or

19  a father who had been in a same-sex relationship at some point

20  during the child's growing-up years.  Right?  These are

21  children who were 18 to 39, as adults, reflecting upon their

22  growing-up years back in -- when I fielded this in 2011.

23       So we looked across that whole domain of both assessments

24  of the present -- like current employment, marital status,

25  family well-being -- and also back about their past --

1    right? -- their growing-up years, their assessments of their

2    relationship with their mother and their father, family

3    dynamics -- and came to the conclusion that those kids who grew

4    up in that kind of a household, that had a parent who had been

5    in a same-sex relationship of unclear duration and unclear

6    arrangement, fared worse on roughly 15 to 25 of the 40

7    different outcomes we studied when compared to children who

8    were raised in stably married mother-and-father households --

9    also compared to a variety of different kinds of households --

10   single-mother households, single-father households,

11   stepparenting households, adopted before age two, adopted after

12   age two.  The reach of that -- the ability of that study was

13   significant.

14       Now, you're right.  It raised a lot of -- both attention

15   and irritation.  And, yet, some people say, "Oh, it's been

16   debunked."  Like it's debunked?  But it's still in print.

17   Because there's nothing factually wrong about what appears

18   there.  People didn't like --

19   Q    Mr. Regnerus --

20   A    -- the conclusions.

21   Q    Mr. Regnerus, isn't the true that the journal that printed

22   it issued an audit, and the audit found that it should never

23   have been printed in the first place?

24   A    The audit -- I'd be happy to talk about that.  The audit,

25   which is an almost unheard of experience, occurred because the

1  editor of the journal seemed sort of paralyzed by the criticism

2  that he was getting.  So he appointed someone who claimed to be

3  a neutral party, who had been a friend of mine for a fair

4  number of years, who's a sociologist of religion, by the way --

5  not a sociologist of sexual behavior per se -- to audit the

6  entire process.  And he concluded at the end of the process --

7  he didn't like the fact that it was published -- but he didn't

8  see radical anomalies in the review process if that -- you

9  know -- to characterize it.

10      And so, I mean, I was stunned that such a thing would

11  happen.  And -- so it remained in print.  The editor felt so

12  harassed -- he was sued by someone in New Jersey in Florida

13  court -- and retired prematurely and passed away not that long

14  ago.  And I'm very sorry for his experience.  At the same time,

15  the article is not untrue.

16  Q    Mr. Regnerus, just to clarify, regardless of the

17  conclusions of the study, the Court in DeBoer took issue with

18  the methodology of the study; is that correct?

19  A    What do you mean "the Court"?  The Judge?

20  Q    The Judge.

21  A    Right.  Insofar as a Judge is expected to really

22  understand the nuances of regression methods and the use of

23  control variables.

24  Q    And, Mr. Regnerus, are you aware that the Sixth Circuit

25  Court of Appeals, in considering the appeal in this matter,

1   likewise reaffirmed the statements of the District Court
2   regarding your study and your testimony?
3   A    I'm not aware of that at all.  I just know they overturned
4   the decision.  That's all.
5   Q    Mr. Regnerus, are you a clinical psychologist?
6   A    I'm not.
7   Q    Are you an expert in the field of mental health outcomes
8   for LGBTQ youth?
9   A    Not an expert.  Expert in the methodology of some of the
10  studies in this domain.
11  Q    And, Mr. Regnerus, are you an expert on religious liberty
12  issues or the religious underpinnings of Council for Christian
13  College and Universities' code of conduct statements?
14  A    I'm not sure who is an expert on those things.  I'm a
15  sociologist of religion who typically studies large-scale data
16  on the religious influences on youth, young adult behavior,
17  relationship behavior, et cetera.
18       MR. SOUTHWICK:  Your Honor, Plaintiffs move to
19  exclude the portions of Mr. Regnerus' expert report that deal
20  with clinical psychology, LGBT mental health outcomes, sexual
21  orientation change efforts, gender identity change efforts, as
22  well as separately move to exclude Mr. Regnerus' testimony
23  regarding methodology, as he has previously been found by a
24  Federal Court that his methodologies themselves are
25  unbelievable and not worthy of serious consideration.

1         MR. SCHAERR:  Your Honor, may I conduct some

2    follow-up questioning?

3         THE COURT:  Certainly.

4         MR. SCHAERR:  Thank you.

5

6              DIRECT EXAMINATION (Continued)

7    BY MR. SCHAERR:

8    Q    Dr. Regnerus, what was the -- what did the Sixth Circuit

9    ultimately do with the District Judge's decision in the DeBoer

10   case?

11   A    They reversed it on a two-to-one decision.

12   Q    Okay.  And you mentioned earlier that, in that case, you

13   had -- you had relied upon and testified about a 2012 study on

14   family structures; is that correct?

15   A    Mm-hm.

16   Q    And did your -- did your analysis of that -- did your

17   analysis of that study play any role in your analysis in this

18   case?

19   A    No.

20   Q    Okay.  Does your work on family structures at issue with

21   that case have any bearing on your analysis of the issues in

22   this case?

23   A    They don't.

24   Q    Okay.  You mentioned earlier that you're not a clinical

25   psychologist; correct?

1    A    That's correct.

2    Q    Are you experienced in assessing psychological studies?

3    A    Yes.

4    Q    Okay.  And can one be an expert in assessing psychological

5    studies without being a clinical psychologist?

6    A    Absolutely.  There are plenty of them out there who do

7    exactly that.

8    Q    Okay.  And you would consider them experts in that field?

9    A    Yes.

10   Q    Okay.

11   A    There's plenty about contemporary psychology that has been

12   criticizable over the last 15 to 20 years.

13   Q    And, Dr. Regnerus, do you recall reading the

14   Sixth Circuit's opinion in the DeBoer case?

15   A    I think I have read it at one time.

16   Q    Okay.  Do you recall seeing anything at all in that

17   opinion about criticizing your study?

18   A    No.  I was -- if it exists, I was unaware of it until a

19   moment ago.

20   Q    Okay.

21        MR. SCHAERR:  Well, Your Honor, obviously we oppose

22   the Plaintiffs' motion to exclude any portions of Dr. Regnerus'

23   testimony.  We think he's fully qualified to express his

24   opinions in this case.  And we believe that his opinions will

25   be helpful to the Court.  And obviously he's simply responding

1    to the three expert reports and the two -- the many hours of

2    expert testimony that we've heard from the Plaintiffs.

3              THE COURT:  Anything else?

4              MR. SOUTHWICK:  Nothing further from Plaintiffs.

5              MR. TUCKER:  Your Honor, Ryan Tucker for the

6    Religious Schools.  We certainly do not object to the expert

7    testimony of this individual.

8              THE COURT:  So I thank you for the follow-up in the

9    examination.  He will be acknowledged as an expert.  But his --

10   I will look carefully at his opinions.  And it will go to

11   admissibility and weight to be given to it and expertise.  And,

12   you know, I do understand the distinctions in these studies.

13   And I do understand the distinction between a sociologist and a

14   psychologist.  So I think I can weigh and balance that in this

15   opinion.  But I appreciated the record that was made.  Thank

16   you.  Go ahead.

17             MR. SCHAERR:  Thank you, Your Honor.  We would also

18   move to admit Dr. Regnerus' expert report as Exhibit 26.

19             THE COURT:  Again, his report will be admitted.  The

20   Court retains and will retain the ability to evaluate that

21   report and to the extent it goes to weight and with regard to

22   how that report is used will be, again, looked at by the Court

23   over against the areas of expertise of this particular witness.

24             MR. SCHAERR:  Understood, Your Honor.  Thank you.

25             MS. SNYDER:  Your Honor, this is the Government

1    Defendants.  Just -- I understand the Court's ruling.  Just for

2    the record, we'd like to state an objection to the admission of

3    the report on hearsay.  I understand Your Honor has already

4    taken it into evidence.

5              THE COURT:  Right.

6              MS. SNYDER:  Thank you.

7              MR. SCHAERR:  May I proceed, Your Honor?

8              THE COURT:  Yes, please.

9              MR. SCHAERR:  Thank you.

10   BY MR. SCHAERR:

11   Q    Dr. Regnerus, are you aware of the generation study that

12   was conducted by Dr. Meyer and discussed in his testimony on

13   Thursday?

14   A    Yes, I am.

15   Q    Okay.  Can you briefly review for us what that study found

16   with respect to those members of the LGBT community in the

17   youngest cohort that Dr. Meyer looked at?

18   A    Right.  The generation study that -- in the particular

19   article that Dr. Meyer had coauthored -- noted statistically

20   higher suicide attempts across a lifetime -- higher reports of

21   everyday discrimination, higher psychological distress, greater

22   internalized homophobia all among the youngest cohort

23   18-to-25-year-olds -- in the generation study at the same time,

24   as they report lower levels of physical assault, lower levels

25   of sexual assault, less experience with being robbed,

1   threatened with violence.

2        This is unique in some ways to see, across a lifetime,

3   higher rates of reporting of these all the while happening

4   while American society has become more secular; demonstrated

5   less stigma on average; and the social support for LGBT

6   population, social support for same-sex marriage, et cetera,

7   has grown.

8        So Dr. Meyer's study reports that this -- youngest LGBT

9   adults -- even while they experience higher connection with the

10  LGBT community and no difference in felt stigma -- that the

11  situation remains that they seem in psychologically greater

12  distress across a variety of outcomes compared to their older

13  LGBT peers or cohorts in this study.

14  Q    Okay.  And, Dr. Regnerus, is that -- is that group or that

15  cohort that Dr. Meyer looked at -- is it -- is it limited to

16  members of the LGBT community who attend religious colleges?

17  A    No.  I think the -- that's without regard to like

18  attendance in college at all.

19  Q    So that's in the general population; is that correct?

20  A    As far as I can tell, yes.

21  Q    Okay.  Now, do these findings, in your opinion, have

22  relevance to this case beyond the opinions that Dr. Meyer

23  expressed last week?

24  A    Could you restate that question?

25  Q    Do these findings from Dr. Meyer have relevance in this

1  case beyond the opinions that Dr. Meyer expressed in his

2  testimony last week?

3  A    Yeah.  Yeah, I think so.  I mean, it suggests that

4  previous eras of LGBT students at Christian colleges and

5  universities were probably apt to have understood the unique

6  rules about sexual relationships, et cetera, as the norm, and

7  either they would -- abided by them or surreptitiously thwarted

8  them or simply elected to avoid them -- the colleges -- in the

9  first place, selecting universities that didn't have such

10  rules.

11 Q    Okay.  And does Dr. Meyer's analysis suggest that LGBT

12 students or college-age LGBT students are struggling in other

13 settings besides religious college?

14 A    Yes.

15 Q    Okay.

16 A    Yeah.  The evidence and the generations study declares so.

17 Q    Okay.  So it's a generalized problem?

18 A    It seems to be.  And it seems to be -- crossed different

19 kinds of data sets -- different data collection.  And I cited

20 several studies, including the Rutgers study that Hoogstra had

21 mentioned.

22 Q    Okay.  Well, let's -- and let's move into some of that --

23 some of that data.  Are you aware of any data to suggest that

24 the struggles faced by LGBT young people are more prevalent at

25 religious colleges than they are at secular colleges?

**CCCU-SER-094**

1    A    No.  Having reviewed the REAP study, which is exclusive to

2    CCCU-types of colleges, you see clear difference between LGBT

3    students and non-LGBT students.  But what we don't get from

4    that is a sense of comparison outside of those environments.

5    So I took it upon myself to examine some of the more recent

6    studies that focused on LGBT college students and were at other

7    kinds of institutions.  And --

8    Q    Okay.

9    A    -- they've seemed to be faring no better than the students

10   did at -- in the REAP study -- and sometimes worse.

11   Q    So you say the students in secular colleges are faring no

12   better than the students in the --

13   A    Right.

14   Q    -- in the REAP survey?

15   A    Yeah, it appears so.

16   Q    Well, let's -- and let's dig into that a little more.  I'm

17   going to show you what's been marked as CCCU Exhibit 1.  Or

18   rather Mr. Prince is going to show you.  Okay.  Do you

19   recognize this report, Dr. Regnerus?

20   A    I do.  I've read it.

21   Q    Okay.  And is this the REAP survey that you mentioned

22   earlier?

23   A    It is.

24   Q    Okay.  And what exactly did the REAP survey review?

25   A    They reviewed a variety of outcomes and behaviors, et

1    cetera, as well as experiences -- you know, experiences of

2    stigma, experiences of discipline -- and all of it in the CCCU

3    types of colleges and universities -- and compared LGBT

4    students versus non-LGBT students.  Everybody there is at one

5    of these kinds of CCCU-type of schools.

6    Q    Okay.  Thank you.

7           MR. SCHAERR:  Your Honor, we would move the admission

8    of CCCU Exhibit 1.

9           THE COURT:  Objections?  Anything else?

10          MR. SOUTHWICK:  No objections from Plaintiffs.

11          MS. SNYDER:  No objections from Government

12   Defendants, Your Honor.

13          MR. TUCKER:  And no objections from the Religious

14   Schools.

15          THE COURT:  Thank you.  It will be received.

16          MR. SCHAERR:  Thank you, Your Honor.

17   BY MR. SCHAERR:

18   Q    And do you recall whether the REAP survey mentioned the

19   rates at which LGBT students were disciplined for violations of

20   the school's sexuality policy?

21   A    I do.

22   Q    And do you recall what those rates were?

23   A    Well, in general -- this is among -- there was --

24   5 percent of respondents to the REAP report stated that they

25   had ever faced disciplinary action from their college or

1  university -- right? -- 5 percent.  Among that 5 percent --

2  small minority -- 12 percent reported the sexual code of

3  conduct as a reason for such an action.

4      So it means like if -- 0.05 times 0.12 -- you get 0.006 of

5  1 percent of all REAP survey respondents, or 6 out of every

6  1,000.  There was 3,001 kids in the study.  So we're talking

7  about 18 students out of 3,000 who were disciplined for this

8  particular reason.

9  Q    Okay.

10  A    So, you know, for context, the REAP survey administrators

11  point out that 10 percent of respondents self-identify as a

12  sexual minority or, if you want to be more generous, 12 percent

13  or even 30 percent, depends on how you measure it.  And so

14  we're talking about a lot of students here.  Right?

15  Potentially 300 to 360 to make it even 900 out of the 3,000

16  total in the study.  And we're talking about, you know, 18

17  students total who were disciplined by failing in -- with

18  regard to the sexual code of conduct.  Which having been a

19  student in that environment myself, you know, a lot of people

20  don't like the sexual code of conducts -- right? -- and chafe

21  against them.  So it's a small number, given the focus that

22  we've talked about on -- or heard about on discipline.

23  Q    Okay.  So is it fair to say, based on your review of the

24  REAP survey, that discipline of LGBT students based on the

25  school's sexuality policy is rare?

1    A    Yes.

2    Q    Okay.  Let's pull up what has been marked as CCCU

3    Exhibit 2.  And I'll ask you, Dr. Regnerus, if you recognize

4    this document.

5    A    I do.

6    Q    Okay.  And tell us what that is.

7    A    It's a sort of -- Rutgers University-based reports

8    comparing heterosexuals and what they call queer-spectrum

9    students across a variety of outcomes.  I think it was fielded

10   in 2017.  I mean, if it's published in 2018, I think it was

11   2017.  I'm not entirely sure -- pre-COVID era though.

12   Q    Okay.  And what did that study look at?

13   A    It looked at questions about like victimization, mental

14   health, basic emotional health, substance use, a variety of

15   things.

16   Q    Okay.  And did it focus on LGBT students?

17   A    Yes.  And compared to, you know, heterosexual students, it

18   was not -- if I'm not mistaken -- it was not -- yeah -- I guess

19   this was students only.  But it was not at like CCCU-type

20   schools.  Although there may by Christians among them, but it's

21   not a CCCU-based survey.

22   Q    Okay.  So it's a study of LGBT college students at secular

23   universities; is that fair?

24   A    That's fair.

25            THE COURT:  At the only public university in New

1   Jersey.

2          THE WITNESS:  That's right.  College of New Jersey --

3   no?  That's also public.

4          THE COURT:  Pardon?

5          MR. SCHAERR:  Yes.

6          THE WITNESS:  The College of New Jersey is also

7   public.

8          THE COURT:  But it's considered the only public

9   university in New Jersey.

10          THE WITNESS:  Okay.

11          THE COURT:  The main university.

12          MR. SCHAERR:  Your Honor, we would move the admission

13   of CCCU Exhibit 2.

14          MR. SOUTHWICK:  Plaintiffs have no objections to any

15   of CCCU's exhibits.

16          MS. SNYDER:  No objection, Your Honor.

17          THE COURT:  It will be received.

18          MR. SCHAERR:  Thank you, Your Honor.

19   BY MR. SCHAERR:

20   Q   Well, Dr. Regnerus, let's talk for a minute about what we

21   learned from the Rutgers study compared with the REAP survey.

22   Now, what, if anything -- and you've compared those two

23   studies; correct?

24   A   I did.

25   Q   And what, if anything, does that comparison show about the

1  mental health of LGBT students at religious colleges compared

2  with LGBT students at secular schools?

3  A    Right.  If we're going to evaluate them side by side, in

4  different kinds of samples at different kinds of times, my read

5  on it is that LGBT students who are in non-CCCU schools report

6  at least as high, if not higher, rates of emotional health

7  challenges, depression, anxiety, higher suicidality, if I

8  recall.

9       There's more outcomes in the Rutgers study than the REAP

10  study.  But in terms of victimization -- you know -- notably

11  higher alcohol use -- higher -- which kind of makes sense.  You

12  know, there's probably alcohol policies at CCCU schools.  But

13  there just seems to be a little -- notable more vulnerability

14  in non-CCCU schools.

15  Q    Okay.  So is it fair to say that to the extent the

16  outcomes in the two studies can be compared, LGBT students at

17  CCCU-type colleges fared no worse and, on many measures, better

18  than their counterparts at secular schools?

19  A    Yeah, that's correct.

20  Q    Okay.  So what effect, if any, does the fact that -- well,

21  let me back up.  Is it your understanding that the REAP review

22  was conducted during COVID and during the shutdowns --

23  A    Yes.

24  Q    -- associated with that?

25  A    According to the REAP document, it was fielded during the

1    COVID era.

2    Q    Okay.  And what effect, if any, does that fact have on

3    this comparison between the REAP survey and the Rutgers study?

4    A    Typically speaking, most data collection efforts we saw

5    during the COVID era of anybody, LGBT included, noted higher

6    anxiety rates, higher depression rates, more self-harm, et

7    cetera, during the COVID era.  The REAP survey was fielded

8    during the COVID era -- even though, you know, you have to look

9    at the dates in which it was fielded -- it was not admitted in

10   the text of it if I'm not mistaken -- such that I would say the

11   REAP survey should frankly be an overestimate of kind of

12   problems among students in CCCU schools, LGBT or not, given

13   that it was fielded during a sort of pandemic when we widely

14   recognized that young people were having above-average

15   difficulty.  And, frankly, before that, they were not in great

16   shape either.

17        I think it's fair to say that young adults in the United

18   States are in some measure of crisis -- particularly LGBT

19   students -- yes -- but it's wide.  And since the REAP study was

20   fielded during COVID, that would, on average, if it had been

21   fielded earlier, probably add some degree of additional levels

22   of depression, anxiety, et cetera to the results that is --

23   that's not revealed now.  So I took the liberty of trying to

24   find what else -- what other studies have been fielded during

25   the COVID era.  Because that does reflect sort of a more

1  pronounced experience of troubles.

2  Q    And we'll come to those in just a minute.  But just if we

3  can stay on a REAP report for a minute longer.

4  A    Sure.

5  Q    You mentioned that it was conducted during the COVID era.

6  If it had been conducted in more normal times, would you have

7  expected to see a -- would you expect -- would you have

8  expected to see students at CCCU schools do better or worse, in

9  general, compared to students at secular colleges?

10  A    If COVID had not occurred, and we weren't paying any

11  attention to the sampling dates of these, yeah, that should

12  remain stable in the sense of I would anticipate the nature and

13  dynamics of a lot of CCCU schools offering some degree of

14  generalized protection, especially from like alcohol-related

15  things, violence-related things.  And so those rates should be

16  lower still independent of COVID.

17  Q    Okay.  So the rates would have been lower still in the

18  CCCU schools; is that what you're saying?

19  A    Right.  Certainly in the way of anxiety.  Anxiety took a

20  spike during the COVID era.

21  Q    Okay.  Now, are the conclusions you drew from comparing

22  the REAP report and the Rutgers study consistent with what you

23  found elsewhere in the literature that you just mentioned?

24  A    Yes.  Yeah.

25  Q    And tell us about that.

**CCCU-SER-102**

1   A    Right.  So I took a look around at what else had been

2   fielded during the COVID era.  It was a unique opportunity for

3   data collection -- as they call it, a "natural experiment."

4   There's a survey by Vanderbilt University researchers -- about

5   477 LGBT college students ages 18 to 25 -- same as in the

6   generation study, which was not exclusively college students --

7   that was in April-June 2020.  In that, 61 percent of the

8   students recorded frequent mental distress, 65 percent reported

9   anxiety, 60 percent reported major depressions --

10  Q    Okay.  And these are --

11  A    -- in particular.

12  Q    Are these at secular universities?

13  A    Yeah, I believe so.  Yeah.  It was across a variety of

14  universities if I'm not mistaken.

15  Q    Okay.

16  A    They --

17  Q    And are those --

18  A    Those two kind of compare -- sorry -- go ahead.

19  Q    Are those rates that you mentioned higher or lower than

20  the rates and psychological difficulties as reported in the

21  REAP report?

22  A    On some things they're comparable, and some things they're

23  lower in terms of like -- well -- let me rephrase that.  There

24  are different kinds of measures.  There are clinical

25  measures -- markers -- right?

1  Q    Mm-hm.

2  A    For example, 61 percent said they had more frequent mental

3  distress, which was measured as 14 or more days per month of

4  not good mental health.  65 percent reported anxiety, which is

5  sort of a generalized anxiety disorder -- right? -- a clinical

6  term.  60 percent report a major depression based on patient

7  health questionnaire.

8       You go to REAP, you have comparable numbers, but they

9  typically -- they're self-reports of ever having experienced

10 depression -- okay? -- which is not current to the situation

11 necessarily -- like ever in, you know, your lifetime having

12 experienced depression.

13      64 percent report ever having experienced loneliness.  By

14 the way, compared to the Rutgers, I think it was 70 to

15 79 percent had -- of LGBT students -- had experienced

16 loneliness.  But 59 percent of the other -- rest of the

17 sample -- experienced loneliness.  College can be a lonely

18 experience.

19      73 percent had reported anxiety.  But these are ever --

20 they're just simple self-reports about ever having experienced

21 these things, which is decidedly different than sort of a

22 clinical marker in the present.

23 Q    Mm-hm.

24 A    So when you see that they're comparable numbers, but one's

25 a clinical marker in the present -- the Vanderbilt study -- and

1   one is ever having experienced this self-report -- in the REAP

2   survey -- I'm thinking that the Vanderbilt study is picking up,

3   on average, worse situations in the present than the REAP

4   survey has picked up in the present, although they ask about

5   the past, largely speaking.

6   Q    Okay.  So you recall some discussion in the -- in --

7   previously in this hearing about a 2016 study by Dr. Wolff.

8   A    Correct.

9   Q    Do you recall discussions of that study?  Now, are the

10  conclusions from your comparison consistent with that 2016

11  Wolff study?

12  A    Right.  Well, they're kind of different studies.  His is

13  largely qualitative -- interview-based.

14  Q    Mm-hm.

15  A    The ones I'm referring to are more survey-based analyses.

16  But they're coming from comparable kinds of samples or

17  populations -- CCCU-type schools.

18  Q    Mm-hm.

19  A    So Dr. Wolff, among other conclusions, remarks in that

20  significantly fewer symptoms of depression and social anxiety

21  were detected in the schools that he's focused on -- the

22  CCCU-type schools -- than compared to Catholic and mainline

23  Protestant colleges and universities, both of which tend to

24  have far more progressive behavioral policies and norms.

25       He seemed puzzled by that finding, yet, he acknowledged

1  that religion can offer a substantial amount of comfort and a

2  source of community.  So I think they are somewhat comparable

3  but, you know, quite different time frames.

4  Q    Mm-hm.

5  A    I don't believe -- you know -- I think that this was --

6  Wolff was well before COVID --

7  Q    Right.

8  A    -- and is a different kind of data collection effort.

9  Q    Okay.  But is it fair to say that the overall direction of

10 the Wolff study is similar to the basic conclusion that you

11 reached based on comparing the REAP review and the Rutgers

12 study?

13 A    Yes.

14 Q    Okay.  And I believe the Wolff 2016 study has already been

15 introduced as -- I think as Exhibit 6.

16         MR. SCHAERR:  Does that sound right to you, Paul?

17         MR. SOUTHWICK:  Gene, are you talking about

18 Dr. Wolff's expert report?

19         MR. SCHAERR:  No, his 2016 study.  Maybe I'll just go

20 ahead and move that into -- let's see -- Josh, can you show

21 that study to us with the exhibit number?  Yeah.  I understand

22 that is CCCU Exhibit 6.  Why don't we put that on the screen

23 and have Dr. Wolff identify it -- I'm sorry -- Dr. Regnerus.

24 BY MR. SCHAERR:

25 Q    Dr. Regnerus, is this the 2016 Wolff study that we've been

1    discussing?

2    A    I believe so, yes.

3            MR. SCHAERR:  And, Your Honor, we would move the

4    admission of that study.

5            THE COURT:  Any objection?

6            MS. SNYDER:  No objection from the Government

7    Defendants, Your Honor.

8            MR. SCHAERR:  Okay.  Thank you.

9            THE COURT:  No other objections?  All right.

10            MR. TUCKER:  No objections, Your Honor.

11            THE COURT:  Received.

12            MR. SCHAERR:  Okay.

13    BY MR. SCHAERR:

14    Q    Well, let's move on now and briefly discuss the theology

15    and related practices that are embraced by Christian colleges.

16    Is it your understanding that religious colleges often have

17    policies on sexuality and gender?

18    A    Yes.

19    Q    And do some of them forbid sexual activity outside of a

20    man-woman marriage?

21    A    I would bet that most of the CCCU schools do so.

22    Q    Okay.  And it's fair to say that would be what you would

23    view as probably a characteristic of what you've called the

24    CCCU-type schools; is that right?

25    A    Correct.

1    Q    Okay.  And based on your understanding, what is it that

2    informs those policies?

3    A    Right.  Well, they're mostly from the Protestant tradition

4    of Christianity.  And, historically, notions about Christian

5    sexuality have been -- long been fairly narrowly defined.  To

6    use the modern terms, they are typically heteronormative in

7    their approach to illicit relationships.  Their theological

8    anthropology -- to use that term -- or theology-informed

9    anthropology -- the understanding of the human person -- is

10   probably what we'd call cisnormative.  Right?  It's focused on

11   males and females, men and women.  And these have long been

12   utterly uncontroversial.

13        Now, the policies have long been probably chafed against,

14   as I mentioned before, but not contested in such a live and

15   systematic manner.

16   Q    Okay.

17   A    So -- I'm sorry.  I can --

18   Q    Well, and -- go ahead.

19   A    All right.  So, I mean, Christian commitments, theological

20   commitments of the body, the meaning of sex, sort of the point

21   of relationships, the significance of marriage and child

22   bearing are very old.  They differ somewhat across these

23   different kinds of schools by denomination, et cetera.  But

24   there's kind of a consistent strain to them, I think we can

25   agree.

1   Q    Okay.  And are those beliefs and policies typically
2   grounded in the Bible or other sources?
3   A    In the CCCU, they are typically grounded in the Bible and
4   interpretations thereof.
5   Q    Okay.  And have you formed an opinion, as a sociologist
6   who studies religion, on what would happen to religious
7   colleges that adhere to this theological framework if they
8   tried to make their policies more accommodating towards
9   homosexual and maybe gender-transitioning behavior?
10  A    Right, I have.
11           MR. SOUTHWICK:  Objection, lack of foundation,
12  speculation.
13           MR. SCHAERR:  It's within his expertise and part of
14  his analysis.
15           THE COURT:  I'm going to sustain the objection.
16  BY MR. SCHAERR:
17  Q    Okay.  So you were -- we discussed that you're a
18  sociologist who studies religion.  Correct, Dr. Regnerus?
19  A    That is correct.
20  Q    Okay.  And we've discussed the theological framework on
21  which these -- these policies on what you called "CCCU-type
22  schools" are based; is that right?
23  A    Right.
24  Q    And you've been a professor at a CCCU school; right?
25  A    Briefly, yes.

1    Q    At Calvin College?

2    A    Correct.

3    Q    And so you have some direct experience with an institution

4    that follows that framework; correct?

5    A    Correct.

6    Q    And I think you told me that you were a student at that

7    kind of a college as an undergraduate.

8    A    I was.

9    Q    Okay.  So you have extensive personal experience with this

10   kind of institution --

11   A    I do.

12   Q    -- is that fair?

13   A    Yes.

14   Q    And you've also -- in the court for this case and in other

15   settings -- you've also studied those institutions and what

16   makes them tick; right?

17   A    Yes.  You know, not directly study those institutions.

18   But insofar as studying young adults, Christian and otherwise,

19   yes.

20   Q    Okay.  So based on your experience as a student and a

21   professor at a CCCU-type religious school, how do you think --

22   how do you think the broader community that feeds students to

23   that school, for example, would react if the school tried to

24   change their policies about homosexual and gender transitioning

25   behavior?

1           MR. SOUTHWICK:  Same objections.  Lack of foundation,

2   speculation regarding how unnamed people in the community might

3   feel about policy changes.

4           THE COURT:  Sustained.

5           MR. SCHAERR:  It's a part of -- okay.

6   BY MR. SCHAERR:

7   Q    Well, based on your experience, Dr. Regnerus, what do you

8   believe would happen to the religious character of those

9   colleges if they abandoned their Bible-based policies?

10  A    Their religious character would be up for grabs.  Because

11  the contestation of this kind of thing would create a

12  secularizing force within those universities.  They would have

13  decisions to make about, "Do we tweak the policy a little bit?

14  How much is -- can we feel like we can tweak it?  Is it --

15  what's too much to give away in terms of their particular

16  theological traditions and understandings of the human body,

17  relationships, human sexuality, et cetera?"

18          So you'll see a lot of handwringing, you'll see a lot of

19  meetings over this and, frankly, a lot of these schools it will

20  come down to an understanding of whether they can afford to

21  retain their policy and still survive.  And if that's the

22  decision they have to make, they will either alter it in order

23  to stay open, or they will not alter it and see what happens.

24  But usually this is a case where only the strong, in terms of

25  the financially most stable among these universities, will make

1    it if they don't change.

2        But, frankly, to think about like how do they change it,

3    they'll be faced with a host of questions not only about the

4    present -- you know, what must we do to tweak our policies not

5    to discriminate -- but also like the anticipatory of the

6    future.  Because, you know, oftentimes the plus in LGBT+ is

7    about, you know, forms of sexual orientation or gender identity

8    or combinations thereof that are coming -- emergent in some

9    ways.  So it's kind of asking them to move their boundary marks

10   but in an unclear environment.

11       So I think it would create, frankly, like serious crises

12   at a lot of different schools -- most of the CCCU schools --

13   and create sort of chaos within prior to the -- when they have

14   to make up decisions on this stuff and live with it.

15   Q    Okay.  And you mentioned that some of them would be

16   financially strong enough that they would feel like they could

17   retain their traditional historical understanding of sexuality;

18   right?

19   A    Right.  Typically, depending on if they're

20   tuition-dependent.  If they're tuition-dependent, then they're

21   in serious trouble.

22   Q    Okay.  And so for those who are less tuition-dependent,

23   what would the impact of somebody's forcing -- trying to force

24   them to abandon their traditional policies be on the class of

25   students that they can accept and serve?

1    A    Right.  They would probably not change much about the

2    students they're enrolling there.  It's the universities that

3    are sort of -- will be financially stressed by this that -- you

4    know -- not having access to Stafford Loans and Pell Grants

5    would be -- make for a much more challenging decision-making

6    environment for them.

7    Q    Okay.  And does that also mean that they would have to

8    turn away some students who would otherwise like to go there

9    but could no longer afford to because they don't have federal

10   support?

11   A    Not knowing how admissions works in any of these

12   schools -- admissions is often, so far as I can tell, based on

13   educated guess works and algorithms.  And so I think a lot of

14   those would have to shift quite significantly.

15   Q    Okay.  And they might shift away from students who were

16   financially needy; is that fair?

17   A    That would be more speculative on my behalf.  But if

18   they're looking for people who can afford it, who don't need

19   help, that's who they would be primarily interested in, I

20   suspect.

21   Q    Okay.  And is it fair to say also that what you called

22   CCCU-type institutions are trying to build what they would

23   consider Christian communities?

24   A    Yeah.  It's my experience, personally, and also my

25   observation --

1  Q    Mm-hm.

2  A    -- that the kind of community that they purport to create

3  for students is one of their primary sort of advertising

4  points.

5  Q    Okay.  And is part of that effort to create a Christian

6  community offering a community where -- where people -- where

7  the entire community is committed to living traditional

8  Christian teachings?

9  A    Yes.  You know, most students going to these schools are

10  aware of their relationships, policies, or become aware of them

11  shortly after they get to campus.  And so it's kind of the

12  deal.  Sometimes it's -- you go in assuming there's a policy

13  even if you don't know it yet.  But -- and lots of people are

14  attracted to that.

15      I would presume that most people who elect to attend a

16  school like this are attracted to that notion at least, you

17  know, at the beginning.  I mean, lots of people can rethink

18  their love for the relationship policies after they're

19  enrolled.  And that applies to all manner of kinds of students.

20  But most of the time people going in saying, "This is what I

21  want."

22  Q    Mm-hm.

23  A    Today more than ever people apply to more schools and

24  get -- seem to give a lot more thought to it than ever before,

25  which taxes the algorithms of lots of these schools.  "Hey, if

1   you're applying to eight or ten schools, and you only go to

2   one, what chance do they have of coming here?"

3   Q     Sure.  So as you understand it, Dr. Regnerus, what's your

4   understanding of the evidence on the number of LGBT students

5   who decide to go to CCCU-type colleges even with their

6   sexuality and gender policies?

7   A     Yeah.  That's challenging.  And I reviewed the estimates.

8   I'm thinking that was Dr. Coley who made that if I'm not

9   mistaken.  I know the term 100,000 -- or the word -- the

10  number 100,000 was tossed out, but it possibly is as large as

11  133,000.

12      Now, I think it was Dr. Coley who kind of evaluated this

13  based on sort of how many LGBT, you know, 17 to 18-year-olds

14  should we presume there to be in the country, and then let's

15  sort of apply that to the schools.  But I think there's a lot

16  of self-selectivity that goes on here that he didn't really

17  account for.  I think that there's a fair number who decide

18  that this is, you know, not what they want and don't enroll in

19  the first place --

20  Q     Mm-hm.

21  A     -- more likely don't even apply in the first place.  Or if

22  they apply and enroll, some of them have negative experiences

23  or decide that, you know, college is a time for

24  experimentation, et cetera, and they decide, "Well, maybe this

25  is not for me, and I'll transfer somewhere else."  The United

1    States educational institutions are some of the most forgiving

2    in the world.  I mean, people enroll here, enroll there, two to

3    three different places.  So it's a pretty strong free market in

4    higher ed.

5    Q    Okay.  Now -- but in all events you agree with the

6    Plaintiffs' experts that, at a minimum, it's a significant

7    number of LGBT --

8    A    Yeah.

9    Q    -- students who choose to go to CCCU-type colleges; right?

10   A    Yes.  Yes, for sure.

11   Q    And per your review and your own experience, do you have

12   an understanding of why members of the LGBT population might

13   choose to attend the CCCU-type school?

14   A    Yeah.  I presume that, going in, they have quite similar

15   evaluations as non-LGBT students going in.  They recognize, on

16   average, I suspect, that -- they're aware of the relationship

17   policies, and they want to abide by them.  Sometimes they're

18   not aware, or sometimes they're not aware of the scope of it.

19   But, you know, most of the students enrolling in these things

20   understand it's a Christian institution, Christian-based

21   policies, and desire the kind of environment that that college

22   offers.

23        And, you know, I think both LGBT and non-LGBT students

24   recognize that Christian sexual morality is not simple, not

25   easy.  There's a costly kind of obedience to it.  But there's

**CCCU-SER-116**

1  also forgiveness and the supposition of a community of support

2  for living out difficult things.  So I presume that they're

3  interested in that as much as non-LGBT students.

4  Q    Okay.  And did you review any literature on the mental

5  health of LGBT persons who decide to live celibate lives in

6  order to be able to live consistently with their Christian

7  beliefs?

8  A    Well, insofar as we're talking about the Yarhouse study,

9  yes.  I mean, here's not a lot written on the subject so far as

10  I can tell.

11  Q    Hm.

12  A    And in the Yarhouse book, he talks about -- I think it's

13  300 persons in his study.  And they live in different kinds of

14  situations.  Some are in what they call "mixed-orientation

15  marriages."  Some like to live celibate lives.

16      Anyways, he pools these and reports that 80 percent of

17  them appear in the normal range for depression; 90 percent in

18  the normal range for anxiety; and a little bit lower --

19  63 percent -- for life satisfaction.  So compared to like

20  normal ranges -- you know -- like the average for the

21  population for their age.

22      So it's -- you know -- he also characterizes this life as

23  challenging and not simple, yet, it can be rewarding in terms

24  of family life, and shared children, friendship and love

25  between spouses.  But he noticed too that -- you know -- he had

1   bisexual and homosexuals in the study.  Homosexuality is more
2   apt to contribute to divorce than bisexuality was.  So it's a
3   mixed, complex situation.
4   Q    Okay.  And the Yarhouse study that you mentioned is the
5   study that's discussed in paragraph 38 of your report; is that
6   right?
7   A    I believe so, yes.
8   Q    And how did Dr. Yarhouse's figures compare with the
9   general background rate of depression and anxiety and distress,
10  again, in the broader population?
11  A    Right.  On average, compared to the broader population of
12  adults and different kinds of situations and settings, the
13  relationship status is comparable.
14  Q    Mm-hm.
15  A    LGBT adults tend to have higher rates of emotional health
16  difficulties, self-reported or clinical.
17  Q    Mm-hm.
18  A    So they appear better than their average peers.  At the
19  same time, it's a -- you know -- it's a self-selected sample
20  that Yarhouse employs in this.  So I wouldn't want to set the
21  precedent of comparing self-selected samples too closely with
22  population averages, because there are different kinds of
23  types.
24  Q    Okay.  And do you have any sense of the background rate of
25  depression and other mental illness in the LGBT population at

1    large?

2    A    I think in terms of the rates of adult depression, it's --

3    if I'm not mistaken -- it's between 30 and 40 percent but, I

4    mean, you know, experienced over timed.  Right?  It's not

5    necessarily at any one point in time.

6    Q    Mm-hm.

7    A    People move in and out of depressive episodes, et cetera,

8    higher than what Yarhouse is seeing.

9    Q    Okay.

10   A    But, again, it's not quite the ideal comparison.

11   Q    Sure.  All right.  Does the literature address a category

12   of LGBT adults who decide to enter what are called

13   "mixed-orientation relationships"?

14   A    It does.  And there's not a lot of literature on that.

15   Q    Mm-hm.

16   A    But there's some.  And I located kind of a -- an

17   evaluation of the literature on this subject published I think

18   in 2011 to 2015.

19   Q    Okay.  And is that something that a member of the LGBT

20   community, who is also a devout Christian, might consider as a

21   way of trying to follow their Christian beliefs?

22   A    They could and some do.

23   Q    Mm-hm.

24   A    I don't have a good sense of how many.

25   Q    Mm-hm.

1   A    I'm sure it's a minority though.

2   Q    Okay.  And what impacts, if any, would being at a

3   CCCU-type institution have on their ability to make that

4   choice?

5   A    I'm not sure I followed that question.  Could you repeat

6   again?

7   Q    Okay.  Would such a person's decision to attend a

8   CCCU-type institution -- would that assist or deter them or

9   harm them in trying to live that model?

10  A    Oh, yeah.  I presume it would assist them, provided they

11  found a community of social support and sort of the ability to

12  speak freely, get counseling, and find encouragement on what is

13  obviously a difficult, challenging pathway.

14  Q    Sure.  And would the same be true for members of the LGBT

15  community who decide they want to be celibate, at least for a

16  time?

17  A    Could they -- they would find comparable kinds of support.

18  You know, it varies.  And I recognize that this case is built

19  in part by people's self-reports of decidedly different kinds

20  of experience.

21  Q    Sure.

22  A    But I believe a CCCU purports and attempts to demonstrate

23  kind of a gracious community and assist people in living

24  Christian life in various ways and shapes and forms, not just

25  around the matter of sexuality.  But, as I mentioned before,

1   Christian life is -- I think it was (indiscernible) -- it's
2   nothing if not difficult.  So I think part of their
3   understanding is this is a community that is aimed to help
4   people do difficult things --
5   Q    Okay.
6   A    -- whether they're LGBT or not.
7   Q    Okay.  And so you said earlier that CCCU-type institutions
8   would typically provide a community of people who were trying
9   to live the Christian faith regardless of the difficult
10  circumstances that they find themselves in; right?
11  A    Right.  That seemed to be the case.  Yes.
12  Q    Okay.  And so is it fair to say that an LGBT student who's
13  decided that he or she wants to live a celibate lifestyle, at
14  least while they're in college, would likely find support for
15  that in a CCCU-type institution?
16  A    Yes.  I think they recognize that they have to be -- it
17  could be a challenge to locate that.  But so far as I'm
18  familiar with the CCCU world -- and I'm somewhat familiar with
19  it -- you know, they find that some people can be trusted more
20  than others, et cetera.  Most of these universities, especially
21  in their administrations and in their student life
22  organizations, care deeply about people and want to help them
23  do, you know, difficult things.  And that holds whether they're
24  LGBT or not.
25       I mean, when you are 18 to 23 and in college, whether

1  you're gay or straight, hewing to sexual relationship behavior

2  norms and rules is not simple.  It reminds me a little bit of

3  the old Dallas Cowboys Head Coach Tom Landry.  He says, "My job

4  as a football coach is trying to get men to do what they don't

5  want to do so that that can become what they always want to

6  be" -- you know -- football players.

7  Q    Mm-hm.

8  A    So it's like I think that's how the CCCU understands this.

9  It's like our job is to help students become, you know, not

10  just better educated but more mature Christians, even if, at

11  any given day or weekend, lots of them don't really wish to be.

12  So it's a challenge.  But it's -- I think it's a challenge

13  that's central to their identity as organizations.

14  Q    Okay.  So, Dr. Regnerus, what role might bisexuality or

15  sexual orientation fluidity play in the attractiveness of

16  Christian colleges for members of the LGBT community?

17  A    So Dr. Meyer said the other day -- and it's kind of

18  passing -- and I'm not sure I'll -- I might be paraphrasing

19  these things -- "There are all kinds of combinations that are

20  possible, though perhaps not common."

21       As the wider academic community around the study of sexual

22  orientation recognizes the increasing role of fluidity, both in

23  sexual orientation and in gender ideology -- especially for

24  women but not exclusively so for women -- as that continues to

25  be the case, it's not a stretch for me to think that

1  students -- again, more women than men -- would get to --

2  frankly, I mean, there's probably two-thirds women at most of

3  these CCCU schools in general --

4  Q    Mm-hm.

5  A    -- because of skewed sex ratios -- would get to campus.

6  And, you know, from my work on the third book I published at

7  Oxford, I had a slide in there where it shows that the share of

8  younger adult women who called themselves 100 percent

9  heterosexual, plunges age 18 down through like age 30.  And

10  then it starts another climb up to -- and then surpasses the

11  share of men who do this.

12       There's definitely a U-shaped curve around heterosexuality

13  self-identified among young adult women.  So -- and I can only

14  surmise from that, that during the college experience, there

15  are more women experimenting who have described themselves or

16  their sexual orientation perhaps as somewhat fluent.  Right?

17       Now, that experience -- you know -- they may be

18  experimenting.  At the same time, there's these rules that are

19  fairly fixed in their university about relationship and elicit

20  behavior.  It's plausible to me that the stability of the

21  rules -- while that may by irritating to them -- but it's

22  something that helps them, too, to become what they want to be

23  down the road.

24       Again, it's like -- it's an interesting time in these

25  people's lives.  There's still identity formation going on.

1   There is -- as I just said about the -- sort of the skewed sex

2   ratios -- those make for difficult relationship environments on

3   campus when half of -- a third of the population on campus is

4   male and up to two-thirds is female.

5       So, you know, I can see how these rules are kind of a

6   guide star for people who are in an awkward time of life and in

7   awkward sex ratio scenarios basically.

8   Q    And you can see how those rules, as you put it earlier,

9   would help them to become what they in fact want to be or at

10  least --

11  A    I mean, those things remain stable --

12  Q    Mm-hm.

13  A    -- while they are in sort of this period of searching and

14  at least self-perceived change.

15  Q    Okay.  And --

16          THE COURT:  Counsel, I just want to let everyone

17  know.  It is now 11:30.  And I'm very serious.  I have another

18  docket that starts at 1:00.  That's all the time I have today

19  and the rest of the week.  So I'm going to suggest that -- to

20  the extent that this testimony is going to be helpful -- that

21  we narrow in on what issues actually I need to address and what

22  would be helpful.

23          MR. SCHAERR:  Sure, Your Honor.  And I have just a

24  couple more questions on this topic.  And then I'm -- then I

25  think I'm just about done.  Would the Court prefer to take a

**CCCU-SER-124**

1    break now, or should we keep going?

2          THE COURT:  No.  I don't think there's time for a

3    break --

4          MR. SCHAERR:  Okay.

5          THE COURT:  -- because I suspect there will be a

6    somewhat lengthy cross.  And I'm suggesting that -- I am -- I

7    am very capable of evaluating the testimony and giving what

8    weight it's due, and that people focus on the issues that I

9    need to address in this PI hearing.

10         MR. SCHAERR:  Okay.  Well, thank you, Your Honor.

11   BY MR. SCHAERR:

12   Q    Dr. Regnerus, let's just quickly finish up on this point.

13   In your expert opinion, what do you -- what do you think about

14   whether religious colleges embracing traditional Christian

15   theology on sexuality might be a good fit for LGBT students who

16   are seeking to reconcile their sexuality and/or gender identity

17   with the traditional Christian faith?

18   A    Right.  If that's what they wish, and it's a self-selected

19   higher ed environment out there, I think it's a pretty good

20   place to go.  Because if you look at the higher ed offerings in

21   the United States, there's thousands of colleges and

22   universities, but there's not that many sort of distinctively

23   Christian colleges and universities like the CCCU-type.

24         So people have every option to go other places.  So we

25   should make some presumptions about the people who elect to go

1  here intentionally, willingly, recognizing that, you know,

2  they're persons in formation.  And it can be a challenging

3  four-plus years.  But I think, you know, it's a -- it's good

4  place for community that cares about people.  I recognize that

5  it can not always be a great fit.

6      But, in general, like we -- we see their -- sort of the

7  rates of success even in the REAP report, which, you know, was

8  fielded in the COVID era -- the rates of challenges and

9  difficulties on campus are better than off campus or better

10  than other secular campuses on average.

11  Q    Okay.  And, Dr. Regnerus, what role do you see CCCU-type

12  colleges playing in the diversity of the higher education

13  marketplace?

14  A    Right.  I think they play a pivotal role.  They have lots

15  of fans out there, parents, multigenerations of people who have

16  attended particular schools like them.  They are growing.  They

17  grew during the COVID era, decisively, even while lots of

18  colleges receded.

19  Q    Mm-hm.

20  A    People taking time off, et cetera.  So I think there's

21  demand for such schools.  But most of those schools are

22  constantly cash-strapped, constantly tuition-dependent.  And so

23  I think altering the rules here around this will send a lot of

24  them into a desperate search for whether they can make it or

25  not, and challenges to sort of the idea of whether they can

1  retain their relationship policies as is, or whether they could

2  tweak them sufficiently and yet not give up their sort of

3  Christian character and the ways in which they sort of hinge on

4  a longstanding Christian understanding of human sexuality and

5  the meaning of the body and relationships, including marriage.

6  Q    Okay.  Just two final questions to wrap up, Dr. Regnerus.

7  In summary, just based on your review of the evidence presented

8  by Plaintiffs' experts and your own review of the literature,

9  do you consider there to be a mental health crisis among LGBT

10 young people in general?

11 A    Yes.

12 Q    And --

13 A    It's not limited to LGBT youth, though.  It's a mental

14 health crisis among young people in general.

15 Q    Okay.  And have you seen any evidence to suggest that

16 religious colleges or religious teachings or policies are the

17 cause of that crisis?

18 A    I don't see evidence of the cause of the crisis --

19 obviously a sight of conflict in this debate.  But I see no

20 evidence that they're a uniquely demonstrable cause in that

21 crisis.

22 Q    Okay.  Thank you.

23         MR. SCHAERR:  I have no further questions for this

24 witness at this time.

25         THE COURT:  Cross for the Plaintiffs.

1

2                    CROSS-EXAMINATION  (Continued)

3    BY MR. SOUTHWICK:

4    Q    Good morning, Mr. Regnerus.  Thank you for being here

5    today.  I'm going to ask you some additional follow-up

6    questions.  I believe you just testified that there is indeed a

7    mental health crisis for LGBTQ young people, and that that is

8    not unique to religious college environments, but that in fact

9    it is a verifiable thing in society; is that correct?

10   A    Correct.

11   Q    So if there's a mental health crisis for LGBT young

12   people, don't you think that that would tell you that they

13   might need greater help and greater protections given the

14   crisis?

15   A    I think that's -- you know -- greater help for sure.  I

16   think that one of the questions that is often not addressed

17   here is like how should that help come, from whom should it

18   come, what should the nature of that assistance be, and how are

19   college administrations sort of responsible for all this?

20        I mean, higher ed is asked to do tons of things these

21   days.  And administrations are growing in size.  And so I see

22   that help being offered.  But it raises, of course, lots of

23   questions about how best to assist.

24   Q    Mr. Regnerus, you did some comparisons between the REAP

25   report and -- which is Exhibit 1 -- and the Rutgers report,

1  which is Exhibit 2 for the Counsel Defendants.  Do you recall

2  that testimony?

3  A    I do, yes.

4  Q    And I'm not going to go through all of that.  But I do

5  want to point out and ask you a few questions.  I'd like to

6  compare page 20 of the REAP report -- so, again, Council

7  Exhibit 1, page 20 -- which has a chart about level of

8  perceived support from college.

9  A    Do you want me to pull that up myself or --

10  Q    Yeah, if you could.

11  A    Okay.

12      MR. SCHAERR:  Maybe we could ask Mr. Prince to pull

13  that up so we could all see it.

14      THE WITNESS:  What page and table number did you say?

15      THE COURT:  20.

16  BY MR. SOUTHWICK:

17  Q    It's Page No. 20 of Exhibit 1 of the REAP report.

18  A    Got it.

19  Q    Yeah.  And this is the level of perceived support from

20  college.  It's a bit -- it looks a bit blurry there.  But there

21  is a question in there that says -- that asks -- perceived

22  support from college -- there we go -- and there's questions

23  about whether people feel physically safe, whether they're

24  being prepared for graduation.  I'd like to go down to the

25  section that says, "I feel as though I belong on campus."  So

1  right here.

2  A    Right.

3  Q    Right here.  And the data, according to the REAP report,

4  appears to be that only 16 percent of gender minority students

5  and 23 percent of LGBTQ+ students agree that they feel as

6  though they belong on campus.  Is that a fair summary of this

7  data from the REAP report?

8  A    Yes, insofar as -- you know -- I mean, this is fielded

9  while most of them were not on campus.  So it's a little bit

10 funky to ask a question about how they feel belonging on campus

11 when they could well have been in, you know, month five or six

12 of an off-campus experience.  But, yeah, in general, I presume

13 they're reflecting on that.  And then it's statistically

14 probably significantly lower than straight respondents.

15     At the same time, you know, only 46 percent of straight

16 students reported they feel they belong on campus.  In general,

17 you know, you've got a lot of people who don't feel like they

18 belong, which is -- you know -- it's interesting.  I would

19 surmise, short of confidence, that those numbers are even

20 higher in terms of feeling like they don't belong at secular

21 universities.  But I don't have that kind of comparison here.

22 Q    Well, Mr. Regnerus, we actually do have that comparison,

23 and that's --

24 A    We do?  All right.

25 Q    And that's Exhibit 2 -- the Rutgers report -- pages 14 and

**CCCU-SER-130**

15.  And page 14 asks campus climate for heterosexual and

queer-spectrum students -- question being "I feel like I belong

at this university."  55 percent of heterosexual agreed.

48 percent of queer-spectrum agreed.  Do you see that?

A    Yes.  Statistically, probably significantly different, but

higher at least in terms of queer-spectrum students than --

Q    Right.  So --

A    Right.  (Indiscernible).

Q    -- it's a pretty stark contrast.

A    That was also --

THE COURT:  Wait.  Please stop.  Stop.  Please one of

you ask a question, take a breath, answer the question.  Please

quit speaking over one another.

THE WITNESS:  My apologizes, Your Honor.

MR. SOUTHWICK:  Mine as well.

BY MR. SOUTHWICK:

Q    Mr. Regnerus, are you able to see this chart here?

A    Yeah, if you could blow it up just a bit.

Q    Just a bit?  So we're looking at Exhibit 2, page 14.  And

there's a section right here.  "I feel like I belong at this

university."  And does it appear that approximately 55 percent

of heterosexual students and 40 -- almost 48 percent of

queer-spectrum students agree?

A    Right.  So that means it's almost, on average, about --

probably a little bit above 50-some percent compared to the

last line, which would be lower than 50 percent.  But it's

also -- you know -- they're fielded at very different times.

So there is a -- a decided COVID effect that we just don't know

that -- the magnitude of that effect.  And then also the

different kinds of questions -- they're asking about "my

university," and the other one, if I'm not mistaken, is about

"on campus."  Right?  They're just -- you know -- they're just

different.

Q    Fair enough.  Fair enough.  But the heterosexual and

queer-spectrum responses in Exhibit 2 are pretty close.

There's only a -- a what? -- an 8 percent difference; right?

And then if we look at the REAP report, it's 23 versus 46.  So

there's actually a 23-point difference; is that right?

A    Right.  In the Rutger study, it looks like they coalesced

or pooled together those who "agreed" and "strongly disagreed."

I don't offhand know how the REAP report described that.

There's a simple "yes/no."

Q    And then the second page -- or, sorry -- the next page of

the Rutgers report, which is page 15, asked campus climate

comparison of trans-spectrum and cisgender peers.  And in that

same question, "I feel like I belong at the university,"

54 percent of cisgender agreed, and 38 percent of

trans-spectrum agreed.  Does that look correct?

A    Yeah.  Except it should be compared to the questions

immediately above it about being valued as an individual.  I

1   mean, there should be a correlation between being valued as an

2   individual and feeling like you belong on the campus or at the

3   university.  But one of those yields higher, on average, rates

4   than the other one.  Right?

5       So belongingness and valuedness (sic) -- and then I would

6   compare it to sort of how the REAP question -- you know -- it's

7   tricky to make direct comparisons given quite different

8   samples, different times, and different question wordings.  At

9   the same time, I agree, I see a difference here.

10  Q    Looking back at Council Exhibit No. 1, the REAP report,

11  page 22, a series of questions were asked about on-campus

12  participation among sexual minority, gender minority, and

13  straight students.  And there's a chart about them feeling

14  accepted by others, dating the person you want.

15      And I'm actually look at page 22 of the REAP report.

16  Yeah, that chart right there.  And the first category is

17  feeling accepted by others.  And it's whether or not -- whether

18  they are likely to report not being able to fully participate

19  in college life in their heterosexual and cisgender peers.

20      So for sexual minority students, 43 percent report not

21  being able to fully participate, 48 percent of gender minority,

22  and 4 percent of straight.  Do you see that, Dr. Regnerus?

23  A    Feeling accepted, not fully participate.

24  Q    Right.  Whether or not --

25  A    I mean (indiscernible) --

1   Q    Yeah.  So here sexual and gender minority students appear

2   to have much higher percentages of not feeling accepted by

3   others as compared to straight students; is that correct?

4   A    At face value.

5   Q    And, Mr. Regnerus, have you reviewed any data that would

6   contradict this finding of the REAP report?

7   A    Not directly, though you just looked on the columns.  You

8   know, when you get specific about, you know, joining clubs,

9   prayer groups, dating who you want, having a roommate of your

10  choice -- there's distinctions, but they are a lot smaller

11  distinctions.  So it seems to be tapping kind of -- that first

12  question -- a subjective sense of what other people think of

13  them, not necessarily of whether they are actually -- you

14  know -- have a failure of access to roommates, prayer club,

15  clubs, classes.

16       So they seem -- one seems to be a decidedly more

17  psychological measure.  The other one seems to be like a series

18  of access measures.

19  Q    Mr. Regnerus, would you agree that dating can be a very

20  important part of the college experience for a lot of students,

21  both at CCCU campuses and elsewhere?

22  A    It seems to be less important today than when I was in

23  school.  But, yeah, I mean, historically the 20s -- early

24  20s -- were when you started dating.

25  Q    And according to this data, 25 percent of sexual minority

1   students and 30 percent of gender minority students report that

2   they are not able to date the person that they want.  And

3   that's in contrast to 2 percent of straight students.

4   A    I see that.

5   Q    Is that correct?  Do you have any data that contradicts

6   this assessment here?

7   A    I don't.  Again, at face value, that means three-quarters

8   of the sexual minority don't feel difficulty in that.

9   Q    I apologize.

10          MR. PRINCE:  Mr. --

11          MR. SOUTHWICK:  I'm done with this exhibit.  Thank

12   you, Josh, for your help.  I appreciate that.

13   BY MR. SOUTHWICK:

14   Q    Mr. Regnerus, do you recall being part of a group of

15   sociologists who provided an amicus brief in the Masterpiece

16   Cakeshop v. Colorado Civil Rights Commission case at the

17   Supreme Court in 2017?

18   A    I do.

19   Q    And can you --

20          MR. SOUTHWICK:  Oh, Gene might be trying to say

21   something.

22          MR. SCHAERR:  I was trying to saying something.  I'd

23   like to object to this on relevance grounds.

24          MR. SOUTHWICK:  Your Honor, I'm going to ask

25   Mr. Regnerus about some of his statements regarding structural

1   stigma in this brief.  And I believe that -- to cross-examine

2   him regarding his testimony about structural stigma earlier.

3             THE COURT:  Overruled.  Go ahead.

4   BY MR. SOUTHWICK:

5   Q    Mr. Regnerus, in this brief, you state, "That Antigay

6   discrimination can diminish psychological and physical health

7   is widely acknowledged."  Do you recall that?

8   A    I do.  Do you have a copy of the brief that I could look

9   at?

10  Q    Sure.

11  A    It's been a while since I've looked at it.

12  Q    I can pull it up here on my screen.  Give me one second.

13            MS. SNYDER:  And, Paul, could I also ask that you

14  have somebody email that to me?

15            MR. SOUTHWICK:  Sure.  Okay.  Let me make sure that

16  this popped up.  Okay.  All right.  We'll have that sent

17  around.

18  BY MR. SOUTHWICK:

19  Q    And I'm not trying to introduce this into evidence or

20  anything, but I did want to ask you about some of your

21  statements.  So this is the -- this is the brief I'm referring

22  to here.  And it looks like it was filed on behalf of you and a

23  few others.  Do you recall this brief, generally, Mr. Regnerus?

24  A    Generally, yes.

25  Q    All right.  And the question before the Court was about a

1   Colorado public accommodation law.  This is the wedding cake

2   case; right?

3   A    Yep.

4   Q    As it's called in general parlance.  All right.  And can

5   you inform the Court of the purpose of the brief that you filed

6   in this matter?

7   A    Yeah.  By looking at what you have on the screen?  Or if

8   I -- I could pull it up myself and quickly review it.

9   Q    Do you recall that it had to do with structural stigma or

10  antigay stigma and the effects that that may or may not have on

11  LGBT people?

12  A    Yeah.  That was part of the brief.  Yes.

13  Q    Okay.  And what I'm looking at here is on page -- the top

14  of page 5.  This statement -- this statement here where you

15  state, "That antigay discrimination can diminish psychological

16  and physical health is widely acknowledged."  So, Mr. Regnerus,

17  do you stand by that statement today?

18  A    Yes.

19  Q    All right.  Mr. Regnerus, in your -- I'd like to turn back

20  to your expert report.  So let me pull your report up.  Okay.

21  A    Paul, this is a follow-up to that, if I may?

22  Q    Sure.

23  A    The word "can" is kind of essential to that statement.

24  Because I go on to describe why I did not think the particular

25  case in Colorado rose to that kind of level.  In social

1    science, lots of us use the words "can" or "may."  In my

2    report, I kind of called out -- I believe it was Dr. Wolff and

3    perhaps Dr. Meyer -- for often using "cans" and "mays," which

4    are a weaker than, sort of, does.  Right?  "Does" is sort of

5    this more confident statement like in -- consistently in cases.

6    It does create this problem.  "Can" is sort of like it might.

7    Right?  That's all.

8    Q    Thank you for that clarification.  So, Mr. Regnerus,

9    turning back to your report, it's paragraph 32, if you could

10   let me know when you've had a chance to pull that up --

11   A    I got it.

12   Q    -- or if you can see that all right here.

13   A    Mm-hm.

14   Q    All right.  In paragraph 32, you refer frequently to

15   experiences of brokenness -- broken families, marriages,

16   bodies.  You use that term repeatedly in paragraph 32 about

17   broken.  And can you explain what you mean by "brokenness" in

18   paragraph 32 and in the context of your expert opinions

19   regarding sexual orientation, gender identity, and Christian

20   sexual ethics at the Council's colleges?

21   A    Right.  So it's a quote.  It's not my own words.  But --

22   and I cite it to sort of say that, as I stated, the Christian

23   Church should be free to respond to cultural shifts.  I think

24   it's fair to say, given secularization patterns in the United

25   States, the Christian Church feels more embattled.  But it also

1    is dealing inside its own ranks with the greater levels of
2    brokenness in terms of relationships, divorce rates, personal
3    problems.
4        This is why there's always cultural-wide experience of
5    brokenness, et cetera, including broken bodies -- people who
6    self-harm, et cetera -- drinking, drug use.  And so, you know,
7    it's a -- this term "accompaniment" there you see -- I think
8    this is actually a -- a Catholic theologian is writing this
9    stuff.  Accompaniment is sort of what Christian colleges and
10   universities aim to do, is to accompany people in various
11   degrees of brokenness in their Christian life and why.
12       Now, that is not to claim that LGBT persons are uniquely
13   broken.  I did not make that claim.  Rather, that taps into
14   historical theological understandings of persons, in general,
15   as being broken and separated from God.  So it's just an
16   insertion that highlights that Christian communities often
17   understand their purpose as being one to sort of -- this is
18   kind of a trite term -- but like showing -- one beggar showing
19   the other beggar where the bread is.  Right?
20       So that -- it's a -- to help people to live with the
21   brokenness in their own lives sometimes, of which they can't go
22   back and repair things that have been done to them, things they
23   their parents did, et cetera.  So just a reflection of sort of
24   the theological understanding of sin as brokenness.
25   Q    And then you follow that up with the next paragraph

1   saying -- the second sentence -- "Authentic religious freedom

2   requires allowing Christians to articulate this vision of human

3   sexuality, theology-based anthropology freely and unhindered";

4   is that right?

5   A    Yes.

6   Q    Is it your understanding that the Council for Christian

7   Colleges and Universities -- that they base their sexual

8   conduct policies on a belief or world view that people who

9   engage in homosexual acts or homosexual relationships are

10   broken, as you described above?

11   A    I don't think they base sort of the relationship policies

12   on anything distinctively about sexual orientation but as part

13   of a general perspective of the brokenness that stalks a world

14   that's sort of basically steeped in sin basically.

15       And, you know, talking about structural stigma, you can

16   talk about structural sin and personal sin.  Christians are

17   nothing if not about trying to help people deal with sin in

18   their own lives and quest for Godliness or holiness.  I'm not

19   sure if I'm answering your question though.

20   Q    So, Dr. Regnerus, would you agree that the Counsel for

21   Christian Colleges and Institutions maintain their policies

22   prohibiting same-sex relationships and behavior, at least in

23   part, to convey the message that same-sex relationships and

24   sexual behavior are illegitimate relationship forms?

25   A    Illegitimate would typically mean reference to a

1  community.  I think they would maintain that those are outside
2  the designs of their creator.
3  Q    And would you also agree that similar to a criminal law --
4  like let's say a state criminal law that punishes homosexual
5  sodomy -- that on a smaller scale within this institutional
6  environment, these codes of conduct function in a similar
7  manner by punishing homosexual sodomy or homosexual romantic or
8  sexual relationships?
9  A    From the looks of the REAP report, I don't think a whole
10  lot's getting punished, period, in terms of student
11  administration and sexual relationship policy.  It seems rare,
12  and I suspect that's not how they go about perceiving it.
13  Q    Well, would you agree that state laws -- let me back up a
14  little bit.  Are you familiar that prior to the Supreme Court's
15  decision in Lawrence v. Texas, certain states continue to
16  criminalize homosexual behavior; do you recall that?
17  A    I recall it.  I -- it's my understanding that they were
18  seldom forced.
19  Q    And I do want to ask about that in terms of structural
20  stigma and enforcement.  It's also true that -- I think as you
21  just said -- that these criminal prohibitions on homosexual
22  sodomy were infrequently enforced by state governments; is that
23  right?
24  A    It's my speculation, but I have no data about this.
25  Q    But would you agree that -- even though infrequently

1   enforced -- that laws that criminalize or punish a particular

2   class of persons -- such as homosexuals with laws about

3   homosexual sodomy -- that those can exert a negative impact on

4   LGBTQ people, even if they're not being hauled into court every

5   time they have sex with their partner.  Would you agree with

6   that?

7          MR. SCHAERR:  Your Honor, I'm going to object to this

8   question.  Calls for speculation and a legal conclusion.

9          THE COURT:  Would you rephrase your question, please?

10  BY MR. SOUTHWICK:

11  Q    Would you agree that laws or policies that criminalize or

12  forbid same-sex conduct or same-sex sexual relationships can

13  have an adverse impact on the LGBT community regardless of how

14  frequently those policies are enforced?

15         MR. SCHAERR:  Your Honor, the same two objections to

16  this question.

17         THE COURT:  Break your question down, would you

18  please, and rephrase it.

19  BY MR. SOUTHWICK:

20  Q    Mr. Regnerus, referring to the REAP report, you were

21  testifying about how it's a pretty small percentage of LGBTQ

22  students who have actually experienced a form of discipline for

23  violating university's codes of conduct; do you recall that?

24  A    I do.  I do want to pull that slide up a second myself.

25  I've got it here.  The university sanctions thing?  Got it.

1    Q    Yeah.  Would it surprise you -- going to this issue of

2    structural stigma, would you agree that at least some of the

3    LGBT student population at these schools could feel some kind

4    of stigmatic harm or feeling of exclusion from these policies

5    that prohibit same-sex sexual conduct, even if they don't

6    actually get disciplined pursuant to the policy?

7    A    Yeah.  I think that's fair to say.

8    Q    Mr. Regnerus, in your report you talk, in certain parts,

9    about sexual orientation change efforts and gender identity

10   change efforts.  Do you recall that?

11   A    I do.  If you pull it up, I can make direct reference to

12   it.

13   Q    All right.  I believe that we're starting on paragraph 41

14   of your report.  And you go on through a few paragraphs talking

15   about sexual orientation change efforts and that there are a

16   variety of kinds; do you recall that?

17   A    Yes.

18   Q    So my question to you is -- Dr. Regnerus, it sounds like

19   in here you're talking about -- that there are kind of older

20   forms of sexual orientation change efforts like electroshock

21   therapy, and that you said that that kind of a treatment has

22   been in disfavor for decades; is that right?

23   A    To my knowledge, yes.

24   Q    To your knowledge, are there other forms of sexual

25   orientation change efforts that are in favor currently?

A    In favor?  Again, these are typically not so much about,
like, change.  It's about sort of -- what I highlight there is
the importance of people being able to seek psychological help
for what they wish to seek help for.  And so I'm not comparing
that to change efforts.  But I think about sort of the wide
popularity of cognitive behavior therapy, where you're dealing
with unwanted feelings, and psychologists can often sort of
help people deal with unwanted feelings.

      I make no claims about change in there.  I just complain
there that typically all of these things are lumped into one
sort of kind of label of being about change when I see little
evidence from the CCCU that they're involved in change efforts.
But Dr. Meyer talks about this and kind of creates this
impression that the CCCU schools are -- or give the impression
that this is a clear risk of going there.

Q    Dr. Regnerus, is it your opinion that the colleges
attended by Plaintiffs should be allowed to practice sexual
orientation change efforts in their on-campus counseling
centers as you have described them in your report?

      MR. SCHAERR:  Your Honor, objection.  This calls for
speculation, and it's outside the scope of this testimony.

      THE COURT:  I believe it is.  Sustained.

BY MR. SOUTHWICK:

Q    Dr. Regnerus, I believe that you testified that it's
important for religious colleges like the ones Plaintiffs

1    attend -- it's important for them to be able to preserve their

2    sexual behavioral codes of conduct, because it's an essential

3    part of the kind of college or kind of institution that they

4    are; is that fair to say?

5    A    I think that's fair.  With regard to sort of the

6    specifics, though, it ranged widely within the CCCU.  But I can

7    only presume that they're -- you know -- given the close

8    associations of Christian understandings of the human body and

9    the purpose of relationships, sexuality, and marriage -- all

10   that stuff -- that you're going to get different kinds of

11   policies, but that those policies will be fairly important to

12   those schools.

13   Q    Sorry.  I'm having trouble with my computer trying to pull

14   up this -- okay.  There we go.  Well, my computer's not working

15   here.  All right.  Sorry about that.  I'm struggling with my

16   PDF, but I've got it back.  All right.  I'm nearing the end of

17   my questioning, Dr. Regnerus.  But just a couple more things I

18   want to go over with you.  And this paragraph 33.  Again, we

19   read from this after the brokenness discussion.  And we read

20   the section about, "Authentic religious freedom requires

21   allowing Christians to articulate this vision of human

22   sexuality and theology-based anthropology freely and

23   unhindered."  And that remains your testimony today; is that

24   right?

25   A    Yes.

1   Q   Dr. Regnerus, are you familiar that many of the same

2   Council for Christian College Institutions that are the subject

3   of Plaintiffs' complaint -- that many of those same

4   institutions prohibited interracial marriage and interracial

5   dating among their student body on the basis of sincerely held

6   religious beliefs?

7         MR. SCHAERR:  Your Honor, I have to object to this.

8   It's well beyond the scope of his direct testimony and calls

9   for speculation.

10         THE COURT:  Sustained.

11   BY MR. SOUTHWICK:

12   Q   Mr. Regnerus, you're testifying here about what true

13   religious freedom requires in terms of sexuality and theology.

14   And so what I'm asking for you is about consistency.  Is it

15   your testimony that in order to protect true religious freedom,

16   it would allow the Council for Christian Colleges and

17   Universities to maintain bans on interracial marriage and

18   interracial dating if those bans were on the basis of sincerely

19   held religious belief?

20         MR. SCHAERR:  Your Honor, same objections, plus it

21   calls for a legal conclusion.

22         THE COURT:  I'm going to sustain the objection and

23   ask you to move on.

24   BY MR. SOUTHWICK:

25   Q   Mr. Regnerus, are you affiliated with or -- with the Ruth

1    Institute?

2    A    I -- you just broke up.  "Affiliated" and then I heard

3    "Ruth Institute."

4    Q    Mr. Regnerus, are you affiliated with the Ruth Institute?

5              MR. SCHAERR:  Your Honor --

6              THE WITNESS:  Affiliated --

7              MR. SCHAERR:  Excuse me, Your Honor.  Let me object

8    to that.  It's well beyond the scope of his direct and

9    irrelevant to this proceeding as far as I can tell.

10             THE COURT:  I couldn't tell --

11             MR. SOUTHWICK:  Your Honor --

12             THE COURT:  Was it Root or Ruth?  I couldn't

13   understand what was asked.

14             MR. SOUTHWICK:  Ruth, R-U-T-H.

15             THE COURT:  Okay.

16             MR. SOUTHWICK:  This is going to bias, Your Honor.

17             THE COURT:  Overruled.  It will be asked.

18   BY MR. SOUTHWICK:

19   Q    Mr. Regnerus, are you affiliated with the Ruth Institute?

20   A    I'm familiar with them.  I've given a talk for them.  I'm

21   not affiliated with them in the way that I believe some persons

22   are.

23   Q    And are you aware that the Ruth Institute has been

24   designated as an anti-LGBT hate group by the Southern Poverty

25   Law Center for promoting falsehoods about LGBT people?

1          MR. SCHAERR:  Your Honor, I object to this.  He's

2   already said he's not affiliated with this group, so it can't

3   be -- it can't go to bias.  And it's certainly well beyond the

4   scope of his testimony or his report.

5          THE COURT:  Sustained.  Let's move on.

6          MR. SOUTHWICK:  All right.  No further questions.

7          THE COURT:  Cross for the Department of Justice?

8          MS. SNYDER:  No questions, Your Honor.

9          THE COURT:  Cross for the other Intervenors?

10          MR. TUCKER:  And no questions from the Religious

11   School Intervenors.

12          THE COURT:  Thank you.

13      Redirect?

14          MR. SCHAERR:  Yes, Your Honor, just a couple of

15   questions.

16

17                     REDIRECT EXAMINATION

18   BY MR. SCHAERR:

19   Q    First of all, Mr. Southwick asked you whether some

20   students could feel stigmatized by college policies even if

21   they don't get disciplined under them.  Do you recall that

22   testimony?

23   A    Yes.

24   Q    What impact would you expect those same policies to have

25   on Christian LGBT students who want to follow traditional

1  Christian teachings on matters of sexuality?

2  A    Right.  I would anticipate that -- given there are

3  different kinds of LGBT students who enroll at Christian

4  colleges -- some who approve of the rules, some whom chafe

5  under them, or some whom openly oppose them -- you're going to

6  see -- you should anticipate differential opinions about them

7  based on whether they dislike them or not.

8  Q    Okay.  And for those who want to follow traditional

9  Christian teachings, including members of the LGBT community,

10 what impact would you anticipate that that kind of a rule would

11 have?

12 A    I think they may anticipate that these are protective for

13 them.

14 Q    Mm-hm.

15 A    At the same time, you know, they may have some concern or

16 ambivalence about them.  It is some degree of speculation of

17 what they -- how they think about it.  What I'm prepared to

18 defend is the idea that LGBT students who enroll in CCCU-type

19 schools are a fairly diverse bunch, as I just said.

20 Q    Okay.  So is it fair to say that one person's stigma might

21 be another person's support?

22 A    Yes.  I think that's true.  In this case, some people

23 would perceive those as stigmatizing, and other people would

24 largely ignore them, and other people might think they're

25 protective because that's the kind of person and life they want

1   to develop -- right? -- one that sort of fits the Christian

2   teachings of the school.

3        But, again, you know, students are diverse.  The policies

4   are diverse.  So you're going to see different responses to

5   that, and then different responses over time.  Some people grow

6   more comfortable with them, some people grow less comfortable

7   with them.

8   Q    Okay.  Mr. Southwick asked you about your brief in the

9   Masterpiece case.  Do you recall that?

10  A    I do.

11  Q    Do you recall what the Supreme Court ultimately held in

12  that case?

13  A    I think they ruled in favor of Masterpiece Cake.  I forget

14  the decision.  I understand it's fairly narrow -- and by legal

15  ways I don't grasp.  So --

16  Q    Okay.

17  A    But they ruled in favor of the cake baker.

18  Q    Okay.  Well, if I were to tell you that part of the

19  Court's holding was that traditional Christian views on

20  marriage and sexuality are entitled to respect in governmental

21  proceedings, how, if at all, would that conclusion relate to

22  the opinions that you've expressed here?

23  A    Right.  If I'm not mistaken, and I could be, I think that

24  was Justice Kennedy who wanted to sort of state -- and I think

25  he stated that too in Obergefell -- I think -- that Christian

1   understandings on marriage and sexuality deserve -- I don't

2   know what his language was -- but respect and shouldn't be sort

3   of ruled objectionable out of hand.

4       In both of those cases, in which case, you know,

5   extrapolates to the present case, I would think he or at least

6   the decision writers of those cases would think it's an

7   overreach to sort of strike down the -- so the use of what are

8   historically widely understood Christian understandings of

9   relationship behavior and the body.

10  Q   Okay.  Thank you.  I have no further questions.

11          THE COURT:  May this witness -- yes?

12          MR. SOUTHWICK:  Short recross, Your Honor?

13          THE COURT:  There really is no such thing as recross.

14          MR. SOUTHWICK:  Oh.

15          THE COURT:  I don't know that you have anything more

16  to gain.  But I'd just as soon move on with this witness.

17          MR. SOUTHWICK:  Okay.  Nothing further.

18          THE COURT:  You're welcome.  May this witness be

19  excused?

20          MR. SCHAERR:  Yes, Your Honor.

21          MS. SNYDER:  Yes, from the Government Defendants,

22  Your Honor.  This is Hilarie Snyder.

23          MR. TUCKER:  This is Ryan Tucker.  Yes.

24          THE COURT:  You're excused.  Thank you for your time.

25          THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Further witnesses for the Intervenors?

2          MR. SCHAERR:  Not from CCCU, Your Honor.

3          MR. TUCKER:  And none from the Religious Schools

4  either, Your Honor.  This is Ryan Tucker.

5          THE COURT:  All right.  Thank you.

6      I guess then returning to the Plaintiff.  Anything

7  further?

8          MR. SOUTHWICK:  This is Paul Southwick.  Nothing

9  further from Plaintiffs.

10         THE COURT:  Government, I'm just assuming that's the

11 case for you as well.

12         MS. SNYDER:  Nothing further, Your Honor, from the

13 Government.  Thank you.

14         THE COURT:  All right.  I believe the record now is

15 complete.  And let's talk about dates for filing your arguments

16 in this matter.  In looking at the calendar, I want to -- we

17 did some double-checking.  It seemed to me that -- we were

18 looking at filing simultaneous briefing.  And I was -- we were

19 looking at opening briefs for the 19th.  Does that work for

20 everybody?

21         MR. SOUTHWICK:  Plaintiffs -- that's fine.

22         MS. SNYDER:  Your Honor, just a question.  Do you

23 anticipate, in the briefing, citing to like transcript?  If so,

24 does the court reporter have a sense of when that would be

25 available?

1          THE COURT:  I have two court reporters who handled

2     this matter.  I'm going to go off the record and at least talk

3     to the court reporter who covered Friday and today and see what

4     she might be able to guide me with her schedule.

5

6               (A discussion was held off the record.)

7

8          THE COURT:  So my -- the court reporter -- we're back

9     on the record.  The court reporter tells me she can have the

10    transcript -- and she's assuming that the transcript for court

11    reporter who covered Thursday -- because I don't know whether

12    you've got a transcript or not -- she can have it done in two

13    weeks.  So that would be the 22nd.

14    And my suggestion is if you want transcript before you

15    file your brief, or you can do your brief and then refer to the

16    transcript, that I give you two weeks thereafter to file

17    your -- the opening simultaneous briefing.  Does that work?

18          MR. TUCKER:  Yes, Your Honor.

19          MR. SOUTHWICK:  So, Your Honor, that would mean

20    December 6th for --

21          THE COURTROOM DEPUTY:  Yes.

22          MR. SOUTHWICK:  -- for opening?

23          THE COURT:  Yep, December 6th.  And then -- and I'm

24    going to have a page limit on it.  And I want the page limit on

25    of 35 pages.  The response briefs then I would give you two

1  weeks thereafter.  And I'll give you the same 35 pages

2  simultaneous briefing.  That would be the 20th.

3          MR. SOUTHWICK:  Your Honor?

4          THE COURT:  Yes.

5          MR. SOUTHWICK:  This is getting into a lot of folks'

6  holiday schedules.

7          THE COURT:  It's getting into everybody's holiday

8  schedules.  And I'll take -- you know -- if you want to set

9  something different, you tell me.  I'm going to -- I'll get you

10 an opinion when we get you an opinion.  But I just want to make

11 sure that people have the transcript if they need to use it for

12 their briefing, and that we coordinate simultaneous briefing

13 and page limits.  So if you want to propose something else, be

14 my guest.

15         MR. SOUTHWICK:  So this is Paul Southwick.  If we're

16 waiting for the transcript and following the schedule, then my

17 request would be that the response briefs be due after the --

18 after the holidays -- so sometime in early January.

19         THE COURT:  Fine with us.

20         MS. SNYDER:  That's okay with the Government as well,

21 Your Honor.

22         MR. SOUTHWICK:  Something like January 7th or 10th?

23         THE COURT:  January 10th is fine with me.

24         MS. SNYDER:  Fine with the Government as well, Your

25 Honor.

1          THE COURT:  For the Intervenors?  You're on mute.

2          MR. SCHAERR:  Sorry.  I think we can live with that.

3          THE COURT:  Yeah.

4          MR. TUCKER:  Yes, Your Honor.  This is Ryan Tucker.

5     That's okay.

6          THE COURT:  Lawyers have a way of knowing how to make

7     the holidays more difficult.  And I'm very happy to skirt that

8     with the issues in this case.  I think they're easily -- these

9     schedules are easy to have people meet all their obligations.

10    Is there anything else we need to take up at this time?

11         MR. SOUTHWICK:  Just to clarify, Your Honor -- this

12    is Paul Southwick -- there will by no reply briefing; is that

13    correct?

14         THE COURT:  That's right.  Say it all in those two

15    briefs, 35 pages each.  I have the full record.  I've taken

16    copious notes.  I've read everything in this case.  We'll be

17    prepared to -- you know -- we will take this under advisement.

18    It's submitted now.  And we will have time to rule once we get

19    all the briefing done.  And we will issue an opinion

20    thereafter.  So if there's anything new that comes up, please

21    contact Cathy Kramer, my courtroom deputy, and let me know if

22    there's anything else we need to know about or address.

23    Otherwise, the case is submitted.  I thank you all for you

24    time, for this argument, and for the hearing, as well as what I

25    will anticipate in the written submissions.  And we are in

1   recess.

2

3                    (The proceedings adjourned at 12:26 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      C E R T I F I C A T E

 2     Elizabeth Hunter, et al. v. U.S. Department of Education, et

 3                               al.

 4                          6:21-cv-474-AA

 5                       PRETRIAL CONFERENCE

 6                        November 8, 2021

 7          I certify, by signing below, that the foregoing is a true

 8     and correct transcript, to the best of my ability, of the video

 9     conference proceedings heard via video conference, taken by

10     stenographic means.  Due to the audio-visual connection,

11     parties appearing via speakerphone or cell phone or wearing

12     masks due to coronavirus, speakers overlapping when speaking,

13     speakers not identifying themselves before they speak, fast

14     speakers, the speaker's failure to enunciate, background noises

15     and/or other technical difficulties that occur during video

16     conference proceedings, this certification is limited by the

17     above-mentioned reasons and any technological difficulties of

18     such proceedings occurring over the video conference at the

19     United States District Court of Oregon in the above-entitled

20     cause.

21          A transcript without an original signature, conformed

22     signature, or digitally signed signature is not certified.

23

24     /s/Kendra A. Steppler, RPR

25     _____

       Official Court Reporter        Signature Date: 11/22/2021
```

BY MR. PRINCE: [5]
546/8 548/9 548/25
549/14 550/6
BY MR. SCHAERR:
[14] 553/16 555/7
557/9 560/13 573/7
576/10 580/17 583/19
590/24 591/13 593/16
595/6 609/11 632/18
BY MR. SOUTHWICK:
[46] 503/9 509/11
511/10 512/20 513/14
513/18 514/1 514/24
515/10 517/20 518/8
519/11 522/4 522/20
523/23 527/23 528/8
528/11 529/13 530/14
530/23 532/10 534/1
534/6 535/3 535/16
536/15 537/1 537/25
542/6 542/14 565/14
566/24 569/11 612/3
613/16 615/16 619/13
620/4 620/18 626/10
626/19 628/23 630/11
630/24 631/18
BY MS. SNYDER: [3]
492/8 493/1 498/11
MR. MILLER: [4]
544/15 544/23 545/3
545/11
MR. PRINCE: [10]
527/21 545/6 545/18
545/21 545/24 546/3
548/7 550/5 551/11
619/10
MR. REGNERUS: [1]
552/20
MR. SCHAERR: [51]
491/10 545/13 545/17
548/3 552/16 553/13
554/19 555/4 555/6
559/2 565/4 566/19
569/3 569/8 573/1
573/4 574/21 575/17
575/24 576/7 576/9
580/7 580/16 583/5
583/12 583/18 590/16
590/19 591/3 591/8
591/12 593/13 595/5
608/23 609/4 609/10
611/23 613/12 619/22
626/7 626/15 628/20
630/7 630/20 631/5
631/7 632/1 632/14
635/20 636/2 639/2
MR. SOUTHWICK: [46]
491/6 513/21 513/25
517/15 517/19 518/7
518/18 518/24 522/3
522/18 536/20 537/23
542/11 544/11 545/9
551/17 554/22 565/8
572/18 575/4 580/10
583/14 590/17 593/11
595/1 615/15 619/11
619/20 619/24 620/15
631/11 631/14 631/16
632/6 635/12 635/14
635/17 636/8 636/21

637/19 637/22 638/3
638/9 638/15 638/22
639/11
MR. TUCKER: [15]
491/13 519/4 519/7
544/14 544/20 551/20
552/3 557/5 580/13
591/10 632/10 635/23
636/3 637/18 639/4
MS. SNYDER: [52]
491/8 492/2 492/24
498/10 503/4 509/7
511/7 512/15 513/11
514/6 515/4 517/17
518/2 518/5 518/15
519/2 519/5 521/23
522/16 527/18 528/7
529/11 530/7 530/21
532/1 533/23 534/3
535/2 535/8 536/5
537/20 541/24 542/10
542/12 544/5 548/22
550/1 551/15 551/18
552/11 575/25 576/6
580/11 583/16 591/6
620/13 632/8 636/11
636/12 636/22 638/20
638/24
THE COURT
REPORTER: [1]
549/12
THE COURT: [139]
491/15 491/22 492/1
503/6 509/9 511/9
512/16 513/13 513/17
513/20 513/22 514/8
515/5 517/25 518/4
518/17 518/22 518/25
519/3 519/9 521/25
523/19 527/20 528/10
529/12 530/9 530/22
532/2 533/24 534/4
535/10 536/6 537/24
541/25 544/6 544/13
544/16 544/22 545/1
545/5 545/8 545/16
545/20 545/23 546/1
548/6 548/24 550/3
551/13 551/16 551/22
552/5 552/10 552/13
552/18 552/22 553/4
553/9 553/12 554/21
555/5 556/11 556/21
556/23 557/1 558/4
558/7 558/12 559/4
559/8 559/10 559/12
559/16 559/18 559/24
560/2 560/5 560/10
565/11 566/22 569/6
573/3 575/3 575/8
575/19 576/5 576/8
580/9 580/15 582/25
583/4 583/8 583/11
583/17 591/5 591/9
591/11 593/15 595/4
608/16 609/2 609/5
611/25 613/15 615/11
620/3 626/9 626/17
628/22 630/10 630/22
631/10 631/12 631/15
631/17 632/5 632/7
632/9 632/12 635/11

635/13 635/15 635/18
636/10 636/14 637/1
637/8 637/23 638/4
638/7 638/19 638/23
639/1 639/3 639/6
639/14
THE COURTROOM
DEPUTY: [2] 490/10
637/21
THE WITNESS: [45]
491/21 491/25 512/18
514/10 515/6 530/10
532/5 533/25 534/5
535/11 536/7 542/2
542/13 544/7 546/5
549/13 552/9 553/8
553/10 556/14 556/22
556/25 557/4 558/6
558/11 558/13 559/7
559/9 559/11 559/14
559/17 559/20 560/1
560/4 560/9 560/12
566/23 569/9 583/2
583/6 583/10 613/14
615/14 631/6 635/25

/
/s/Kendra [1] 641/24

0
0.006 [1] 581/4
0.05 [1] 581/4
0.12 [1] 581/4
08212212 [1] 497/14

1
1 percent [1] 581/5
1,000 [1] 581/6
10 percent [1] 581/11
10-12 [1] 560/16
100 [6] 510/16 512/12
512/23 515/11 515/18
558/3
100 percent [1] 607/8
100,000 [2] 599/9
599/10
102 [3] 508/18 508/18
508/20
103 [1] 508/16
106.12 [1] 524/16
106.31 [1] 527/25
106.34 [2] 539/17
519/19
106.40 [1] 528/4
108 [5] 497/22 497/23
550/8 550/10 550/13
109 [3] 548/1 548/12
548/18
10th [2] 488/7 638/22
11 [8] 536/22 536/25
537/7 537/14 537/19
538/3 538/16 540/5
11/22/2021 [1] 641/25
1120 [1] 488/7
11:30 [1] 608/17
12 [4] 547/25 548/12
560/16 581/12
12:26 [1] 640/3
133,000 [1] 599/11
14 [4] 588/3 614/25

615/1 615/19
15 [3] 527/12 569/15
570/6 574/12 615/1
616/19
15100 [1] 489/5
16 percent [1] 614/4
16th [1] 523/16
17 [1] 599/13
1717 [3] 489/13 489/15
489/18
18 [7] 518/12 569/21
581/7 581/16 587/5
605/25 607/9
18-year-olds [1] 599/13
180 [3] 495/8 515/1
515/9
180-day [3] 495/1 495/4
495/6
19 [1] 555/10
1980s [1] 530/1
1989 [1] 536/24
1993 [1] 553/21
19th [1] 636/19
1:00 [1] 608/18

2
2 percent [1] 619/3
20 [7] 518/10 561/6
574/12 613/6 613/7
613/15 613/17
2000 [1] 553/23
20006 [3] 489/13
489/16 489/19
2002 [1] 553/25
2003 [1] 555/24
2004 [1] 555/25
20044 [2] 488/14
488/17
2006 [1] 519/23
2007 [1] 555/16
2011 [2] 569/22 603/18
2012 [4] 557/12 566/13
567/1 573/13
2013 [6] 517/7 517/7
519/20 520/3 522/11
524/9
2014 [7] 515/24 517/7
518/12 520/17 522/13
522/24 523/16
2015 [1] 603/18
2016 [5] 589/7 589/10
590/14 590/19 590/25
2017 [3] 582/10 582/11
619/17
2017-2018 [1] 558/14
2018 [2] 558/14 582/10
2020 [1] 587/7
2021 [6] 487/6 499/15
510/6 546/13 641/6
641/25
20s [2] 618/23 618/24
20th [1] 638/2
21 [10] 496/10 517/5
517/24 518/14 519/11
519/13 543/9 543/10
549/3 549/6
21-474 [1] 491/2
2130 [1] 489/23
21st [4] 496/12 496/17
496/22 497/1
22 [5] 518/14 519/1
523/15 617/11 617/15

615/1 615/9
570/6 574/12 615/1
23 [5] 518/14 519/1
528/13 605/25 616/12
23 percent [1] 614/5
23-point [1] 616/13
25 [2] 570/6 587/5
25 percent [1] 618/25
26 [6] 554/6 554/7
554/13 554/16 554/20
575/18
27th [1] 520/17

3
3,000 [2] 581/7 581/15
3,001 [1] 581/6
30 [3] 538/6 603/3
607/9
30 percent [2] 581/13
619/1
300 [2] 581/15 601/13
32 [4] 622/9 622/14
622/16 622/18
320 [1] 489/10
33 [1] 629/18
34 [3] 524/16 527/25
528/4
35 [7] 515/2 515/12
546/22 546/25 637/25
618/1 639/15
36 [4] 493/3 515/2
515/12 535/17
360 [1] 581/15
38 [1] 602/5
38 percent [1] 616/22
39 [1] 569/21

4
4 percent [1] 617/22
40 [2] 570/6 615/22
40 percent [1] 603/3
405 [1] 489/23
41 [1] 627/13
4112 [1] 489/24
4128 [1] 488/8
43 percent [1] 617/20
431-4112 [1] 489/24
45th [1] 488/9
46 [1] 616/12
46 percent [1] 614/15
474 [1] 491/2
477 [1] 587/5
48 percent [3] 615/4
615/22 617/21
4800 [1] 489/10
4th [1] 520/3

5
5 percent [3] 580/24
581/1 581/1
50 [1] 616/1
50-18 [1] 518/12
50-20 [1] 518/10
50-some [1] 615/25
54 percent [1] 616/22
541 [1] 489/24
55 percent [2] 615/3
615/21
59 percent [1] 588/16

**6**

60 percent [1]  587/9
61 [1]  588/2
61 percent [1]  587/7
63 percent [1]  601/19
64 [1]  588/13
65 percent [2]  587/8
588/4
6:21-cv-474-AA [2]
487/5 641/4
6th [2]  519/19 637/23

**7**

70 [5]  546/12 546/15
546/16 547/4 588/14
73 [8]  510/4 510/5
510/8 510/14 510/15
510/15 515/1 546/13
73 percent [1]  588/19
76 [1]  488/9
7706 [1]  488/9
79 percent [1]  588/15

**8**

8 percent [1]  616/11
80 [1]  558/3
80 percent [1]  601/16
83929 [1]  488/5
8420 [1]  488/5
85260 [1]  489/6
8716 [1]  489/11
883 [2]  488/14 488/17
8:00 [1]  487/7
8:46 [1]  518/20
8:58 [1]  518/20
8th [2]  489/23 524/9

**9**

90 percent [1]  601/17
90-plus [1]  515/17
900 [4]  489/13 489/15
489/18 581/15
90th [1]  489/5
97005-8716 [1]  489/11
97203 [1]  488/5
97209-4128 [1]  488/8
97219 [1]  488/10
97401 [1]  489/23
9:08 [1]  523/21
9:09 [1]  523/21

**A**

AA [2]  487/5 641/4
abandon [1]  596/24
abandoned [1]  595/9
abide [1]  600/17
abided [1]  578/7
ability [7]  532/13 532/16
570/12 575/20 604/3
604/11 641/8
able [14]  504/22 517/10
517/15 531/13 531/23
538/18 601/6 615/17
617/18 617/21 619/2
628/3 629/1 637/4
abortion [2]  528/2 531/1
abortions [2]  527/7
527/13
about [126]  492/9
492/13 495/3 497/3
499/11 506/19 520/3
520/9 521/5 522/13

522/15 524/2 525/23
527/12 528/15 529/4
532/12 536/18 537/6
537/19 537/21 538/17
540/25 541/20 543/8
550/7 555/3 555/19
557/1 557/18 557/19
557/24 558/18 558/24
561/16 563/25 564/8
564/8 564/8 564/14
567/10 567/10 569/15
569/25 570/17 570/24
573/13 574/11 574/17
578/6 581/7 581/14
581/16 581/22 581/22
582/13 583/20 583/25
586/25 587/4 588/20
589/4 589/7 590/17
592/4 594/24 595/3
595/13 596/2 596/3
596/7 597/1 601/8
601/12 605/22 607/19
608/1 608/25 609/13
609/25 610/4 612/23
613/7 613/23 614/10
615/24 616/5 616/6
616/25 617/11 617/13
618/8 619/25 620/2
620/20 622/25 622/16
624/12 624/15 624/16
624/17 625/12 625/19
625/24 626/2 626/21
627/9 627/15 627/19
628/1 628/2 628/5
628/9 628/11 628/13
629/15 629/20 630/12
630/14 631/25 633/6
633/16 633/17 634/8
636/15 639/22
above [7]  520/19
585/14 615/25 616/25
624/10 641/17 641/19
above-average [1]
585/14
above-entitled [1]
641/19
above-mentioned [1]
641/17
Absolutely [3]  499/9
560/4 574/6
academic [4]  560/24
560/25 567/3 606/21
accept [1]  596/25
acceptable [2]  513/9
514/3
accepted [4]  617/14
617/17 617/23 618/2
access [8]  520/7 533/7
539/17 539/25 541/21
597/4 618/14 618/18
accident [1]  560/3
accommodating [1]
593/8
accommodation [1]
621/1
accompaniment [2]
623/7 623/9
accompany [1]  623/10
accord [1]  528/3
according [6]  508/15
526/16 549/6 584/25
614/3 618/25

account [1]  599/17
accuracy [1]  498/16
accurate [30]  494/4
494/9 494/14 495/18
495/25 496/2 496/5
496/11 499/4 509/12
509/25 510/1 510/8
510/9 515/19 515/20
520/10 520/24 523/5
523/6 524/12 524/13
534/11 535/7 541/15
546/19 546/20 547/1
547/2 549/5
accurately [3]  493/17
493/23 494/20
achieve [1]  555/15
acknowledged [4]  575/9
589/25 620/7 621/16
acknowledges [1]
522/24
across [1]  569/23
576/20 577/2 577/12
582/9 587/13 592/22
act [1]  495/9
acting [6]  493/10
532/22 532/23 533/4
533/6 538/10
action [10]  493/7
494/18 494/19 495/1
495/24 499/19 514/13
542/22 580/25 581/3
actions [2]  496/6
548/15
activities [1]  520/8
activity [1]  591/19
acts [2]  534/9 624/9
actual [1]  528/3
actually [24]  496/5
498/25 499/20 500/4
500/10 501/13 504/21
505/25 513/2 515/2
515/14 517/12 526/4
527/25 531/12 531/23
608/21 614/22 616/13
617/15 618/13 623/8
626/22 627/6
add [1]  585/21
added [1]  526/4
additional [7]  496/25
511/25 552/10 560/23
560/25 585/21 612/5
address [5]  512/7
603/11 608/21 609/9
639/22
addressed [3]  563/19
565/1 612/16
addresses [1]  539/19
adhere [2]  564/15 593/7
adjourned [1]  640/3
administration [1]
625/11
administrations [3]
605/21 612/19 612/21
administrative [20]
492/11 492/19 494/19
495/1 495/24 497/6
497/8 498/6 498/8
499/7 499/25 500/15
500/18 500/21 501/5
502/19 531/22 543/15
546/11 546/22
administratively [5]

523/8 523/12 531/6
532/8 541/25
administrators [1]
581/10
admissibility [1]  575/11
admission [8]  519/1
540/25 541/8 554/19
576/2 580/7 583/12
591/4
admissions [2]  597/11
597/12
admit [2]  565/6 575/18
admitted [2]  575/19
585/9
adolescence [1]  569/16
adolescent [1]  556/1
adolescents [2]  556/3
557/20
adopted [2]  570/11
570/11
adoption [2]  565/22
adult [7]  556/5 557/12
557/13 572/16 603/2
607/8 607/13
adulthood [2]  556/3
556/6
adults [7]  569/21 577/9
585/17 594/18 602/12
602/15 603/12
advanced [3]  539/17
540/1 540/17
adverse [1]  626/13
advertising [1]  598/3
advised [1]  561/2
advisement [1]  639/17
advising [1]  561/1
advisory [1]  536/11
affiliated [7]  630/25
631/2 631/4 631/6
631/19 631/21 632/2
affirmed [7]  507/6 530/4
597/18
afield [1]  569/4
aforementioned [1]
568/6
after [12]  500/10 507/12
507/19 516/1 553/23
567/17 570/11 598/11
598/18 629/19 638/17
638/18
again [27]  498/12
501/22 502/5 503/12
508/16 515/6 522/16
527/12 529/6 534/3
536/10 544/16 548/3
549/4 569/3 575/19
575/22 602/10 603/10
604/6 607/1 607/24
613/6 619/7 628/1
629/18 634/3
against [15]  497/15
520/4 520/5 520/6
524/10 524/12 524/25
529/2 529/7 531/11
531/19 538/21 575/23
581/21 592/13
age [6]  570/11 570/12
578/12 601/21 607/9
607/9
aged [1]  556/2
ages [1]  587/5

ago [8]  503/11 512/23
513/23 552/4 555/19
561/9 571/14 574/19
agree [22]  512/11
512/13 512/23 533/10
535/25 539/10 567/19
567/21 568/19 592/25
600/5 614/5 615/23
617/9 618/19 624/20
625/3 625/13 625/25
626/5 626/11 627/2
agreed [6]  533/9 615/3
615/4 616/15 616/22
616/23
ahead [17]  491/24
503/6 517/21 518/23
522/2 537/24 538/15
545/2 553/9 553/12
555/5 565/11 575/16
587/18 590/20 592/18
620/3
AIKEN [1]  487/22
aim [1]  623/10
aimed [1]  605/3
al [6]  487/4 487/8 491/2
491/3 641/2 641/3
alcohol [1]  584/11
584/12 586/14
alcohol-related [1]
586/14
alerted [1]  526/6
Alex [1]  540/23
algorithms [2]  597/13
598/25
all [106]  496/3 499/13
499/24 501/4 504/5
505/5 506/14 506/24
508/3 508/13 509/3
509/4 509/12 509/17
509/21 509/23 509/24
510/10 510/12 510/13
510/19 511/3 511/16
511/21 512/10 514/15
514/19 517/10 518/7
518/18 519/3 519/19
520/2 521/2 521/12
522/11 522/23 523/15
524/2 526/18 526/23
528/12 528/17 538/19
539/13 540/10 542/4
542/17 543/19 546/9
548/6 548/15 552/5
553/9 556/4 558/6
559/10 560/1 560/2
560/2 560/10 563/1
566/11 567/9 568/25
569/9 572/3 572/4
574/16 576/22 577/3
577/18 580/2 581/5
591/9 592/19 598/19
600/5 603/11 606/19
608/18 612/19 613/4
613/13 614/24 620/16
620/25 621/4 621/19
622/7 622/12 622/14
627/13 628/10 629/9
629/15 629/16 632/6
632/19 634/21 636/5
636/14 639/9 639/14
639/19 639/23

allegation [2]  521/6
524/11

**A**

allegations [15] 497/25 499/3 504/19 506/1 506/6 508/9 512/6 516/21 520/9 532/7 538/25 539/7 539/25 540/10 540/21
alleged [2] 495/9 535/14
alleges [3] 520/6 535/25 539/16
alleging [1] 492/19 520/5
Alliance [1] 489/5
allow [6] 518/16 527/6 527/16 528/1 550/14 630/16
allowed [1] 628/17
allowing [4] 527/8 528/1 624/2 629/21
allows [1] 550/10
almost [3] 570/25 615/22 615/24
along [2] 514/5 542/19
already [9] 500/4 522/23 531/20 537/18 538/21 543/20 576/3 590/14 632/2
also [39] 492/13 493/5 494/18 495/2 498/22 503/2 507/9 514/19 522/14 523/6 523/11 527/21 534/7 540/9 543/15 550/3 554/13 556/16 569/25 570/9 575/17 583/3 583/6 594/14 594/15 596/5 597/7 597/21 597/24 601/1 601/22 603/20 615/10 616/2 616/4 620/13 622/25 625/3 625/20
alter [2] 595/22 595/23
altering [1] 610/23
although [3] 564/9 582/20 589/4
alumni [1] 535/21
always [5] 502/15 514/18 606/5 610/5 623/4
am [15] 487/7 504/19 518/20 518/20 523/21 523/21 531/16 535/24 536/16 538/4 542/18 549/13 576/14 609/6 609/7
ambiguous [5] 530/7 532/1 535/8 537/22 541/24
ambivalence [1] 633/16
Amendment [3] 548/14 548/15 548/20
American [6] 557/18 560/18 560/18 568/6 569/17 577/4
amicus [1] 619/15
among [16] 499/19 558/20 561/24 564/10 576/22 580/23 581/1 582/20 585/12 589/19 595/25 607/13 611/9

611/14 617/12 630/5
amount [3] 498/25 498/25 590/1
analyses [2] 563/6 589/15
analysis [19] 504/9 504/11 541/9 541/10 541/11 541/12 541/13 541/19 541/22 542/2 558/16 558/23 560/7 573/16 573/17 573/17 573/21 578/11 593/14
analytic [1] 557/15
analytical [1] 567/11
analyze [1] 504/18
ANN [1] 487/22
anomalies [1] 571/8
another [6] 507/2 556/4 607/10 608/17 615/13 633/21
answer [12] 512/16 513/1 513/6 514/8 514/9 532/2 532/3 541/25 542/1 542/3 542/8 615/12
answering [1] 624/19
anthropology [4] 592/8 592/9 624/3 629/22
anti [1] 631/24
anti-LGBT [1] 631/24
antiabortion [1] 524/11
anticipate [8] 518/6 586/12 633/2 633/8 633/10 633/12 636/23 639/25
anticipatory [1] 596/5
antigay [6] 557/17 558/18 559/13 620/5 621/10 621/15
anxiety [12] 584/7 585/6 585/22 586/19 586/19 587/9 588/4 588/5 588/19 589/20 601/18 602/9
any [51] 495/22 496/15 499/19 500/3 500/15 500/17 500/21 501/2 502/1 502/8 503/16 504/11 506/20 506/22 508/6 510/7 511/21 525/5 525/15 525/16 528/24 531/9 531/17 544/1 544/13 544/21 551/14 554/21 559/2 560/23 561/19 562/14 573/17 573/21 574/22 578/23 583/14 584/20 585/2 586/10 591/5 597/11 601/4 602/24 603/5 604/2 606/11 611/15 618/5 619/5 641/17
anybody [1] 585/5
Anyone [1] 544/22
anything [16] 506/19 510/25 559/2 562/6 574/16 575/3 580/9 583/22 583/25 620/20 624/12 635/15 636/6 639/10 639/20 639/22
anyway [1] 562/22
Anyways [1] 601/16

anywhere [1] 527/8
apart [1] 557/7
apologies [5] 513/25 545/14 548/3 548/7 550/23
apologize [3] 543/7 545/21 619/9
apologizes [1] 615/14
appeal [1] 571/25
Appeals [1] 571/25
appear [5] 554/16 601/17 602/18 615/21 618/1
appearing [1] 641/11
appears [8] 506/4 510/17 519/24 554/9 554/25 570/17 579/15 614/4
applicability [1] 548/21
application [1] 549/18
applied [1] 551/7
applies [2] 508/8 598/19
apply [5] 549/16 598/23 599/15 599/21 599/22
applying [1] 599/1
appointed [1] 571/2
appreciate [2] 552/7 619/12
appreciated [1] 575/15
approach [2] 547/8 592/7
appropriate [6] 495/12 500/5 508/21 512/7 514/14 514/19
appropriately [1] 499/2
approval [2] 499/21 549/24
approve [2] 501/3 633/4
approximately [6] 496/11 496/12 496/22 510/19 535/19 615/21
April [2] 526/23 587/7
April-June 2020 [1] 587/7
apt [2] 578/5 602/2
Arbor [10] 517/6 519/13 519/21 520/4 520/16 521/18 522/9 522/25 523/11 541/19
Archives [1] 560/20
are [170]
area [4] 561/13 561/14 561/15 561/19
areas [3] 555/21 555/21 575/23
aren't [1] 542/8
argue [1] 551/6
argument [1] 639/24
argumentive [1] 527/18
arguments [1] 636/15
around [13] 499/15 546/12 547/4 555/16 555/24 555/24 564/6 587/1 604/25 606/21 607/12 610/23 620/17
arranged [1] 500/4
arrangement [1] 570/6
arranging [1] 500/3
article [8] 558/24 559/1

559/5 559/6 560/8 560/21 577/5 577/17
articles [4] 557/11 557/21 557/24 560/15
articulate [2] 546/2 624/2 629/21
as [153] 492/5 493/17 493/23 494/4 494/9 494/14 494/18 494/20 495/18 495/25 496/2 496/5 496/11 496/12 496/17 497/5 502/7 503/16 504/23 505/24 506/23 507/4 507/23 508/11 508/22 512/4 514/2 514/11 514/12 514/15 514/18 514/18 514/22 514/22 517/1 517/24 518/14 521/15 523/3 525/18 526/4 530/25 530/25 531/23 532/3 532/23 534/8 535/22 541/11 542/4 543/23 545/24 548/20 549/10 551/7 551/22 552/1 552/17 553/1 553/1 554/20 554/24 552/2 555/3 555/23 556/3 562/4 564/17 565/6 566/7 566/18 569/6 569/21 571/21 572/21 572/22 572/23 575/9 575/18 576/24 577/20 577/20 578/6 579/17 580/1 580/1 581/3 581/11 582/2 584/6 587/3 587/5 587/20 588/3 590/15 590/15 591/23 592/14 593/5 594/7 594/18 594/20 597/12 599/3 599/10 599/10 600/15 601/3 601/3 601/8 601/9 601/22 603/20 604/25 605/17 606/4 606/13 606/21 606/24 607/16 608/1 608/8 611/1 613/25 614/5 614/8 615/15 616/25 617/1 618/3 621/4 622/22 623/15 623/17 623/24 624/10 624/12 625/20 626/2 628/19 631/9 631/9 631/24 633/19 633/23 635/13 635/16 636/11 638/20 638/24 639/24 639/24
aside [3] 534/24 535/12 536/4
ask [23] 513/23 515/6 521/25 522/19 524/2 525/17 528/13 536/18 537/6 543/7 558/4 582/3 589/4 612/5 613/5 613/12 614/10 615/12 619/24 620/13 620/20 625/19 630/23
asked [15] 521/20 524/15 526/16 532/12 533/8 533/14 534/7 534/21 612/20 616/19

617/11 631/13 631/17 632/19 634/8
asking [7] 513/16 515/12 527/15 541/4 596/9 616/5 630/14
asks [2] 613/21 615/1
assault [2] 576/24 576/25
assert [2] 508/7 531/1
asserted [1] 516/2
asserting [1] 549/24
assess [1] 540/10
assessing [1] 562/8 574/2 574/4
assessment [5] 539/10 540/7 568/19 568/20 619/6
assessments [2] 569/23 570/1
assign [1] 508/22
assigned [6] 493/15 494/13 509/1 509/5 509/14 509/15
assist [4] 604/8 604/10 604/23 612/23
assistance [2] 532/15 612/18
Assistant [21] 499/21 500/19 500/23 500/24 501/2 502/16 506/25 507/6 520/17 527/3 532/6 532/22 532/23 533/1 533/4 533/6 538/10 542/19 542/23 543/5 555/18
Associate [1] 555/18
associated [1] 584/24
Association [1] 568/6
associations [1] 629/8
associative [1] 543/16
assuming [5] 505/3 551/22 598/12 636/10 637/10
assurance [25] 492/14 502/9 505/15 505/17 505/24 505/25 507/3 507/13 507/15 508/7 516/20 525/18 527/4 530/17 531/20 532/6 533/18 537/17 539/5 539/6 543/18 543/25 544/9 549/4 549/8 assurances [2] 502/6 543/20
assured [3] 530/3 530/11 539/7
attached [1] 517/1
attempts [2] 576/20 604/22
attend [7] 533/15 533/20 577/16 598/15 600/13 604/7 629/1
attendance [1] 577/18
attended [4] 541/6 543/20 610/16 628/17
attending [1] 543/24
attention [3] 492/17 570/14 586/11
attitudes [3] 556/2 557/18 557/19
Attorney [1] 489/10
attorneys [1] 555/2

**A**

attracted [2] 598/14
598/16
attractiveness [1]
606/15
attuned [1] 564/21
audio [3] 544/25 545/14
641/10
audio-visual [1] 641/10
audit [5] 570/22 570/22
570/24 570/24 571/5
August [1] 522/13
522/24
Austin [1] 555/9
Authentic [2] 624/1
629/20
available [2] 525/13
636/25
Ave [1] 488/9
Avenue [1] 489/23
average [23] 510/2
510/6 510/15 514/25
546/11 546/15 546/21
546/23 547/4 547/5
547/9 558/19 577/5
585/14 585/20 589/3
600/16 601/20 602/11
602/18 610/10 615/24
617/3
averages [1] 602/22
avoid [1] 578/8
Aw [1] 566/3
aware [20] 492/18
492/21 530/4 531/9
531/16 531/17 532/5
535/17 535/23 535/24
571/24 572/3 576/11
578/23 598/10 598/10
600/16 600/18 600/18
631/23
away [6] 517/13 559/23
571/13 595/15 597/8
597/15
awkward [2] 608/6
608/7
awry [1] 558/22
AZ [1] 489/6

**B**

back [23] 509/22
511/17 511/18 515/24
518/23 518/24 521/2
530/1 542/11 548/5
552/7 555/24 558/4
569/22 569/25 584/21
617/10 621/19 622/9
623/22 625/13 629/16
637/8
background [5] 553/18
564/11 602/9 602/24
641/14
baker [1] 634/17
balance [1] 575/14
bans [4] 565/20 565/21
630/17 630/18
BAPTIST [2] 487/12
489/3
base [2] 624/7 624/11
based [38] 502/2 502/9
502/13 509/2 520/5
520/7 520/20 527/4

530/15 536/10 539/23
534/23 556/14 556/16
563/6 564/11 564/23
565/4 581/23 581/24
582/7 582/21 588/6
589/13 589/15 590/11
592/1 593/22 594/20
595/7 595/9 597/12
599/13 600/20 611/7
624/3 629/22 633/7
bases [1] 529/21
basic [3] 505/4 582/14
590/10
basically [7] 543/19
557/5 558/14 558/19
608/7 624/14 624/14
basis [13] 506/4 507/15
516/4 516/12 516/15
516/20 523/6 523/13
531/25 547/20 550/17
630/5 630/18
Bates [1] 538/16
BAXTER [2] 488/9
491/6
be [152] 491/12 495/8
498/21 500/24 501/12
501/14 501/20 502/10
504/11 504/22 505/19
505/22 506/3 506/8
507/7 507/7 507/9
507/14 507/21 508/9
508/10 510/17 512/8
512/13 512/24 513/1
513/4 513/5 513/9
514/3 516/23 518/23
519/9 519/24 525/14
525/23 526/8 533/16
533/21 534/22 534/25
535/5 536/2 536/8
540/13 540/14 540/19
540/23 541/4 541/9
541/10 542/20 542/25
543/3 543/8 544/3
545/7 545/10 545/18
546/21 547/3 549/18
551/6 551/16 552/15
554/16 559/18 564/3
564/5 564/21 566/1
566/2 570/24 571/2
574/4 574/25 575/9
575/11 575/19 575/22
578/18 578/18 579/9
580/15 581/12 583/17
584/13 584/16 585/11
586/15 588/17 591/22
595/10 596/3 596/15
596/24 597/3 597/5
597/17 597/19 599/14
601/6 601/23 604/14
604/15 605/11 605/16
605/17 605/19 606/6
606/11 606/18 606/25
607/17 607/22 608/9
608/20 608/22 609/5
609/15 610/2 610/5
611/9 612/18 614/4
616/1 616/24 617/1
618/11 618/16 618/17
618/19 618/22 619/20
622/23 628/17 629/1
629/11 631/17 632/3
633/21 634/23 635/2

635/18 636/24 637/4
638/17 638/17 639/16
bearing [3] 543/4
573/21 592/22
Beaverton [1] 489/11
because [35] 497/18
500/1 504/9 506/5
506/18 509/14 510/24
513/2 515/7 517/12
520/8 521/3 521/6
522/5 533/17 541/1
542/8 544/17 552/1
559/13 569/16 570/17
570/25 585/25 595/10
596/6 597/9 602/22
607/5 609/5 609/20
621/24 629/2 633/25
637/11
become [6] 577/4
598/10 606/6 606/9
607/22 608/9
been [79] 492/5 493/4
496/6 496/19 496/25
497/10 497/12 497/18
497/24 498/1 498/20
499/1 499/13 500/7
500/11 500/11 502/8
507/22 509/1 509/5
509/14 509/24 511/15
512/11 512/21 512/22
514/13 514/22 515/1
515/18 531/13 531/23
533/1 535/19 537/17
538/18 538/21 539/5
539/6 542/22 550/7
550/11 551/24 553/1
553/25 555/10 557/14
567/3 567/5 567/6
568/2 568/14 569/19
570/4 570/15 570/23
571/3 572/23 574/11
579/17 581/18 582/2
585/20 585/24 586/6
586/17 587/1 590/14
590/25 592/5 592/5
592/11 592/13 593/24
614/11 620/11 623/22
627/22 631/23
before [19] 487/22
504/4 514/20 517/8
522/21 541/13 543/10
548/1 549/24 553/24
570/11 585/15 590/6
592/14 598/24 604/25
620/25 637/14 641/13
beggar [2] 623/18
623/19
beginning [1] 491/4
500/12 598/17
begins [1] 501/13
behalf [9] 491/13
492/19 493/7 522/8
529/7 565/19 568/12
597/17 620/22
behavior [19] 555/25
556/2 556/9 560/20
562/1 564/6 565/7
571/5 572/16 572/17
593/9 594/25 606/1
607/20 624/22 624/24
625/16 628/6 635/9

**behavioral** [2] 589/24
589/25
behaviors [1] 579/25
being [26] 503/12
509/13 511/17 511/18
541/23 552/7 554/24
555/2 569/25 574/5
576/25 604/2 612/4
612/22 613/24 615/2
616/25 617/1 617/18
617/21 619/14 623/15
623/17 626/4 628/3
628/11
belief [2] 624/8 630/19
beliefs [6] 526/19
541/20 593/1 601/7
603/21 630/6
believe [41] 499/10
505/13 507/18 514/10
516/16 521/24 524/20
525/23 532/24 534/9
535/4 536/19 537/21
545/24 547/25 550/1
553/6 554/6 554/13
557/2 559/11 568/10
568/17 568/24 568/24
574/24 587/13 590/5
590/14 591/2 595/8
602/7 604/22 612/6
620/1 622/2 627/13
628/22 628/24 631/21
636/14
belong [9] 613/25 614/6
614/16 614/18 614/20
615/2 615/20 616/21
617/2
belonging [1] 614/10
belongingness [1] 617/5
below [1] 641/7
besides [1] 578/13
best [5] 500/5 513/6
560/19 612/23 641/8
bet [1] 591/17
Beth [2] 492/24 498/10
better [11] 512/5 556/19
556/20 579/9 579/12
584/17 586/8 602/18
606/10 610/9 610/9
between [12] 517/5
518/11 524/4 561/16
561/20 575/13 579/2
585/3 601/25 603/3
612/24 617/1
beyond [8] 510/14
510/15 510/16 577/22
578/1 630/8 631/8
632/3
bias [2] 631/16 632/3
Bible [3] 593/2 593/3
595/9
Bible-based [1] 595/9
biblical [1] 564/15
big [1] 564/18
binder [1] 492/23
bisexual [1] 602/1
bisexuality [2] 602/2
606/14
bit [18] 497/3 499/11
503/14 504/12 509/22
539/13 547/9 556/5
595/13 601/18 606/2
613/20 613/20 614/9

615/18 615/19 615/25
623/4
blanket [1] 540/17
blow [1] 615/18
blue [1] 544/19
blurry [1] 613/20
Bob [3] 534/16 534/19
536/1
bodies [2] 622/16 623/5
body [7] 564/8 592/20
595/16 611/5 629/8
630/5 635/9
boils [1] 567/9
book [5] 556/1 556/4
556/6 601/12 607/6
books [5] 556/4 556/16
556/25 561/19 561/21
both [9] 547/24 556/22
569/23 570/14 589/23
600/23 606/22 618/21
635/4
bottom [3] 524/14 529/1
538/15
boundary [1] 596/9
Box [2] 488/14 488/17
Branch [1] 488/16
bread [1] 623/19
break [9] 509/10 509/10
518/16 518/20 523/21
557/7 609/1 609/3
626/17
breath [1] 615/12
brief [12] 513/3 619/15
620/1 620/5 620/8
620/21 620/23 621/5
621/12 634/8 637/15
637/15
briefing [9] 517/2
636/18 636/23 637/17
638/2 638/12 638/12
639/12 639/19
briefly [8] 500/1 528/15
543/12 560/23 562/24
576/15 591/14 593/25
briefs [4] 636/19 637/25
638/17 639/15
Brigham [1] 497/15
498/5 529/18
broader [3] 594/22
602/10 602/11
broke [1] 631/2
broken [6] 622/15
622/17 623/5 623/13
623/15 624/10
brokenness [6] 622/15
622/17 623/2 623/5
623/11 623/21 624/24
624/13 629/19
build [1] 597/22
built [1] 604/18
bunch [1] 633/19
BYU [12] 509/24
518/12 528/14 528/20
529/2 529/7 529/8
529/18 529/20 529/25
530/5 530/16
BYU-Idaho [9] 518/12
528/14 529/7 529/8
529/18 529/20 529/25
530/5 530/16
BYU-Idaho's [1] 528/20

**C**

Cakeshop [1] 619/16
calendar [2] 521/20 636/16
call [10] 492/24 512/9 552/17 556/8 563/21 564/7 582/8 587/3 592/10 601/14
called [11] 552/15 553/1 558/18 568/11 591/23 593/21 597/21 603/12 607/8 621/4 622/2
calls [4] 626/8 628/20 630/8 630/21
Calvin [1] 553/24 594/1
came [1] 570/3
campus [19] 541/21 598/11 607/5 608/3 608/3 610/9 610/9 613/25 614/6 614/9 614/10 614/12 614/16 615/1 616/7 616/19 617/2 617/11 628/18
campuses [2] 610/10 618/21
can [93] 495/11 498/10 498/24 500/7 503/20 503/22 507/2 507/25 508/2 509/18 510/11 512/17 513/6 514/8 514/9 517/22 517/25 520/12 520/13 522/1 525/23 528/23 531/15 532/3 532/3 533/7 534/7 540/14 541/25 541/25 542/4 543/12 545/11 545/25 546/4 546/5 548/10 548/11 560/23 562/24 566/17 569/13 574/4 575/14 576/15 577/20 584/16 586/3 588/17 590/1 590/20 592/17 592/24 595/14 595/14 595/20 596/25 597/12 597/18 598/17 601/10 601/23 605/19 606/5 607/13 608/5 608/8 610/2 610/5 610/24 610/25 618/19 619/19 620/6 620/12 621/4 621/15 621/23 622/1 622/6 622/12 622/17 624/15 626/3 626/12 627/11 628/7 629/6 631/9 637/9 637/12 637/15 639/2
can't [7] 513/1 541/11 542/3 543/2 623/21 632/2 632/3
cannot [3] 525/1 530/10 545/7
cans [1] 622/3
capable [1] 609/7
car [1] 560/2
care [1] 605/22
career [1] 558/1
careful [3] 540/19 541/12 541/14
carefully [4] 538/23

540/8 540/9 575/10
cares [1] 610/4
Carolina [1] 553/23
case [75] 487/5 491/2 492/18 493/16 495/10 495/11 497/21 501/16 503/3 503/22 504/1 504/3 504/11 505/12 506/8 506/18 507/4 508/15 508/22 508/25 509/1 509/5 509/14 509/15 517/1 521/14 522/15 540/13 540/23 542/3 546/25 550/12 553/21 554/4 554/8 562/15 563/15 564/24 565/5 565/22 565/23 565/23 565/24 566/4 566/4 566/7 566/21 567/15 569/5 573/10 573/12 573/18 573/21 573/22 574/14 574/24 577/22 578/1 594/14 595/24 604/18 605/11 606/25 619/16 621/2 621/25 633/22 634/9 634/12 635/4 635/5 636/11 639/8 639/16 639/23
cases [10] 504/6 504/14 511/21 525/10 531/17 543/15 547/8 622/5 635/4 635/6
cash [1] 610/22
cash-strapped [1] 610/22
category [2] 603/11 617/16
Catherine [1] 533/2
Catholic [1] 589/22 623/8
Cathy [1] 639/21
cause [4] 611/17 611/18 611/20 641/20
caution [2] 536/8 540/19
caveat [1] 505/21
CCCU [56] 491/10 519/4 544/23 552/16 553/20 563/20 563/21 563/24 564/13 579/2 579/17 580/2 580/5 580/8 582/2 582/19 582/21 583/13 584/5 584/12 584/14 584/17 585/12 586/8 586/13 586/18 589/17 589/22 590/22 591/21 591/24 593/3 593/21 593/24 594/21 596/12 597/22 599/5 600/9 600/13 604/3 604/8 604/22 605/7 605/15 605/18 606/8 607/3 609/23 610/11 618/21 628/12 628/14 629/6 633/18 636/2
CCCU's [1] 583/15
CCCU-based [1] 582/21
CCCU-type [23] 563/20 563/21 563/24 564/13

580/5 582/19 584/11 593/21 594/21 597/22
589/17 589/22 587/24
593/21 594/21 597/22
599/5 600/9 600/13
604/3 604/8 605/7
605/15 609/23 610/11 633/18
CCCU-types [1] 579/2
CDC [1] 563/9
celibate [4] 601/5 601/15 604/15 605/13
cell [1] 641/11
Center [1] 631/25
centers [1] 628/19
central [4] 543/17 568/25 569/2 606/13
certain [4] 495/10 498/25 501/23 506/16 540/14 550/14 625/15 627/8
certainly [9] 504/6 504/12 505/22 516/19 527/2 573/3 575/6 586/19 632/3
certainty [1] 530/10
certification [1] 641/16
certified [1] 641/22
certify [1] 641/7
cetera [16] 557/7 572/17 577/6 578/6 580/1 585/7 585/22 592/23 595/17 599/24 603/7 605/20 610/20 623/5 623/6 623/23
CFR [3] 524/16 527/25 528/4
chafe [1] 581/20 633/4
chafed [1] 592/13
Chair [2] 568/9 568/13
challenge [1] 569/16 605/17 606/12 606/12
challenged [1] 559/5
challenges [3] 584/7 610/8 610/25
challenging [5] 597/5 599/7 601/23 604/13 610/2
chance [5] 519/14 537/2 537/11 599/2 622/10
change [21] 525/21 525/21 526/4 572/21 572/21 594/24 596/1 596/2 597/1 608/14 627/9 627/10 627/15 627/20 627/25 628/2 628/5 628/9 628/11 628/12 628/18
changed [1] 525/24
changes [6] 499/11 499/14 499/16 499/23 500/1 595/3
chaos [1] 596/13
Chapel [1] 553/23
character [3] 595/8 595/10 611/3
characteristic [1] 591/23
characterization [1] 525/9
characterize [2] 562/24 571/9
characterizes [1]

601/22
Characterizing [1] 563/2
charge [1] 544/9
chart [10] 493/3 496/20 509/3 509/22 549/6 549/7 613/7 615/17 617/13 617/16
checked [1] 545/15
checking [1] 591/24
chemistry [4] 539/18 539/20 540/1 540/17
child [1] 592/21
child's [1] 569/20
children [5] 557/13 568/23 569/21 570/7 601/24
children's [2] 557/12 558/8
choice [2] 604/4 618/10
choose [2] 600/9 600/13
CHRISTIAN [49] 487/11 489/8 553/19 564/7 564/15 564/21 572/12 578/4 591/15 592/4 592/19 594/18 597/23 598/5 598/8 600/20 600/20 600/24 601/6 603/20 603/21 604/24 605/1 605/9 606/16 609/14 609/17 609/23 611/3 611/4 622/19 622/22 622/25 623/9 623/11 623/16 624/6 624/21 629/8 630/2 630/16 632/25 633/1 633/3 633/9 634/1 634/19 634/25 635/8
Christian-based [1] 600/20
Christianity [2] 564/18 592/4
Christians [5] 582/20 606/10 624/2 624/16 629/21
Church [2] 622/23 622/25
circles [1] 567/4
Circuit [2] 571/24 573/8
Circuit's [1] 574/14
circulated [1] 516/23
circumstance [1] 501/2
circumstances [4] 505/8 535/12 550/14 605/10
cisgender [3] 616/20 616/22 617/19
cisnormative [1] 592/10
cite [1] 622/22
cited [2] 568/14 578/19
cites [1] 563/11
citing [1] 636/23
civil [29] 488/13 488/16 491/1 516/3 516/13 517/6 518/13 522/7 524/5 526/24 527/3 528/20 529/7 529/9 529/19 529/23 530/1 530/18 531/4 531/13 531/23 538/11 541/16 542/16 544/3 568/15 619/16

claim [9] 521/13 524/15 524/24 525/5 536/3 546/21 547/3 623/12 623/13
claimed [3] 525/23 531/21 571/2
claims [2] 524/22 531/11 546/22 547/4 628/9
clarification [2] 512/9 622/8
clarify [7] 512/5 516/10 521/3 532/23 539/9 571/16 639/11
class [2] 596/24 626/2
classes [2] 561/4 618/15
clear [5] 500/24 502/10 562/19 579/2 628/15 climate [2] 615/1 616/19
climb [1] 607/10
clinical [9] 572/5 572/20 573/24 574/5 587/24 588/5 588/22 588/25 602/16
close [3] 550/12 616/10 629/7
closed [6] 497/18 505/19 507/14 523/8 523/12 541/16
closely [1] 602/21
closing [1] 531/6
club [1] 618/14
clubs [2] 618/8 618/15
coach [2] 606/3 606/4
coalesced [1] 616/14
coauthor [1] 558/15
coauthored [1] 576/19
code [17] 527/12 527/16 534/17 572/13 581/2 581/18 581/20
codes [3] 625/6 626/23 629/2
cognitive [1] 628/6
cohort [3] 576/17 576/22 577/15
cohorts [1] 577/13
Coie [1] 488/7
Coley [3] 562/10 599/8 599/12
colleague [3] 544/24 545/4 559/7
colleagues [1] 557/16
collected [1] 556/15
collection [1] 578/19 585/4 587/3 590/8
college [35] 487/12 489/3 530/3 553/19 553/20 553/24 572/13 577/18 578/12 578/13 579/6 580/25 582/22 583/2 583/6 587/5 587/6 588/17 594/1 594/7 599/23 600/21 605/14 605/25 607/14 612/8 612/19 613/8 613/20 613/22 617/19 618/20 629/3 630/2 632/20
college-age [1] 578/12
colleges [37] 487/11

colleges... [36] 489/8
563/21 563/25 577/16
578/4 578/8 578/25
578/25 579/2 579/11
580/3 584/1 584/17
586/9 589/23 591/15
591/16 593/7 595/9
599/5 600/9 606/16
609/14 609/21 609/23
610/12 610/18 611/16
622/20 623/9 624/7
624/21 628/16 628/25
630/16 633/4
Colorado [3] 619/16
621/1 621/25
Columbia [2] 524/10
559/11
column [34] 493/14
493/15 493/17 493/20
493/21 493/23 494/1
494/2 494/4 494/6
494/7 494/9 494/11
494/12 494/14 494/16
494/17 494/20 494/23
494/24 494/24 494/25
495/13 495/18 495/20
495/21 495/22 495/25
496/4 496/11 496/16
496/17 497/4 543/17
columns [1] 618/7
combinations [2] 596/8
606/19
combine [1] 556/17
come [9] 499/20 501/17
504/4 555/24 561/11
586/2 595/20 612/17
612/18
comes [4] 501/15 505/7
537/17 639/20
comfort [1] 590/1
comfortable [2] 634/6
634/6
coming [3] 589/16
596/8 599/2
Commission [1] 619/16
commitments [2]
592/19 592/20
committed [1] 598/7
committee [1] 568/10
common [2] 558/15
606/20
communication [5]
495/22 527/2 527/5
529/18 529/20
communications [3]
496/3 496/21 496/25
communities [2] 597/23
623/16
community [23] 576/16
577/10 577/16 590/2
594/22 595/2 598/2
598/6 598/6 598/7
601/1 603/20 604/11
604/15 604/23 605/3
605/8 606/16 606/21
610/4 625/1 626/13
633/9
comparable [7] 587/22
588/8 588/24 589/16
590/2 602/13 604/17

compare [4] 587/18
602/8 613/6 617/4
compared [17] 570/7
570/9 577/12 580/3
582/17 583/21 583/22
584/1 584/16 586/9
588/14 589/22 601/19
602/11 615/25 616/24
618/3
comparing [5] 582/8
586/21 590/11 602/21
628/4
comparison [9] 505/18
579/4 583/25 585/3
589/10 603/10 614/21
614/22 616/20
comparisons [2] 612/24
617/7
compiled [2] 493/9
493/10
complain [1] 628/9
complainant [11]
494/18 494/25 495/14
495/23 496/21 498/24
507/7 507/22 508/6
522/8 539/15
complainant's [1]
539/25
complainants [6] 493/6
511/20 511/20 512/3
514/14 543/14
complainants' [1] 493/7
complaint [87] 493/22
494/2 494/8 497/9
497/12 497/13 497/14
497/15 497/17 497/18
497/24 497/25 498/4
498/5 498/15 498/19
498/22 499/1 499/8
502/21 502/24 503/15
503/16 504/16 504/19
504/22 505/5 505/18
506/2 506/6 506/17
507/14 508/9 508/10
508/22 508/23 509/24
512/6 514/21 515/24
516/1 516/4 516/11
516/17 516/21 519/24
520/4 520/6 520/13
521/7 521/8 522/15
523/7 523/12 524/10
528/21 529/2 529/6
529/9 529/22 530/6
530/11 531/14 531/18
531/24 532/7 532/8
535/14 536/9 536/14
537/16 538/20 538/25
539/7 540/11 540/21
541/4 546/12 550/7
550/11 550/11 550/14
550/17 551/1 551/2
551/8 630/3
complaints [75] 492/11
492/19 493/3 493/4
493/5 494/13 494/13
495/8 497/6 497/8
497/15 497/23 498/7
498/8 499/13 499/17
499/25 500/15 500/18
500/18 500/21 501/5
501/8 501/12 501/19
502/2 502/6 502/20

508/14 509/1 509/4
509/10 509/14 509/17
509/23 510/10 510/12
510/13 510/19 510/20
510/25 511/12 511/13
511/15 512/5 512/12
512/22 512/24 513/4
513/9 514/4 514/11
514/12 514/18 514/23
515/2 515/8 515/13
515/17 516/14 516/20
521/9 524/25 525/25
531/3 531/7 535/18
538/13 541/12 541/17
542/21 542/25 546/15
546/22 546/25
complete [2] 510/3
514/25 536/12 636/15
completed [3] 515/2
515/18 524/1
completely [1] 540/10
completion [4] 510/6
512/14 512/24 513/2
complex [1] 602/3
compliance [2] 506/16
520/23
comply [1] 525/7
component [1] 556/17
comport [1] 548/15
compound [2] 509/8
535/8
computer [2] 545/11
629/13
computer's [1] 629/14
concern [1] 633/15
concluded [1] 571/6
conclusion [6] 569/14
570/3 590/10 626/8
630/21 634/21
conclusions [10] 567/8
567/13 568/22 569/1
569/2 570/20 571/17
586/21 589/10 589/19
conditions [1] 495/10
conduct [12] 521/16
534/17 572/13 573/1
581/3 581/18 624/8
625/6 626/12 626/23
627/5 629/2
conducted [6] 563/6
563/8 576/12 584/22
586/5 586/6
conducts [1] 581/20
conference [5] 641/5
641/9 641/9 641/16
641/18
confidence [1] 614/19
confident [1] 622/5
confirmed [1] 533/1
conflict [3] 506/16
520/23 611/19
conformed [1] 641/21
confusing [2] 509/8
530/7
connected [3] 545/10
558/17 559/21
connection [4] 548/4
551/25 577/9 641/10
connections [1] 491/16
consent [2] 498/24
505/2
conservative [2] 564/5

564/20
consider [5] 502/19
504/5 514/20 534/25
548/19 561/12 574/8
597/23 603/20 611/9
consideration [4]
499/14 514/19 567/19
572/25
considerations [1]
498/16
considered [2] 534/22
583/8
considering [4] 499/7
499/23 499/25 571/25
consistency [1] 630/14
consistent [9] 520/22
546/21 547/3 547/8
548/14 549/18 586/22
589/10 592/24
consistently [2] 601/6
622/5
constantly [2] 610/22
610/22
constitutes [1] 514/22
consulting [1] 568/10
contact [1] 639/21
contemporary [1]
574/11
contestation [1] 595/11
contested [1] 592/14
context [4] 522/19
530/5 581/10 622/18
continue [8] 491/24
502/19 513/8 514/4
519/10 527/16 568/21
625/15
Continued [3] 492/7
573/6 612/2
continues [1] 606/24
Continuing [1] 489/2
contradict [1] 618/6
contradicts [1] 619/5
contrast [2] 615/9 619/3
contribute [1] 602/2
control [1] 571/23
controlled [1] 549/17
controlling [1] 520/23
convey [1] 624/23
coordinate [1] 638/12
copies [3] 517/23
518/22 518/25
copious [1] 639/16
copy [7] 517/11 517/12
517/15 518/3 521/21
554/10 620/8
CORBAN [1] 487/12
core [3] 562/4 563/18
563/20
coronavirus [1] 641/12
correct [93] 492/20
495/14 496/13 496/14
496/20 496/22 496/23
501/6 501/7 504/10
505/10 505/11 505/20
506/11 507/10 507/11
507/16 507/17 508/10
508/11 509/6 509/15
509/16 509/19 509/20
510/17 511/13 511/16
515/16 519/21 519/25
520/1 523/9 524/6
524/7 525/8 526/1

526/2 526/11 527/7
527/18 530/1 530/2
530/20 531/8 533/2
533/3 538/6 538/7
542/9 542/16 543/1
543/2 543/22 544/4
546/12 546/13 546/17
551/4 553/7 560/9
562/11 563/12 563/13
565/25 566/7 566/8
566/15 566/16 567/2
567/6 568/1 571/18
573/14 573/25 574/1
577/19 583/23 584/19
589/8 591/25 593/18
593/19 594/2 594/4
594/5 612/9 612/10
616/23 618/3 619/5
639/13 641/8
corrected [1] 496/19
correctly [2] 548/16
548/17
correlation [1] 617/1
correspondence [14]
515/22 517/5 518/11
519/14 519/20 520/2
520/16 522/13 522/24
523/4 523/24 528/14
529/15 529/16
corresponding [1]
543/14
costly [1] 600/25
Couch [1] 488/7
could [70] 491/4 491/19
492/22 492/24 493/2
493/20 494/1 494/6
494/11 494/16 494/23
494/24 495/4 495/20
495/20 497/11 497/12
498/12 507/13 507/14
507/20 507/21 507/22
507/24 508/7 513/8
513/8 522/19 523/15
526/25 527/11 529/15
533/15 533/18 533/20
537/9 538/8 546/24
550/18 550/20 551/1
551/23 553/17 554/6
558/23 559/21 560/6
566/23 568/25 569/9
577/24 596/16 597/9
603/22 604/5 604/17
605/17 611/1 613/10
613/12 613/13 614/11
615/18 620/8 620/13
621/8 622/9 627/3
632/20 634/23
couldn't [2] 631/10
631/12
COUNCIL [8] 487/11
489/8 572/12 613/6
617/10 624/6 630/2
630/16
Council's [1] 622/20
counsel [6] 516/24
544/20 544/23 608/16
613/1 624/20
Counsel's [3] 521/24
522/16 555/2
counseling [1] 604/12
628/18
counterparts [1] 584/18

**C**

country [2] 562/3
599/14
couple [4] 503/11
608/24 629/17 632/14
course [9] 498/20
531/21 546/3 546/25
550/21 558/1 561/9
564/18 612/22
courses [6] 539/18
539/19 539/23 540/1
540/17 561/8
coursework [2] 540/14
540/15
court [51] 487/1 487/23
489/22 493/8 495/4
495/21 496/8 498/1
498/2 498/3 498/12
516/24 526/25 534/18
538/8 553/4 565/6
565/15 565/19 565/24
566/18 566/25 567/17
567/18 567/22 567/23
569/13 571/13 571/17
571/19 571/25 572/1
572/24 574/25 575/20
575/22 594/14 608/25
619/17 620/25 621/5
626/4 634/11 636/24
637/1 637/3 637/8
637/9 637/10 641/19
641/25
Court's [5] 508/24
536/21 576/1 625/14
634/19
Courthouse [1] 489/22
courtroom [1] 639/21
coverage [1] 556/24
covered [5] 505/3 506/1
516/20 637/3 637/11
covers [7] 504/19 506/1
506/6 532/7 539/7
540/10 540/20
COVID [19] 563/6
563/8 582/11 584/22
585/1 585/5 585/7
585/8 585/20 585/25
586/5 586/10 586/16
586/20 587/2 590/6
610/8 610/17 616/3
Cowboys [1] 606/3
CPM [2] 508/17 508/20
create [6] 595/11
596/11 596/13 598/2
598/5 622/6
created [1] 549/7
creates [1] 628/13
creation [1] 543/23
creator [1] 625/2
criminal [3] 625/3 625/4
625/21
criminalize [3] 625/16
626/1 626/11
crises [1] 596/11
crisis [9] 585/18 611/9
611/14 611/17 611/18
611/21 612/7 612/11
612/14
criticism [1] 571/1
criticizable [1] 574/12
criticized [4] 567/3

567/5 568/2 569/13
criticizing [1] 574/17
cross [18] 503/8 516/23
519/10 536/16 545/2
545/3 545/5 546/7
547/25 549/2 565/9
565/13 609/6 611/25
612/2 620/1 632/7
632/9
cross-examination [7]
503/8 516/23 546/7
547/25 549/2 565/13
612/2
cross-examine [1]
620/1
crossed [2] 491/16
578/18
cultural [2] 622/23
623/4
cultural-wide [1] 623/4
current [17] 493/7
525/10 526/11 530/15
535/20 535/23 535/25
536/2 539/2 539/3
539/4 539/11 540/4
540/6 554/10 569/24
588/10
currently [8] 494/8
497/18 523/18 533/17
535/22 543/25 549/4
627/25
curve [1] 607/12
cut [2] 548/4 549/12
cv [5] 487/5 554/11
554/14 560/17 641/4

**D**

D.C [5] 488/14 488/17
489/13 489/16 489/18
d/b/a [1] 487/12
Dallas [2] 496/18 606/3
Daniel [1] 553/10
data [16] 558/16 563/9
572/15 578/19 578/19
578/23 578/23 585/4
587/3 590/8 614/3
614/7 618/5 618/25
619/5 625/24
date [16] 493/18 493/24
494/2 494/4 494/9
494/14 494/21 495/18
495/25 496/2 500/13
502/7 510/11 557/6
619/2 641/25
dated [2] 520/17 523/16
dates [4] 510/11 585/9
586/11 636/15
dating [7] 534/20
617/14 618/9 618/19
618/24 630/5 630/18
DAVIS [2] 488/13 491/8
day [7] 495/1 495/4
495/6 540/24 552/8
606/11 606/17
days [23] 495/8 510/4
510/5 510/8 510/14
510/15 510/16 512/12
512/23 515/1 515/1
515/9 515/12 515/19
521/20 546/12 546/13
546/16 546/16 547/4
569/17 588/3 612/21

deal [5] 536/8 572/19
613/13 627/7 628/8
596/12 624/17 628/8
dealing [3] 521/3 623/1
628/6
Death [2] 558/17
559/21
debate [1] 611/19
DeBoer [6] 566/1 566/2
567/15 571/17 573/9
574/14
debunked [2] 570/16
570/16
decades [1] 627/22
December [3] 519/19
637/20 637/23
December 6th [2]
519/19 637/23
December 6th for [1]
637/20
decent [2] 491/15 561/3
decide [8] 506/15 599/5
599/17 599/23 599/24
601/5 603/12 604/15
decided [2] 605/13
616/3
decidedly [3] 588/21
604/19 618/16
deciding [1] 502/22
decision [31] 500/14
500/17 500/20 500/25
502/10 502/13 502/15
502/15 506/25 511/12
511/14 518/1 536/12
543/5 550/4 556/2
556/5 556/9 556/9
567/11 568/9 568/11
572/4 573/9 573/11
595/22 597/5 604/7
625/15 634/14 635/6
decision-maker [7]
502/14 500/17 500/20
500/25 506/25 536/12
550/4
decision-making [6]
556/2 556/5 556/9
556/9 567/11 597/5
decisions [3] 515/23
595/13 596/14
decisively [1] 610/17
declaration [1] 517/1
declares [1] 578/16
deeply [1] 605/22
defend [1] 633/18
defendant [2] 532/24
551/18
Defendant's [1] 492/22
Defendants [12] 487/9
487/14 488/12 489/3
489/8 491/9 519/6
576/1 580/12 591/7
613/1 635/21
Defendants-Intervenors
[1] 487/14
defending [2] 489/5
565/19
defined [1] 592/5
definitely [3] 510/23
547/6 607/12
degree [6] 503/2 553/22
561/13 585/21 586/13
633/16
degrees [1] 623/11

deliberate [1] 540/19
demand [1] 489/2
demonstrable [1]
611/20
demonstrate [1] 604/22
demonstrated [1] 577/4
demonstrates [1] 522/6
denomination [1]
592/23
denying [2] 520/7
541/21
department [15] 487/7
488/13 488/16 491/2
521/13 524/15 547/10
555/10 568/3 568/8
568/9 568/12 568/13
632/7 641/2
dependent [4] 596/20
596/20 596/22 610/22
depending [1] 596/19
depends [1] 581/13
deposition [14] 496/6
496/8 496/10 503/12
509/21 510/2 515/21
532/11 532/21 533/6
533/14 534/7 535/5
538/6
depression [11] 584/7
585/6 585/22 588/6
588/10 588/12 589/20
601/7 602/9 602/25
603/2
depressions [1] 587/9
depressive [1] 603/7
deputy [1] 639/21
derail [1] 533/8
describe [9] 495/21
529/15 538/8 543/12
553/17 560/23 566/17
567/22 621/24
described [8] 502/24
503/1 521/15 523/3
607/15 616/16 624/10
628/19
describes [2] 521/14
526/18
describing [1] 525/13
description [4] 493/5
524/19 534/12 535/7
descriptions [1] 513/3
deserve [1] 635/1
designated [1] 631/24
designs [1] 625/2
desire [1] 600/21
desk [2] 504/16 506/17
desperate [1] 610/24
despite [1] 508/3
detected [1] 589/21
deter [1] 604/8
determination [8]
505/18 505/22 506/3
506/7 506/10 506/11
506/13 516/19
determinations [3]
506/21 506/23 506/23
determine [10] 498/17
498/21 498/22 505/23
505/25 506/4 514/20
538/24 539/6 539/18
determined [1] 509/17
determines [4] 498/14
508/8 508/17 508/19

determining [3] 500/5
540/20 548/20
develop [1] 634/1
devout [1] 603/20
dial [1] 545/13
dialing [1] 548/5
did [43] 499/24 510/25
511/20 526/10 526/11
532/16 533/9 548/16
549/8 553/19 554/1
554/4 554/5 554/10
554/12 555/15 558/16
562/6 562/14 562/16
562/17 562/22 562/23
565/18 566/10 573/8
573/16 573/16 573/16
579/10 579/24 582/12
582/16 583/24 601/4
602/8 612/24 613/14
620/20 621/24 623/13
623/23 636/17
didn't [12] 525/3 526/8
549/12 558/5 558/9
566/25 568/8 570/18
571/7 571/7 578/9
599/16
differ [1] 592/22
difference [5] 577/10
579/2 616/11 616/13
617/9
different [35] 504/12
525/19 560/7 564/10
569/15 570/7 570/9
578/18 578/19 584/4
584/4 587/24 588/21
589/12 590/3 590/8
592/23 596/12 600/3
601/13 602/12 602/22
604/19 615/5 616/2
616/5 616/8 617/7
617/8 617/8 629/10
633/3 634/4 634/5
638/9
differential [1] 633/6
difficult [8] 601/2 604/13
605/2 605/4 605/9
605/23 608/2 639/7
difficulties [6] 491/17
587/20 602/16 610/9
641/15 641/17
difficulty [2] 585/15
619/8
dig [1] 579/16
digitally [1] 641/22
diminish [3] 568/15
620/6 621/15
diminished [2] 558/19
559/18
direct [12] 492/17 499/10
503/5 547/24 553/7
553/15 573/6 594/3
617/7 627/11 630/8
631/8
directed [2] 500/2
538/11
direction [1] 590/9
directly [3] 561/21
594/17 618/7
director [6] 493/11
513/19 514/2 542/8
542/15 542/18
disagree [3] 525/9

**D**

disagree... [2] 567/20 568/20
disagreed [1] 616/15
disciplinary [1] 580/25
discipline [6] 528/2 560/20 580/2 581/22 581/24 626/22
disciplined [5] 580/19 581/7 581/17 627/6 632/21
Disconnect [1] 545/12
discrete [1] 534/9
discriminate [2] 547/20 596/5
discriminated [1] 524/12
discriminating [1] 520/6
discrimination [15] 492/11 495/9 515/24 520/5 520/20 521/10 522/8 531/12 531/19 532/13 532/17 533/7 576/21 620/6 621/15
discriminatory [4] 534/8 534/9 534/11 536/1
discuss [2] 521/12 591/14
discussed [5] 549/2 576/12 593/17 593/20 602/5
discussing [1] 591/1
discussion [3] 589/6 629/19 637/6
discussions [2] 561/11 589/9
disfavor [1] 627/22
dislike [1] 633/7
dismiss [7] 497/23 498/15 500/15 500/17 502/1 502/9 502/13
dismissal [2] 498/3 542/23
dismissals [1] 501/3
dismissed [18] 497/10 497/12 497/19 497/20 497/21 497/22 501/16 508/10 509/24 516/3 516/12 516/14 516/19 532/8 550/7 550/11 550/16 551/3
dismisses [1] 550/25
dismissing [3] 531/13 531/24 541/17
disorder [1] 588/5
display [1] 554/6
dispositive [1] 501/1
disputes [2] 567/10 567/10
distance [1] 568/8
distanced [1] 568/4
distinction [1] 575/13
distinctions [3] 575/12 618/10 618/11
distinctively [2] 609/22 624/12
distinctiveness [1] 564/9
distress [5] 576/21 577/12 587/8 588/3 602/9
DISTRICT [8] 487/1

487/2 487/23 489/22 524/9 572/15 573/9 641/19
diverse [3] 633/19 634/3 634/4
diversity [1] 610/12
DIVISION [3] 487/3 488/13 488/16
divorce [2] 602/2 623/2
do [156]
docket [10] 493/15 493/16 493/17 493/23 497/14 517/4 518/10 518/12 519/23 608/18
Doctors [1] 562/10
document [32] 517/4 519/16 520/15 520/25 522/1 522/6 522/19 522/21 523/4 523/17 524/3 526/16 526/20 526/22 527/24 528/12 528/14 536/17 537/4 537/5 538/5 538/8 538/10 540/2 540/5 543/7 543/12 543/13 549/2 563/7 582/4 584/25
documentation [2] 511/21 530/12
documents [12] 507/23 516/23 516/25 517/8 518/9 518/13 521/21 527/19 530/24 532/21 533/5 542/4
does [52] 493/12 493/13 493/17 493/19 493/23 493/25 494/20 494/22 495/15 495/16 495/17 496/2 496/4 506/7 506/14 510/8 518/22 518/25 519/21 519/22 520/10 520/11 533/12 533/13 534/2 534/14 534/15 539/17 540/4 540/16 544/23 545/4 549/23 554/16 573/20 578/11 583/25 584/20 585/2 585/25 590/16 597/7 603/11 603/14 615/21 616/23 622/4 622/4 622/6 636/19 636/24 637/17
doesn't [2] 506/19 532/3
doing [2] 554/7 569/4
domain [5] 562/4 564/22 567/9 569/23 572/10
don't [57] 500/10 500/12 506/10 510/21 513/2 514/10 514/15 515/5 516/18 518/6 526/17 527/8 528/24 537/20 541/10 541/13 542/2 544/1 544/7 545/3 560/16 562/20 564/2 567/21 568/24 573/23 579/3 581/20 590/5 590/22 596/1 597/9 597/18 598/13 599/18 599/21 603/24 606/4 606/11 609/2

611/18 612/1 614/13 616/16 619/7 619/8 624/11 625/9 627/5 632/21 634/15 635/1 635/15 637/11
done [11] 541/9 541/10 541/23 547/22 560/15 561/5 608/25 619/11 623/22 637/12 639/19
door [1] 541/16
double [1] 636/17
double-checking [1] 636/17
doubt [1] 510/7
down [15] 498/10 509/10 509/10 520/14 521/17 524/14 539/13 546/2 567/10 595/20 607/9 607/23 613/24 626/17 635/7
dozen [1] 558/18
Dr [24] 526/13 542/7 557/16 558/16 559/6 559/7 559/7 575/18 576/12 576/17 576/19 577/15 577/22 577/25 578/1 578/11 602/8 606/14 606/17 611/6 617/22 622/3 628/13 628/24
Dr. [51] 509/12 519/12 528/19 529/14 530/24 531/9 542/15 552/17 553/17 554/7 554/14 554/20 555/8 557/10 558/15 559/1 560/14 560/14 562/16 565/6 568/5 568/14 569/4 573/8 574/12 574/22 576/11 577/8 577/14 579/19 582/3 583/20 589/7 589/19 590/18 590/23 590/23 590/25 593/18 595/7 599/3 599/8 599/12 609/12 610/11 622/4 624/20 627/18 628/16 629/17 630/1
Dr. Coley [2] 599/8 599/12
Dr. Hatzenbuehler's [1] 559/1
Dr. Mark [3] 552/17 554/20 558/15
Dr. Meyer's [1] 577/8
Dr. Regnerus [28] 553/17 554/7 554/14 555/8 557/10 560/14 560/14 565/6 569/4 573/8 574/13 576/11 577/14 579/19 582/3 583/20 590/23 590/25 593/18 595/7 599/3 609/12 610/11 624/20 627/18 628/16 629/17 630/1
Dr. Regnerus' [3] 568/5 568/14 574/22
Dr. Shirley [1] 562/16
Dr. Wells [1] 542/15
Dr. Wills [6] 509/12

519/12 529/14 529/14 530/24 531/9
Dr. Wolff [4] 589/7 589/19 590/23 622/2
Dr. Wolff's [1] 590/18
draft [1] 547/15
drew [1] 586/21
drinking [1] 623/6
Drive [1] 489/10
drug [1] 623/6
ducks [1] 511/4
due [6] 609/8 638/17 641/10 641/12
duly [1] 553/1
duration [1] 570/5
during [32] 499/10 502/24 503/1 503/11 508/6 509/21 512/3 515/21 532/11 532/21 533/5 533/14 534/7 534/16 563/6 569/16 569/20 584/22 584/22 584/25 585/5 585/7 585/8 585/13 585/20 585/24 586/5 586/20 587/2 607/14 610/17 641/15
Duron [1] 540/23
Duron's [1] 541/4
dynamics [2] 570/3 586/13

**E**

each [12] 494/2 494/7 503/11 510/11 525/3 525/3 541/12 542/21 542/25 543/13 546/18 639/15
earbuds [2] 545/10 545/12
earlier [17] 507/4 507/18 508/13 512/4 514/12 514/12 525/3 527/5 534/19 545/15 573/12 573/24 579/22 585/21 605/7 608/8 620/2
early [3] 500/2 618/23 638/18
easily [1] 639/8
easy [2] 600/25 639/9
economics [3] 556/8 557/3 557/8
ed [4] 600/4 609/19 609/20 612/20
ED2.000078 [1] 538/16
editor [2] 571/1 571/11
edits [1] 496/15
educated [2] 597/13 606/10
education [7] 487/7 491/3 520/8 547/11 553/19 610/12 641/2
educational [21] 493/21 504/24 507/8 507/24 508/7 516/7 524/23 524/25 525/5 526/6 526/9 531/2 531/11 531/19 532/14 533/15 535/20 535/22 549/16 553/17 600/1
effect [4] 584/20 585/2

616/3 616/4
effects [1] 621/10
effort [2] 590/8 598/5
efforts [13] 507/21 568/15 572/21 572/21 585/4 627/9 627/10 627/15 627/20 627/25 628/5 628/12 628/18 eight [2] 522/14 599/1
either [7] 498/15 502/3 551/7 578/7 585/16 595/22 636/4
elect [2] 598/15 609/25
elected [1] 578/8
electroshock [1] 627/20
elicit [1] 607/19
ELIZABETH [2] 487/4 641/2
ELLIOTT [3] 488/13 491/8 518/15
else [9] 544/22 575/3 580/9 585/24 587/1 599/25 638/13 639/10 639/22
elsewhere [2] 586/23 618/21
email [1] 620/14
embattled [1] 622/25
embraced [1] 591/15
embracing [1] 609/14
emergent [1] 596/8
emotional [5] 508/5 563/22 582/14 584/6 602/15
employment [1] 569/24
employs [1] 602/20
enable [1] 499/2
encouragement [1] 604/12
end [8] 500/12 508/7 521/17 522/11 536/16 560/17 571/6 629/16
energy [1] 507/23
enforce [1] 527/16
enforced [3] 625/22 626/1 626/14
enforcement [10] 492/10 493/11 502/18 513/19 514/2 521/5 542/9 542/15 542/18 625/20
engage [1] 624/9
enough [4] 505/7 596/16 616/9 616/9
enroll [6] 599/18 599/22 600/2 600/2 633/3 633/18
enrolled [1] 598/19
enrolling [2] 597/2 600/19
ensure [1] 547/7
entail [1] 556/16
entailed [2] 556/13 556/13
enter [1] 603/12
entire [2] 571/6 598/7
entirely [2] 567/18 582/11
entitled [1] 634/20 641/19
entity [2] 524/17 524/18
entries [1] 495/22

**E**

entry [1] 496/18
enunciate [1] 641/14
environment [6] 581/19
596/10 597/6 600/21
609/19 625/6
environments [4]
568/23 579/4 608/2
612/8
episodes [1] 603/7
equal [2] 520/7 533/7
era [13] 563/6 563/8
582/11 585/1 585/5
585/7 585/8 585/25
586/5 586/20 587/2
610/8 610/17
eras [1] 578/4
especially [3] 586/14
605/20 606/23
essential [2] 621/23
629/2
essentially [3] 527/3
559/13 568/22
establish [1] 508/23
estimate [1] 557/24
estimates [1] 599/7
estimation [1] 552/9
et [22] 487/4 487/8
491/2 491/3 557/7
572/17 577/6 578/6
579/25 585/6 585/22
592/23 595/17 599/24
603/7 605/20 610/20
623/5 623/6 623/23
641/2 641/2
ethics [1] 622/20
EUGENE [2] 487/3
489/23
evaluate [7] 492/10
546/11 546/22 547/4
563/16 575/20 584/3
evaluated [3] 567/7
569/15 599/12
evaluating [4] 504/14
541/4 557/16 609/7
evaluation [29] 497/9
498/9 498/13 498/14
499/4 500/16 500/19
501/22 502/5 502/6
502/22 507/19 508/14
509/6 509/25 510/3
510/3 510/6 511/16
512/1 512/3 512/14
512/24 513/2 514/25
515/3 515/14 515/18
603/17
evaluations [2] 546/18
600/15
even [24] 500/25
501/14 508/3 508/6
509/1 514/12 515/18
525/13 551/2 577/9
581/13 581/15 585/8
598/13 599/5 599/21
606/10 610/7 610/17
614/19 625/25 626/4
627/5 632/20
evening [1] 552/7
events [1] 600/5
eventually [1] 558/25
ever [13] 547/11 547/15

547/19 553/25 580/25
588/9 588/11 588/15
588/19 588/20 589/1
598/23 598/24
every [10] 502/21
502/23 503/15 536/12
542/21 542/25 547/1
581/5 609/24 626/4
everybody [6] 517/25
518/22 518/23 518/25
580/4 636/20
everybody's [2] 551/24
638/7
everyday [1] 576/21
everyone [1] 608/16
everyone's [1] 537/13
everything [2] 509/9
639/16
evidence [11] 508/4
508/25 576/4 578/16
599/4 611/7 611/15
611/18 611/20 620/19
628/12
exacerbate [1] 563/22
exact [2] 500/13 564/2
exactly [4] 540/20 555/2
574/7 579/24
examination [13] 492/7
503/8 516/23 546/7
547/24 547/25 549/2
553/15 565/13 573/6
575/9 612/2 632/17
examine [2] 579/5
620/1
example [8] 498/2
539/14 539/14 539/15
540/12 540/18 588/22
594/23
examples [1] 540/22
Except [1] 616/24
exception [4] 497/9
497/12 498/5 501/16
exceptions [1] 525/13
exclude [3] 572/19
572/22 574/22
excluded [1] 540/14
exclusion [1] 627/4
exclusive [1] 579/1
exclusively [3] 543/5
587/6 606/24
excuse [1] 496/12
502/18 513/17 513/20
516/22 552/1 556/11
556/11 631/7
excused [4] 551/16
552/8 635/19 635/24
executive [1] 568/10
exempt [2] 520/19
526/8
exempted [3] 505/17
540/9 540/14
exemption [87] 492/14
500/25 502/2 502/9
502/14 503/25 504/2
504/10 504/18 505/7
505/9 505/15 505/17
505/25 506/6 507/4
507/14 507/16 508/8
511/5 516/3 516/4
516/12 516/15 516/20
523/1 523/7 523/13
524/16 524/22 525/25

526/9 527/4 527/6
528/4 528/5 529/21
529/22 529/25 530/3
530/5 530/11 530/16
530/18 530/19 531/21
531/21 531/25 532/6
532/13 532/16 533/18
534/23 534/24 535/13
536/4 537/18 538/12
538/22 538/23 538/24
538/25 539/5 539/6
539/9 539/10 539/16
539/19 539/21 539/22
539/22 540/7 540/9
540/13 540/17 540/20
543/18 544/1 549/4
549/9 549/15 549/22
549/25 551/6
exemptions [11] 502/7
524/24 525/6 525/6
525/13 525/23 526/14
537/9 538/14 538/18
543/21
exercise [1] 525/15
exert [1] 626/3
exhibit [58] 492/22
493/2 493/3 493/9
493/10 493/12 498/10
503/23 508/16 509/2
509/3 514/13 515/13
516/18 517/23 517/24
519/13 523/15 528/13
535/19 536/19 536/20
536/22 536/25 537/7
537/14 537/19 538/2
538/16 540/5 543/9
543/10 547/23 549/3
549/6 554/6 554/7
554/13 554/16 554/20
569/17 575/18 579/17
580/8 582/3 583/13
590/15 590/21 590/22
612/25 613/1 613/7
613/17 614/25 615/19
616/10 617/10 619/11
exhibits [5] 517/1
517/21 518/14 519/1
583/15
existed [1] 505/24
existing [1] 504/18
exists [2] 544/10 574/18
expect [2] 586/7 632/24
expected [4] 552/14
571/21 586/7 586/8
expeditiously [1] 514/18
expelled [1] 535/22
experience [2] 560/24
560/25 563/23 565/5
570/25 571/14 576/25
577/9 586/1 588/18
595/7 597/24 600/11
604/20 607/14 607/17
614/12 618/20 623/4
experienced [10] 574/2
588/9 588/12 588/13
588/15 588/17 588/20
589/1 603/4 626/22
experiences [5] 580/1
580/1 580/2 599/22
622/15

experiment [1] 587/3
599/24
experimenting [2]
607/15 607/18
expert [37] 552/17
554/4 554/8 554/20
554/24 554/25 555/3
556/19 561/25 562/7
562/9 562/14 562/20
562/25 563/16 563/19
564/23 565/6 566/7
567/17 569/6 572/7
572/9 572/9 572/11
572/14 572/19 574/4
575/1 575/2 575/6
575/9 575/18 590/18
609/13 621/20 622/18
expertise [4] 559/5
575/11 575/23 593/13
experts [5] 562/12
565/1 574/8 600/6
611/8
explain [7] 494/6
494/11 494/16 495/4
497/11 556/12 622/17
explored [1] 556/7
express [1] 574/23
expressed [3] 577/23
578/1 634/22
extended [1] 563/5
extensive [1] 594/9
extent [8] 520/20 539/9
540/7 544/2 556/7
575/21 584/15 608/20
extra [2] 504/9 504/11
extrapolates [1] 635/5

**F**

face [2] 618/4 619/7
faced [3] 578/24 580/25
596/3
fact [15] 507/18 509/14
510/16 525/5 527/6
532/16 538/5 547/7
568/13 568/21 571/7
584/20 585/2 608/9
612/8
factors [1] 514/19
facts [1] 498/1
factual [2] 563/18
564/25
factually [1] 567/6
570/17
faculty [1] 547/19
failing [1] 581/17
failure [2] 618/14
641/14
fair [47] 503/18 503/19
504/8 505/7 507/24
511/1 511/2 521/8
522/5 522/10 522/23
526/20 526/21 528/19
529/10 531/4 537/18
546/14 548/19 549/19
549/21 549/23 550/10
561/12 561/24 564/13
571/3 581/23 582/23
582/24 584/15 585/17
590/9 591/22 594/12
597/16 597/21 599/17
605/12 614/6 616/9

616/19 622/24 627/7
629/5 629/5 633/20
fairly [6] 510/22 592/5
607/19 629/11 633/19
634/14
faith [2] 605/9 609/17
fall [2] 538/25 557/6
falsehoods [1] 631/25
Falwell [8] 524/4 524/8
526/13 526/15 526/25
527/1 527/5 527/25
familiar [11] 516/6
516/13 538/2 549/10
566/4 566/6 605/18
605/18 625/14 630/1
631/20
families [2] 568/16
622/15
family [6] 569/15
569/25 570/2 573/14
573/20 601/24
fans [1] 610/15
far [9] 514/22 517/13
569/4 577/20 589/24
597/12 601/9 605/17
631/9
fared [2] 570/6 584/17
faring [2] 579/9 579/11
fast [1] 641/13
father [4] 569/19 570/2
570/8 570/10
favor [5] 536/13 627/25
628/1 634/13 634/17
federal [11] 488/16
498/1 498/2 532/14
550/12 565/24 566/18
566/25 567/16 572/24
597/9
federally [1] 531/2
feeds [1] 594/22
feel [15] 595/3 595/14
596/16 613/23 613/25
614/5 614/10 614/16
614/17 615/2 615/20
616/21 619/8 627/3
632/20
feeling [7] 614/20 617/2
617/13 617/17 617/23
618/2 627/4
feelings [2] 628/7 628/8
feels [1] 622/25
felt [2] 571/11 577/10
female [2] 524/12 608/4
females [1] 592/11
few [8] 517/17 524/2
524/3 526/24 546/9
613/5 620/23 627/14
fewer [1] 589/20
fickle [1] 545/16
field [3] 540/19 572/7
574/8
fielded [13] 569/22
582/9 584/25 585/7
585/9 585/13 585/20
585/21 585/24 587/2
610/8 614/8 616/2
fields [1] 591/1
figure [1] 511/4
figures [1] 602/8
file [9] 505/15 507/4
507/14 508/23 525/18
537/18 539/22 637/15

**F**

file... [1] 637/16
filed [30] 492/19 493/3
493/4 495/8 495/14
497/15 497/15 497/24
498/1 498/19 499/17
510/12 512/22 520/4
520/13 521/7 521/9
522/15 524/10 526/1
529/6 529/22 531/18
532/7 535/19 538/21
542/22 551/1 620/22
621/5
filing [6] 493/6 498/2
510/25 531/3 636/15
636/18
filings [1] 543/15
fill [1] 520/12
final [7] 505/22 506/3
506/10 506/24 506/25
543/5 611/6
financial [1] 532/14
financially [4] 595/25
596/16 597/3 597/16
find [10] 504/17 514/21
538/18 569/7 585/24
604/12 604/17 605/10
605/14 605/19
finding [5] 589/25 618/6
findings [2] 558/24
560/6 577/21 577/25
finds [1] 567/18 567/23
fine [6] 545/23 565/11
636/21 638/19 638/23
638/24
fingers [1] 491/16
finish [1] 609/12
finished [3] 523/25
528/18 537/12
first [27] 493/14 499/5
504/21 514/15 517/4
519/19 521/2 522/5
524/3 524/3 538/20
546/10 548/14 548/15
548/19 550/22 553/1
558/8 560/7 561/23
570/23 578/9 599/19
599/21 617/16 618/11
632/19
fiscal [2] 510/6 546/13
fit [2] 609/15 610/5
fits [1] 634/1
five [1] 614/11
fixed [1] 607/19
Floor [1] 488/7
Florida [1] 571/12
fluent [1] 607/16
fluidity [2] 606/15
606/22
focus [3] 581/21 582/16
609/8
focused [1] 579/6
589/21 592/10
folks' [1] 638/5
follow [10] 540/4 557/15
573/2 575/8 603/21
612/5 621/21 623/25
632/25 633/8
follow-up [5] 557/15
573/2 575/8 612/5
621/21

followed [3] 530/17
533/21 604/5
following [2] 521/19
638/16
follows [3] 492/5 553/2
594/4
football [2] 606/4 606/6
forbid [2] 591/19 626/12
force [2] 595/12 596/23
forced [1] 625/18
Forces [1] 560/20
forcing [1] 596/23
foregoing [1] 641/7
forget [1] 634/13
forgiveness [1] 601/1
forgiving [1] 600/12
form [4] 498/24 505/2
513/24 626/22
formally [2] 524/15
524/24
formation [2] 607/25
610/2
formed [1] 593/5
former [2] 524/4 532/22
forms [5] 596/7 604/24
624/24 627/20 627/24
forth [2] 503/2 529/21
forthcoming [1] 557/18
forward [14] 495/12
498/15 498/23 500/4
500/6 500/8 501/15
501/17 501/24 502/22
505/1 506/8 511/19
521/19
found [6] 503/17 570/22
572/23 576/15 586/23
604/11
foundation [6] 512/15
514/6 529/11 530/21
593/11 595/1
four [4] 528/14 555/19
556/4 610/3
four-page [1] 528/14
four-plus [1] 610/3
fourth [1] 497/4
Fox [4] 515/22 516/2
523/10 541/18
frames [1] 590/3
framework [3] 593/7
593/20 594/4
frankly [1] 565/22
585/11 585/15 595/19
596/2 596/11 607/2
free [4] 511/15 551/6
600/3 622/23
freedom [5] 489/5 624/1
629/20 630/13 630/15
freely [3] 604/12 624/3
629/22
frequent [2] 587/8 588/2
frequently [2] 622/14
626/14
freshman [1] 561/9
Friday [12] 491/18
492/9 492/13 495/3
496/3 502/25 503/1
505/3 516/22 532/25
552/7 637/3
Friday's [9] 493/18
493/24 494/4 494/9
494/14 494/21 495/18
495/25 496/2

friend [4] 571/3
friendship [1] 601/24
front [4] 492/23 493/8
505/19 519/16
full [3] 553/5 555/20
639/15
fully [4] 574/23 617/18
617/21 617/23
function [1] 625/6
fundamental [1] 559/14
Fundamentally [1]
567/9
funded [1] 531/2
funky [1] 614/10
further [21] 496/6 503/5
508/19 508/21 509/19
520/16 530/12 539/13
544/11 551/11 554/24
559/2 575/4 611/23
632/6 635/10 635/17
636/1 636/7 636/9
636/12
future [2] 539/23 596/6

**G**

gain [1] 635/16
gather [1] 511/25
gay [1] 614/10
gender [30] 520/21
520/22 521/10 523/2
528/24 530/19 531/19
541/20 541/21 547/12
547/14 547/16 547/18
547/21 560/21 572/21
591/17 593/9 594/24
596/7 599/6 606/23
609/16 614/4 617/12
617/21 618/1 619/1
622/19 627/9
gender-transitioning [1]
593/9
GENE [4] 489/12
491/10 590/17 619/20
general [24] 504/5
512/13 512/23 529/15
534/25 551/7 560/17
561/13 566/17 568/5
569/13 577/19 580/23
586/9 602/9 607/3
610/6 611/10 611/14
614/12 614/16 621/4
624/13 624/13
generalized [3] 578/17
586/14 588/5
generally [14] 502/17
502/18 504/12 505/20
505/21 512/2 512/22
529/17 536/7 536/9
536/13 564/14 620/23
620/24
generation [4] 576/11
578/18 576/23 587/6
generations [1] 578/16
generous [1] 581/12
gentlemen [1] 544/19
George [4] 515/22
516/2 523/10 541/18
get [19] 511/4 518/2
537/2 563/10 579/3
581/4 598/11 598/24
560/3 613/18 614/17
607/5 618/8 627/6

629/10 632/21 638/9
600/6 638/16
getting [5] 536/16 571/2
625/10 638/5 638/7
give [13] 512/17 517/17
532/3 532/3 536/11
595/15 598/24 611/2
620/12 628/14 637/16
637/25 638/1
given [24] 504/11
512/21 530/15 547/7
575/11 581/21 585/12
606/11 612/13 617/7
622/24 629/7 631/20
633/2
gives [2] 539/13 539/14
giving [1] 609/7
go [49] 491/24 498/15
500/6 502/22 503/6
517/10 517/21 517/22
518/23 519/15 521/13
522/2 526/18 537/24
538/15 538/15 544/19
545/2 553/9 553/12
555/5 558/4 565/11
575/10 575/16 587/18
588/8 590/19 592/18
597/8 598/12 599/1
599/5 600/9 609/20
609/24 609/25 613/4
613/22 613/24 620/3
621/24 623/21 625/12
627/14 629/14 629/18
632/3 637/2
God [3] 561/2 561/10
623/15
Godliness [1] 624/18
goes [10] 521/12
526/17 528/5 529/24
560/21 567/22 567/23
569/6 575/21 599/16
going [63] 491/16
491/17 498/23 500/4
500/8 501/24 503/13
504/18 504/20 511/5
516/24 516/25 518/9
519/12 521/2 521/16
523/19 525/4 537/6
541/4 541/13 542/7
542/7 542/20 542/25
543/8 544/3 545/1
545/5 545/13 546/1
548/12 552/1 553/6
566/3 566/19 567/16
579/17 579/18 584/3
593/15 598/9 598/20
600/14 600/15 607/25
608/19 608/20 609/1
612/5 613/4 619/24
626/7 627/1 628/15
629/10 630/22 631/16
633/5 634/4 637/2
637/24 638/9
Goldberg [1] 532/24
gone [2] 531/10 561/3
good [9] 503/10 518/18
552/8 588/4 603/24
609/15 609/19 610/3
612/4
got [10] 536/24 559/24
560/3 613/18 614/17
622/11 626/25 626/25

629/16 637/12
governing [1] 526/19
Government [29] 491/9
491/18 492/22 503/23
508/16 509/2 514/13
515/13 519/5 535/18
536/24 537/7 538/2
543/8 543/9 547/23
549/6 551/13 551/18
552/10 552/11 575/25
580/11 591/6 635/21
636/10 636/13 638/20
638/24
Government's [4]
536/18 536/18 536/22
549/3
governmental [1]
634/20
governments [1] 625/22
grabs [1] 595/10
gracious [1] 604/23
graduate [2] 541/1
541/8
Graduated [1] 553/21
graduation [1] 613/24
grant [3] 498/21 527/15
528/5
granted [7] 520/18
523/7 527/9 530/18
538/21 539/1 539/5
granting [5] 495/10
527/8 538/23 539/9
539/20
grants [3] 527/6 597/4
grasp [2] 564/17 634/15
great [3] 536/8 585/15
610/5
greater [6] 576/21
577/11 612/13 612/13
612/15 623/1
grew [3] 524/8 570/3
610/17
GREY [2] 489/9 489/10
Griffith [1] 489/10
grounded [2] 593/2
593/3
grounds [1] 619/23
group [8] 505/23 542/20
542/24 543/3 577/14
619/14 631/24 632/2
groups [1] 618/9
grow [2] 634/5 634/6
growing [5] 569/20
569/22 570/1 610/16
612/21
growing-up [3] 569/20
569/22 570/1
grown [2] 557/13 577/7
guess [5] 532/22 564/7
582/18 597/13 636/6
guest [1] 638/14
guidance [1] 503/24
506/14 506/14 506/18
506/20 506/22 530/17
537/15 540/5 547/18
guide [2] 608/6 637/4
guidelines [1] 504/5
guys [1] 518/15

**H**

had [49] 491/17 495/23
500/3 500/4 502/8

CCU-SER-167

H

had... [44] 509/1 511/22
516/17 519/14 523/12
523/17 528/15 529/14
530/16 531/1 531/20
531/21 532/12 533/4
534/19 537/2 537/10
545/14 557/14 559/22
560/24 561/5 568/14
569/19 570/4 570/4
571/3 573/13 573/13
576/19 578/20 580/25
585/20 586/6 586/10
587/1 588/2 588/15
588/15 588/19 601/25
607/7 621/9 622/10
half [1] 608/3
hand [2] 552/23 635/3
handle [3] 503/24 504/2
504/4
handled [1] 637/1
handles [1] 546/18
handwringing [1]
595/18
happen [6] 501/25
507/2 518/16 571/11
593/6 595/8
happening [4] 514/14
514/22 516/6 577/3
happens [1] 595/23
happy [4] 517/10 555/4
570/24 639/7
harassed [1] 571/12
hard [2] 517/13 518/3
harm [5] 559/19 585/6
604/9 623/6 627/4
Harvard [1] 559/11
has [62] 495/1 495/23
496/19 497/10 497/12
497/18 497/24 498/20
499/1 499/12 499/13
500/7 501/16 504/16
508/20 509/17 509/18
512/21 514/13 515/14
516/14 516/19 521/6
531/10 531/12 531/18
531/23 532/6 532/8
533/1 534/10 537/7
537/21 538/16 538/21
539/5 539/6 543/18
547/10 547/13 547/15
547/17 547/19 547/22
550/7 550/11 566/20
567/6 567/7 568/2
568/4 572/23 574/11
576/3 577/4 577/7
582/2 589/4 590/14
613/7 627/21 631/23
hasn't [1] 567/3
hate [2] 521/23 631/24
Hatzenbuehler [3]
558/15 559/9 559/10
Hatzenbuehler's [2]
559/1 567/7
hauled [1] 626/4
have [180]
having [18] 492/5
498/23 527/13 540/25
544/25 553/1 561/12
579/1 581/18 585/14
588/9 588/11 588/13

588/20 589/1 597/4
618/9 629/15
he [42] 491/19 491/19
491/19 512/16 512/16
514/8 514/9 526/16
526/17 526/18 529/18
532/2 532/2 532/3
532/3 540/25 541/5
541/25 541/25 552/18
558/16 558/17 571/2
571/2 571/6 571/7
571/7 571/12 572/23
575/9 589/25 589/25
599/16 601/12 601/16
601/22 601/25 601/25
605/13 606/3 634/25
635/5
he's [13] 509/7 545/6
545/7 545/8 545/13
548/5 554/25 559/11
574/23 574/25 589/21
632/1 632/2
Head [1] 606/3
headline [1] 537/8
headquarters [7] 499/18
499/20 499/21 500/5
542/20 542/24 543/4
health [17] 563/22
572/7 572/20 582/14
582/14 584/1 584/6
588/4 588/7 601/5
602/15 611/9 611/14
612/7 612/11 620/6
621/16
hear [8] 544/17 545/25
546/4 548/10 549/12
552/1 554/23 555/1
heard [10] 515/8 545/7
545/19 551/24 552/4
556/18 575/2 581/22
631/2 641/9
hearing [6] 487/19
491/3 540/25 589/7
609/9 639/24
hearsay [1] 576/3
held [6] 511/17 511/18
630/5 630/19 634/11
637/6
Hello [1] 545/18
help [18] 531/10 531/13
531/23 597/19 605/3
605/22 606/9 608/9
612/13 612/15 612/17
612/22 619/12 623/20
624/17 628/3 628/4
628/8
helpful [5] 550/4 569/7
574/25 608/20 608/22
helps [1] 607/22
her [4] 562/22 568/12
568/17 637/4
HERBERT [2] 489/9
489/10
here [41] 491/11 496/7
498/2 503/12 513/3
515/13 517/4 517/24
520/14 521/4 525/19
537/21 540/18 552/8
565/1 581/14 599/2
599/16 600/2 610/1
610/23 612/4 612/17
614/1 614/3 614/21

615/17 615/20 617/0
618/9 618/9 620/12
620/22 621/13 621/14
622/12 626/25 627/19
629/15 630/12 634/22
here's [1] 601/9
hers [1] 562/17
heteronormative [1]
592/6
heterosexual [7] 582/17
607/9 615/1 615/3
615/22 616/9 617/19
heterosexuality [1]
607/12
heterosexuals [1] 582/8
hew [1] 564/7
hewing [1] 606/1
Hey [2] 507/13 598/25
high [1] 584/6
higher [23] 576/20
576/20 576/21 577/3
577/9 584/6 584/7
584/11 584/11 585/5
585/6 587/19 600/4
602/15 603/8 609/19
609/20 610/12 612/20
614/20 615/6 617/3
618/2
highlight [1] 628/2
highlights [1] 623/16
HILARIE [4] 488/15
491/8 517/15 635/22
Hill [1] 553/23
him [2] 520/7 620/2
himself [1] 522/1
hinge [1] 611/3
his [36] 491/20 511/7
513/11 526/15 540/25
541/1 541/8 544/25
548/4 554/25 559/12
565/4 565/5 566/20
569/6 571/14 572/24
574/23 574/24 575/9
575/10 575/19 576/12
578/1 589/12 590/19
593/13 593/14 601/13
619/25 620/2 630/8
631/8 632/4 632/4
635/2
historical [2] 596/17
623/14
historically [4] 564/21
592/4 618/23 635/8
hm [28] 561/7 561/22
564/4 564/19 566/14
566/16 573/15 588/1
588/23 589/14 589/18
590/4 598/1 598/22
599/20 601/11 602/14
602/17 603/6 603/15
603/23 603/25 606/7
607/4 608/12 610/19
622/13 633/14
hold [10] 510/20 510/21
510/24 511/3 511/11
511/13 511/23 512/21
512/24 521/4 521/4
537/20 540/18 552/8
565/1 581/14 599/2
holding [1] 634/19
holds [1] 605/23
holiday [2] 638/6 638/7
holidays [2] 638/18
639/7

holiness [1] 624/18
homosexual [10] 593/9
594/24 624/9 624/9
625/4 625/7 625/7
625/16 625/21 626/3
Homosexuality [2]
560/21 602/1
homosexuals [2] 602/1
626/2
honor [85] 491/25 492/2
503/4 509/7 513/25
518/2 519/2 519/4
519/6 521/23 522/16
527/12 527/16 527/18
527/21 535/2 545/14
545/21 546/3 548/3
550/1 550/5 551/11
551/15 551/19 552/9
552/12 552/16 553/13
554/19 555/4 559/2
565/4 565/8 566/19
569/3 572/18 573/1
574/21 575/5 575/17
575/24 575/25 576/3
576/7 580/7 580/12
580/16 583/12 583/16
583/18 591/3 591/7
591/10 603/23 609/10
615/14 619/24 626/7
626/15 628/20 630/7
630/20 631/5 631/7
631/11 631/16 632/1
632/8 632/14 635/12
635/20 635/22 635/25
636/2 636/4 636/12
636/22 637/18 637/19
638/3 638/21 638/25
639/4 639/11
HONORABLE [1]
487/22
Hoogstra [2] 562/16
578/20
Hoogstra's [1] 563/7
hope [1] 514/17
Hopefully [1] 552/3
host [1] 596/3
hours [1] 575/1
household [2] 569/18
570/4
households [6] 569/17
570/8 570/9 570/10
570/10 570/11
housing [1] 515/24
516/11
how [43] 492/13 501/8
503/24 504/2 504/3
504/17 506/20 506/22
510/20 510/21 511/4
556/7 557/5 557/5
557/24 558/17 561/11
575/22 581/13 594/21
594/22 595/2 595/14
596/2 597/11 599/13
602/8 603/24 606/8
608/5 608/8 612/17
612/18 612/23 614/10
616/16 617/6 625/12
626/13 626/21 633/17
634/21 639/6
However [2] 528/2
530/15

holiness [1] 624/18

human [7] 592/9 595/16
593/17 611/4 624/2
629/8 629/21
HUNTER [1] 487/4
491/2 641/2
hypotheticals [1] 536/11

I

I'd [16] 492/17 517/23
518/13 524/2 528/12
536/17 540/22 554/23
555/1 565/9 570/24
613/5 613/24 619/22
621/19 635/16
I'll [12] 517/21 519/15
537/23 539/15 553/5
582/3 590/19 599/25
606/18 638/1 638/8
638/9
I'm [101] 491/11 491/16
491/22 492/21 496/4
503/13 503/21 504/15
504/17 513/15 513/15
513/16 515/12 516/13
516/16 516/24 516/25
517/4 517/10 519/12
522/18 523/18 523/19
528/16 532/5 536/11
537/5 537/6 546/24
548/12 550/19 550/24
551/22 552/1 552/6
553/20 555/4 556/21
556/23 557/19 559/4
562/2 562/19 566/3
566/19 567/15 571/14
572/3 572/6 572/14
572/14 579/16 582/11
582/18 585/10 587/14
589/2 589/15 590/23
592/17 593/15 599/8
599/8 603/3 604/1
604/5 605/17 605/18
606/18 608/17 608/19
608/24 608/25 609/6
612/5 613/4 616/6
617/15 619/11 619/24
620/19 620/21 621/13
624/18 624/19 626/7
628/4 629/13 629/15
629/16 630/14 630/22
631/20 631/20 633/17
634/23 636/10 637/2
637/23 638/9 639/7
I've [29] 514/22 524/1
528/18 536/23 537/12
538/19 553/25 555/10
555/24 556/10 556/24
557/15 559/24 560/17
562/1 561/2 561/5
561/5 561/6 561/8
561/8 563/9 579/20
620/11 626/25 629/16
631/20 639/15 639/16
Idaho [9] 518/12 528/14
529/7 529/8 529/18
529/20 529/25 530/5
530/25
Idaho's [1] 528/20
idea [3] 505/6 610/25
633/18
ideal [1] 603/10
ideation [1] 559/19

**I**

identical [1] 497/25
identified [2] 498/6 607/13
identify [7] 493/2 494/24 497/13 504/22 544/18 581/11 590/23
identifying [1] 641/13
identity [15] 520/21 520/22 521/10 523/2 528/24 530/19 531/19 541/21 572/21 596/7 606/13 607/25 609/16 622/19 627/9
ideology [1] 606/23
ignore [1] 633/24
illegitimate [2] 624/24 624/25
illicit [1] 592/7
illness [1] 602/25
immediately [2] 496/5 616/25
impact [7] 492/14 499/24 596/23 626/3 626/13 632/24 633/10
impacted [2] 499/13 500/1
impacts [1] 604/2
implemented [2] 499/12 499/16
implementing [1] 523/3
importance [1] 628/3
important [5] 618/20 618/22 628/22 629/1 629/11
importantly [1] 501/13
impression [1] 628/14 628/14
inappropriately [1] 568/14
include [6] 496/3 496/4 502/6 526/11 541/14 554/10
included [3] 496/18 537/14 585/5
includes [2] 493/21 495/22
including [6] 521/21 525/6 578/20 611/5 623/5 633/9
inconsistent [1] 524/20
incorrect [1] 496/18
increase [1] 559/13
increasing [1] 606/22
indeed [4] 533/1 533/19 545/17 612/6
independent [1] 586/16
Index [2] 558/17 559/21
indicated [1] 512/4
indicates [7] 493/6 494/2 494/7 494/12 494/25 495/2 539/22
indication [2] 502/8 544/9
indiscernible [4] 549/10 605/1 615/8 617/25
individual [5] 493/16 544/16 575/7 616/25 617/2
individuals [2] 493/6 543/4

infer [1] 528/23
influence [1] 557/16
influences [3] 556/1 557/5 572/16
inform [1] 621/5
information [9] 494/20 499/1 508/18 508/20 508/21 509/18 511/25 521/20 525/23
informed [1] 592/8
informs [2] 525/12 592/2
infrequently [2] 625/22 625/25
initial [8] 505/6 505/8 505/12 505/13 506/11 506/20 507/2 517/2
injunction [4] 487/19 491/3 517/3 540/24
injuries [1] 536/1
insertion [1] 623/16
inside [1] 623/1
insofar [5] 564/17 571/21 594/18 601/8 614/8
instance [2] 514/15 530/25
instances [2] 496/24 531/5
instant [1] 494/18
Institute [5] 631/1 631/3 631/4 631/19 631/23
institution [24] 493/22 504/23 504/24 507/9 507/24 508/7 525/5 530/3 531/11 531/20 533/15 533/17 533/17 533/20 538/21 539/16 549/17 594/3 594/10 600/20 604/3 604/8 605/15 629/3
institution's [3] 538/24 539/19 547/14
institutional [1] 625/5
institutions [27] 516/8 524/24 524/25 526/7 526/10 531/3 532/14 535/21 535/22 537/8 538/13 538/17 543/20 543/21 543/25 544/9 549/8 564/11 579/7 594/15 594/17 597/22 600/1 605/7 624/21 630/2 630/4
institutions' [1] 541/20
instructed [3] 547/15 547/17 547/19
instructions [1] 538/13
intend [1] 525/15
intends [1] 525/15
intentionally [1] 610/1
intents [1] 542/17
interaction [1] 495/23
interactions [2] 496/21 514/14
interested [4] 556/21 556/23 597/19 601/13
interesting [2] 607/24 614/18
internalized [1] 576/22
interpretation [1] 526/15
interpretations [1] 593/4

interprets [1] 548/13
interracial [4] 630/4 630/4 630/7 630/18
interrupt [2] 513/23 521/24
intersection [2] 561/16 561/20
INTERVENOR [6] 489/3 489/8 491/10 551/23 552/2 552/16
Intervenors [10] 487/14 491/14 544/13 544/21 551/21 552/14 632/9 632/11 636/1 639/1
interview [2] 556/17 589/13
interview-based [1] 589/13
interviewing [1] 511/19
interviews [6] 500/3 500/6 500/7 511/24 511/25 556/20
introduce [4] 491/4 517/21 517/23 620/19
introduced [2] 518/14 590/15
invalid [1] 551/7
investigate [5] 492/10 534/8 534/11 535/14 539/25
investigating [1] 538/13
investigation [26] 495/12 498/16 500/22 505/5 507/5 507/6 507/8 507/9 507/12 507/20 507/20 507/25 516/2 521/7 521/14 521/16 522/7 525/4 525/7 525/10 525/22 526/7 535/13 536/10 536/14 542/23
investigations [4] 508/2 512/13 537/8 538/17
investigator [7] 504/15 505/6 505/8 505/12 505/13 505/16 507/3
investigators [6] 503/24 506/15 506/20 513/8 514/3 514/11
invitation [1] 525/11
invitatory [1] 525/11
invite [2] 524/23 525/17
invites [1] 525/5
inviting [1] 525/17
involved [2] 494/18 628/12
involves [3] 516/17 528/23 546/25
irrelevant [1] 631/9
irritating [1] 607/21
irritation [1] 570/15
is [473]
ISAAK [1] 488/6
isn't [7] 509/4 515/3 525/2 525/7 527/12 546/19 570/21
issuance [1] 527/4
issue [10] 505/4 505/9 535/12 563/19 563/20 565/1 571/17 573/20 627/1 639/19
issued [4] 532/6 543/18

568/13 570/22
504/2 504/4 511/5 512/7 512/8 525/25 557/22 560/24 561/16 561/18 566/21 572/12 573/21 608/21 609/8 639/8
issuing [1] 506/9
it [320]
it's [117] 503/1 503/1 504/8 509/4 511/5 512/3 512/5 512/11 515/1 515/18 517/13 525/18 532/25 537/7 538/5 540/18 540/18 543/8 545/6 550/3 550/3 551/9 554/13 557/7 559/24 567/5 567/5 567/24 570/15 570/16 570/16 578/17 581/21 582/7 582/10 582/20 582/22 583/8 585/17 585/19 591/22 592/10 593/13 595/5 596/9 597/2 597/24 598/11 598/12 600/3 600/6 600/20 601/12 601/22 602/2 602/19 602/19 603/2 603/3 603/4 603/10 604/1 605/1 606/8 606/9 606/12 606/12 606/12 606/12 606/17 606/25 607/20 607/21 607/24 607/24 609/8 609/18 609/19 610/3 610/3 611/13 611/13 613/17 613/20 614/9 614/13 614/18 615/9 615/24 616/1 616/12 617/6 617/17 620/11 621/4 622/9 622/21 622/21 624/22 623/7 623/15 623/20 625/17 625/20 625/24 626/21 628/2 628/21 628/24 629/1 629/2 630/8 631/8 632/3 634/14 635/6 638/7 639/18
its [8] 511/4 526/19 526/19 527/16 528/3 548/13 550/16 623/1
itself [3] 568/4 568/8 569/16
Ivanhoe [1] 488/5
IX [41] 492/20 506/16 506/17 508/5 516/15 519/24 521/5 521/12 522/8 523/1 523/7 523/12 524/20 524/21 524/25 524/25 525/4 525/6 525/25 528/21 531/2 531/3 531/7 531/18 531/22 533/16 533/20 534/23 534/24 535/1 535/17 537/16 538/12 541/17 542/21 544/2 548/21 549/16 550/17 550/18 551/2 551/6

J.C [1] 488/4
Jaffe [3] 489/12 489/15 489/17
January [4] 523/16 638/18 638/22 638/23
January 10th is [1] 638/23
January 16th [1] 523/16
January 7th or [1] 638/22
Jerry [4] 524/4 524/8 526/15 527/24
Jersey [5] 571/12 583/1 583/2 583/6 583/9
JESSUP [2] 487/13 489/3
job [2] 606/3 606/9
jobs [1] 561/3
Joe [1] 536/20
joining [2] 491/12 618/8
Jones [3] 534/16 534/19 536/2
JOSEPH [2] 488/9 491/6
Josh [5] 544/15 545/9 545/12 590/20 619/12
JOSHUA [7] 489/14 491/11 527/22 544/25 545/4 545/6 545/18
journal [5] 558/25 560/19 560/21 570/21 571/1
journals [2] 560/14 560/19
JUDGE [4] 487/23 571/19 571/20 571/21
Judge's [4] 566/4 567/16 567/16 573/9
July [1] 510/13
June [3] 510/12 520/17 587/7
June 27th [1] 520/17
jurisdiction [10] 498/18 498/19 504/6 505/2 506/5 521/6 532/9 534/10 535/6 536/3
just [83] 491/19 498/12 500/24 502/10 502/17 503/13 503/14 508/14 511/23 513/8 513/23 514/3 516/10 516/16 518/9 519/15 520/12 521/2 521/25 523/24 524/2 531/5 531/15 532/23 536/23 537/2 537/9 537/13 543/12 544/18 547/7 548/4 551/23 551/25 552/19 552/19 556/11 559/4 559/4 559/20 559/24 560/10 562/24 569/9 571/16 572/3 576/1 576/1 584/13 586/2 586/2 586/23 588/20 590/19 604/24 606/10 608/1 608/16 608/23 608/25 609/12 611/6 611/7 612/6 615/18 615/19 616/3 616/7 616/7 618/7 623/15

CCCU-SER-169

**J**

just... [12] 623/23
625/21 628/9 629/17
631/2 632/14 633/19
635/16 636/10 636/22
638/10 639/11
Justice [4] 488/13
488/16 632/7 634/24
justification [1] 526/17

**K**

keep [2] 491/16 609/1
Kendra [2] 489/22
641/24
Kennedy [1] 634/24
key [1] 558/24
kids [2] 570/3 581/6
kind [51] 506/14 506/18
517/22 520/12 526/9
541/8 541/10 541/22
546/1 556/2 556/17
557/7 558/5 561/10
563/9 563/25 570/4
584/11 585/11 587/18
589/12 590/8 592/24
594/7 594/10 595/11
596/9 598/2 598/11
599/12 600/21 600/25
603/16 604/23 606/17
608/5 614/21 618/11
621/23 621/25 622/2
623/18 627/3 627/19
627/21 628/11 628/13
629/3 629/3 633/10
633/25
kinds [20] 570/9 578/19
579/7 580/5 584/4
584/4 587/24 589/16
592/23 598/19 601/13
602/12 602/22 604/17
604/19 606/19 616/5
627/16 629/10 633/3
knew [1] 499/17
know [104] 497/20
501/8 501/14 501/18
501/20 501/25 502/1
502/3 504/21 504/25
505/8 505/14 506/23
507/3 507/19 507/22
512/12 513/3 523/24
532/3 533/15 533/20
537/2 537/10 538/18
542/2 551/25 560/16
561/17 562/15 563/4
571/9 572/3 575/12
580/1 581/10 581/16
581/19 582/17 584/10
584/12 585/8 588/11
590/3 590/5 594/17
596/4 596/6 596/7
597/4 598/9 598/13
598/17 599/9 599/13
599/18 599/23 600/19
600/23 601/20 601/22
601/25 602/19 603/4
604/18 605/19 605/23
606/6 606/9 607/6
607/17 608/5 608/17
610/1 610/3 610/7
612/15 614/8 614/11
614/15 614/17 614/18

616/2 616/3 616/7
616/10 617/6 618/6
618/8 618/14 622/10
623/6 624/15 629/7
633/15 634/3 635/2
635/4 635/15 637/11
638/8 639/17 639/21
639/22
knowing [4] 544/2 544/8
597/11 639/6
knowledge [8] 501/17
547/10 547/13 547/16
561/13 561/14 627/23
627/24
knows [3] 496/9 512/16
532/2
Kramer [1] 639/21

**L**

label [1] 628/11
lack [3] 532/8 593/11
595/1
laid [1] 504/5
Landry [1] 606/3
language [7] 525/11
525/19 525/24 526/4
526/8 526/11 635/2
large [4] 556/15 572/15
599/10 603/1
large-scale [2] 556/15
572/15
largely [3] 589/5 589/13
633/24
last [19] 495/9 507/25
508/2 520/14 520/15
527/24 528/12 543/7
549/2 552/2 553/5
553/11 557/1 561/23
569/10 574/12 577/23
578/2 616/1
later [6] 491/12 500/11
522/14 526/24 533/18
557/15
law [6] 488/4 489/10
621/1 625/3 625/4
631/25
Lawrence [1] 625/15
laws [4] 625/13 626/1
626/2 626/11
lawsuit [1] 532/24
lawyers [2] 519/14
639/6
layer [1] 504/9
lays [1] 538/12
learn [1] 533/8
learned [1] 583/21
learns [1] 497/24
least [25] 509/5 509/13
510/12 525/18 526/15
526/16 530/25 531/4
537/3 541/17 544/8
549/7 556/15 565/21
584/6 598/16 604/15
605/14 608/10 608/14
615/6 624/22 627/2
635/5 637/2
led [2] 558/18 567/7
legal [5] 505/23 562/20
626/8 630/21 634/14
legitimacy [1] 568/15
lengthy [1] 609/6
less [6] 546/15 576/25

577/15 596/22 618/22
631/6
let [17] 503/21 509/22
523/24 536/3 537/17
537/10 538/18 542/11
584/21 587/23 608/16
620/15 621/20 622/10
625/13 631/7 639/21
let's [19] 497/3 518/17
518/17 522/12 538/15
554/6 578/22 578/22
579/16 579/16 582/2
583/20 590/20 591/14
599/14 609/12 625/4
632/5 636/15
letter [24] 492/14 505/5
506/9 520/17 524/8
524/9 525/3 525/10
525/10 525/12 525/19
527/8 528/18 528/19
528/23 529/24 538/23
538/24 539/5 543/18
543/23 549/5 549/9
568/17
letters [6] 525/21
525/22 526/8 526/12
539/8 539/20
level [4] 501/14 501/23
506/25 613/7 613/19
621/25
levels [5] 506/24 576/24
576/24 585/21 623/1
LGBT [66] 516/7
523/11 530/25 563/22
572/20 576/16 577/5
577/8 577/10 577/13
577/16 578/4 578/11
578/12 578/24 579/2
579/3 579/6 580/3
580/4 580/19 581/24
582/16 582/22 584/1
584/2 584/5 584/16
585/5 585/12 585/18
587/5 588/15 596/6
599/4 599/13 600/7
600/12 600/15 600/23
600/23 601/3 601/5
602/15 602/25 603/12
603/19 604/14 605/6
605/12 605/24 606/16
609/15 611/9 611/13
612/11 621/11 623/12
626/13 627/3 631/24
631/25 632/25 633/3
633/9 633/18
LGBTQ [15] 516/14
516/17 520/14 521/4
521/9 522/7 531/10
531/17 532/7 568/15
572/8 612/7 614/5
626/4 626/21
Lhamon [1] 533/2
liberty [13] 518/11
524/15 525/20 526/18
527/6 527/9 527/11
527/15 572/11 585/23
life [11] 558/19 601/19
601/22 601/24 604/24
605/1 605/21 608/6
617/19 621/1 633/25
lifestyle [1] 605/13

lifetime [3] 576/20
577/2 588/7
lifted [5] 500/7 500/9
512/10 512/11 512/21
like [87] 491/15 492/17
517/6 517/11 517/12
517/21 517/23 518/6
518/14 518/16 519/14
524/2 524/17 527/12
528/3 528/12 534/25
536/1 536/10 536/17
536/21 540/22 545/9
552/17 554/17 554/23
555/1 561/1 561/10
562/3 563/4 563/4
565/9 569/24 570/16
570/18 571/7 576/2
577/17 581/4 581/20
582/13 582/19 586/14
587/23 588/11 595/14
596/2 596/5 596/11
596/16 597/8 598/16
601/15 601/19 601/20
606/8 606/9 607/9
607/24 609/23 610/6
610/16 612/17 613/5
613/24 614/17 614/20
615/2 615/20 616/14
616/21 617/2 618/17
619/23 620/22 621/19
622/5 622/6 623/18
625/4 627/18 627/20
628/2 628/25 636/23
638/22
likely [3] 599/21 605/14
617/18
likewise [3] 500/23
501/20 572/1
limit [2] 637/24 637/24
limited [5] 498/25
539/24 577/15 611/13
641/16
limits [1] 638/13
line [4] 518/10 519/23
566/20 616/1
lines [1] 560/16
list [4] 536/20 543/24
560/16 560/21
listed [2] 535/18 544/8
listen [1] 513/22
listing [2] 493/3 543/13
lists [4] 493/15 543/16
543/16 543/17
literally [1] 495/6
literature [1] 586/23
601/4 603/11 603/14
603/17 611/8
little [20] 495/3 497/3
499/11 503/14 504/12
509/22 537/3 539/13
547/9 556/5 558/22
579/16 584/13 595/13
601/18 606/2 614/9
615/25 625/14 628/17
live [11] 592/14 596/14
601/5 601/6 601/13
601/15 604/9 605/9
605/13 623/20 639/2
lives [5] 601/5 601/15
607/25 623/21 624/18
living [3] 598/7 601/2
604/23

LLC [1] 488/4
lm [1] 487/1 489/12
489/15 489/17
Loans [1] 597/4
locate [1] 605/17
located [2] 538/19
603/16
loneliness [3] 588/13
588/16 588/17
lonely [1] 588/17
long [7] 500/10 510/20
510/21 571/13 592/5
592/11 592/13
longer [5] 546/23 547/5
547/9 586/3 597/9
longevity [1] 558/20
longstanding [1] 611/4
look [34] 492/22 494/23
495/20 504/7 504/13
505/1 505/14 505/16
510/10 510/11 516/25
518/5 518/9 519/21
520/10 520/14 521/17
522/12 524/14 526/7
529/1 540/8 557/2
563/5 563/7 575/10
582/12 585/8 587/1
609/20 616/12 616/23
617/15 620/8
looked [11] 530/24
558/22 563/5 563/9
569/23 575/22 576/17
577/15 582/13 618/7
620/11
looking [16] 502/6
505/22 509/2 512/8
515/22 522/6 537/5
558/17 597/18 615/19
617/10 621/7 621/13
636/16 636/18 636/19
looks [10] 517/6 519/14
524/17 528/3 545/9
554/17 613/20 616/14
620/22 625/9
lost [15] 558/19
lot [23] 507/22 508/4
505/8 508/25 569/17
570/14 581/14 581/19
586/13 595/18 595/18
595/19 596/12 597/13
598/24 599/15 601/9
603/14 610/23 614/17
618/10 618/20 638/5
lot's [1] 625/10
lots [8] 598/13 598/17
598/25 606/11 610/14
610/17 612/22 622/1
love [3] 557/6 598/18
601/24
lower [9] 576/24 576/24
586/16 586/17 587/19
587/23 601/18 614/14
616/1
lumped [1] 628/10

**M**

M-A-R-K [1] 552/25
macro [1] 557/7
made [6] 496/25 502/8
515/14 527/5 575/15
599/8
magnitude [1] 616/4

**M**

main [1] 583/11
mainline [1] 589/22
maintain [4] 528/1
624/21 625/1 630/17
major [2] 587/9 588/6
majority [1] 510/13
majors [1] 561/5
make [34] 491/23
499/23 501/24 503/21
505/18 506/7 506/10
506/10 506/12 506/21
506/22 516/19 518/1
530/12 536/23 551/24
581/15 593/8 595/13
595/22 595/25 596/14
597/5 604/3 608/2
609/25 610/24 617/7
620/15 623/13 627/11
628/9 638/10 639/6
maker [7] 500/14
500/17 500/20 500/25
506/25 536/12 550/4
makes [4] 521/18 563/8
584/11 594/16
making [11] 499/17
505/21 506/3 515/24
556/2 556/5 556/9
556/9 567/11 568/9
597/5
male [1] 608/4
males [1] 592/11
man [1] 591/20
man-woman [1] 591/20
manner [4] 547/8
592/15 598/19 625/7
Manual [10] 497/22
503/3 503/17 503/23
504/2 504/3 504/17
506/19 508/15 521/15
many [8] 557/24 575/1
584/17 599/13 603/24
609/22 630/1 630/3
marital [1] 569/24
Mark [7] 552/17 552/20
553/10 554/20 558/15
559/9 559/10
marked [1] 579/17
582/2
marker [2] 588/22
588/25
markers [1] 587/25
market [1] 600/3
marketplace [1] 610/13
marks [1] 596/9
marriage [12] 564/8
565/20 565/21 577/6
591/20 592/21 611/5
629/9 630/4 630/17
634/20 635/1
marriages [2] 601/15
622/15
married [1] 570/8
masks [1] 641/12
master's [1] 553/22
Masterpiece [3] 619/15
634/9 634/13
matter [12] 498/18
504/6 506/5 521/14
534/10 535/6 536/3
571/25 604/25 621/6

636/16 637/2
matters [1] 635/1
mature [1] 606/10
may [31] 492/14 495/7
500/11 500/11 502/6
504/21 504/22 506/6
512/8 513/4 513/5
518/2 526/7 545/18
546/15 546/16 547/8
551/16 573/1 576/7
582/20 607/17 607/21
621/10 621/10 621/21
622/1 633/12 633/15
635/11 635/18
maybe [5] 515/7 590/19
593/9 599/24 613/12
mays [1] 622/3
me [48] 496/12 502/18
503/20 503/21 503/22
509/22 513/17 513/20
516/10 516/22 517/13
536/23 537/2 537/10
538/18 542/11 545/25
546/4 548/4 548/10
550/20 552/4 556/11
556/11 564/24 569/10
584/21 587/23 594/6
599/25 606/2 606/25
607/20 613/9 620/12
620/14 620/15 621/20
622/10 625/13 631/7
631/7 636/17 637/4
637/9 638/9 638/23
639/21
mean [24] 560/16
562/20 564/17 571/10
571/19 578/3 582/10
592/19 597/7 598/17
600/2 601/9 603/4
605/25 607/2 608/11
612/20 614/8 617/1
617/25 618/23 622/17
624/25 637/19
meaning [4] 535/21
549/16 592/20 611/5
means [6] 498/13
546/15 581/4 615/24
617/7 641/10
measure [3] 581/13
585/18 618/17
measured [1] 588/3
measurements [1]
567/10
measures [4] 584/17
587/24 587/25 618/18
medically [1] 534/21
medicine [2] 557/20
559/1
meet [1] 639/9
meetings [1] 595/19
Melanie [1] 493/10
member [3] 553/20
568/10 603/19
members [6] 576/16
577/16 600/12 604/14
606/16 633/9
memorandum [2]
536/19 536/24
memorandums [1]
537/15
men [7] 539/24 540/15
564/9 592/11 606/4

607/3 607/11
Mental [1] 572/9
572/20 582/13 584/1
587/8 588/2 588/4
601/4 602/25 611/9
611/13 612/7 612/11
mentioned [15] 492/10
546/10 573/12 573/24
578/21 579/21 580/18
586/5 586/23 587/19
592/14 596/15 602/4
604/25 641/17
merely [2] 522/18 534/8
message [1] 624/23
met [2] 503/11 505/4
methodological [2]
561/14 561/18
methodologies [1]
572/24
methodology [4] 567/12
571/18 572/9 572/23
methods [2] 561/4
571/22
Meyer [14] 558/16
559/6 559/7 562/10
576/12 576/17 576/19
577/15 577/22 577/25
578/1 606/17 622/3
628/13
Meyer's [4] 557/16
559/7 577/8 578/11
Michigan [2] 565/24
565/24
microphone [2] 545/11
545/21
mid [1] 499/16
mid-September [1]
499/16
might [23] 501/12 505/6
505/8 506/4 507/3
507/5 525/14 533/17
540/12 545/10 595/2
597/15 600/12 603/20
606/14 606/18 609/15
612/13 619/20 622/6
633/20 633/24 637/4
MILLER [4] 489/17
491/11 544/24 545/1
mind [2] 516/17 543/4
mine [2] 571/3 615/15
minimum [1] 600/6
ministers [1] 539/23
ministry [1] 540/16
minorities' [1] 557/17
minority [14] 556/7
558/20 581/2 581/12
604/1 614/4 617/12
617/12 617/20 617/21
618/1 618/25 619/1
619/8
minute [5] 513/23
518/16 583/20 586/2
586/3
minutes [1] 517/18
mischaracterizes [1]
511/7
MISHA [1] 488/6
missed [2] 528/25
550/22
missing [3] 520/13
524/18 551/25
misspoke [1] 515/11

misstated [1] 509/7
misstates [6] 513/15
514/6 515/4 537/22
542/10 542/12
misstating [1] 513/15
mistaken [7] 582/18
585/10 587/14 599/9
603/3 616/6 634/23
misunderstood [1]
515/7
mixed [3] 601/14 602/3
603/13
mixed-orientation [2]
601/14 603/13
Mm [27] 561/7 561/22
564/4 564/19 566/14
566/16 573/15 588/1
588/23 589/14 589/18
590/4 598/1 598/22
599/20 602/14 602/17
603/6 603/15 603/23
603/25 606/7 607/4
608/12 610/19 622/13
633/14
Mm-hm [27] 561/7
561/22 564/4 564/19
566/14 566/16 573/15
588/1 588/23 589/14
589/18 590/4 598/1
598/22 599/20 602/14
602/17 603/6 603/15
603/23 603/25 606/7
607/4 608/12 610/19
622/13 633/14
model [1] 604/9
modern [1] 592/6
moment [2] 528/15
574/19
moments [1] 552/4
Monday [1] 487/6
month [3] 520/3 588/3
614/11
months [8] 507/21
508/1 508/2 508/4
513/9 513/9 522/14
526/24
moralities [1] 560/2
morality [1] 600/24
more [49] 497/3 500/4
512/22 515/1 536/17
546/16 551/18 552/11
556/21 556/23 557/8
557/17 564/7 564/20
564/21 577/4 578/24
579/5 579/16 581/12
584/9 584/13 585/6
585/25 586/6 588/2
588/3 589/15 589/24
593/8 597/5 597/17
598/23 598/23 598/24
599/21 602/1 605/19
606/10 607/1 607/15
608/24 618/16 622/5
622/25 629/17 634/6
635/15 639/7
morning [3] 503/10
545/22 612/4
mortalities [1] 560/2
mortality [4] 557/17
558/19 559/13 559/18
most [17] 512/12
556/16 557/2 561/3

585/4 591/21 595/25
590/12 598/9 598/15
598/20 600/1 600/19
605/20 607/2 610/21
614/9
mostly [2] 556/14 592/3
mother [4] 569/18 570/2
570/8 570/10
motion [2] 517/2 574/22
move [23] 495/12 505/1
506/8 509/18 514/17
528/10 536/9 554/19
565/5 572/18 572/22
575/18 578/22 580/7
583/12 590/20 591/3
591/14 596/9 603/7
630/23 632/5 635/16
moved [2] 556/3 556/5
moving [3] 511/19
514/4 553/24
Mr [8] 513/16 526/25
545/24 546/4 567/7
614/22 619/10 631/4
Mr. [88] 491/19 491/22
492/9 503/10 508/13
512/18 514/2 514/10
515/6 515/12 515/21
516/6 516/9 516/9
516/11 517/7 519/17
522/5 522/21 523/24
524/23 525/8 527/3
528/9 528/13 528/15
528/16 531/17 532/11
532/12 535/17 536/16
537/3 537/13 537/21
538/2 541/3 541/4
543/9 544/11 545/1
545/25 548/4 548/7
548/10 549/3 550/20
552/6 553/6 554/7
554/24 565/9 565/15
565/18 565/23 566/25
567/12 567/15 569/12
570/19 570/21 571/16
571/24 572/5 572/11
572/19 572/22 579/18
612/4 612/24 613/12
615/17 618/5 618/19
619/14 619/25 620/5
620/23 621/16 621/19
622/8 626/20 627/8
630/12 630/25 631/19
632/19 634/8
Mr. Duron's [1] 541/4
Mr. Falwell [1] 527/1
Mr. Miller [1] 545/1
Mr. Prince [6] 548/4
548/7 550/20 554/7
579/18 613/12
Mr. Regnerus [31]
554/24 565/15 565/18
565/23 566/25 567/12
567/15 569/12 570/19
570/21 571/16 571/24
572/5 572/11 612/4
612/24 615/17 618/5
618/19 619/14 619/25
620/5 620/23 621/16
621/19 622/8 626/20
627/8 630/12 630/25
631/19
Mr. Regnerus' [3] 565/9

**M**

Mr. Regnerus'... [2]
572/19 572/22
Mr. Schaerr's [1] 553/6
Mr. Southwick [9]
512/18 514/10 515/6
516/9 516/9 528/16
549/3 632/19 634/8
Mr. Wells [2] 537/13
537/21
Mr. Willis [1] 491/19
Mr. Willis [32] 491/22
492/9 503/10 508/13
514/2 515/12 515/21
516/6 516/11 517/7
519/17 522/5 522/21
523/24 524/23 525/8
528/9 528/13 528/15
531/17 532/11 532/12
535/17 536/16 537/3
538/2 541/3 543/9
544/11 545/25 548/10
552/6
much [10] 552/6 552/7
552/13 595/14 595/15
597/1 597/5 601/3
618/2 628/1
muffled [2] 546/1 558/5
multigenerations [1]
610/15
Murphy [1] 525/20
must [7] 497/23 539/18
539/24 540/7 540/9
548/15 596/4
mute [4] 544/15 544/15
545/8 639/1
muted [1] 545/9
my [61] 491/16 496/5
496/10 497/2 501/17
502/15 503/1 504/16
510/21 516/22 516/24
517/24 524/1 532/18
532/25 533/25 535/11
536/16 537/12 539/2
540/4 541/3 542/17
544/24 545/3 545/21
546/10 547/13 549/21
550/19 550/23 551/9
553/10 553/10 558/1
563/20 584/4 597/17
597/24 597/24 606/3
607/6 615/14 616/5
620/12 622/1 622/21
625/17 625/24 627/18
627/23 629/13 629/14
629/15 629/17 637/8
637/14 638/14 638/16
639/21 641/8
myself [7] 556/16
561/12 579/5 581/19
613/9 621/8 626/24

**N**

name [8] 491/20 493/21
494/17 552/19 553/5
553/10 553/11 559/8
named [1] 532/23
names [2] 524/16
524/17
naming [1] 563/1
narrow [2] 608/21

634/14
narrowly [1] 592/3
National [2] 558/17
559/21
nationally [1] 556/15
natural [1] 587/3
nature [5] 504/24
529/15 540/21 586/12
612/18
near [3] 513/4 513/5
536/16
nearing [4] 512/13
512/24 513/1 629/16
necessarily [7] 504/25
536/12 540/18 563/1
588/11 603/5 618/13
necessary [1] 505/2
necessitate [1] 498/23
need [12] 509/9 516/18
517/17 526/17 546/2
597/18 608/21 609/9
612/13 638/11 639/10
639/22
needy [1] 597/16
negative [2] 599/22
626/3
negotiations [1] 508/4
neutral [1] 571/3
never [4] 547/13 547/17
547/22 570/22
new [8] 533/1 552/19
571/12 582/25 583/2
583/6 583/9 639/20
next [7] 494/23 518/10
522/12 522/13 539/8
616/18 623/25
NFSS [2] 567/24 568/4
NICHOLAS [3] 489/17
491/11 544/24
no [66] 487/5 488/9
491/2 496/4 498/17
501/17 502/12 502/15
502/15 503/4 504/1
504/3 505/6 519/4
519/5 519/7 525/11
525/17 536/22 544/7
544/9 544/11 544/14
544/17 545/6 547/17
547/22 551/11 551/15
552/4 552/11 557/1
559/20 562/15 567/24
573/19 574/18 577/10
577/17 579/1 579/9
579/11 580/10 580/11
580/13 583/3 583/14
583/16 584/17 590/19
591/6 591/9 591/10
597/9 609/2 611/19
611/23 616/17 625/24
628/9 632/6 632/8
632/10 635/10 635/13
639/12
No. [17] 493/14 493/15
493/17 497/14 514/13
517/5 517/24 519/13
519/23 523/15 528/13
536/25 538/3 540/5
543/9 613/17 617/10
No. 08212212 [1]
497/14
No. 1 [4] 493/14 493/15
493/17 617/10

No. 11 [3] 536/25 538/3
540/5
No. 15-14-2006 [1]
519/23
No. 20 [1] 613/17
No. 21 [3] 517/24
519/13 543/9
No. 22 [1] 523/15
No. 23 [1] 528/13
No. 3 [1] 514/13
No. 50-21 [1] 517/5
noises [1] 641/14
non [7] 579/3 580/4
584/5 584/14 600/15
600/23 601/3
non-CCCU [2] 584/5
584/14
non-LGBT [5] 579/3
580/4 600/15 600/23
601/3
none [4] 501/15 511/17
511/18 636/3
norm [1] 578/6
normal [4] 586/6 601/17
601/18 601/20
norms [2] 589/24 606/2
North [1] 553/22
not [195]
notable [1] 584/13
notably [1] 584/10
note [1] 508/15
noted [2] 576/19 585/5
notes [2] 527/24 639/16
nothing [1] 551/17
551/18 551/20 551/22
566/20 570/17 575/4
605/2 624/17 635/17
636/8 636/12
noticed [1] 601/25
notification [3] 506/9
526/9 526/12
notified [2] 507/7 507/9
notify [1] 525/16
notion [1] 598/16
notions [1] 592/4
November [4] 487/6
520/3 524/9 641/6
November 4th [1] 520/3
November 8th [1] 524/9
now [38] 492/17 495/3
500/14 509/4 511/15
512/10 512/11 513/7
514/22 516/18 517/22
525/2 525/3 528/16
529/14 531/5 532/22
537/5 547/10 554/14
562/5 567/15 570/14
577/21 583/22 585/23
586/21 589/9 591/14
592/13 599/12 600/5
607/17 608/17 609/1
623/12 636/14 639/18
Now's [1] 490/10
nuances [1] 571/22
number [24] 493/15
493/16 508/23 509/1
509/5 509/14 509/15
521/21 522/15 523/2
525/5 530/24 533/5
543/3 561/5 563/11
571/4 581/21 590/21
599/4 599/10 599/17

600/7 613/14
number 100,000 [1]
599/10
numbers [5] 493/17
493/23 588/8 588/24
614/19
numerous [2] 506/24
555/1
nursing [2] 541/1 541/8
NW [4] 488/7 489/13
489/15 489/18

**O**

oath [1] 491/24
obedience [1] 600/25
Obergefell [1] 634/25
object [8] 566/19 569/3
575/6 619/23 626/7
630/7 631/7 632/1
objection [40] 509/7
511/7 512/15 513/11
514/6 515/4 518/6
519/4 521/23 522/16
527/18 528/7 529/11
530/7 530/21 532/1
533/23 534/3 535/2
535/8 536/5 537/20
541/24 542/10 544/5
544/18 548/22 550/1
554/21 554/22 554/23
569/7 576/2 583/16
591/5 591/6 593/11
593/15 628/20 630/22
objectionable [1] 635/3
objections [14] 517/25
519/3 519/5 519/7
580/9 580/10 580/11
580/13 583/14 591/9
591/10 595/1 626/15
630/20
obligated [1] 541/19
obligations [1] 639/9
observation [1] 597/25
observations [1] 561/12
obviously [4] 574/21
574/25 604/13 611/19
occasion [1] 555/24
occur [1] 641/15
occurred [2] 570/25
586/10
occurring [1] 641/18
OCR [104] 492/10
492/19 493/4 493/11
494/3 494/12 494/19
494/25 495/8 495/10
495/23 496/7 497/7
497/9 497/23 497/24
498/14 498/16 498/21
498/23 499/17 499/24
501/5 501/8 501/18
502/1 502/17 502/18
503/17 503/20 503/21
503/22 503/24 504/4
504/15 506/15 507/23
508/5 508/8 508/17
508/19 508/22 509/17
510/18 510/20 511/4
511/12 513/19 514/2
515/23 515/23 516/12
516/19 518/11 519/20
519/23 519/24 520/2
520/3 520/16 521/6

521/7 521/9 521/17
521/24 523/7 524/10
524/25 523/15 526/6
527/6 527/15 528/22
528/5 530/4 530/15
532/8 534/7 534/10
534/25 535/6 535/13
536/3 537/16 538/11
538/22 539/4 540/4
541/3 541/19 542/9
542/18 543/16 546/18
547/1 547/10 547/13
548/13 548/15 548/19
550/15 550/16 550/25
551/1
OCR's [25] 493/12
493/16 494/7 495/7
499/7 499/12 499/14
503/2 511/14 520/17
521/5 524/23 525/1
525/2 525/21 525/21
527/1 530/17 532/13
532/16 538/23 539/2
539/11 540/6 549/24
October [7] 496/10
496/12 496/12 496/17
496/22 497/1 500/12
October 21 [1] 496/10
October 21st [4] 496/12
496/17 496/22 497/1
off [5] 610/9 610/20
614/12 637/2 637/6
off-campus [1] 614/12
offer [1] 590/1
offered [4] 540/18
554/24 555/3 612/22
offering [2] 586/13
598/6
offerings [1] 609/20
offers [1] 600/22
offhand [1] 616/16
office [32] 494/12
496/18 501/13 501/23
501/24 516/3 516/13
516/22 517/5 518/13
522/7 524/5 524/10
526/24 528/20 529/7
529/9 529/19 529/23
530/1 530/18 531/3
531/5 531/10 531/12
531/22 539/18 539/24
541/16 542/16 543/4
544/3
office's [1] 539/21
offices [5] 499/18
499/19 500/3 501/15
538/22
official [5] 506/22 525/1
525/2 542/17 641/25
officials [2] 542/20
542/24
often [7] 561/11 591/16
597/12 612/16 622/3
623/16 628/7
oftentimes [1] 596/6
Oh [11] 499/6 513/21
535/2 536/23 545/5
560/16 562/17 570/15
604/10 619/20 635/14
okay [137] 493/9
494/23 495/13 496/8
496/11 496/15 496/20

O

okay... [130] 497/3
497/11 501/18 502/1
502/17 502/23 503/20
511/23 514/25 515/17
517/19 522/11 529/6
538/15 547/10 548/12
554/4 554/16 554/18
555/6 555/13 555/17
555/21 557/21 560/23
561/15 561/19 561/24
562/5 562/18 562/22
562/24 563/11 563/18
563/24 564/23 565/3
569/8 573/12 573/20
573/24 574/4 574/8
574/10 574/16 574/20
576/15 577/14 577/21
578/11 578/15 578/17
578/22 579/8 579/18
579/21 579/24 580/6
581/9 581/23 582/2
582/6 582/12 582/16
582/22 583/10 584/15
584/20 585/2 586/17
586/21 587/10 587/15
588/10 589/6 590/9
590/14 591/8 591/12
591/22 592/1 592/16
593/1 593/5 593/17
593/20 594/9 594/20
595/5 596/15 596/22
597/7 597/15 597/21
598/5 600/5 601/4
602/4 602/24 603/9
603/19 604/2 604/7
605/5 605/7 605/12
606/14 608/15 609/4
609/10 610/11 611/6
611/15 611/22 613/11
620/15 620/16 621/13
621/20 629/14 631/15
633/8 633/20 634/8
634/16 634/18 635/10
635/17 638/20 639/5
old [3] 515/9 592/22
606/3
older [3] 556/5 577/12
627/19
olds [2] 576/23 599/13
once [5] 499/1 508/17
508/19 518/2 639/18
one [57] 497/9 497/11
497/15 497/21 500/2
501/4 501/16 504/6
509/23 515/2 515/13
518/10 530/25 533/5
533/18 536/17 536/17
537/14 540/22 540/24
541/12 542/21 542/25
543/7 550/7 553/20
557/12 557/16 558/9
558/10 558/12 558/13
562/2 562/2 568/22
573/11 574/4 574/15
580/4 589/1 598/3
599/2 603/5 612/16
615/11 615/13 616/6
617/3 617/4 618/16
618/17 620/12 623/17
623/18 628/10 633/20

63/1
ones [1] 588/24
one's [1] 545/7
online [1] 545/7
only [17] 515/1 515/13
539/22 540/15 543/5
546/9 582/19 582/25
583/8 595/24 596/3
599/1 607/13 614/4
614/15 616/11 629/7
open [9] 498/15 500/21
505/19 514/20 523/12
525/4 535/13 542/23
595/23
opened [5] 499/2 507/7
507/8 507/10 516/1
opening [17] 505/5
507/5 507/12 507/19
521/7 521/14 522/7
525/7 525/10 525/22
526/7 526/8 536/9
536/13 636/19 637/17
637/22
openings [1] 501/3
openly [1] 633/5
operative [1] 498/1
opinion [18] 508/24
564/25 564/25 566/3
566/4 567/16 568/12
568/18 574/14 574/17
575/15 577/21 593/5
609/13 628/16 638/10
638/10 639/19
opinions [9] 536/11
574/24 574/24 575/10
577/22 578/11 622/18
633/6 634/22
opportunities [1] 533/8
opportunity [3] 523/17
529/14 587/2
oppose [2] 574/21
633/5
opposed [2] 531/24
534/8
option [1] 609/24
order [6] 498/17 511/14
517/3 595/22 601/6
630/15
OREGON [2] 487/2
641/19
organization [3] 549/17
549/19 549/24
organization's [1]
520/23
organizations [2]
605/22 606/13
orientation [25] 520/21
521/10 523/1 531/18
541/2 541/7 547/20
557/11 558/7 567/1
572/21 596/7 601/14
603/13 606/15 606/22
606/23 607/16 622/19
624/12 627/9 627/18
627/20 627/25 628/18
original [1] 641/21
other [48] 496/15
499/19 501/17 503/11
503/16 504/4 505/4
505/8 509/23 513/3
515/17 516/7 516/7
516/14 516/19 541/14

543/21 543/25 599/3
561/24 562/8 587/4
563/5 563/17 564/24
568/2 578/12 579/16
585/24 588/16 589/19
591/9 593/2 594/14
602/25 606/17 609/24
610/10 616/6 617/4
618/12 618/17 623/19
627/24 632/9 633/23
633/24 641/15
others [5] 605/20
617/14 617/17 618/3
620/23
otherwise [3] 594/18
597/8 639/23
our [6] 505/23 514/17
562/4 562/4 596/4
606/9
out [32] 504/5 504/17
507/13 511/4 511/18
512/2 515/12 519/15
523/19 524/8 533/4
538/12 545/15 546/23
546/25 548/5 549/12
555/23 564/3 574/6
581/5 581/7 581/11
581/15 599/10 601/2
603/7 609/19 610/15
613/5 622/2 635/3
outcome [2] 558/8
566/17
outcomes [10] 557/12
557/13 570/7 572/7
572/20 577/12 579/25
582/9 584/9 584/16
outside [6] 548/22
550/2 579/4 591/19
625/1 628/21
over [20] 508/9 512/12
515/8 515/18 521/6
527/11 534/16 534/18
553/6 558/1 561/2
564/22 574/12 575/23
595/19 603/4 615/13
629/18 634/5 641/18
overall [1] 590/9
overestimate [1] 585/11
overlap [1] 561/21
overlapping [1] 641/12
overreach [1] 635/7
overrule [1] 569/7
overruled [15] 512/16
514/8 515/5 515/5
530/9 532/2 533/24
534/4 535/10 536/6
541/25 544/6 566/22
620/3 631/17
oversees [1] 524/18
overturned [1] 572/3
own [8] 528/3 568/3
600/11 611/8 622/21
623/1 623/21 624/18
Oxford [1] 556/4 607/7

P

P.O [2] 488/14 488/17
page [39] 490/2 493/14
508/16 519/19 520/14
520/15 520/15 520/15
521/2 521/4 521/13
521/15 521/17 522/12

543/21 543/25 599/3
538/15 547/25 548/12
613/6 613/7 613/14
613/17 615/1 615/19
616/18 616/18 616/19
617/11 617/15 621/13
621/14 637/24 637/24
638/13
pages [8] 522/6 524/3
535/4 537/6 614/25
637/25 638/1 639/15
pandemic [1] 585/13
paragraph [1] 521/4
521/5 528/6 602/5
622/9 622/14 622/16
622/18 623/25 627/13
629/18
paragraphs [3] 537/10
537/12 627/14
paralyzed [1] 571/1
paraphrase [1] 503/13
paraphrasing [1] 606/18
Pardon [1] 583/4
parent [2] 557/14 570/4
parenting [3] 566/13
567/1 568/23
parents [5] 558/8
566/13 568/23 610/15
623/23
parlance [1] 621/4
part [20] 520/18 537/15
550/22 552/6 554/13
554/16 556/7 568/17
593/13 595/5 598/5
604/19 605/2 618/20
619/14 621/12 624/12
624/23 629/3 634/18
participate [3] 617/18
617/21 617/23
participating [1] 559/22
participation [1] 617/12
particular [24] 495/14
497/17 498/3 498/17
504/23 513/4 528/25
530/11 539/7 542/3
549/22 563/10 563/25
564/6 564/10 568/5
575/23 576/18 581/8
581/11 595/15 610/16
621/24 626/1
particularly [1] 537/9
561/13 585/18
parties [2] 565/19
641/11
partner [1] 626/5
partners [1] 568/16
parts [1] 627/8
party [1] 571/3
passed [2] 559/22
571/13
passing [1] 606/18
past [3] 537/22 569/25
589/5
pathway [1] 604/13
patient [1] 588/6
patterns [1] 622/24
PAUL [13] 488/4 488/4
491/6 503/10 553/2
554/22 565/8 590/16
620/13 621/21 636/8
638/15 639/12

pause [15] 500/3 500/7
500/9 500/11 510/18
510/18 510/24 511/3
511/11 511/19 511/20
511/23 512/10 512/11
512/21
pausing [1] 500/6
paying [1] 586/10
PDF [2] 629/16
peer [3] 557/21 557/25
560/15
peer-reviewed [2]
557/21 557/25
peer-reviewing [1]
560/15
peers [4] 577/13 602/18
616/20 617/19
Pell [1] 597/4
pending [1] 501/5
people [54] 557/5
559/22 561/1 570/15
570/18 578/24 581/19
585/14 595/2 597/18
598/6 598/13 598/15
598/17 598/20 598/23
600/2 603/7 604/23
605/4 605/8 605/19
605/22 608/6 609/8
609/24 609/25 610/4
610/15 610/20 611/10
611/14 612/7 612/12
613/23 614/17 618/12
621/11 623/5 623/10
623/20 624/8 624/17
626/4 628/3 628/8
631/25 633/22 633/23
633/24 634/5 634/6
638/11 639/9
people's [2] 604/19
607/25
per [3] 571/5 588/3
600/11
perceive [1] 633/23
perceived [4] 608/14
613/8 613/19 613/21
perceiving [1] 625/12
percent [42] 515/17
580/24 581/1 581/11
581/2 581/5 581/11
581/12 581/13 587/7
587/8 587/9 588/2
588/4 588/6 588/13
588/15 588/16 588/19
601/16 601/17 601/19
603/3 607/8 614/4
614/5 614/15 615/3
615/4 615/21 615/22
615/25 616/1 616/11
616/22 616/22 617/20
617/21 617/22 618/20
619/1 619/3
percentage [1] 626/21
percentages [1] 618/2
perfect [1] 540/12
perhaps [4] 561/1
606/20 607/16 622/3
period [5] 510/22
510/23 517/7 608/13
625/10
Perkins [1] 488/7
person [6] 550/10
552/19 592/9 617/14

**P**

person... [2] 619/2 633/25
person's [3] 604/7 633/20 633/21
personal [7] 498/18 499/1 505/1 508/5 594/9 623/2 624/16
personally [1] 597/24
persons [7] 601/5 601/13 610/2 623/12 623/14 626/2 631/21
perspective [1] 624/13
Ph.D [2] 553/22 554/2
phase [1] 556/6
PHOENIX [1] 487/13 489/3
phone [3] 545/14 548/4 641/11
physical [4] 517/23 576/24 620/6 621/16
physically [1] 613/23
PI [1] 609/9
picked [1] 589/4
picking [1] 589/2
piece [2] 557/16 557/18
pieces [1] 520/13
pivotal [1] 610/14
place [9] 501/11 501/22 501/23 570/23 578/9 599/19 599/21 609/20 610/4
places [2] 600/3 609/24
plaintiff [4] 494/17 511/13 540/23 636/6
Plaintiff's [1] 504/15
plaintiffs [32] 487/5 488/3 491/5 491/7 492/17 492/18 493/7 495/24 496/22 503/6 503/16 510/25 518/24 535/18 536/21 543/14 543/17 543/20 544/12 551/17 554/23 565/9 572/18 575/2 575/4 580/10 583/14 611/25 628/17 628/25 636/9 636/21
Plaintiffs' [31] 497/6 497/8 499/13 499/25 500/15 500/18 500/21 501/4 502/19 508/14 509/3 509/4 509/12 509/23 510/10 510/19 510/20 511/11 514/4 515/2 517/24 528/13 542/21 556/19 562/12 563/19 565/1 574/22 600/6 611/8 630/3
plausible [1] 607/20
play [4] 505/7 573/17 606/15 610/14
players [1] 606/6
playing [1] 610/12
please [36] 491/4 492/22 492/25 493/2 493/20 494/1 494/6 494/11 494/16 494/23 495/20 497/13 500/10 511/9 512/19 513/22 516/10 518/23 521/25

522/2 525/15 531/15 541/10 551/23 555/3 555/5 556/12 566/23 569/10 576/8 615/11 615/11 615/12 626/9 626/18 639/20
plenty [1] 557/23 574/6 574/11
plunges [1] 607/9
plus [4] 515/17 596/6 610/3 630/20
PM [1] 640/3
point [23] 500/2 501/24 503/20 503/22 505/3 507/12 507/13 507/15 508/6 509/17 511/18 512/14 512/25 514/16 553/20 560/7 569/19 581/11 592/20 603/5 609/12 613/5 616/13
points [1] 598/4
policies [37] 521/22 530/15 534/8 534/11 563/22 564/6 564/10 584/12 589/24 591/17 592/2 592/13 593/1 593/8 593/21 594/24 595/9 596/4 596/24 598/10 598/18 599/6 600/17 600/21 611/1 611/16 624/8 624/11 624/21 626/11 626/14 627/4 629/11 629/11 632/20 632/24 634/3
policy [28] 506/14 524/11 528/1 534/17 534/22 534/22 534/25 535/5 535/14 536/1 536/2 539/3 539/4 539/11 540/4 540/6 547/11 547/14 547/15 547/18 580/20 581/25 595/3 595/13 595/21 598/12 625/11 627/6
pooled [1] 616/15
pools [1] 601/16
popped [2] 491/23 620/16
popularity [1] 628/6
population [11] 558/16 577/6 577/19 600/12 601/21 602/10 602/11 602/22 602/25 608/3 627/3
population-based [1] 558/16
populations [2] 558/20 589/17
portion [1] 548/17
portions [2] 572/19 574/22
Portland [3] 488/5 488/8 488/10
position [2] 553/24 568/6
positions [1] 555/17
possession [1] 493/12
possibility [4] 507/17 508/11 508/12 547/7
possible [3] 499/14 514/18 606/20
possibly [1] 504/23

**S**

599/10
541/9 539/14
581/15
Poverty [1] 631/24
practice [5] 524/23 525/1 525/2 539/2 628/17
practices [1] 591/15
prayer [2] 618/9 618/14
pre [1] 582/11
pre-COVID [1] 582/11
precedent [1] 602/21
predecessor [1] 530/3
preexisting [1] 507/15
prefer [1] 608/25
pregnancies [1] 527/17
pregnancy [1] 527/13
preliminary [5] 487/19 491/3 506/7 517/3 540/24
prematurely [1] 571/13
preparation [2] 538/5 562/5
prepared [3] 613/24 633/17 639/17
preparing [1] 562/25
prerequisites [1] 505/4
present [7] 569/24 588/22 588/25 589/3 589/4 596/4 635/5
presented [1] 611/7
preserve [1] 629/1
President [6] 519/20 524/4 528/20 529/17 529/20 529/20
presume [8] 564/9 598/15 599/14 600/14 601/2 604/10 614/12 629/7
presumptions [1] 609/25
PRETRIAL [1] 641/5
pretty [6] 491/15 600/3 609/19 615/9 616/10 626/21
prevalent [1] 578/24
prevent [1] 532/13 532/17
previous [1] 578/4
previously [5] 492/5 526/6 565/15 572/23 589/7
priesthood [1] 540/16
primarily [2] 563/16 597/19
primary [1] 598/3
PRINCE [13] 489/14 491/11 527/22 544/25 545/4 545/6 545/18 548/4 548/7 550/20 554/7 579/18 613/12
principles [2] 504/13 548/16
print [5] 517/15 518/15 519/15 570/16 571/11
print-out [1] 519/15
printed [4] 517/3 517/12 570/21 570/23
prior [12] 496/5 505/13 510/7 520/3 526/8 526/12 529/3 533/4 555/17 563/8 596/13
protective [2] 633/12

**R**

621/1
561/6 562/2 578/5
584/12 585/21 591/23
592/10 592/13 597/1
607/2 614/14 615/5
615/25
problem [2] 578/17
626/6
problems [4] 496/15 563/22 585/12 623/3
procedure [1] 521/22
procedures [1] 538/12
proceed [1] 576/7
proceeding [4] 531/22 551/5 565/16 631/9
proceedings [7] 487/21 565/19 634/21 640/3 641/9 641/16 641/18
process [33] 492/10 492/15 499/7 499/12 499/14 500/2 501/11 501/12 501/22 501/22 502/5 502/7 502/17 502/18 502/21 502/22 502/23 503/15 503/15 503/17 503/20 508/6 511/5 514/5 514/17 516/6 516/9 516/10 517/22 536/12 571/6 571/6 571/8
processes [2] 507/25 521/15
processing [18] 494/7 497/21 503/3 503/17 503/21 503/22 504/1 504/3 504/7 506/19 508/15 508/19 508/21 509/19 514/5 514/18 521/9 521/15
professor [6] 555/12 555/18 555/19 555/20 593/24 594/21
program [4] 505/23 520/8 541/1 541/8
Programs [1] 488/16
progressive [1] 589/24
prohibit [2] 520/20 627/5
prohibited [1] 630/4
prohibiting [1] 624/22
prohibitions [3] 534/20 534/20 625/21
promoted [1] 555/19
promoting [1] 631/25
prompt [1] 521/16
pronounced [1] 586/1
properly [1] 530/16
proposal [2] 501/15 501/24
proposal's [1] 502/8
proposals [1] 501/17
propose [2] 506/12 638/13
proposed [2] 499/20 506/13
protect [1] 630/15
protected [3] 533/16 533/21 544/3
protection [1] 586/14
protections [1] 612/13

**633/25**

Protestant [3] 564/3 589/23 592/3
provide [10] 506/15 506/18 519/15 522/18 526/9 526/17 539/17 540/17 568/23 605/8
provided [7] 506/20 506/22 566/12 566/18 567/17 604/10 619/15
provides [5] 493/4 495/10 497/23 503/23 525/22
providing [4] 507/22 507/23 524/16 540/15
provision [4] 501/4 528/4 540/9 550/13
provisions [3] 497/22 520/19 524/21
psychological [9] 568/6 574/2 574/4 576/21 587/20 618/17 620/6 621/15 628/3
psychologically [1] 577/11
psychologist [4] 572/5 573/25 574/5 575/14
psychologists [1] 628/7
psychology [2] 572/20 574/11
public [5] 582/25 583/3 583/7 583/8 621/1
published [10] 555/22 557/10 558/7 558/24 559/5 560/6 571/7 582/10 603/17 607/6
pull [12] 516/24 566/3 582/2 613/9 613/12 620/12 621/8 621/20 622/10 626/24 627/11 629/13
pulling [1] 517/4
punish [4] 527/7 527/9 527/17 626/1
punished [1] 625/10
punishes [1] 625/4
punishing [1] 625/7
purport [1] 598/2
purports [1] 604/22
purpose [4] 511/24 621/5 623/17 629/9
purposes [2] 542/18 556/12
pursuant [3] 508/17 508/20 627/6
pursued [1] 558/23
put [5] 510/20 510/21 533/4 590/22 608/8
putting [3] 510/18 534/24 535/12
puzzled [1] 589/25

**Q**

qualifications [1] 565/10
qualified [1] 574/23
qualitative [2] 556/20 589/13
quarters [1] 619/7
queer [6] 582/8 615/2 615/4 615/6 615/23 616/10
queer-spectrum [6]

Q

queer-spectrum... [6]
582/8 615/2 615/4
615/6 615/23 616/10
quest [1] 624/18
question [48] 509/8
509/9 511/9 512/19
513/6 513/23 513/24
514/8 515/7 521/25
529/12 530/8 531/15
535/9 537/22 539/2
540/4 541/3 542/3
542/8 542/12 546/10
546/24 550/19 550/20
558/4 559/14 566/23
569/10 577/24 604/5
613/21 614/10 615/2
615/12 615/12 616/21
617/6 617/8 618/12
620/25 624/19 626/8
626/9 626/16 626/17
627/18 636/22
questioning [3] 566/20
573/2 629/17
questionnaire [1] 588/7
questions [30] 503/5
524/2 537/6 544/12
544/13 544/14 544/21
544/24 546/9 551/11
552/4 559/3 582/13
596/3 608/24 611/6
611/23 612/6 612/16
612/23 613/5 613/22
616/5 616/24 617/11
632/6 632/8 632/10
632/15 635/10
quickly [3] 547/23
609/12 621/8
quit [1] 615/13
quite [7] 558/9 562/20
590/3 597/14 600/14
603/10 617/7
quote [2] 520/19 622/21

R

R-A-N-D-O-L-P-H [1]
492/4
R-E-G-N-E-R-U-S [2]
552/25 553/11
R-U-T-H [1] 631/14
radical [1] 571/8
raise [1] 552/22
raised [5] 493/22
530/16 561/18 570/8
570/14
raises [1] 612/22
raising [1] 525/25
ran [1] 540/13
range [2] 601/17 601/18
ranged [1] 629/6
ranges [1] 601/20
ranks [1] 623/1
rare [2] 581/25 625/11
rate [2] 602/9 602/24
rates [16] 577/3 580/19
580/22 584/6 585/6
585/6 586/15 586/17
587/19 587/20 602/15
603/2 610/7 610/8
617/3 623/2
rather [5] 517/13 525/6

ratio [1] 608/7
ratios [2] 607/5 608/2
reach [2] 512/2 570/12
reached [3] 564/25
567/9 590/11
reaching [1] 507/21
react [1] 594/23
read [19] 517/13 522/1
522/21 522/22 522/23
527/11 539/15 548/12
548/16 548/17 549/15
566/5 567/16 574/15
579/20 584/4 629/19
629/19 639/16
reading [6] 520/24
528/18 528/23 549/20
549/21 574/13
reaffirmed [2] 568/5
572/1
really [8] 512/5 540/13
544/1 566/20 571/21
599/16 606/11 635/13
REAP [40] 563/4 579/1
579/10 579/14 579/21
579/24 580/18 580/24
581/5 581/10 581/24
583/21 584/9 584/21
584/25 585/3 585/7
585/11 585/19 586/3
586/22 587/21 588/8
589/1 589/3 590/11
610/7 612/24 613/6
613/17 614/3 614/7
616/12 616/16 617/6
617/10 617/15 618/6
625/9 626/20
reason [3] 510/7 581/3
581/8
reasons [1] 641/17
recall [41] 492/9 492/13
495/7 500/9 503/11
510/4 510/5 510/19
510/21 515/21 516/1
516/5 516/16 516/18
532/15 532/18 533/10
533/11 535/6 535/11
568/16 574/13 574/16
580/18 580/22 584/8
589/6 589/9 613/1
619/14 620/7 620/23
621/9 625/16 625/17
626/23 627/10 627/16
632/21 634/9 634/11
recalling [1] 565/23
receded [1] 610/18
receive [3] 504/22
532/14 554/1
received [16] 494/3
508/21 509/18 510/11
519/9 520/4 522/25
524/9 528/21 529/18
529/19 529/25 531/20
580/15 583/17 591/11
receives [1] 547/1
recent [2] 557/2 579/5
recently [2] 493/4
557/18
recess [1] 640/1
recipient [7] 493/21
499/1 499/2 504/23
520/21 525/12 525/25

recipients [2] 543/13
543/16
recognize [7] 579/19
582/3 600/15 600/24
604/18 605/16 610/4
recognized [2] 508/24
585/14
recognizes [2] 520/2
606/22
recognizing [1] 610/1
recollection [4] 510/22
533/21 533/25 537/14
recommend [1] 507/5
recommendation [1]
542/22
recommending [1]
506/8
reconcile [1] 609/16
record [11] 491/4
513/12 544/18 556/12
575/15 576/2 636/14
637/2 637/6 637/9
639/15
recorded [2] 525/19
587/8
records [1] 493/12
recross [2] 635/12
635/13
redactions [2] 520/9
521/3
redirect [3] 551/14
632/13 632/17
reevaluation [1] 558/14
refer [6] 516/18 522/1
540/22 564/13 622/14
637/15
reference [7] 528/24
529/24 536/21 563/8
566/6 624/25 627/11
references [3] 494/16
494/17 530/2
referred [4] 508/22
510/18 511/11 566/12
referring [4] 562/10
589/15 620/21 626/20
refile [1] 550/11
refiling [1] 550/14
reflect [5] 493/17
493/23 494/20 495/16
585/25
reflected [1] 496/7
reflecting [2] 569/21
614/13
reflection [1] 623/23
reflects [2] 495/13
496/20
regard [8] 495/22
529/22 530/11 544/8
575/21 577/17 581/18
629/5
regarding [15] 515/23
524/10 525/22 528/21
529/9 539/25 541/7
572/23 595/2 619/25
620/2 622/19
regardless [3] 571/16
605/9 626/13
regards [1] 517/17
regional [12] 494/12
499/18 499/19 500/2
501/13 501/15 501/23

501/24 538/22 539/18
539/25 608/20
Regnerus [70] 552/17
552/20 553/10 553/17
554/7 554/14 554/20
554/24 555/2 555/8
557/10 560/14 560/14
565/6 565/15 565/18
565/23 566/25 567/12
567/15 569/4 569/12
570/19 570/21 571/16
571/24 572/5 572/11
573/8 574/13 576/11
577/14 579/19 582/3
583/20 590/23 590/25
593/18 595/7 599/3
606/14 609/12 610/11
611/6 612/4 612/24
614/22 615/17 617/22
618/5 618/19 619/14
619/25 620/5 620/23
621/16 621/19 622/8
624/20 626/20 627/8
627/18 628/16 628/24
629/17 630/1 630/12
630/25 631/4 631/19
Regnerus' [9] 565/9
567/18 568/3 568/5
568/14 572/19 572/22
574/22 575/18
regression [1] 571/22
regulation [1] 524/21
regulations [2] 523/3
548/13
relate [1] 634/21
related [5] 540/15
566/12 586/14 586/15
591/15
relating [1] 523/1
relationship [20] 555/25
556/9 557/6 557/14
564/6 569/19 570/2
570/5 572/17 598/18
600/16 602/13 606/1
607/19 608/2 611/1
624/11 624/24 625/11
635/9
relationships [15] 558/9
578/6 592/7 592/21
595/17 598/10 603/13
611/5 623/2 624/9
624/22 624/23 625/8
626/12 629/9
relevance [5] 527/21
528/7 577/22 577/25
619/23
relevant [3] 520/18
562/8 563/17
relied [1] 573/17
religion [12] 555/23
561/8 561/10 561/16
561/20 561/25 565/7
571/4 572/15 590/1
593/6 593/18
religious [102] 491/14
492/14 500/25 502/2
502/9 502/13 503/24
504/2 504/10 504/18
504/24 505/7 505/9
506/16 511/5 516/2
516/4 516/12 516/15
519/8 520/24 522/25

501/24 538/22 539/18
Regnerus [70]  552/17
523/6 523/13 524/16
524/17 524/18 524/19
524/24 525/6 525/25
526/14 527/15 529/21
529/22 529/25 530/5
531/11 531/21 531/25
532/12 532/16 534/23
534/24 535/13 536/4
537/8 537/17 537/18
538/12 538/14 538/17
538/22 539/4 539/16
539/21 539/23 540/7
541/6 543/18 543/21
544/1 544/14 544/21
547/11 547/19 548/20
549/3 549/8 549/17
549/19 549/24 551/20
556/1 563/25 572/11
572/12 572/16 575/6
577/16 578/13 578/25
580/13 584/1 591/16
593/6 594/21 595/8
595/10 609/14 611/16
611/16 612/8 624/1
628/25 629/20 630/6
630/13 630/15 630/19
632/10 636/3
remain [7] 509/24 510/8
533/12 534/2 534/14
586/12 608/11
remained [1] 571/11
remaining [1] 498/6
498/8
remains [4] 508/11
510/9 577/11 629/23
remarks [1] 589/19
remember [2] 549/5
550/8
remind [2] 491/23
498/12
reminds [1] 606/2
rendered [1] 568/11
repair [1] 623/22
repeat [5] 512/18 515/7
550/20 569/9 604/5
repeatedly [1] 622/16
rephrase [10] 509/9
511/9 513/13 513/23
529/12 531/15 537/23
587/23 626/9 626/16
replicate [2] 558/23
560/6
reply [1] 639/12
report [59] 554/4 554/8
554/10 554/20 554/25
562/6 562/16 562/19
562/20 562/22 562/25
563/4 563/7 563/11
572/19 575/18 575/19
575/21 575/22 576/3
576/24 579/19 580/24
584/5 586/3 586/22
587/21 588/6 588/13
589/1 590/18 602/5
610/7 612/25 612/25
613/6 613/17 614/3
614/7 614/25 616/12
616/16 616/19 617/10
617/15 617/18 617/20
618/6 619/1 621/20
621/20 622/2 622/9
625/9 626/20 627/8

CCU-SER-175

**R**

report... [3]  627/14
628/19 632/4
reported [9]  499/18
581/2 587/8 587/9
587/20 588/4 588/19
602/16 614/16
reporter [8]  489/22
553/4 636/24 637/3
637/8 637/9 637/11
641/25
reporters [1]  637/1
reporting [1]  577/3
reports [15]  561/18
562/7 562/9 562/14
563/17 563/19 564/23
575/1 576/20 577/8
582/7 588/9 588/20
601/16 604/19
representatives [1]
511/20
represented [1]  556/15
request [12]  495/5
495/6 495/6 495/14
495/16 505/14 520/18
521/18 527/4 527/12
533/18 638/17
requested [6]  495/1
498/20 519/1 522/25
527/10 527/25
requesting [6]  521/19
529/21 530/17 538/24
539/8 539/20
require [3]  520/21 541/7
549/23
required [3]  498/3 504/9
541/21
requirement [3]  495/7
495/11 512/4
requirements [2]  509/13
548/14
requires [4]  495/8 624/2
629/20 630/13
rescind [1]  541/7
rescinded [1]  541/1
research [2]  556/13
561/4
researched [2]  555/22
557/10
researchers [1]  587/4
resolution [3]  501/11
501/12 507/21
resolve [3]  492/11
501/8 501/18
resolved [1]  501/20
resources [2]  508/4
508/5
respect [10]  499/12
506/17 516/7 523/2
530/17 530/19 565/10
576/16 634/20 635/2
respond [3]  499/2
551/23 622/23
responded [1]  531/6
respondents [4]  580/24
581/5 581/11 614/14
responding [2]  529/8
574/25
responds [1]  526/25
response [10]  519/24
524/24 524/25 526/4

526/23 527/1 527/2
529/17 637/25 638/4
responses [3]  616/10
634/4 634/5
responsible [1]  612/19
rest [5]  526/20 526/21
552/8 588/16 608/19
restate [4]  531/15
546/24 566/23 577/24
restraining [1]  517/2
restrict [1]  532/16
restricts [1]  532/13
restroom [1]  541/22
result [1]  499/14
results [1]  585/22
resume [1]  511/15
resumed [1]  511/16
retain [4]  575/20 595/21
596/17 611/1
retained [2]  563/14
563/16
retains [1]  575/20
rethink [1]  598/17
retired [1]  571/13
retracted [2]  559/1
567/6
returning [2]  551/13
636/6
reveal [1]  498/25
revealed [1]  585/23
Reverend [1]  527/5
reversed [1]  573/11
review [35]  499/21
505/24 511/21 523/17
523/25 524/1 528/15
529/14 530/12 537/3
537/9 537/11 537/12
538/23 539/5 539/21
560/18 562/6 562/14
562/16 562/17 562/22
564/23 565/5 571/8
576/15 579/24 581/23
584/21 590/11 600/11
601/4 611/7 611/8
621/8
reviewed [16]  506/24
531/5 532/21 533/5
538/5 543/3 547/24
557/21 557/25 560/18
562/7 562/25 579/1
579/25 599/7 618/5
reviewing [6]  523/18
528/16 539/20 542/20
542/25 560/15
rewarding [1]  601/23
Ricks [1]  530/3
right [141]  503/22 504/9
509/17 509/21 510/14
510/16 511/3 511/6
511/17 512/10 513/6
515/15 516/18 517/10
518/7 518/18 519/3
519/19 520/2 521/2
521/12 522/12 522/23
523/13 523/14 523/15
524/2 525/15 526/23
528/12 528/16 528/17
531/7 536/23 536/24
537/5 538/19 539/13
543/19 545/2 546/9
548/6 552/5 552/23
553/9 555/9 555/16

550/16 562/12 563/2
560/11 562/12 562/2
566/11 567/25 568/7
568/25 569/9 569/15
569/20 570/1 570/14
571/21 576/5 576/18
579/13 581/1 581/14
581/20 583/2 584/3
586/19 587/1 587/25
588/5 589/12 590/7
590/16 591/9 591/24
592/3 592/10 592/19
593/10 593/22 593/23
593/24 594/16 596/18
596/19 597/1 600/9
602/6 602/11 603/4
603/11 605/10 605/11
607/16 609/18 610/14
614/1 614/2 614/3
614/24 615/7 615/8
615/20 615/24 616/7
616/11 616/13 616/14
617/4 617/16 617/24
620/16 620/25 621/2
621/4 621/19 622/4
622/7 622/12 622/14
622/21 623/19 624/4
625/23 627/13 627/22
629/15 629/16 629/24
632/6 633/2 634/1
634/23 636/5 636/14
639/14
rights [31]  516/3 516/14
517/6 518/13 522/7
524/5 526/24 527/3
528/20 529/7 529/9
529/19 529/23 530/1
530/18 531/2 531/4
531/6 531/10 531/12
531/23 533/16 533/21
538/11 541/16 542/16
544/3 544/3 548/20
568/15 619/16
risk [1]  628/15
road [1]  607/23
robbed [1]  576/25
Robin [1]  525/20
role [5]  573/17 606/14
606/22 610/11 610/14
romantic [1]  625/7
Room [1]  489/23
roommate [1]  618/9
roommates [1]  618/14
Root [1]  631/12
rose [1]  621/25
roughly [1]  570/6
RPR [2]  489/22 641/24
rule [2]  633/10 639/18
ruled [3]  634/13 634/17
635/3
rules [9]  578/6 578/10
606/2 607/18 607/21
608/5 608/8 610/23
633/4
ruling [1]  576/1
Rutger [1]  616/14
Rutgers [12]  563/7
578/20 582/7 583/21
584/9 585/3 586/22
588/14 590/11 612/25
614/25 616/19
Ruth [7]  630/25 631/3

631/12 631/22 631/14
631/19 631/25
RYAN [10]  489/4
491/13 519/7 544/20
551/21 552/3 575/5
635/23 636/4 639/4

**S**

safe [1]  613/23
said [19]  497/11 500/10
505/13 515/11 528/3
533/6 533/9 545/24
548/4 557/2 568/24
588/2 605/7 606/17
608/1 625/21 627/21
632/2 633/19
same [41]  497/25
503/15 503/15 504/8
522/14 534/20 556/8
557/14 558/8 558/25
565/19 565/21 566/13
567/5 567/8 568/22
569/19 570/5 571/14
576/23 577/6 587/5
595/1 602/19 604/14
607/18 614/15 616/21
617/9 624/22 624/23
626/12 626/12 626/15
627/5 630/1 630/3
630/20 632/24 633/15
638/1
same-sex [16]  534/20
556/8 557/14 558/8
565/19 565/21 566/13
568/22 569/19 570/5
577/6 624/22 624/23
626/12 626/12 627/5
sample [2]  588/17
602/19
samples [4]  584/4
589/16 602/21 617/8
sampling [1]  586/11
sanctions [1]  626/25
satisfaction [1]  601/19
satisfied [1]  509/13
saw [2]  558/22 585/4
say [54]  491/19 499/4
502/23 503/18 503/19
504/8 506/19 507/24
509/12 511/1 511/2
515/8 521/8 522/5
522/10 522/24 526/21
528/19 529/10 530/10
531/4 537/18 542/4
544/17 546/14 548/19
549/23 550/10 552/19
561/15 561/21 561/24
562/9 563/24 564/13
570/15 579/11 581/23
584/15 585/10 585/17
590/9 591/22 597/21
605/12 613/14 619/20
622/22 622/24 625/4
627/7 629/4 633/20
639/14
saying [9]  503/21
513/15 515/11 540/8
568/14 586/18 598/20
619/22 624/1
says [19]  497/4 508/17
508/19 519/23 521/5
521/13 521/15 521/18

524/8 524/14 538/20
539/18 539/15 548/13
549/15 567/22 606/3
613/21 613/25
scale [2]  556/15 572/15
625/5
scenarios [1]  608/7
SCHAERR [6]  489/12
489/12 489/15 489/17
491/10 545/24
Schaerr's [1]  553/6
schedule [2]  637/4
638/16
schedules [3]  638/6
638/8 639/9
scholarly [1]  561/3
scholars [1]  568/3
school [17]  491/14
544/21 547/15 547/17
547/20 550/18 551/2
563/24 593/24 594/21
594/23 594/23 598/16
600/13 618/23 632/11
634/2
school's [3]  547/11
580/20 581/25
schools [45]  519/8
544/14 548/20 551/20
564/14 564/14 564/20
575/6 580/5 580/14
582/20 584/2 584/5
584/12 584/14 584/18
585/12 586/8 586/13
586/18 589/17 589/21
589/22 591/21 591/24
592/23 593/22 595/19
596/12 596/12 597/12
598/9 598/23 598/25
599/1 599/15 607/3
610/16 610/21 610/21
627/3 628/14 629/12
633/19 636/3
science [2]  558/25
622/1
scope [7]  548/22 550/2
600/18 628/21 630/8
631/8 632/4
Scottsdale [1]  489/6
screen [9]  516/24
517/12 517/24 552/18
554/14 554/14 590/22
620/12 621/7
se [1]  571/5
search [1]  610/24
searching [1]  608/13
seated [1]  518/23
sec [1]  523/19
second [8]  521/4 558/9
558/12 558/13 616/18
620/12 624/1 626/24
Secretary [17]  499/22
500/19 500/23 500/24
501/3 507/1 507/6
520/17 527/3 532/6
532/22 532/23 533/1
533/4 538/11 542/19
542/24
Secretary's [1]  502/16
543/6
section [21]  497/22
497/22 508/16 508/17
508/18 508/20 537/7

S

section... [14] 537/19
538/17 539/17 548/1
548/12 548/18 549/15
550/8 550/10 550/17
550/22 613/25 615/20
629/20
sections [1] 525/16
secular [10] 577/4
578/25 579/11 582/22
584/2 584/18 586/9
587/12 610/10 614/20
secularization [1]
622/24
secularizing [1] 595/12
see [43] 493/14 500/7
505/15 505/17 517/11
517/25 518/6 527/8
528/24 529/4 529/5
540/2 540/3 552/18
571/8 577/2 579/2
586/7 586/8 588/24
590/20 595/18 595/18
595/23 608/5 608/8
610/6 610/11 611/18
611/19 612/21 613/13
615/4 615/17 617/9
617/22 619/4 622/12
623/7 628/11 633/6
634/4 637/3
seeing [2] 574/16 603/8
seek [3] 549/24 628/3
628/4
seeking [1] 609/16
seem [3] 577/11 598/24
618/16
seemed [5] 571/1 579/9
589/25 605/11 636/17
seems [9] 544/25
578/18 578/18 584/13
618/11 618/16 618/17
618/22 625/11
seen [4] 514/12 517/8
543/9 611/15
seldom [1] 625/18
selected [3] 602/19
602/21 609/18
selecting [1] 578/9
selectivity [1] 599/16
self [15] 559/19 581/11
585/6 588/9 588/20
589/1 599/16 602/16
602/19 602/21 604/19
607/13 608/14 609/18
623/6
self-harm [3] 559/19
585/6 623/6
self-identified [1] 607/13
self-identify [1] 581/11
self-perceived [1]
608/14
self-report [1] 589/1
self-reported [1] 602/16
self-reports [3] 588/9
588/20 604/19
self-selected [3] 602/19
602/21 609/18
self-selectivity [1]
599/16
SEMINARY [2] 487/13
489/3

sent [1] 610/23
senior [1] 588/11
sense [2] 564/2 579/4
584/11 586/12 602/24
603/24 618/12 636/24
sent [1] 620/16
sentence [3] 538/20
539/8 624/1
separated [1] 623/15
separately [1] 572/22
September [4] 499/12
499/15 499/16 500/12
September 2021 [1]
499/15
series [3] 528/12
617/11 618/17
serious [5] 567/19
572/25 596/11 596/21
608/17
serve [1] 596/25
set [4] 491/1 503/2
602/20 638/8
sets [2] 529/21 578/19
setting [1] 536/4
settings [3] 578/13
594/15 602/12
seven [1] 522/14
several [8] 507/21
507/25 508/2 508/3
561/9 562/3 566/10
578/20
severely [1] 568/2
sex [27] 520/5 520/7
532/13 532/17 533/6
534/20 556/8 557/14
558/8 561/10 565/19
565/21 566/13 568/22
569/19 570/5 577/6
592/20 607/5 608/1
608/7 624/22 624/23
626/5 626/12 626/12
627/5
sex-based [1] 520/5
sexual [56] 520/21
521/10 523/1 531/18
541/1 541/7 547/20
556/1 556/5 556/8
557/2 557/6 557/11
557/17 558/7 558/20
560/20 561/25 565/7
567/1 571/5 572/20
576/25 578/6 581/2
581/12 581/18 581/20
591/19 596/7 600/24
606/1 606/15 606/21
606/23 617/16 617/12
617/20 618/1 618/25
619/8 622/19 622/20
624/7 624/12 624/24
625/8 625/11 626/12
627/5 627/9 627/15
627/20 627/24 628/17
629/2
sexuality [26] 547/12
547/14 547/16 547/18
560/24 561/16 561/20
564/16 580/20 581/25
591/17 592/5 595/17
596/17 599/6 604/25
609/15 609/16 611/4
624/3 629/9 629/22
630/13 633/1 634/20

635/1
shari [1] 549/16
shape [1] 585/16
shaped [1] 607/12
shapes [1] 604/24
share [3] 516/24 607/7
607/11
shared [1] 601/24
she [4] 605/13 637/4
637/9 637/12
she's [1] 637/10
shift [2] 597/14 597/15
shifts [1] 622/23
Shirley [1] 562/16
short [4] 510/22 543/8
614/19 635/12
shorthand [1] 567/24
shortly [1] 598/11
should [2] 504/16
504/17 505/19 512/13
512/24 513/1 538/22
570/22 585/11 586/11
586/15 599/14 609/1
609/25 612/17 612/17
612/18 616/24 617/1
622/23 628/17 633/6
shouldn't [1] 635/2
show [4] 579/17 579/18
583/25 590/20
showing [2] 623/18
623/18
shown [1] 504/16
shows [2] 543/19 607/7
shutdowns [1] 584/22
sic [2] 491/19 617/5
side [2] 584/3 584/3
sight [1] 611/19
signature [1] 641/21
641/22 641/22 641/25
signed [2] 498/23
641/22
significance [1] 592/21
significant [2] 570/13
600/6
significantly [5] 510/14
589/20 597/14 614/14
615/5
signing [1] 641/7
similar [8] 497/24
497/25 518/10 523/10
590/10 600/14 625/3
625/6
similarly [2] 504/2
516/14
simple [5] 588/20
600/24 601/23 606/2
616/17
simply [6] 505/1 511/19
525/12 525/14 574/25
578/8
simultaneous [4] 636/18
637/17 638/2 638/12
sin [5] 623/24 624/14
624/16 624/16 624/17
since [7] 496/6 519/16
522/23 553/25 567/7
585/19 620/11
sincerely [1] 630/5
630/18
single [2] 570/10
570/10
single-father [1] 570/10

single-mother [1]
570/10
sir [1] 546/24
sit [1] 513/8
sitting [6] 505/19
506/17 514/4 514/11
514/15 514/23
situation [7] 531/9
532/5 539/14 540/12
577/11 588/10 602/3
situations [4] 537/16
589/3 601/14 602/12
six [1] 614/11
Sixth [3] 571/24 573/8
574/14
Sixth Circuit [2] 571/24
573/8
Sixth Circuit's [1]
574/14
size [2] 543/2 612/21
skewed [2] 607/5 608/1
skirt [1] 639/7
slash [2] 495/23 543/14
slide [2] 607/7 626/24
slow [1] 546/2
small [7] 542/20 542/24
543/2 547/5 581/2
581/21 626/21
smaller [1] 618/10
625/5
Smith [4] 536/19 536/23
536/24 538/11
SNYDER [6] 488/15
491/8 566/1 566/2
567/15 635/22
so [221]
so-called [1] 568/11
social [9] 558/25 560/20
561/4 561/12 577/5
577/6 589/20 604/11
621/25
society [3] 560/21 577/4
612/9
Sociological [1] 560/18
sociologist [7] 555/23
571/4 571/5 572/15
575/13 593/5 593/18
sociologists [2] 562/4
619/15
sociology [12] 554/3
555/10 555/12 555/18
557/8 560/19 561/8
561/25 565/6 568/3
568/8 568/9
sodomy [4] 625/5 625/7
625/22 626/3
some [75] 491/17
496/24 499/11 513/4
513/5 515/22 516/23
516/25 520/9 520/12
522/18 531/4 532/21
537/6 543/19 544/23
546/15 546/16 549/3
549/7 556/7 556/17
556/19 556/20 556/22
560/7 561/17 563/9
565/9 566/11 569/19
570/15 572/9 573/1
577/2 578/22 578/23
579/5 585/18 585/21
586/13 587/22 587/22
589/6 591/19 594/3

596/8 596/15 597/8
599/22 600/1 601/14
601/15 603/16 603/22
605/19 609/25 612/5
612/24 615/25 619/25
620/20 627/2 627/3
631/21 632/19 633/4
633/4 633/5 633/15
633/16 633/22 634/5
634/6 636/17
somebody [5] 507/13
544/16 544/17 551/23
620/14
somebody's [2] 551/25
596/23
someone [3] 492/18
571/2 571/12
something [10] 506/1
536/8 561/10 603/19
607/22 619/21 619/22
638/9 638/13 638/22
sometime [1] 638/18
sometimes [8] 505/6
507/25 508/2 579/10
598/12 600/17 600/18
623/21
somewhat [5] 590/2
592/22 605/18 607/16
609/6
somewhere [1] 599/25
soon [2] 552/1 635/16
sorry [20] 491/22 496/2
496/4 503/21 515/11
535/2 546/24 550/19
550/24 552/6 557/19
559/17 571/14 587/18
590/23 592/17 616/18
629/13 629/15 639/22
sort [45] 559/20 561/9
562/3 562/4 564/11
571/1 582/7 585/13
585/25 588/5 588/21
592/20 596/13 597/3
598/3 599/13 599/15
604/11 608/1 608/13
609/22 610/6 610/25
611/2 611/3 612/19
617/6 622/4 622/4
622/6 622/22 623/9
623/17 623/23 624/11
624/14 628/2 628/5
628/7 628/11 629/5
634/1 634/24 635/2
635/7
sound [1] 590/16
sounds [3] 491/15
518/18 627/18
source [1] 590/2
sources [1] 593/2
Southern [1] 631/24
SOUTHWICK [18]
488/4 488/4 491/6
503/10 512/18 514/10
515/6 516/9 516/9
528/16 549/3 554/23
565/8 632/19 634/8
636/8 638/15 639/12
speak [10] 505/23
527/19 541/10 541/13
542/5 544/17 545/7
552/19 604/12 641/13
speaker's [1] 641/14

**S**

speakerphone [1] 641/11
speakers [3] 641/12 641/13 641/14
speaking [12] 492/9 492/13 504/12 512/2 529/17 536/7 536/13 568/11 585/4 589/5 615/13 641/12
specific [8] 504/1 504/4 520/9 524/19 525/11 528/24 540/22 618/8
specifically [4] 497/3 523/2 529/2 563/14
specificity [3] 503/2 504/3 542/4
specifics [1] 629/6
spectrum [8] 582/8 615/2 615/4 615/6 615/23 616/10 616/20 616/23
speculate [2] 536/10 541/11
speculation [16] 512/15 528/7 529/11 530/21 533/23 534/3 536/5 541/24 544/5 593/12 595/2 625/24 626/8 628/21 630/9 633/16
speculative [2] 548/23 597/17
spell [1] 553/5
spelled [1] 553/11
spent [1] 500/4
spike [1] 586/20
spoke [2] 495/3 499/11
spouses [1] 601/25
Spring [10] 517/6 519/13 519/21 520/4 520/16 521/18 522/8 522/25 523/11 541/18
stability [1] 607/20
stable [3] 586/12 595/25 608/11
stably [1] 570/8
staff [1] 538/12
Stafford [1] 597/4
stage [32] 494/7 497/4 497/6 497/9 498/6 498/9 498/13 498/14 498/14 498/17 499/4 499/5 500/16 500/19 507/19 508/14 508/24 509/6 509/25 510/3 510/4 511/16 512/3 513/5 513/5 515/1 515/3 515/14 515/18
stalks [1] 624/13
Stamp [1] 538/16
stamped [1] 519/19
stand [4] 532/19 567/12 568/21 621/17
standards [2] 504/7 504/13
star [1] 608/6
stark [1] 615/9
started [3] 544/17 555/23 618/24
starting [1] 627/13

starts [2] 607/19 608/18
State [12] 498/1 571/19 525/1 536/7 553/5 576/2 620/5 621/15 625/4 625/13 625/22 634/24
stated [4] 520/18 580/24 622/22 634/25
statement [12] 530/13 533/9 540/6 567/20 567/21 568/7 568/13 621/14 621/14 621/17 621/23 622/5
statements [4] 572/1 572/13 619/25 620/21
states [16] 487/1 487/23 489/22 509/22 520/16 525/14 529/1 558/21 567/17 567/24 585/18 600/1 609/21 622/25 625/15 641/19
stating [1] 536/3
statistically [3] 576/19 614/13 615/5
status [8] 493/5 495/2 495/16 496/20 497/17 562/19 569/24 602/13
statute [3] 549/11 549/20 549/23
statutes [1] 548/13
stay [2] 586/3 595/23
steeped [1] 624/14
stemming [1] 536/1
stenographic [1] 641/10
step [2] 506/12 523/19
stepparenting [1] 570/11
Steppler [2] 489/22 641/24
stigma [14] 557/17 558/18 559/13 577/5 577/10 580/2 620/1 620/2 621/9 621/10 624/15 625/20 627/2 633/20
stigmatic [1] 627/4
stigmatized [1] 632/20
stigmatizing [1] 633/23
still [10] 491/23 495/12 501/5 511/17 553/21 570/16 586/16 586/17 595/21 607/25
stock [1] 540/18
stop [2] 615/11 615/11
straight [7] 606/1 614/14 614/15 617/13 617/22 618/3 619/3
strain [1] 592/24
strapped [1] 610/22
Street [6] 488/5 488/7 489/5 489/13 489/15 489/18
strengths [1] 556/18
stress [1] 514/21
stressed [1] 597/3
stretch [1] 606/25
strike [1] 635/7
strong [3] 595/24 596/16 600/3
strongly [1] 564/9 616/15
structural [7] 619/25

struck [2] 621/9 624/15
structure [2] 526/19 569/15
structures [2] 573/14 573/20
struggles [1] 578/24
struggling [2] 578/12 629/15
student [36] 515/23 516/17 520/5 520/7 516/19 521/18 521/20 523/11 528/22 528/25 529/8 529/23 531/10 531/13 531/18 531/23 532/8 533/15 533/19 534/17 534/17 535/25 536/2 541/18 541/22 550/17 551/1 551/6 581/19 594/6 594/20 622/25 625/1 625/10 627/3 630/5
student's [5] 516/11 523/7 531/14 550/25 551/7
students [89] 516/7 516/15 520/22 521/9 524/12 527/17 528/2 530/25 533/7 534/21 535/20 535/20 535/23 543/24 544/1 547/19 561/2 563/23 578/4 567/12 578/12 579/3 579/3 579/6 579/9 579/11 579/12 580/4 580/4 580/19 581/7 581/14 581/17 581/24 582/9 582/16 582/17 582/19 582/22 584/1 584/2 584/5 584/16 585/12 585/19 586/8 586/9 587/5 587/6 587/8 588/15 594/22 596/25 597/2 597/8 597/15 598/3 598/9 598/9 599/4 600/9 600/15 600/19 600/23 601/3 606/9 607/1 609/15 614/4 614/5 614/16 615/2 615/6 615/22 615/23 617/13 617/20 618/8 618/20 619/1 619/1 619/3 626/22 632/20 632/25 633/3 633/18 634/3
students' [1] 531/6
studied [2] 570/7 594/15
studies [22] 557/22 557/25 562/8 562/24 563/2 563/11 563/17 564/24 567/8 572/10 572/15 574/2 574/5 575/12 578/20 579/6 583/23 584/16 585/24 589/12 593/6 593/18
study [63] 555/25 558/14 560/5 566/12 566/18 567/1 567/3 567/13 567/22 567/25 568/21 568/22 569/1

569/2 569/14 570/12 571/17 571/19 571/21 573/13 573/17 574/17 576/11 576/15 576/18 576/23 577/8 577/13 578/16 578/20 579/1 579/10 581/6 581/16 582/12 582/22 583/21 584/9 584/10 585/3 585/19 586/22 587/6 588/25 589/2 589/7 589/9 589/11 590/10 590/12 590/14 590/19 590/21 590/25 591/4 594/17 601/8 601/13 602/1 602/4 602/5 606/21 616/14
studying [1] 594/18
stuff [4] 567/11 596/14 623/9 629/10
stunned [1] 571/10
subject [13] 498/18 504/6 506/5 508/18 511/12 519/23 534/10 535/6 536/3 554/1 601/9 603/17 630/2
subject-matter [6] 498/18 504/6 506/5 534/10 535/6 536/3
subjective [1] 618/12
submissions [1] 639/25
submit [1] 554/4
submitted [2] 639/18 639/23
suboptimal [1] 568/23
subsection [2] 549/18 550/13
subsequent [1] 496/25
subset [1] 547/5
substance [1] 582/14
substantial [1] 590/1
success [1] 610/7
such [19] 509/18 534/22 535/5 536/2 542/4 546/18 547/4 547/15 549/19 571/10 578/9 581/3 585/10 592/14 604/7 610/21 626/2 635/13 641/18
sue [2] 571/18 551/1
sued [1] 571/12
sufficiently [1] 611/2
suggest [5] 550/4 578/11 578/23 608/19 611/15
suggested [1] 507/4
suggesting [1] 609/6
suggestion [1] 637/14
suggests [1] 578/3
suicidality [1] 584/7
suicide [3] 559/19 560/3 576/20
Suite [5] 488/5 489/10 489/13 489/15 489/18
summarize [2] 493/12 526/25
summary [4] 526/20 526/21 611/7 614/6
support [1] 577/5
577/6 597/10 601/1 604/11 604/17 605/14 613/8 613/19 613/22

633/21
supposed [2] 505/14 505/16
supposition [1] 601/1
Supreme [3] 619/17 625/14 634/11
sure [32] 491/23 492/1 499/17 503/21 512/21 517/14 518/4 522/3 536/23 551/24 553/20 558/11 560/12 572/14 582/11 586/4 599/3 600/10 603/11 604/1 604/5 604/14 604/21 606/18 608/23 612/15 620/10 620/15 620/15 621/22 624/19 638/11
surmise [2] 607/14 614/19
surpasses [1] 607/10
surprise [1] 627/1
surreptitiously [1] 578/7
survey [20] 556/14 559/22 563/4 563/6 579/14 579/21 579/24 580/18 581/5 581/10 581/24 582/21 583/21 585/3 585/7 585/11 587/4 589/2 589/4 589/15
survey-based [3] 556/14 563/6 589/15
surveys [1] 556/16 556/20
survive [1] 595/21
suspect [4] 507/24 600/16 609/5 625/12
suspected [1] 505/24
sustain [2] 593/15 630/22
Sustained [9] 527/20 528/10 530/22 548/24 550/3 595/4 628/22 630/10 632/5
Suzanne [1] 532/24
SW [2] 488/9 489/10
sworn [2] 492/5 553/1
symptoms [1] 589/20
system [1] 545/10
systematic [1] 592/15

**T**

table [1] 613/14
take [19] 498/10 499/20 506/12 507/20 518/5 518/16 523/24 537/3 537/9 546/15 546/16 546/23 547/5 547/9 608/25 615/12 638/8 639/10 639/17
taken [8] 496/6 514/13 518/20 523/21 548/15 576/4 639/15 641/9
takes [1] 546/11
taking [3] 501/23 510/18 610/20
talk [8] 497/3 570/24 583/20 624/16 627/8 631/20 636/15 637/2
talked [1] 550/7 557/1 581/22
talking [12] 529/6

CCU-SER-178

T

talking... [11] 561/15
563/25 564/14 581/6
581/14 581/16 590/17
601/8 624/15 627/14
627/19
talks [4] 521/4 522/15
601/12 628/13
tapping [1] 618/11
taps [1] 623/13
taught [3] 561/6 561/8
561/9
taxes [1] 598/25
teach [2] 561/4 561/4
teaching [2] 561/1
564/21
teachings [5] 598/8
611/16 633/1 633/9
634/2
technical [2] 567/11
641/15
technological [1] 641/17
Technology [1] 545/16
TELEPHONIC [2] 488/1
489/1
tell [15] 520/13 543/2
555/8 568/25 569/13
577/20 582/6 586/25
597/12 601/10 612/12
631/9 631/10 634/18
638/9
telling [1] 564/24
tells [1] 637/9
temporary [2] 500/6
517/2
ten [2] 535/19 599/1
tend [5] 564/3 564/5
564/5 589/23 602/15
tenets [6] 506/16
520/24 524/19 539/24
541/6 549/19
tent [1] 564/18
tenure [4] 555/13
555/14 555/15 555/18
term [6] 588/6 592/8
599/9 622/16 623/7
623/18
terminated [1] 527/17
termination [1] 527/13
terms [17] 502/21
539/10 559/4 562/20
584/10 587/23 592/6
595/15 595/24 601/23
603/2 614/20 615/6
623/2 625/10 625/19
630/13
territory [1] 563/10
testified [22] 492/5
495/7 501/4 503/13
503/14 507/18 508/13
509/21 510/2 514/12
525/24 537/15 537/21
540/24 540/25 553/1
565/15 565/18 566/7
573/13 612/6 628/24
testify [3] 525/3 565/18
566/25
testifying [4] 521/24
522/17 626/21 630/12
testimony [56] 502/24
503/1 505/13 507/23

509/8 510/4 519/5
510/7 511/8 512/14
513/11 513/16 514/7
515/4 532/15 532/18
532/19 532/25 533/10
533/11 533/12 533/19
533/22 534/2 534/10
534/12 534/14 534/16
535/4 535/7 535/11
537/22 562/5 566/11
566/18 566/21 567/17
567/18 567/23 572/2
572/22 574/23 575/2
575/7 576/12 578/2
608/20 609/7 613/2
620/2 628/21 629/23
630/8 630/15 632/4
632/22
Texas [6] 552/21
553/25 555/9 555/13
568/4 625/15
text [3] 549/10 549/23
585/10
texted [1] 548/4
than [37] 509/23 512/22
513/3 515/1 525/7
531/13 541/14 546/15
546/16 546/23 547/5
547/9 557/8 578/25
579/9 579/12 584/9
584/18 587/19 588/21
589/3 589/22 598/23
598/24 602/2 602/18
603/8 605/20 607/1
610/9 610/10 614/14
615/6 616/1 617/4
618/22 622/4
thank [55] 491/25 492/2
503/4 503/6 518/5
518/18 519/9 519/12
519/18 528/17 528/19
532/11 537/13 544/11
544/22 546/3 546/9
551/10 551/13 551/16
552/6 552/9 552/13
552/22 553/4 553/13
554/1 554/18 560/11
560/14 566/3 573/4
575/8 575/15 575/17
575/24 576/6 576/9
580/6 580/15 580/16
583/18 591/8 609/10
611/22 612/4 619/11
622/8 632/12 635/10
635/24 635/25 636/5
636/13 639/23
Thanks [1] 503/12
that [940]
that's [56] 496/14
496/23 503/19 503/23
504/24 509/24 510/1
520/1 522/10 523/14
530/2 533/25 540/23
542/17 545/23 549/21
553/21 557/4 560/9
562/3 563/19 567/2
568/1 572/4 574/1
577/17 577/19 582/24
583/2 583/3 584/19
585/23 595/21 597/19
599/7 602/5 606/8
606/13 608/18 609/8

612/15 614/23 614/25
615/5 627/7 627/14
625/12 627/7 629/5
633/22 633/25 636/10
636/21 638/20 639/5
639/14
their [72] 492/18 506/17
510/25 520/22 523/12
527/17 531/2 531/24
533/16 533/20 544/2
544/8 550/11 551/2
563/21 564/11 568/16
569/21 569/25 570/1
570/1 570/1 570/2
570/2 577/12 580/25
584/18 592/7 592/7
593/8 594/24 595/9
595/10 595/15 595/21
596/9 596/17 596/24
598/3 598/10 598/18
599/5 601/6 601/21
602/18 603/21 604/3
605/2 605/21 605/21
606/13 607/16 607/19
609/16 610/6 611/1
611/2 617/19 623/11
623/17 623/21 623/23
624/7 624/18 624/21
624/25 626/5 628/18
629/1 630/5 638/12
639/9
them [66] 505/19
511/17 514/5 514/15
515/14 517/10 518/15
533/8 556/19 556/20
560/17 560/18 561/3
563/1 563/21 564/7
567/9 574/6 574/8
581/21 582/20 584/3
591/19 592/24 594/16
596/9 596/15 596/24
597/6 598/10 599/22
600/17 601/17 604/8
604/9 604/10 605/22
606/11 607/21 607/22
608/9 610/16 610/24
611/2 614/9 617/13
618/13 623/22 628/19
629/1 631/20 631/20
631/21 632/21 633/5
633/5 633/6 633/7
633/13 633/16 633/24
634/6 634/7
themselves [7] 527/19
542/5 572/24 605/10
607/8 607/15 641/13
then [58] 495/13 496/6
496/20 505/16 505/17
507/6 507/7 507/14
507/19 507/20 516/3
518/5 518/12 520/9
521/12 521/17 522/12
524/14 526/16 526/23
528/5 529/1 529/8
529/24 530/4 537/10
538/10 538/15 539/13
539/24 542/19 550/18
551/1 553/5 555/5
555/18 555/19 557/17
558/25 560/20 599/14
607/10 607/10 608/24

609/15 614/3 614/25
623/25 631/2 634/5
636/6 637/15 637/23
637/25 638/16
theologian [1] 623/8
theological [8] 564/11
592/7 592/19 593/7
593/20 595/16 623/14
623/24
theologically [2] 564/5
564/20
theology [6] 591/14
592/8 609/15 624/3
629/22 630/13
theology-based [2]
624/3 629/22
theology-informed [1]
592/8
theory [1] 556/8 557/4
557/7 559/12
therapy [2] 627/21
628/6
there [82] 491/19 496/6
496/15 496/17 498/16
500/6 504/4 505/9
505/9 505/14 505/15
507/3 507/21 508/3
514/13 514/13 515/8
520/9 537/3 538/20
540/2 543/7 543/17
544/17 544/19 549/7
550/13 552/14 552/18
553/21 555/10 555/16
555/17 559/12 559/19
563/23 564/1 569/18
570/18 574/6 574/6
580/4 580/23 581/6
582/20 584/13 587/23
587/24 597/2 597/8
599/14 600/2 602/22
606/19 607/7 607/14
608/1 609/5 609/19
610/15 611/9 612/6
613/20 613/20 613/21
613/22 616/3 617/1
617/16 623/7 627/15
627/19 627/24 628/2
628/9 628/10 628/15
629/14 633/2 635/13
639/10 639/12
there's [52] 497/11
501/22 502/5 504/1
504/3 504/9 504/10
504/11 505/15 507/13
507/19 514/11 524/17
525/11 525/17 536/17
536/17 537/17 544/9
562/3 570/17 574/11
584/9 584/12 587/4
592/24 598/12 599/15
599/17 600/25 602/25
603/14 603/16 607/2
607/12 607/18 607/25
609/2 609/21 609/22
610/20 612/11 613/22
615/20 616/11 616/13
616/17 617/13 618/10
623/4 639/20 639/22
thereafter [4] 560/7
637/16 638/1 639/20
Therefore [1] 521/19

thereof [2] 593/4 596/8
these [70] 494/12
494/13 502/2 502/5
504/13 507/25 511/5
511/12 511/21 512/12
512/22 512/23 513/4
513/8 513/8 514/11
514/16 514/23 516/25
517/8 517/11 517/21
518/13 525/12 531/5
542/25 547/8 556/14
556/16 557/22 561/11
564/20 569/17 569/20
575/12 577/3 577/11
577/25 580/5 586/11
587/10 587/12 588/19
588/21 592/11 592/22
593/21 593/21 595/19
595/25 597/11 598/9
598/25 600/19 601/16
605/20 606/19 607/23
607/18 607/24 608/5
612/20 625/6 625/21
627/3 627/4 628/1
628/10 633/12 639/8
thesis [1] 559/6
they [147] 500/3 501/20
505/22 505/22 505/24
506/3 506/4 506/6
506/8 506/10 506/10
509/14 509/24 510/15
510/21 513/1 519/9
520/20 525/14 535/21
535/22 542/5 544/7
544/7 556/3 559/20
559/21 564/3 564/5
564/5 572/3 573/11
573/23 576/24 577/9
577/11 578/7 578/25
579/25 580/24 582/8
585/15 587/3 587/16
588/2 588/8 589/4
590/2 592/6 592/22
593/3 593/7 595/9
595/12 595/20 595/22
596/2 596/13 596/16
596/16 596/25 597/1
597/19 597/22 598/2
598/11 599/2 599/18
599/22 599/24 600/14
600/15 600/17 601/13
601/14 602/18 603/22
604/10 604/15 604/17
605/16 605/19 606/4
606/5 607/17 607/22
608/9 608/13 609/18
610/14 610/14 610/16
610/16 610/24 610/25
611/1 611/3 612/12
614/11 614/16 614/16
614/17 614/20 616/14
617/18 618/10 618/13
618/16 619/2 619/2
623/21 623/22 624/7
624/11 625/1 625/12
625/17 626/5 627/5
628/4 629/3 632/21

CCU-SER-179

| T | | times [6] 561/6 581/4 | transitions [2] 557/19 | U |
|---|---|---|---|---|

they... [10] 633/7
633/12 633/15 633/17
633/17 633/25 634/13
634/17 638/11 641/13
they'll [1] 596/3
they're [41] 504/4
505/21 510/16 512/8
524/20 535/21 551/24
587/22 587/22 588/9
588/20 588/24 589/12
589/16 592/3 596/19
596/20 596/20 597/2
597/18 598/18 600/16
600/17 600/18 601/2
605/6 605/14 605/23
610/2 611/20 613/23
614/13 616/2 616/5
616/7 616/7 626/4
628/12 629/7 633/24
639/8
they've [2] 511/16 579/9
thing [7] 507/2 564/12
571/10 595/11 612/9
626/25 635/13
things [23] 499/19
556/18 561/11 561/24
564/3 572/14 582/15
586/15 586/15 587/22
587/22 588/21 600/19
601/2 605/4 605/23
606/19 608/11 612/20
623/22 623/22 628/10
629/17
think [75] 491/11
503/14 505/2 537/20
555/16 558/14 561/10
562/2 565/22 574/15
574/23 575/14 577/17
578/3 582/9 582/10
585/17 588/14 590/2
590/5 590/15 592/24
594/6 594/21 594/22
596/2 596/11 597/13
599/12 599/15 599/17
600/23 601/12 603/2
603/17 605/1 605/2
605/16 606/8 606/12
606/25 608/25 609/2
609/13 609/19 610/3
610/14 610/20 610/23
612/12 612/15 612/16
618/12 621/24 622/23
623/7 624/11 625/1
625/9 625/20 627/7
628/5 629/5 633/12
633/17 633/22 633/24
634/13 634/23 634/24
634/25 635/5 635/6
639/2 639/8
thinking [1] 589/2 599/8
third [5] 521/5 556/6
558/10 607/6 608/3
thirds [2] 607/2 608/4
this [258]
thorough [1] 541/11
thoroughly [1] 569/12
those [72] 493/5 499/23
500/1 501/8 501/11
501/18 502/13 504/7
505/4 506/15 506/21

506/23 506/23 511/24
524/25 525/16 531/6
535/12 535/19 537/10
537/11 539/22 541/20
544/1 556/3 556/25
562/8 562/12 563/11
564/3 564/10 568/24
569/18 570/3 572/14
576/16 579/4 580/22
583/22 586/2 586/15
587/17 587/18 587/19
592/2 593/1 594/15
594/17 595/8 595/12
596/22 597/14 608/2
608/8 608/11 610/21
614/19 616/15 617/3
625/1 626/3 626/14
629/11 629/12 630/3
630/18 632/24 633/8
633/23 635/4 635/6
639/14
though [13] 515/18
558/22 582/11 585/8
604/1 606/20 611/13
613/25 614/6 618/7
624/19 625/25 626/6
thought [4] 515/8 545/5
545/14 598/24
thoughtful [1] 541/14
thousands [4] 546/18
546/23 547/1 609/21
threatened [1] 577/1
threatens [1] 533/7
three [14] 516/25 518/9
518/13 522/5 555/19
556/15 561/11 562/7
562/9 563/16 563/19
575/1 600/3 619/7
three-quarters [1] 619/7
through [12] 496/3
496/22 510/11 514/17
515/14 517/10 517/22
519/15 526/18 607/9
613/4 627/14
Thursday [2] 576/13
637/11
thwarted [1] 578/7
tick [1] 594/16
tie [1] 544/19
time [45] 491/1 500/5
507/23 508/25 510/3
510/6 510/22 510/23
514/25 517/7 521/8
523/24 533/19 546/10
546/11 546/22 547/4
549/7 567/5 568/11
571/14 574/15 576/23
590/3 598/20 599/23
602/19 603/5 604/16
607/18 607/24 608/6
608/18 609/2 610/20
611/24 614/15 617/9
626/5 633/15 634/5
635/24 639/10 639/18
639/24
timed [1] 603/4
timeline [2] 499/24
500/1
timeliness [5] 495/4
495/7 495/11 505/1
512/7
timely [2] 498/19 521/7

584/4 586/6 618/2
617/8
title [43] 492/20 506/16
516/17 508/5 516/15
519/24 521/5 521/12
522/8 523/1 523/7
523/12 524/20 524/21
524/25 525/4 525/6
525/25 528/21 531/2
531/3 531/7 531/18
531/22 533/16 533/20
534/23 534/24 535/1
535/17 537/16 538/12
541/17 542/17 542/21
544/2 548/21 549/16
550/17 550/18 551/2
551/6 555/11
today [19] 491/16
503/12 522/22 532/19
533/12 534/2 534/14
537/21 545/15 550/16
552/8 562/5 598/23
608/18 612/5 618/22
621/17 629/23 637/3
together [3] 557/7
561/11 616/15
told [2] 514/22 594/6
Tom [1] 606/3
tons [1] 612/20
too [5] 595/15 601/25
602/21 607/22 634/25
took [11] 547/4 552/6
552/23 560/5 563/5
563/7 571/17 579/5
585/23 586/19 587/1
top [1] 621/13
topic [3] 560/17 563/10
608/24
topics [1] 556/24
tossed [1] 599/10
total [2] 581/16 581/17
toward [3] 500/12 536/9
540/6
towards [3] 520/14
521/17 593/8
track [1] 559/21
tradition [1] 592/3
traditional [9] 564/15
596/17 596/24 598/7
609/14 609/17 632/25
633/8 634/19
traditionally [1] 564/7
traditions [1] 595/16
training [4] 539/23
540/15 540/16 565/4
tran [1] 616/20 616/23
trans-spectrum [2]
616/20 616/23
transcript [11] 487/21
636/23 637/10 637/10
637/12 637/14 637/16
638/11 638/16 641/8
641/21
transfer [1] 599/25
transgender [11] 515/23
516/11 523/10 528/21
528/25 529/8 529/23
534/20 541/18 541/22
557/20
transitioning [3] 534/21
593/9 594/24

567/9
treat [1] 520/22
treated [1] 504/8
treatment [1] 627/21
tricky [1] 617/7
tried [4] 513/22 563/9
593/8 594/23
Trinity [1] 553/19
trite [1] 623/18
TRO [2] 508/24 508/25
trouble [3] 544/25
596/21 629/13
troubles [1] 586/1
true [10] 509/4 515/3
543/23 570/21 604/14
625/20 630/12 630/15
633/22 641/7
trusted [1] 605/19
try [1] 564/14
trying [17] 511/4 516/16
522/18 531/1 545/7
585/23 596/23 597/22
603/21 604/9 605/8
606/4 619/20 619/22
620/19 624/17 629/13
TUCKER [10] 489/4
491/13 519/17 544/20
551/21 552/3 575/5
635/23 636/4 639/4
tuition [1] 596/20
596/20 596/22 610/22
tuition-dependent [4]
596/20 596/20 596/22
610/22
turn [13] 492/17 504/16
504/17 504/20 519/12
523/15 536/22 547/23
547/25 552/13 553/6
597/8 621/19
turning [1] 622/9
turnover [1] 569/17
tweak [4] 595/13
595/14 596/4 611/2
two [22] 500/11 518/16
560/19 561/21 569/17
570/11 570/12 573/11
575/1 583/22 584/16
587/18 600/2 607/2
608/4 611/6 626/15
637/1 637/12 637/16
637/25 639/14
two-minute [1] 518/16
two-thirds [2] 607/2
608/4
type [24] 498/22 563/20
563/21 563/24 564/13
580/5 582/19 584/17
589/17 589/22 591/24
593/21 594/21 597/22
599/5 600/9 600/13
604/3 604/8 605/7
605/15 609/23 610/11
633/18
types [6] 569/16 569/18
569/18 579/2 580/3
602/23
typically [11] 572/15
585/4 588/9 592/6
593/1 593/3 596/19
605/8 624/25 628/1
628/10

U-shaped [1] 607/12
U.S [3] 487/7 491/2
641/2
ultimate [3] 500/14
500/17 500/20
ultimately [2] 573/9
634/11
unaware [1] 574/18
unbelievable [3] 567/18
567/23 572/25
unclear [1] 570/5 570/5
596/10
uncontroversial [1]
592/12
under [17] 491/24
495/10 497/21 497/22
501/2 524/16 525/16
525/16 535/1 535/6
535/12 537/7 550/8
550/13 632/21 633/5
639/17
undergraduate [2]
561/5 594/7
underpinnings [1]
572/12
understand [19] 512/5
512/6 550/19 552/14
558/5 558/9 560/10
562/21 571/22 575/12
575/13 576/1 576/3
590/21 599/3 600/20
623/17 631/13 634/14
understanding [26]
496/24 497/2 510/8
528/6 532/25 549/21
550/16 550/23 550/25
551/5 551/9 563/18
564/15 584/21 591/16
592/1 592/9 595/20
596/17 599/4 600/12
605/3 611/4 623/24
624/6 625/17
understandings [6]
564/8 595/16 623/14
629/8 635/1 635/8
understands [1] 556/8
557/5 606/8
understood [1] 550/5
558/10 575/24 578/5
635/8
undertakes [1] 498/17
unheard [1] 570/25
unhindered [2] 624/3
629/23
Union [1] 541/5 541/6
unique [5] 561/9 577/2
578/5 587/2 612/8
uniquely [2] 611/20
623/12
UNITED [9] 487/1
487/23 489/22 558/20
585/17 599/25 609/21
622/24 641/19
universities [20] 487/11
489/8 561/21 578/5
578/9 580/3 582/23
587/12 587/14 589/23
595/12 595/25 597/2
605/20 609/22 609/23
614/21 623/10 624/7

CCU-SER-180

**U**

universities... [1] 630/17
Universities' [1] 572/13
university [56] 487/12
487/13 489/3 497/16
515/22 516/2 517/6
518/11 519/13 519/21
520/4 520/6 520/19
521/18 522/9 522/25
523/11 523/11 523/16
524/5 524/19 524/20
524/21 525/20 526/19
527/7 527/9 527/15
528/1 534/19 536/2
541/5 541/5 541/7
541/18 541/19 547/13
552/21 553/22 553/25
555/9 555/13 568/4
581/1 582/7 582/21
583/9 583/11 587/4
607/19 615/3 615/21
616/6 616/21 617/3
626/25
university's [7] 520/8
520/18 521/21 527/11
534/17 541/6 626/23
University-based [1]
582/7
unlawful [1] 534/22
535/1 535/5
unless [1] 528/25
unlike [1] 567/6
unnamed [1] 595/2
unrelated [1] 555/1
until [3] 500/4 501/15
574/18
untrue [1] 571/15
unwanted [2] 628/7
628/8
up [48] 491/23 492/24
498/21 504/16 506/24
509/22 516/25 517/4
522/7 542/11 557/13
557/15 566/3 569/10
569/22 570/1 570/4
573/2 575/8 582/2
584/21 589/2 589/4
595/10 596/14 607/10
608/4 609/12 611/2
611/6 612/5 613/9
613/13 615/18 620/12
620/16 621/8 621/20
621/21 622/10 623/25
625/13 626/24 627/11
629/14 631/2 639/10
639/20
uphold [1] 567/8
upon [3] 569/21 573/13
579/5
us [17] 491/12 515/21
517/17 521/20 523/24
536/9 541/13 555/8
566/10 568/25 569/13
576/15 582/6 586/25
590/21 622/1 638/19
use [20] 498/24 502/19
502/21 502/21 502/23
503/14 503/16 545/11
545/13 546/14 571/22
582/14 584/11 592/6
592/8 622/1 622/16

**Case** [4] 623/6 635/7
638/11
used [2] 576/23 575/22
uses [1] 492/10
using [1] 622/3
usually [1] 595/24
utterly [1] 592/12

**V**

value [3] 569/6 618/4
619/7
valued [2] 616/25 617/1
valuedness [1] 617/5
Vanderbilt [3] 587/4
588/25 589/2
variables [1] 571/23
varies [1] 604/18
variety [11] 512/8 561/2
563/5 567/8 570/9
577/12 579/25 582/9
582/14 587/13 627/16
various [4] 494/13
498/16 604/24 623/10
vary [1] 564/10
vast [1] 510/13
Velez [1] 493/10
ventured [1] 555/25
verifiable [1] 612/9
versus [2] 580/4 616/12
very [21] 501/13 502/17
502/18 504/4 508/6
517/13 529/2 540/19
543/8 547/6 552/6
552/7 552/13 567/11
571/14 592/22 608/17
609/7 616/2 618/19
639/7
via [2] 641/9 641/11
victimization [2] 582/13
584/10
video [6] 488/1 489/1
641/8 641/9 641/15
641/18
view [3] 514/15 591/23
624/8
views [2] 568/5 634/19
violated [1] 535/15
violating [1] 626/23
violation [2] 550/18
551/2
violations [3] 492/20
527/13 580/19
violence [2] 577/1
586/15
violence-related [1]
586/15
vision [2] 624/2 629/21
visual [1] 641/10
VOLUME [1] 487/20
vulnerability [1] 584/13

**W**

W-I-L-L-S [1] 492/4
wait [4] 528/10 528/10
528/10 615/11
waiting [2] 517/23
638/16
waive [1] 495/6
waiver [9] 495/1 495/2
495/5 495/6 495/11
495/14 495/16 498/20
512/7
waivers [1] 495/3

**want** [40] 508/15
528/25 547/23 547/25
528/4 547/23 547/25
551/23 551/25 558/4
581/12 598/21 599/18
600/17 602/20 604/15
605/22 606/5 606/5
607/22 608/9 608/16
613/5 613/9 617/14
618/9 619/2 620/20
625/19 626/24 629/18
632/25 633/8 633/25
636/16 637/14 637/24
638/8 638/10 638/13
wanted [5] 491/22
521/2 547/7 560/10
634/24
wants [1] 605/13
was [153] 493/10
493/22 494/2 496/8
496/10 496/17 496/18
497/14 497/20 497/21
497/25 500/6 500/9
500/10 501/16 505/25
507/9 508/25 510/4
510/5 510/22 510/23
511/1 511/3 511/4
511/12 511/14 511/19
511/23 511/24 511/25
513/15 515/11 515/24
516/1 516/12 518/20
521/6 521/9 521/9
522/11 522/11 522/15
523/7 523/21 525/24
526/4 526/15 526/16
527/10 527/15 530/2
530/11 532/15 532/24
533/1 534/10 535/5
535/11 535/14 537/22
541/19 542/2 544/17
544/18 546/13 549/3
549/7 551/2 553/19
553/20 555/16 556/6
557/4 557/12 557/14
558/8 558/12 558/13
558/14 558/24 559/12
559/12 559/15 559/19
559/20 560/8 561/10
563/8 563/16 565/21
565/22 568/11 568/12
568/17 569/12 569/14
569/18 570/12 571/2
571/7 571/10 571/12
573/8 574/18 574/18
575/15 576/12 580/23
581/6 582/9 582/10
582/18 582/18 582/19
582/19 584/22 584/25
585/7 585/9 585/9
585/13 585/19 586/5
587/2 587/6 587/7
587/13 588/3 588/14
590/5 590/6 594/8
599/8 599/10 599/12
602/2 605/1 610/7
615/10 618/22 619/22
620/22 620/25 621/12
622/2 631/12 631/13
634/19 634/24 635/2
636/18 637/6
Washington [5] 488/14
488/17 489/13 489/16

**489/18**
wash'n [1] 489/16
wasn't [4] 497/20
499/23 510/20 529/14
way [11] 500/5 506/24
513/6 544/1 544/8
571/4 586/19 588/14
603/21 631/21 639/6
ways [5] 577/2 596/9
604/24 611/3 634/15
we [123] 491/15 491/17
491/18 498/2 498/17
498/18 498/22 498/24
498/24 499/16 499/17
500/2 500/4 500/10
501/11 502/21 502/21
503/14 504/5 504/7
504/13 505/3 506/5
506/8 511/21 512/2
512/8 514/19 514/20
515/13 517/17 517/22
518/2 518/12 518/5
520/12 520/13 520/14
521/3 525/17 525/17
526/11 526/17 527/11
531/5 532/21 533/5
534/16 534/18 540/7
540/8 540/9 541/11
541/12 543/15 543/15
545/14 545/14 547/7
547/8 549/2 550/7
552/4 552/6 554/6
554/19 556/8 558/23
560/19 564/7 564/17
569/23 570/7 574/21
574/23 574/24 575/6
575/17 579/3 580/7
583/12 583/20 585/4
585/13 586/2 586/10
590/22 591/3 592/24
593/17 593/13 595/14
595/14 596/4 599/14
608/21 609/1 609/24
610/6 610/6 613/12
613/13 613/22 614/22
614/24 616/3 616/12
629/14 629/18 629/19
636/16 636/17 636/18
638/10 638/12 639/2
639/10 639/19 639/22
639/25
we'd [2] 576/2 592/10
we'll [5] 491/24 552/13
586/2 620/16 639/16
we're [18] 491/17 509/2
510/13 517/22 518/9
522/6 526/7 529/6
551/25 581/6 581/14
581/16 584/3 601/8
615/19 627/13 637/8
638/15
we've [9] 503/10 506/22
514/12 530/24 534/18
575/2 581/22 590/25
593/20
weaker [1] 622/4
wearing [1] 641/11
wedding [1] 621/1
week [3] 577/23 578/2
608/19
weekend [1] 606/11
weeks [5] 500/11
503/11 637/13 637/16

**638/1**
weigh [2] 536/13
575/14
weight [2] 575/11
575/21 609/8
welcome [1] 635/18
well [49] 504/21 509/22
516/11 517/21 528/3
530/25 532/4 532/22
545/1 545/3 548/20
554/1 564/2 565/4
566/16 568/8 568/25
569/25 572/22 574/21
578/22 579/16 580/1
580/23 583/20 584/20
587/23 589/12 590/6
591/14 592/3 592/18
595/7 599/24 601/8
609/10 614/11 614/22
615/15 625/13 629/14
630/8 631/8 632/3
634/18 636/11 638/20
638/24 639/24
well-being [1] 569/25
Wells [3] 537/13 537/21
542/15
went [1] 518/15 534/16
534/18
were [47] 499/11
499/16 499/17 500/3
505/4 508/3 510/12
510/20 510/21 517/1
526/1 531/1 545/5
549/7 555/17 558/5
559/22 561/18 563/6
563/14 569/1 569/18
569/21 570/8 578/5
579/6 580/19 580/22
581/7 581/17 585/14
585/15 589/21 593/17
594/6 597/15 605/8
614/9 617/11 618/24
625/17 625/22 626/20
630/18 634/18 636/17
636/18
weren't [2] 535/21
586/10
WESTERN [2] 487/12
489/3
what [142] 493/14
493/20 494/1 494/6
494/11 494/16 494/24
495/4 495/21 497/6
497/17 498/6 498/12
501/14 502/17 502/18
502/24 503/1 503/2
505/17 506/14 506/18
511/24 512/5 513/3
513/13 514/22 515/12
525/14 527/1 537/16
537/19 538/8 540/8
540/9 540/20 540/20
541/13 542/2 544/2
554/1 554/24 555/2
555/11 555/17 555/21
555/24 556/7 556/12
556/23 557/5 557/11
558/12 558/17 559/8
559/24 562/19 563/14
563/24 564/24 566/11
566/17 568/25 569/4
569/13 570/17 571/19

| W | | | | |
|---|---|---|---|---|
| what... [75] 573/8 573/8 576/15 579/3 579/24 580/22 582/2 582/6 582/8 582/12 583/20 583/22 583/25 584/20 585/2 585/24 585/24 586/18 586/22 587/1 591/22 591/23 592/1 592/10 593/6 593/21 594/15 595/7 595/23 596/4 596/23 597/21 597/22 598/20 599/2 599/18 601/14 603/8 603/12 604/2 604/12 606/4 606/5 606/14 607/22 608/9 608/21 608/21 609/7 609/13 609/13 609/18 610/11 612/18 613/14 616/11 618/12 621/7 621/13 622/17 623/9 628/2 628/4 630/12 630/14 631/13 632/24 633/10 633/17 633/17 634/11 635/2 635/7 637/3 639/24 what's [5] 544/8 563/18 579/17 595/15 599/3 501/12 whatever [2] 499/3 501/12 when [41] 495/9 496/8 500/9 501/18 501/20 501/25 504/10 504/21 512/2 513/22 523/24 537/2 537/10 538/18 538/20 541/3 541/16 546/14 548/20 555/15 559/22 561/15 562/9 563/24 564/13 569/22 570/7 585/13 588/24 596/13 605/25 608/3 614/11 618/8 618/22 618/24 622/10 628/11 636/24 638/10 641/12 where [30] 497/12 497/23 503/20 503/22 503/23 504/16 504/16 504/19 531/12 531/22 532/5 532/8 537/16 539/4 540/12 540/13 543/15 549/3 553/25 555/8 556/6 569/18 595/24 598/6 598/6 598/6 607/7 621/14 623/19 628/6 wherein [1] 498/14 whether [63] 494/25 495/18 495/18 498/18 498/19 498/20 498/21 498/22 499/23 500/14 500/17 500/20 502/1 504/18 505/2 505/7 505/18 505/23 505/25 506/15 508/18 513/1 514/20 516/13 516/16 530/4 532/12 533/8 533/14 533/16 533/20 534/7 534/21 535/7 538/25 539/6 539/19 540/10 541/5 541/6 | 541/20 542/22 543/17 9442 563/20 580/18 595/20 605/6 605/23 605/25 609/14 610/24 610/25 611/1 613/23 613/23 617/17 617/17 617/24 618/13 632/19 633/7 637/11 which [67] 494/12 497/13 497/23 498/3 498/20 498/24 499/24 506/7 506/25 508/16 509/3 510/13 513/5 516/9 516/17 519/13 520/15 524/21 525/4 525/18 525/22 530/25 531/1 531/9 531/17 533/6 534/17 534/18 536/19 538/16 539/23 540/25 547/23 549/17 553/20 555/23 560/14 563/8 564/21 567/24 568/10 569/16 570/25 579/1 580/19 581/18 584/11 585/9 587/6 588/3 588/4 588/10 588/21 589/23 593/21 598/25 610/7 611/3 612/25 613/1 613/7 614/18 616/1 616/19 622/3 623/21 635/4 while [10] 517/22 577/3 577/4 577/9 605/14 607/21 608/13 610/17 614/9 620/11 who [74] 493/9 493/10 494/18 500/14 500/20 515/24 527/7 527/17 528/2 531/1 535/20 535/25 540/16 540/24 543/24 557/13 557/14 559/22 569/19 569/21 570/3 570/4 570/7 571/2 571/3 572/14 572/15 574/6 577/16 581/7 581/17 584/5 593/6 593/18 596/22 597/8 597/15 597/18 597/18 597/19 598/15 599/5 599/8 599/12 599/17 600/9 601/5 603/12 603/20 604/15 605/8 607/8 607/11 607/15 608/6 609/15 609/25 610/15 614/17 616/15 618/9 619/15 623/5 624/8 626/22 632/25 633/3 633/4 633/8 633/18 634/24 637/1 637/3 637/11 who's [5] 558/15 564/2 564/3 571/4 605/12 whole [4] 510/3 560/16 569/23 625/9 whom [3] 612/17 633/4 633/5 whose [2] 550/11 559/8 why [10] 497/20 501/10 501/21 502/4 505/17 590/22 600/12 621/24 623/4 623/11 wide [3] 585/19 623/4 | 628/5 Widely [1] 567/3 567/4 568/2 585/13 620/7 621/16 629/6 635/8 wider [1] 606/21 will [48] 491/12 501/3 501/10 501/14 501/18 501/20 501/24 501/25 502/1 502/17 502/18 504/11 506/12 506/12 508/22 519/9 521/25 539/9 541/9 541/10 541/11 541/14 543/3 548/19 569/7 574/24 575/9 575/10 575/10 575/19 575/20 575/22 580/15 583/17 595/19 595/22 595/23 595/25 597/3 609/5 610/23 629/11 631/17 639/12 639/17 639/18 639/19 639/25 WILLIAM [3] 487/12 489/3 538/11 willingly [1] 610/1 Willis [1] 491/19 Wills [43] 491/21 491/22 491/22 492/9 503/10 508/13 509/12 513/16 514/2 515/12 515/7 519/12 519/17 517/7 519/12 519/17 522/5 522/21 523/24 524/23 525/8 528/9 528/13 528/15 528/19 529/14 530/24 531/9 531/17 532/11 532/12 535/17 536/16 537/3 538/2 541/3 542/7 543/9 544/11 545/25 546/4 548/10 552/6 wish [3] 606/11 609/18 628/4 withdrawn [1] 560/8 within [10] 495/8 499/24 521/20 536/3 538/25 593/13 595/12 596/13 625/5 629/6 without [7] 525/13 563/1 564/24 568/9 574/5 577/17 641/21 witness [22] 490/2 491/18 517/16 522/1 534/18 551/12 551/16 552/1 552/4 552/14 552/17 553/1 554/25 562/7 562/9 563/17 566/7 575/23 611/24 635/11 635/16 635/18 witnesses [4] 552/10 552/11 556/19 636/1 Wolff [10] 562/10 589/7 589/11 589/19 590/6 590/10 590/14 590/23 590/25 622/2 Wolff's [1] 590/18 woman [2] 531/1 591/20 women [13] 527/7 527/9 539/17 540/14 564/9 592/11 606/24 606/24 607/1 607/2 | 607/8 607/13 607/15 wonder [1] 589/24 wondering [1] 516/13 word [3] 546/14 599/9 621/23 wordings [1] 617/8 words [3] 568/24 622/1 622/21 work [8] 511/21 555/8 555/9 568/14 573/20 607/6 636/19 637/17 worked [1] 545/22 working [1] 629/14 works [2] 597/11 597/13 world [4] 600/2 605/18 624/8 624/13 worse [5] 570/6 579/10 584/17 586/8 589/3 worthy [2] 567/19 572/25 would [146] 491/23 498/21 498/23 499/20 501/14 503/16 505/4 505/22 505/23 506/3 506/8 507/7 507/7 507/9 508/9 508/10 512/10 512/12 512/18 512/23 513/9 514/2 515/6 516/18 517/11 517/12 518/6 520/23 526/6 526/21 527/11 530/12 530/18 533/16 533/21 534/22 534/24 534/25 535/5 535/13 535/25 536/2 536/8 536/9 536/13 536/21 540/23 544/7 546/21 547/3 549/18 550/4 550/14 551/6 552/16 552/19 552/22 554/19 559/18 561/21 564/21 566/1 566/2 571/10 574/8 575/17 578/7 580/7 583/12 585/10 585/20 586/6 586/7 586/7 586/12 586/17 591/3 591/21 591/22 591/22 593/6 594/23 595/8 595/10 595/11 595/12 596/11 596/15 596/16 596/23 597/1 597/5 597/7 597/8 597/14 597/17 597/19 597/22 598/15 604/2 604/7 604/8 604/10 604/14 604/17 605/8 605/14 607/1 607/5 608/9 608/22 608/25 612/12 614/18 616/1 617/5 618/5 618/19 624/20 624/25 625/1 625/3 625/13 625/25 626/5 626/9 626/11 626/17 627/1 627/2 630/16 632/24 632/2 633/10 633/10 633/23 633/23 634/21 635/5 635/6 636/24 637/13 637/17 637/25 638/2 638/17 wouldn't [2] 504/25 | 602/20 wrap [1] 611/6 write [1] 547/17 writers [1] 635/6 writing [2] 547/18 623/8 written [11] 508/20 509/18 547/11 547/19 549/11 556/10 557/15 559/6 561/19 601/9 639/25 wrong [2] 510/25 570/17 wrote [3] 556/1 556/3 558/24 Y Yarhouse [5] 601/8 601/12 602/4 602/20 603/8 Yarhouse's [1] 602/8 yeah [46] 513/22 536/23 536/24 542/13 544/7 545/13 557/4 558/13 559/14 559/17 562/2 562/17 563/9 564/17 566/16 568/17 569/12 578/3 578/3 578/16 579/15 582/18 584/19 586/11 586/24 587/13 587/13 590/21 597/24 599/7 600/8 600/14 604/10 613/10 613/19 614/12 615/18 616/24 617/16 618/1 618/23 621/7 621/12 627/1 627/7 639/3 year [10] 510/6 526/1 546/13 546/18 547/11 553/23 553/24 557/15 576/23 599/13 years [13] 555/10 555/19 558/18 561/3 561/6 561/9 564/22 569/20 569/22 570/1 571/4 574/12 610/3 Yep [2] 621/3 637/23 yes [139] 492/12 492/16 492/21 493/3 493/13 493/19 493/25 494/5 494/10 494/15 494/22 495/15 495/19 496/1 496/17 497/5 497/14 497/21 501/2 503/19 506/12 507/17 508/2 508/11 510/1 511/14 512/2 514/17 515/25 516/5 519/2 519/22 520/1 520/11 521/1 521/11 522/10 522/22 523/5 523/9 526/22 527/14 529/5 532/18 533/13 533/19 533/25 534/5 534/10 534/13 535/5 536/8 537/5 540/6 542/17 543/3 543/11 543/13 543/23 544/20 545/20 546/5 546/20 547/6 547/8 548/2 548/11 548/17 549/6 549/13 550/9 550/13 551/4 551/9 552/16 552/20 |

Y

yes... [63] 553/8 553/19
554/9 554/15 555/14
557/23 558/2 561/17
562/7 562/13 563/3
565/2 565/21 567/2
574/3 574/9 576/8
576/14 577/20 578/14
582/1 582/17 583/5
584/23 585/19 586/24
590/13 591/2 591/18
593/25 594/13 594/17
594/19 598/9 600/10
600/10 601/9 602/7
605/11 605/16 611/17
613/3 614/8 615/5
616/17 620/24 621/12
621/18 624/5 627/17
627/23 629/25 632/14
632/23 633/22 635/11
635/20 635/21 635/23
637/18 637/21 638/4
639/4
yes/no [1]  616/17
yesterday [1]  516/22
yet [7]  513/5 564/24
570/15 589/25 598/13
601/23 611/2
yields [1]  617/3
you [546]
you'd [2]  505/1 527/12
you'll [2]  595/18 595/18
you're [31]  491/23
513/19 540/13 542/7
542/7 544/15 544/15
545/1 545/9 546/1
546/1 549/10 552/8
561/25 564/14 565/23
570/14 573/24 586/18
593/17 599/1 606/1
627/19 628/6 629/10
630/12 633/5 634/4
635/18 635/24 639/1
you've [20]  521/15
522/23 523/25 529/14
537/2 537/10 537/15
538/18 555/21 557/25
560/24 583/22 591/23
593/24 594/14 594/15
614/17 622/10 634/22
637/12
young [16]  497/16
498/5 529/18 556/3
556/4 556/6 572/16
578/24 585/14 585/17
594/18 607/13 611/10
611/14 612/7 612/11
younger [1]  607/8
youngest [3]  576/17
576/22 577/8
your [219]
yourselves [2]  491/4
544/18
youth [3]  572/8 572/16
611/13

Herbert G. Grey, OSB # 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908
Email: herb@greylaw.org

*Counsel for Defendant-Intervenor CCCU*

Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

* Admitted *pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| ELIZABETH HUNTER, et al., | |
| Plaintiffs, | No. 6:21-CV-00474-AA |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, et al., | EXPERT DECLARATION OF DR. MARK REGNERUS |
| Defendants, | |
| v. | |
| COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY, | |
| Defendants-Intervenors. | |

I, Mark Regnerus, am an adult of sound mind and make this statement voluntarily, based upon my own personal knowledge, education, and experience.

## I.    CREDENTIALS & SUMMARY OF OPINIONS

1.    I am a professor of sociology at the University of Texas at Austin. I received my Ph.D. from the University of North Carolina at Chapel Hill in 2000. I became an assistant professor of sociology and director of the Calvin College Center for Social Research in 2001, then became an assistant professor of sociology at UT-Austin in 2002, an associate professor in 2007, and a full professor in 2018.

2.    I have published numerous articles and four books on sexual-relationship behavior and decision-making since 2003.[1]  The books, peer-reviewed journal articles, and essays I have written include material on sexual orientation and, more recently, attitudes about (and results of) transgender medicine. I am an experienced peer reviewer, having reviewed dozens of manuscripts in the past decade on these and related topics—including for top journals in both sociology and sex/sexuality studies (e.g., *Archives of Sexual Behavior*, *Journal of Homosexuality*, etc.). I have extensive survey administration experience as well, having fielded three nationally-representative surveys since 2011, and consulted on survey construction for several others, including the National Study of Family Growth and the National Longitudinal Study of Adolescent to Adult Health (or Add Health). A more complete

---

[1] Regnerus, M. D. (2007). *Forbidden fruit: Sex & religion in the lives of American teenagers*. Oxford University Press.; Regnerus, M. & Uecker, J. (2011). *Premarital sex in America: How young Americans meet, mate, and think about marrying*. Oxford University Press.; Regnerus, M. (2017). *Cheap sex: The transformation of men, marriage, and monogamy* Oxford University Press.; Regnerus, M. (2020). *The future of Christian marriage*. Oxford University Press.

review of my professional experience, publications, and research is provided in my curriculum vitae, a copy of which is attached hereto as Exhibit A.

3.      My experience in the area of sexuality research primarily concerns basic methodological matters, involving design, measurement, statistical inference, interpretation of data, and reflections on the research and publication norms that have developed in this new domain in conjunction with media interest and professional and organizational pressures.  This leans not only on my knowledge of the research in this domain, but also on the details of quantitative and qualitative research, subjects I have taught to sociology majors at least 20 times since my appointment on the faculty at the University of Texas.

4.      I have been retained as an expert witness by Schaerr|Jaffe LLP, in connection with this litigation.  I have actual knowledge of the matters stated in this report.  I base the following opinions on my own knowledge, research, experience, and publications, and the work of other academics and writers.  The materials I have used to research and write this report are the standard sources used by other experts in my field.  I am receiving $250 per hour for my time spent preparing this report.  My compensation is not dependent upon the outcome of this litigation or the substance of my opinions.

5.      I have reviewed the newly submitted expert witness reports by Drs. Jonathan Coley, Ilan Meyer, and Joshua Wolff, (all dated October 29, 2021). I have also reviewed the declaration of Shirley Hoogstra, submitted to this Court on October

15, 2021. My remarks below attend to their declarations, as well as offer observations from other studies and legal documents related to this case.

6.    I have no interest in suggesting that the lives of LGBT young adults, including but hardly limited to those attending CCCU-type colleges and universities, are simple ones. There is a developing epidemic of anxiety and depression among young people in general. The REAP survey, about which I have more to say below, revealed that just about half of all students at the surveyed Christian colleges and universities experience loneliness, isolation, and anxiety, while 36 percent report bouts of depression. While LGBT youth appear to experience these even more poignantly, it should be obvious already that many students in these (and other) universities are struggling.

7.    Moreover, I would never dream of endorsing the maltreatment that some LGBT youth have experienced. Just how common and severe such treatment is today is, perhaps, at question. Instead, Christian college administrators, faculty members, and students owe to each other—brothers and sisters all—virtuous acts of friendship, kindness, encouragement, and occasional challenge. This is life together on campus—something I too experienced as an undergraduate at a CCCU member school, and briefly as a faculty member before moving on to a research university. I made more meaningful friendships in one year on the faculty at Calvin College (now Calvin University) than I have in over 19 years at a large, secular, state university.

8.    But to suggest that somehow life for LGBT students at CCCU-type colleges and universities is *inordinately* more challenging is to assert something for

which there is no sustained evidence. In fact, even the REAP study reveals a better portrait than the average college and university. Students at CCCU-type colleges and universities report less alcohol use, less physical and sexual assault and sexual harassment (1-3%), as well as more modest alcohol use (12%) and drug use (5%) when compared with data collected from other samples of LGBT young people during the COVID era.

9.    What follows below is hardly a dismissal of the challenges LGBT students face. Instead, what appears herein is a straightforward assessment of the arguments and claims made in the complaint, the REAP report, and by the Plaintiffs' expert witnesses. I maintain that, in spite of the assertions they make, there is no empirical basis for the push to force CCCU-type Christian colleges and universities to alter their longstanding policies around sexual relationship standards and behaviors or face possible loss of federal funding—most typically in the form of student access to Stafford loans and Pell grants. To hold such colleges and universities hostage in this manner would harm the Plaintiffs' fellow students, and in so doing—if successful—radically limit the diversity of higher educational options in the United States. CCCU-type colleges and universities exist today because students generally value the educational mission offered by the schools, usually pay a premium for it, and want to be taught by their faculty.

## II.    COMPARATIVE DATA ANALYSIS OF THE REAP AND OTHER STUDIES

10.    The Religious Exemption Accountability Project's (REAP) survey merits discussion. It was a survey whose aim is to assess the psychological challenges of

students in Christian colleges, etc. Unfortunately, fielding a survey aimed at understanding the sources of psychological distress in early 2021—and then insinuating blame aimed at the institutions themselves—are invariably confounded with the pronounced, historically unprecedented experience of COVID-era shutdowns, universities going virtual, etc. For comparison, I have stalled an in-person interview-based study of fertility decision-making for nearly two years (so far) precisely because of possible COVID-era confounding. That is, I wouldn't be able to discern the unique effects of COVID-related concerns (vis-à-vis other effects on fertility decision-making) until some degree of normalcy returns and fertility rates stabilize. That the REAP organization pressed forward with a survey during the heart of the COVID-era's university alterations and virtual courses—and fails to mention the pandemic anywhere in the report on the survey—suggests imprudence as well as political rather than scientific motivation. It's not simply unprofessional to fail to discuss this. It's deceptive.

11.    In general, the REAP sample is a massive opt-in list whose generalizability is unclear, even after weighting (on unclear variables). Given that this is essentially a massive convenience sample, it makes no sense to call the figures therein "estimates," since estimates imply—as Dr. Meyer points out on page 7 of his report—a population parameter to which the estimate is referring (and confidence intervals, etc.), and practically presumes a population-based sample. But an opt-in sample like the one the REAP survey is based upon is by definition *not* a population-based sample. Weighting can aid but not solve this challenge.

12.    The most significant limitation of the survey, however, is understanding to what the numbers ought to be compared. The report's authors simply compare LGBT student responses to those of non-LGBT students. There is no comparison group of, say, LGBT secular-university students. Alternately, there was no comparison between the responses of LGBT students at CCCU colleges and those from other non-CCCU schools. All the reader is left to do is to wonder about the meaning of the figures therein and wonder if the differences (between LGBT and heterosexual students) reported therein are larger or smaller or comparable to the differences that would be visible at secular universities or non-CCCU schools, or among LGBT and heterosexual young adults who are not attending college. This was an easy comparison to arrange, and the designers elected not to do it. I can only wonder if it was intentional.

13.    We can, however, consider some of the numbers and wonder how they might compare to students from other universities in the College Pulse's American College Student Panel.

14.    The REAP report notes on page 2 that "[m]ost sexual and gender minority students are closeted," but then remarks that 19% of sexual minority students "report telling no one about their sexual or gender identity," while 56% "have only told five or fewer people." If only 19% have told no one, how does one conclude that most are closeted? (And how exactly do the authors define the term? They don't say.)

7

15.     Moreover, only five percent of respondents to the REAP report stated that they had ever faced disciplinary action from their college or university (Question 11 of toplines, page 31). Among that small minority (of five percent), 12 percent reported the "sexual code of conduct" as the reason for such action. This means that a mere six-tenths of one percent of all REAP survey respondents, or six in every 1,000 students, reported a sexual code of conduct violation that merited disciplinary action. Since the text states that the survey was administered to "3,000 full-time students currently enrolled in four-year degree programs at taxpayer-funded Christian colleges and universities that explicitly discriminate against LGBTQ+ students," this means that just 18 of the 3000 respondents to the sample were disciplined for this reason. For context, the REAP survey administrators point out that 10% of respondents (or around 300 students) self-identified as a sexual minority, 12% (or 360 students) as non-heterosexual, and "approximately 30%" (or 900 students) if applying a "broader definition that encompasses self-identification and any attraction or experience that is not between a heterosexual female and a heterosexual male." Hence, the number of sexual minorities on campus (10%)—the most conservative number offered—is 17 times as large as the number of students who reported disciplinary action for violating the sexual code of conduct, the very same code that is purported to cause so much anxiety, fear, and purported "condemnation from their campus community." Given these numbers, it is implausible to suggest a causal link between these codes and the students' anxiety.

CCCU-SER-191

16.    It is also implausible to suggest based on the data that these codes are administered in a discriminatory, unfair manner. Section V of the REAP report concerns "University Sanctions," which as just noted is a rare occurrence. The report hints at distinctions in sanctions between straight students and sexual and gender minority ones. But given that only 18 out of 3,000 students reported sanctions related to the sexual code of conduct, there are certainly no statistically significant distinctions in how students are treated. This stands in stark contrast to some of the claims made by the Plaintiffs in the Amended Complaint. Moreover, reports of "suggested" sexual orientation or gender identity change efforts are virtually nonexistent, which contrasts with the personal narratives of numerous Plaintiffs. The REAP report speculates that such low numbers are due to the low level of self-revelation, but there is little survey evidence to support this claim (as noted above).

17.    The REAP survey report is best compared with survey data on mental health collected elsewhere from LGBTQ+ students enrolled in other universities *during the COVID era*. A survey by Vanderbilt University researchers of 477 LGBT college students ages 18-25 recruited to participate between late April to early June 2020 offers one such comparison. In it, 61% reported frequent mental distress (i.e., 14 or more days per month of "not good" mental health), 65% reported anxiety (i.e., generalized anxiety disorder), and 60% reported major depression (based on the Patient Health Questionnaire 2-item screener).[2] By comparison, 60% of the REAP

_____

[2] Gilbert Gonzales, Emilio Loret de Mola, Kyle A. Gavulic, Tara McKay, Christopher Purcell, "Mental Health Needs Among Lesbian, Gay, Bisexual, and Transgender College Students During the COVID-19 Pandemic," Journal of

survey sexual minority respondents reported ever having experienced depression, 64% reported experience of loneliness, and 73% of anxiety, but each of these REAP variables was measured only as a positive (yes/no) response to the question, "During your time at [school name], have you experienced any of the following?" Suffice it to say, comparing an "ever felt" measure with clinical markers is simply not the same.

18.    This Vanderbilt survey of 477 was recruited in part by contacting "LGBT-serving organizations on 254 college campuses." That means the sample comprises a more ideal comparison to the REAP sample, since there would be far fewer "LGBT-serving" organizations on campuses represented by the REAP survey participants.

19.    Another survey—a purported "national" (but nonprobability) survey—fielded during the COVID-19 era (May-August 2020) by University of Maryland public health researchers to LGBTQ+ undergraduate and graduate students (N=565) reported that 65% "met the clinical criteria for moderate or severe psychological distress."[3] Forty percent "often" felt very isolated from others. Compared to before the pandemic, 44% of respondents said they "hid their LGBTQ+ identity from other people more often." When compared with the more blunt measurements in the REAP study, fielded during the same public health crisis, it suggests that the LGBT

---

Adolescent    Health    67    (2020),    5:    645-648. https://doi.org/10.1016/j.jadohealth.2020.08.006.

[3] Salerno, J.P., Pease, M., Devadas, J., Nketia, B, & Fish, J.N. (2020). *COVID-19-Related Stress Among LGBTQ+ University Students: Results of a U.S. National Survey*. University of Maryland Prevention Research Center. https://doi.org/10.13016/zug9-xtmi

respondents to the REAP study fared *better* than those interviewed in this pair of pandemic surveys focused on LGBTQ+ students outside of CCCU-type schools.

20.     Another study—a longitudinal cohort study of sexual and gender minority persons (not necessarily students) evaluated by UC-San Francisco and Stanford University researchers—added a COVID-19 data collection point in late March (to late April) 2020, examining the change in symptoms for those respondents with and without depression and generalized anxiety disorder at the time of first interview (June 2019).[4] The follow-up with 2,288 respondents revealed statistically significant leaps in depression and anxiety symptoms since the 2019 survey, but only among those who did *not* display preexisting clinical depression or anxiety conditions. This suggests that the REAP survey—fielded once and during the pandemic—may be displaying inflated "baseline" numbers for LGBTQ student mental health self-reports, a function of the timing of the survey and differential sensitivity to pandemic-induced challenges.

21.     Yet another report issued by Rutgers University, discussed at some length in Dr. Hoogstra's declaration, investigated the responses of "queer-spectrum" and "trans-spectrum" students across several pooled survey efforts, most of which were collected in 2016 and 2017, nearing five years old, on average—compared with the COVID-era surveys explored above. In the Rutgers study, the authors note that

---

[4] Flentje, A., Obedin-Maliver, J., Lubensky, M. E., Dastur, Z., Neilands, T., & Lunn, M. R. (2020). Depression and Anxiety Changes Among Sexual and Gender Minority People Coinciding with Onset of COVID-19 Pandemic. *Journal of general internal medicine*, *35*(9), 2788–2790. https://doi.org/10.1007/s11606-020-05970-4

**CCCU-SER-194**

57% of queer-spectrum students did not agree that their university "is a safe and secure campus," up from 43% of heterosexual students who also disagreed with the statement.[5] Here again, this Rutgers study suggests that, with respect to their perceptions of safety, LGBT youth at CCCU-type colleges are doing better than their peers at secular campuses.

22.    Regardless of the timing, the addition of other COVID-era survey comparisons—ones collected well afield of the Christian college or university about which this case turns—reveals tall challenges for LGBT young adults even within secular and affirming subcultures. This includes those young adults who not only have access to but are known by LGBT-serving campus organizations.[6] In other words, the presumption that "affirmation" alone leads to categorically better mental health outcomes for young adult LGBT students lacks sustained evidence. None of the student data collection efforts discussed above displays consistently better outcomes than what the REAP study learned when it surveyed LGBT students at CCCU-type colleges and universities.

23.    On the contrary, while anxiety and depression levels appear comparable between REAP and the other COVID-era survey reports, the overall rates of substance use, eating disorders, sexual assault, sexual harassment, and physical

---

[5] Greathouse, M., BrckaLorenz, A., Hoban, M., Huesman, R., Rankin, S., & Stolzenberg, E. B. (2018, August). *Queer-spectrum and trans-spectrum student experiences in American higher education: The analyses of national survey findings.* Rutgers University, Tyler Clementi Center. Retrieved from https://rucore.libraries.rutgers.edu/rutgers-lib/60802/

[6] Gonzales et al., 2020.

CCCU-SER-195

assault reported by LGBT students in the REAP survey are notably better than those reported among LGBT adolescents in the United States—the feeder population for colleges and universities. The CDC's National Youth Risk Behavior Survey (2015-17) reports that 24% of gay adolescents attested to having experienced sexual violence, 17% reported forced sexual intercourse, and 28% said they'd been bullied at school; 64% had experience with alcohol, and 44% had used marijuana.[7] In the REAP survey, on the other hand, a comparatively small 25% of sexual minority students (of unstated sex) reported alcohol use, 11% said they'd been bullied, 5% said they'd experienced sexual assault, and 1% reported being physically assaulted. Whereas 20% of sexual minority students reported "suicidal thoughts" in the REAP survey, fully 28% of the CDC study's gay adolescents and 46% of the study's lesbian adolescents had considered attempting suicide.

24.    It is not difficult to conclude here that surveying students on mental health matters—especially but not only LGBTQ students—during the COVID era is suboptimal for discerning baseline or "normal" emotional health status. Students who return home from their university studies for extended stays—as occurred in Spring 2020—exhibit different mental health challenges. And yet it is a short leap to conclude that LGBTQ students who returned home were apt to face taller difficulties, on average, than heterosexual students. Hence to make conclusions about comparative mental health between sexual/gender minority students and non-

---

[7] Michelle M. Johns et al., *Violence Victimization, Substance Use, and Suicide Risk Among Sexual Minority High School Students — United States, 2015–2017*, https://www.cdc.gov/mmwr/volumes/67/wr/mm6743a4.htm?s_cid=mm6743a4_e)

**CCCU-SER-196**

minority students from the REAP survey, and then draw conclusions on the effects of CCCU-type schooling, culture, and relationship rules on the mental health of minority students is a poor scientific decision. The survey ought to have been fielded before the COVID crisis, or well after the respondents returned to their campuses (even if some courses remained online). Surveying while respondents were living at home, with all the random and nonrandom challenges that experience presents, is imprudent. Interpreting those data without regard to these dynamics is scientifically reckless.

25.     In sum, while the Plaintiff's complaint and the expert witness reports go to considerable length to imply that the Plaintiffs are in danger—from others and from themselves—if their colleges and universities do not take concrete steps to "affirm" their lifestyle choices or otherwise to make them feel accepted—by creating what expert witness Joshua Wolff identified as "Gender/Sexuality Alliances (GSAs), or by altering their sexual behavior and relationship policies to treat gay and straight relationships alike—the evidence does not show that such steps would make LGBT students at Christian colleges any better off than those attending other institutions. While it is obvious that the Plaintiffs would prefer these steps, it is a leap to suggest that "affirmed" life outside the CCCU context and their campuses is categorically healthier for sexual minorities.

## III.   THE THEOLOGICAL BASIS FOR CODES OF SEXUAL CONDUCT IN AND THE CHALLENGES OF AFFINITY GROUPS FOR CCCU-TYPE SCHOOLS

26.     GSAs are not necessary to create safety for LGBTQ+ students, since their security has already been demonstrated to be equal or superior at CCCU-type

schools, when compared to other public university venues. Respecting the dignity of all students, insisting upon the virtuous treatment of other students, etc., is a general means of protecting the safety and inherent human rights of all students, regardless of their sexual-identity status.

27.    Furthermore, the creation of GSAs or an equivalent affinity group on CCCU-type campuses may be considered an undue burden on the freedom of these organizations to practice their religion and pursue the mission of the school. How so?

28.    Historically, the forms of Christianity practiced among supporters of the universities and colleges in question here represents a "worldview," wherein revelation has been understood to have been given by God both about his own divine nature but also about human nature. Such revelation is understood to come from the Bible, but also discernible through the order of creation itself. The creation of male and female, made in God's image as described in Genesis 1:27, is definitive Christian theology-based anthropology, which cannot be re-made or re-defined any more than the eternal attributes of God himself. Christian theology-based anthropology also understands humans as a unity of body and soul. The body is not inconsequential nor able to be re-defined at will; believers tend to understand the body as a "temple" that is indwelt by the Holy Spirit (that is, the third member of the Trinitarian God). It is in this Biblical context that many of the sexual boundaries are described in the New Testament, including the limitation of sexual relations between a man and woman bound by life-long marriage commitments. (1 Cor. 6-7).

CCCU-SER-198

29.    In traditional Christian thought, moreover, sexuality is commonly understood as a good gift, but one that is particularly sensitive to the boundaries placed around it, for such is believed to be given by an all-knowing and all-good and loving Creator. Same-sex relations are forbidden alike in the Old and New Testaments, as well as consistently throughout two millennia of Christian teaching. In Christian thought, there is no greater dignity that can be given to the human person than that of being made in the image of God, and the body being the very temple of God.

30.    To the extent LGBTQ+ students experience stress as a result of sexuality-related policies at CCCU-type schools, such stress flows in no small part from disagreement with traditional Christian theology on sexuality, and/or behaviors inconsistent with that theology. Consider recent research demonstrating that actions involving "moral incongruence, defined as "the experience of violating one's deeply held moral values," can lead to stress and unhappiness.[8] For instance, studies have shown that men who use pornography but believe that porn use is morally unacceptable are apt to exhibit "depressive symptoms at low frequencies, likely stemming from cognitive stress or dissonance."[9] A similar study showed that men engaging in same-sex sexual behavior, as well as women engaging in nonmarital sex,

---

[8] Perry, S. L., Grubbs, J. B., & McElroy, E. E. (2021). Sex and Its Discontents: How Moral Incongruence Connects Same-Sex and Non-Marital Sexual Activity with Unhappiness. *Archives of Sexual Behavior*, *50*(2), 683-694.

[9] Perry, S. L. (2018). Pornography Use and Depressive Symptoms: Examining the Role of Moral Incongruence. *Society and Mental Health*, *8*(3), 195-213. https://doi.org/10.1177/2156869317728373

CCCU-SER-199

while holding convictions that such is "always wrong," were more likely to report unhappiness. Thus, the study concluded: "Sexual behavior per se is not associated with unhappiness, but moral inconsistency or conflict regarding one's sexual behavior is."[10]

31.    LGBTQ+ advocacy groups (like GSAs) on CCCU-type campuses are thought to propose a new, alternative anthropology, one which is irreconcilable with and thus competes with basic tenets of the Christian faith. Rather than human identity being defined by the sexed embodiedness of male and female, human identity now is defined by sexual identity labels or sexual interests. These labels and interests continue to expand in our current culture, and Christianity consistently finds itself "counter-cultural" and must decline the re-definition of human identity upon any sexual basis other than male and female. To accommodate in such a significant matter, is to cease to practice the historic Christian faith.

32.    The Christian church must be free to respond to these cultural shifts, as one scholar writes: "There is, as always,  a culture-wide experience of brokenness: broken marriages, broken families, and broken bodies. And this brokenness must be met. But in order to meet it we must first be able to know it *as broken*. Then too we must know that there is a new level to the brokenness. There is . . . a new substitute anthropology which *promotes* this brokenness, even produces it. Any

---

[10] Perry, S. L., Grubbs, J. B., & McElroy, E. E. (2021). Sex and Its Discontents: How Moral Incongruence Connects Same-Sex and Non-Marital Sexual Activity with Unhappiness. *Archives of Sexual Behavior*, *50*(2), 683-694.

**CCCU-SER-200**

accompaniment of and pastoral care for the broken world we live in therefore would require an intelligent love."[11]

33.    There are many who disagree with Christian sexual ethics and vision as articulated above, but Christians believe that only this theology-based vision leads to ultimate human flourishing. Authentic religious freedom requires allowing Christians to articulate this vision of human sexuality and theology-based anthropology freely and unhindered.

34.    Many Christian colleges form and support various kinds of LGBTQ+ "affinity groups," which provide a gathering place for LGBTQ+ students to support each other in their quest to live out the Christian vision in light of their common circumstances.  Most such colleges, however, do not support LGBTQ+ advocacy groups (like GSAs) because they generally undermine the overall goals of the religious school setting.

35.    Consider that recent research on Gay-Straight Alliances (GSAs) in schools acknowledges that the presence of GSAs affect school climates, defined as "the essence of school life"[12] that "reflects norms, goals, values, interpersonal relationships, teaching, learning and leadership practices, and organizational

---

[11]  McCarthy, Margaret H. (2016). Gender Ideology and the Humanum. *Communio: Body and Gender*, Summer, 274-298. The quote is from p. 296.

[12]  Porta, C. M., Singer, E., Mehus, C. J., Gower, A. L., Saewyc, E., Fredkove, W., & Eisenberg, M. E. (2017). LGBTQ youth's views on gay-straight alliances: building community, providing gateways, and representing safety and support. *Journal of School Health*, *87*(7), 489-497. The quote is from p. 490.

CCCU-SER-201

structures."[13]  Thus, the "norms" and "values" in such groups run counter to the Christian schools' missions of forming their students with a Christian worldview and in their faith. Note that research finds that affinity groups like GSAs influence "not only LGBTQ youth, but all youth in school settings."[14] Research lists some of the benefits of GSAs to include "queer" social events (e.g. "queer prom") and "advocacy."[15] The kind of advocacy as described is a direct challenge to and undermining of the basic Christian beliefs as described above, as some have described the functions of affinity groups as creating "activist movements" for social change—change that runs counter to Christian theology.[16]

36.    Many of the functions that the "affinity" groups seek to achieve are noble and should be expressly pursued by Christian campuses for LGBTQ+ identified members as well as all other students, and that is the creation of community where students can be open and honest and share "emotional connection and social support."[17] In a common Christian understanding, the Body of Christ and the fellowship of believers should be a source of this ultimate support. CCCU-type

---

[13] Ibid, quoting: National School Climate Center. [Accessed August 5, 2016] School climate. 2016. Available at: http://www.schoolclimate.org/climate/; Tableman B, Herron A. School climate and learning. Best Practice Briefs. Dec.2004 31:1–10. [Accessed       September       27th,       2016]       Available       at: http://outreach.msu.edu/bpbriefs/issues/brief31.pdf.

[14] Porta et al. (2017), p. 491.

[15] Ibid, p. 491.

[16] Deming, E., Soule, K., Poulsen, N., & Walker, T. (2014). Gay–straight alliances impact on school climate and lesbian, gay, bisexual, or transgender student well-being. *Vistas Online (ACA Knowledge Center), Article*, *45*, 1-9, p. 2; Russell, S. T., Muraco, A., Subramaniam, A., & Laub, C. (2009). Youth empowerment and high school gay-straight alliances. Journal of youth and adolescence, 38(7), 891-903.

[17] Porta et al. (2017), p. 494.

CCCU-SER-202

colleges and universities can and should commit themselves to strive even harder toward this goal for all of their students to form one body and one supportive community, in pursuit of the goal of Christian discipleship and living, no matter their sexual identities or struggles. And those CCCU-type colleges that form such groups generally do so in pursuit of that goal.

37.    Mark Yarhouse, a professor and psychologist who studies persons who live as "celibate gay Christians" as well as same-sex attracted Christians who pursue relationships with the opposite sex, is unflinching in his treatment of a complex subject matter. In a recent nonrepresentative survey he posed several questions to 300 "celibate gay Christians" for the purpose of measuring psychological distress and well-being, Yarhouse noted the diversity in approach among this group. Sixty-six participants remained single and sought to refrain from sexual activity entirely, while another 66 were in what they identified as "mixed orientation marriages," that is between a person with a homosexual or bisexual orientation (gay or bi) and a heterosexual orientation (straight). Just over half (168) said they were abstaining from same-sex sexual behavior but open to a relationship with the opposite sex.[18]

38.    More to the point, Yarhouse describes this sample as "healthier than might be expected," given the challenges they face. On the Depression, Anxiety, and Stress Scale (DASS-21), 80% of this group were in the normal range for depression,

---

[18] Yarhouse, M., Zaporozhets, O. (2021, July 15). The mental health and well-being of celibate gay Christians, https://www.livingout.org/resources/articles/96/the-mental-health-and-well-being-of-celibate-gay-christians#footnotelist_0_3; Yarhouse, M., Zaporozhets, O. (2019). Costly Obedience: What we can learn from the celibate gay Christian community. Zondervan.

with 12% mild, 8% moderate, and 1% experiencing severe depressive symptoms. Higher numbers were assessed in the normal range for anxiety and stress (93% and 94%, respectively). In terms of personal well-being, 63% reported life satisfaction as high (27% as medium and 10% as low). Across the board, more of the respondents in mixed-orientation marriages were apt to score in normal ranges when compared with the other pair of groups.[19]

39.    A unique summary of research on "mixed orientation marriages" (in this case gay men married to straight women) was published a decade ago, and concluded that "[m]ixed-orientation marriages are fraught with complexity."[20] To be sure. The authors go on to detail challenges (e.g., "tension between societal expectations, love for spouse, and same-sex attraction"), but also rewards: "Friendship and love between spouses, along with shared children, led to family life and community integration. These were reported to deter couples from separating and to enhance their general life satisfaction." Bisexual individuals in such unions "reported the greatest difficulty feeling understood by society, but the greatest likelihood of having a satisfying sexual relationship within an enduring marriage." On the other hand, high ratings on scales of pure homosexuality (rather than bisexuality) were correlated with high incidence of divorce.

---

[19] Ibid.

[20] Hernandez, B. C., Schwenke, N. J., and Wilson, C. M. "Spouses in mixed-orientation marriage: A 20-year review of empirical studies," *Journal of Marital and Family Therapy* 37 (2011): 307-318.

CCCU-SER-204

40.     My point in discussing Yarhouse is not to establish some sort of baseline expectation of emotional well-being among gay Christians attempting to exhibit chaste lifestyles of one sort or another. Rather, it is to demonstrate that this is a real community whose commitment to particular visions of sexual expression are animated by their Christian faith in ways that are often consonant with the visions expressed by CCCU-type colleges and universities, as these apply to their students. No one is claiming this is simple. No one is claiming that other Christian traditions apart from those represented in the CCCU do not have different visions for what it means to be a gay Christian; plenty do. Rather, it is simply to observe the empirical existence of communities of Christians who value the same vision for sexuality and relationships that is valued by the CCCU (albeit implemented in their distinctive ways). Moreover, it is also to observe that average emotional well-being among this population, measured in various ways, is not poor, but appears above-average, especially when contrasted with some of the estimates discussed earlier. As this sample suggests, sexuality is not emotional destiny.

## IV.    DR. ILAN MEYER'S REPORT

41.     Although most of my remarks about Dr. Ilan Meyer's expert witness report pertain to his work on minority-stress theory, a few words about "conversion therapy" (or SOCE) are in order, in part because they reflect live scholarly debates (but dead political ones) about the etiology and nature of sexuality.

42.     In his extensive report, Dr. Meyer refers to "conversion therapy" techniques on page 17, citing "electric shock" as a form of "physical punishment . . .

intended to condition people against their natural sexual orientation or gender identity." Such a method has been in disfavor for decades. In the 2009 American Psychological Task Force's report *Appropriate Therapeutic Responses to Sexual Orientation*, the most recent study listed involving such a technique was published in 1981—forty years ago. Such techniques are irrelevant to the present and are often invoked as a bogeyman to discredit reasonable, patient-initiated, voluntary therapeutic exploration of a person's unwanted sense of sexual identity, attractions, and behaviors.

43.    Moreover, there is a vast difference between the intentional pursuit of counseling (e.g., cognitive behavioral therapy) to deal with unwanted sexual attractions and those persons who were subjected to such against their will. I will attend to the latter; however, the former is commonly lumped in with the latter, a move which is politically expedient for the pursuit of wholesale bans on any counseling around feelings, impulses, etc., regardless of the age or wishes of the client. Sociologist Paul Sullins is a co-author of a study of 125 men who were exposed to SOCE. Rather than articulating a universal hostility to it, the authors found that "[l]ess than 5% of participants reported experiencing negative changes," an observation that led the authors to conclude that "[o]verall, we found that a large majority of these sexual minority men perceived their engagement in SOCE to enhance their well-being" and that "[r]eports of positive change were stronger and more widely distributed than those of negative change, most strongly for depression, but also for self-esteem, social functioning, self-harm, suicidality, and

CCCU-SER-206

alcohol/substance abuse."[21] The reasons why people pursue counseling and psychotherapy matter.

44.     On page 17, Dr. Meyer makes reference to SOCE as encompassing *any* approach "intended to condition people against their natural sexual orientation or gender identity." On the same page, Dr. Meyer further maintains that "LGBT persons need to learn to accept their LGBT identity in the coming out process," implying a sense of inevitability about who they are. Perhaps. But a "natural sexual orientation or gender identity" is not, as Dr. Meyer's assertion suggests, always rooted in birth or from a child's earliest memories, as the term implies and as Dr. Meyer appears to presume.

45.     For example, the American Academy of Pediatrics (AAP) policy statement on the care and support for transgender and gender-diverse children and adolescents holds that the self-recognition of gender identity "develops over time" and yet "[f]or some people, gender identity can be fluid, shifting in different contexts."[22] Indeed, Columbia University sociologist Tey Meadow reports in her article on the production of legal gender classifications: "Many courts look to medical

---

[21] Sullins DP, Rosik CH and Santero P. Efficacy and risk of sexual orientation change efforts: a retrospective analysis of 125 exposed men [version 2; peer review: 2 approved]     F1000Research     2021,     10:222 https://doi.org/10.12688/f1000research.51209.2

[22] Rafferty, J. & Committee on Psychosocial Aspects of Child and Family Health.(2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents, 142 *Pediatrics* 4 e20182162; doi: https://doi.org/10.1542/peds.2018-2162.

24

definitions of sex…. yet there is no consensus about when gender change actually happens."[23]

46.   Sexual orientation, meanwhile, appears both more discernible and more stable for men than for women.[24] Dr. J. Michael Bailey, a well-regarded psychologist and behavioral geneticist best known for his work on the etiology of sexual orientation, maintains women's sexual orientation is much more sensitive to social influence and more subject to personal decision-making.[25] Others agree. University of Utah psychologist Dr. Lisa Diamond has long claimed the same about women's sexual orientation, as has Dr. Jane Ward, a sociologist of sex, gender, and queer politics at UC-Riverside, who captures the dilemma that survey self-report data pose to the idea of immutability: "[I]f we all really believed that sexual orientation was congenital—or present at birth—then no one would ever worry that social influences

---

[23]   Meadow, T. (2010).   "A rose is a rose": On producing legal gender classifications, *Gender & society 24*(6), 814–837, p. 824. https://doi.org/10.1177/0891243210385918

[24]   Roy F. Baumeister, "Gender Differences in Erotic Plasticity: The Female Sex Drive as Socially Flexible and Responsive," Psychological Bulletin 126 (2000): 347-374; Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* (Cambridge, MA: Harvard University Press, 2008); Lisa M. Diamond, "Was It a Phase? Young Women's Relinquishment of Lesbian/Bisexual Identities over a 5-Year Period," *Journal of Personality and Social Psychology* 84 (2003), 352–364; Lisa Diamond, "Development of Sexual Orientation Among Adolescent and Young Adult Women," *Developmental Psychology* 34 (1998): 1085-1095; Illouz, *Why Love Hurts*; Letitia Anne Peplau and Linda D. Garnets, "A New Paradigm for Understanding Women's Sexuality and Sexual Orientation," *Journal of Social Issues* 56 (2000): 329-350.

[25]   J. Michael Bailey, "What is Sexual Orientation, and Do Women Have One?" in *Contemporary Perspectives on Lesbian, Gay, and Bisexual Identities*, ed. Debra A. Hope (New York: Springer, 2009), 43-64. The quote is from page 60.

CCCU-SER-208

could have an effect on our sexual orientation. But I think that in reality, we all know that sexual desire is deeply subject to social, cultural, and historical forces."[26]

47.    Rather, Dr. Meyer applies a framework of understanding male homosexuality, in which a more robust pattern of stability is commonly discerned, to reach blanket assertions about sexual orientation and gender identity, domains which—if including women—tend to display far more instability than he lets on. Hence, Dr. Meyer's references to a "natural" sexual orientation or gender identity imply a decidedly male "bias," one that is decreasingly reflected in research conclusions.

48.    Dr. Meyer also discusses numerous studies that purport to document the deleterious effects of social stigma on the psychological and physical health of sexual minorities. One manuscript of his that he does not discuss, however, is a recent publication based on the Williams Institute's new, large, five-year survey data collection effort aimed to understand differences between "generations" of LGBT adults: those aged 18-25, 34-41, and 52-59, dubbed the "equality," "visibility," and "pride" generations. In it, Dr. Meyer and his coauthors observe higher suicide behavior among the youngest cohort of LGBT adults—those who have experienced the least overt stigma and the greatest levels of social acceptance, and who witnessed what many hold to be the signal social achievement, the advent of nationwide same-

---

[26] Jane Ward, "No One is Born Gay (or Straight): Here Are 5 Reasons Why," paragraph 12, *Social (In)Queery* [Online] March 18, 2013. Available: http://socialinqueery.com/2013/03/18/no-one-is-born-gay-or-straight-here-are-5-reasons-why. [January 29, 2014].

sex civil marriage. And yet these developments have not yielded greater mental health. Instead, the "equality" generation displays "no signs that the improved social environment attenuated their exposure to minority stressors," but rather displays worse psychological distress and suicide behavior.[27]

49.    Nor is there any merit to the claim that the relationship/sexual conduct policies of CCCU-type institutions are increasing the risk of suicide among LGBTQ+ students. The 2021 Meyer et al. study based on the Generations data observes that 30 percent of *all* 18-25-year-old LGBT persons reported a suicide attempt in their lifetime. Yet, remarkably, the share of 34-41-year-old and 52-59-year-old LGBT Americans who reported a suicide attempt in their lifetime is lower (24 and 21 percent, respectively) than the youngest cohort, despite far more years to have done so.

50.    That the "equality" generation of LGBT Americans is in worse emotional shape than the older pair of cohorts studied, despite the latter's far longer experience with social disapproval, signals obvious weakness in the minority stress theory's fit, for if in fact social stigma is a central cause of stress, there should be less stress for this youngest generation, given lower social stigma. But instead of reckoning with this, leaning on his own claims (page 7) that the "scientific method allows for testing of theory-based hypotheses that can be nullified using statistical analyses and causal

---

[27] Meyer IH, Russell ST, Hammack PL, Frost DM, Wilson BDM (2021) Minority stress, distress, and suicide attempts in three cohorts of sexual minority adults: A U.S. probability sample. *PLoS ONE* 16(3): e0246827. https://doi.org/10.1371/journal.pone.0246827. The quotes here are from the study's abstract.

inference," Dr. Meyer (and his coauthors) double down. They assert in the face of the evidence that in spite of the clear diminution of anti-LGBT stigma in the United States—especially among young people—the results somehow "speak to the endurance of cultural ideologies such as homophobia and heterosexism and accompanying rejection of and violence toward sexual minorities."

51.    I am hardly the only social scientist who thinks the minority-stress theory has obvious limitations. Michael Bailey, mentioned above, maintains that minority stress theory is prematurely credited with explaining mental health disparities. Bailey asserts that "[t]he minority stress model has relied exclusively on self-report data to quantitate stigmatization" but that "[t]he accuracy of such self-report data is plausibly influenced by individual temperament."[28] That is, vulnerability to stress and stigma are not only experienced by minorities. Moreover, resilience to the same is not out of the question, and may have to do with temperament. In other words, minority stress theory tends to lack a clear sense of agency on the part of persons.

52.    Bailey continues, citing the possibility of "an alternative model postulating a reversed direction of effect." That is, the minority stress model is criticized for not being able to distinguish causal directionality, or "whether prejudice and discrimination lead to a greater likelihood of developing mental health problems,

---

[28]    Bailey, J. Michael. (2020). The minority stress model deserves reconsideration, not just extension. *Archives of Sexual Behavior*, *49*(7), 2265-2268.  The quote is from p. 2266.

or whether mental health problems lead to a greater likelihood of experiencing—or perceiving—prejudice and discrimination."[29]

The concern about overreach on the part of minority stress theory and its proponents has led to the expression of supplementary theories, including a "rejection sensitivity model" for understanding sexual minority health.[30] That is, an approach that—among other things—considers the role of "perception" in stigma-related experiences. This means that not all instances of self-reported stigma may be equally valid (e.g., if it were subject to external observation). This may help explain, in part, the Generations survey's observation of statistically identical levels of self-reported verbal insults or abuse "since age 18" as reported by 18-25-year-olds, 34-41-year-olds, *and* 52-59-year-olds. If true, it would have to mean that stigmatizing behavior like insults and verbal abuse have surged of late rather than receded, as most maintain—and that the oldest LGBT cohort experienced far less stigma than believed. Alternately, viewed through the lens of the rejection sensitivity model, perhaps LGBT young adults *perceive* more stigmatizing and antagonistic behavior aimed in their direction than is actually being exhibited. If this is true—and it is admittedly difficult to discern—then Dr. Wolff's remark (on page 18) about the American Psychological Association's appeal to the U.S. Department of Education "to investigate allegations

---

[29] The quote is from Zucker, K. J., Lawrence, A. A., & Kreukels, B. P. (2016). Gender dysphoria in adults. Annual Review of Clinical Psychology, 12, 217–247, but it also appears in Bailey, *supra* n.28.

[30] Feinstein, B. A., 2020, "The rejection sensitivity model as a framework for understanding sexual minority mental health," *Archives of Sexual Behavior* (2020) 49:2247–2258 https://doi.org/10.1007/s10508-019-1428-3.

CCCU-SER-212

of harm" is an invitation to scrutinize *far more events* of less egregious nature (on average) than were experienced by the oldest cohort of LGBT Americans.

53.    One of the underdiscussed aspects of this case is the staggering lack of self-efficacy and internalized locus of control that is simply presumed of LGBTQ young adults. Instead, what is assumed is a crippling inability to respond to perceived conditions around them and make decisions about their own lives. In sum, there is a presumed lack of agency—not only in these three expert witness reports but throughout much of the literature on LGBT health outcomes. It may well be real— after all, it seems to characterize the Plaintiffs, who appear to reflect the "equality" cohort in Meyer et al.'s 2021 study using his own Generations data. But the oldest cohort in that study would not recognize this lack of agency. Many of them built alternative institutions rather than do the more laborious work of "unraveling heteronormativity" in more traditional institutions.

54.    Moreover, in spite of the surge in support for LGBT Americans, evident in Gallup historical polling, [31] Dr. Meyer's study reports that the youngest LGBT adults report higher rates of "everyday discrimination" and "internalized homophobia," and far higher levels of psychological distress than older LGBT adults, even while they report higher "connection with the LGBT community" and no difference in the level of "felt stigma." This is the situation despite the fact that the youngest cohort reported consistently (and statistically significantly) lower rates of

---

[31]    Gallup,    *LGBT    Rights*,    https://news.gallup.com/poll/1651/gay-lesbian-rights.aspx.

physical and sexual assaults, robbery, and threats of violence than the oldest cohort of LGBT adults. What does one make of this conundrum? This is not to blame them, or to say that they, like so many of their age cohorts, are not suffering from distress. But the actual source of this distress is what is in question, and these clear contrasts must be considered if we are to understand and respond in ways that actually will help. In contrast to the authors' consistent appeal to the stable presence of homophobia, heterosexism, rejection, and violence, one is prompted to wonder if perhaps the youngest generation of LGBT adults—represented in this case by the Plaintiffs—feels more poignantly forces of rejection, competition, and violence from their own peers?[32] This is empirically unclear—and seldom discussed—territory.

55.    Alternately, the youngest cohort of LGBT adults exhibits greater sensitivity to (or memory of) perceived slights, quicker presumptions of prejudice, and lower threshold for interpreting others' behavior toward them as insulting or abusive than do older cohorts of LGBT adults. It is impossible to say, from the study's data as presented, but when the youngest cohort (which is between age 18 and 25) reports statistically identical rates of lifetime verbal insults or abuse since age 18 as do their older LGBT counterparts, it suggests there may be something to the "rejection sensitivity" model noted above.

56.    Other revelations from the Generations study highlight possible reasons for the greater psychological challenges among the youngest LGBT cohort. In

---

[32] Hobbes, M., Together Alone (2017). https://highline.huffingtonpost.com/articles/en/gay-loneliness/.

particular, the youngest report first sex with a same-sex partner at just over age 16, two years younger than those now 34-41 and three years younger than those now age 52-59. Lower average age at first sexual experience is consonant with more poignant challenges.[33]

57.    What relevance does the unmentioned study of Dr. Meyer's have for the present case? Plenty. It suggests that previous eras of LGBT students at Christian colleges and universities were apt to have understood the unique rules (about sexual relationships, etc.) as the norm, and either abided by them, surreptitiously thwarted them, or simply elected to avoid the institution in the first place—selecting a university that seemed less concerned with such rules. The Plaintiffs in this case, on the other hand, represent the "Equality" cohort in the Generations study by being quicker to perceive discrimination, sense injustice, feel stigmatized, and suffer psychological distress—all despite the fact that even most of the colleges and universities they attend have more informal support, produce more likeminded friendships, and boast a student body that is more tolerant than previous eras. Their expectations of equality in how Christian theological traditions understand sexuality, the meaning and purpose and validity of sexual relationships—in sum, the morality of nonmarital relationships and the boundaries of marriage—are simply far different than previous eras of LGBT students. Their grievance is portrayed as with the

---

[33] Osorio, A., Lopez-del Burgo, C., Carlos, S., & de Irala, J. (2017). The sooner, the worse? Association between earlier age of sexual initiation and worse adolescent health and well-being outcomes. *Frontiers in psychology*, *8*, 1298.

institution—their own college or university—and yet at bottom the difference is with the Christian theological tradition that animates these institutions.

58.    That appears to be Dr. Meyer's approach. For example, on page 12 of his report, Dr. Meyer cites and discusses the Williams Institute's report entitled "Religiosity among LGBT Adults in the US," which estimates that just over 3 million LGBT adults are moderately religious and an additional 2.2 million are highly religious.[34] From there, Dr. Meyer speculates that LGBT adults who (choose to) "belong to non-affirming denominations are particularly vulnerable to stigma and stress[.]" Yet from Dr. Hoogstra's declaration, we know that this group—LGB students who know about a given school's policy on sexuality at the time of matriculation—makes up around 90 percent of all LGB students. Hoogstra Decl. ¶¶ 20–21. Once there, many silently disagree with them (40%). But many others chose those schools precisely because of their sex-related policies (31.3%). *Ibid*. For these students, the goal of religious higher education seems in part to find a way to reconcile their faith with their sexual orientation or gender identity. *Id.* ¶ 22. And CCCU-type institutions provide communities in which they can do so.

59.    Since the vast majority, if not all, of students at Christian colleges and universities are not forced to be enrolled there, this case raises the question about why students who report feelings of distress, irritation, or anger at their

---

[34] Conron, K. J., Goldberg, S. K., & O'Neill, K. (2020). Religiosity among LGBT adults in the US. Los Angeles, CA: The Williams Institute at UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Religiosity-Oct-2020.pdf

CCCU-SER-216

administration's policies do not simply respond by transferring to another university. There are an extraordinary number of them, after all. Indeed, several examples from the Amended Complaint would prompt many readers to wonder why such a student was interested in a Christian higher education at all. But they were, and plenty appear to remain so.

## V.    DR. JOSHUA WOLFF'S REPORT

60.    Dr. Wolff studies what he identifies (on page 4 of his report) as "the intersections of religion, spirituality, and campus climate on the lives of LGBTQ+ students who attend" colleges similar to those represented by the CCCU.

61.    In his expert witness report, Dr. Wolff lists the various ways in which LGBTQ+ students at such colleges and universities "may" or "can" experience what he describes as "unique" challenges, including: verbal and sexual harassment, threats, assaults, jokes, slurs, instances of incivility and social rejection, insufficient support, etc. What the reader is treated to, however, is little sense of just *how much* more these things actually are (rather than "may" be) experienced at CCCU-type schools than elsewhere. As with the REAP survey, there is no sense of "just how much worse" life is for LGBTQ+ persons at Christian colleges than elsewhere. The reality, as I have shown above using multiple sources of empirical data above, is striking—it is no worse, and very likely better.

62.    Instead, Dr. Wolff treats the reader to a litany of non-specific, non-comparative claims at multiple points in his report that lack a sense of effect size by repeatedly using phrases like "are associated with," "more likely to," "significantly

higher," "higher rates," etc. Such terms signal non-specific effect sizes along with implied causal directionality—without actual numbers, rates, effect sizes, etc. This is particularly evident on page 11, where he could have stated percentages of the 213 sexual minority students who reported elevated clinical symptoms of depression, anxiety, eating concerns, substance use, etc., but does not. He does, however, articulate the percentage (37%) that have experienced bullying or harassment (on page 12). These, he maintains, "*were more likely* to report symptoms of depression." How much more likely?

63.   Dr. Wolff notes a study of his that "found that LGB youth living in counties that had higher concentrations of non-affirming faith communities had increased rates of alcohol abuse and more sexual partners[.]" This, of course, has nothing inherently to do with the religiousness of LGB youth or their peers or neighbors, much less how such youth—especially those who believe in Christian sexual ethics—would fare in CCCU-type schools.[35]

64.   In describing the experiences of participants in his 2017 study, Dr. Wolff further notes that participants "shared a common experience of sadness and remorse over lost opportunities to fully explore and be known authentically as they looked back at past experiences" at their respective Christian colleges. This is not unique to

---

[35] County-level data, moreover, is a primary sampling unit whose efficacy is difficult to defend, in comparison to census tracts or blocks. After all, counties range in population from the millions (e.g., Cook County, Los Angeles County, Harris County) to the very few.

LGBTQ+ students. Many of us look back at our college days with some regrets about friendships that went unformed or underdeveloped, opportunities missed, etc.

65.    Moreover, there is little information provided here about the sample of Dr. Wolff's interviewees—how they came to be in the study, and if—like in the REAP survey—there is a comparison group of non-LGBT students interviewed. In my experience and observation, and as explained by Dr. Hoogstra, LGBT students at CCCU-type schools are generally comprised of those who support the school's mission and live at peace with their school's sexuality and relationship policies—and then there are those like the Plaintiffs to this case, who do not. Whether Dr. Wolff's interviewees comprise the former as well as the latter is unclear, at least from his report.

66.    Instead, in a remark about mandatory referrals to campus counseling centers for violating policies about gender norms and expressions, he asserts that "some students reported" that such centers "may have the goal of changing sexual orientation and/or gender identity to comply with religious norms." I commend him for his honesty in expressing what the students reported. However, the statement suggests that the unclear number of students who reported this did not actually know that this was a goal of the counseling center. Moreover, the REAP survey (page 24, Section V on University Sanctions) suggests this is rarely the case.

67.    Dr. Wolff concludes aptly, on page 13, that "the relationship between campus policies and mental health is probably complex and weird." Indeed, surprisingly little evidence has been brought forward in this case to suggest that

campus sexuality policies—the very thing the Plaintiffs are contesting in the complaint—are demonstrably associated with poor LGBT student outcomes.

68.    Finally, LGBT students enrolled at the kind of evangelical college widely represented in the CCCU display, in Dr. Wolff's own published work, "significantly fewer symptoms of depression and social anxiety" than students at Catholic and Mainline Protestant colleges and universities, which are on average far more progressive regarding behavioral policies and norms, and certainly more likely to have GSAs.[36] Dr. Wolff seems puzzled by this result, and yet acknowledges that "religion may offer a substantial amount of comfort and source of community to many SM (sexual minority) students who find incongruence with their sexual orientation and their faith," with a reference to Mark Yarhouse's work.[37] I could not have said it better.

## VI.    DR. JONATHAN COLEY'S REPORT

69.    Dr. Coley poses an obvious (and good) question in his expert witness report, namely why LGBTQ students wish to attend Christian colleges and universities in the first place. His interview-based study of LGBTQ students at four institutions reveals an interesting selection, since three of the four schools are not known for having demanding sexuality and relationship behavior policies.

---

[36] Wolff, J. R., Himes, H. L., Soares, S. D., Kwon, E. M., "Sexual minority students in non-affirming religious higher education: Mental health, outness, and identity," Psychology of Sexual Orientation and Gender Diversity 3 (2016), 201-212. The quote is from 207.

[37] Ibid., page 208.

70.    Another project of Dr. Coley's is the construction of an ambitious database of university policies on LGBTQ matters, in particular student handbook "bans on 'homosexual acts' or 'homosexual behavior'" which Dr. Coley notes—but does not detail—"often carried the same penalties as bans on 'rape' or 'incest'" (page 5). And yet to repeat what we've learned from the REAP survey—almost no students (six out of every 1,000) reported running afoul of their school's sexual code of conduct to the point where the violation merited disciplinary action. Thus, it is difficult to see how these codes could have any real, systematic negative impact on students' emotional health.

71.    Further, on page 7 of his report, Dr. Coley estimates the size of the population of LGBTQ students that are "impacted" by their Christian university's discriminatory policies. He surmises that "[I]f a similar percentage of students at CCCU institutions identify as LGBTQ, there are likely over 70,000 LGBTQ students at CCCU institutions alone. Alternately, the more liberal estimate of 30% of students who report same-sex attractions or past same-sex sexual behavior would yield 133,500 LGBTQ students in CCCU schools. All of this is speculative, but unproblematic. However, Dr. Coley presumes a random process by which LGBTQ young adults decide where to go to college, one in which no self-selectivity is involved. This is ironic, since most young adults seem to display all manner of self-selection processes regarding higher education, weighing cost, prestige, availability of desired major, family influences, peer influences, etc. I mention this only because the fact that self-selectivity is not imagined here by Dr. Coley reveals something that

38

animates many research conclusions about the lives of LGBT young adults—that is, a presumptive lack of self-efficacy.

72.     In reality, it makes sense to admit that most LGBTQ students enrolled at CCCU-type schools are there *because they wanted to be*. Students think hard about where to go to college, and tend to weigh the costs and benefits of their options. Rather than conclude out of hand that the average LGBTQ Christian enrolled at a CCCU-type school thinks quite similarly to the Plaintiffs in this case, it is likely to be more accurate that such students are more likely than the Plaintiffs to wish to follow the Christian ideal of chastity in relationships—whether successful or not. To hold that sexual relationships traditionally viewed in Christianity as illicit are not in fact wrong (i.e., sinful, etc.) is simply to attempt to rewrite the theological history of those Christian denominations that gave rise to organizations like those represented in the CCCU. For Christians of all stripes, Christianity often requires a "costly obedience,"[38] and conservative, religious students tend to both need and want encouragement and support to live out the tenets of their faith.

73.     Finally, Dr. Coley advocates for the formation of LGBTQ student groups as well as institutional centers, and criticizes those colleges and universities he studied which do not permit such centers or formal group recognition. While there are many laudable reasons for hosting or joining such a group, one obvious reason why CCCU-type schools are reticent to officially recognize such groups is for a pair of

---

[38] Yarhouse, M., Zaporozhets, O. (2019). *Costly Obedience: What we can learn from the celibate gay Christian community*. Zondervan.

the reasons for which Dr. Coley states such groups to exist—that is to foster "romantic relationships" and "opportunities for activism." These are two principles which such universities may well perceive as being contrary to their relationship policies, and violations of which they reasonably believe would themselves prompt stress and other negative outcomes in their students.

## VII. <u>CONCLUDING OBSERVATIONS</u>

74. The battle over civil same-sex marriage lasted for decades in the United States. But it did not yield the power to coerce Christian churches into conducting same-sex marriages. This is akin to what the Plaintiffs seek to accomplish—but by judicial fiat. That is, they wish to force Christian colleges and universities—many of which sport hundreds of thousands of alumni who wished to attend and worked hard to graduate from them—to undo their relationship policies, which are expressions of their theological and religious beliefs and commitments, or face possible closure due to the inability of students to merit Stafford loans or Pell grants, a situation that would (in reality) force many students to look elsewhere for their degree.

75. Forcing a university to choose between their theology and financial survival—their deeply-rooted policies on human sexuality or their (ubiquitous) dependence on federal student loan dollars—is a false choice. The only winners if such schools are forced to choose would be those universities—and those parents and students—with the deepest pockets. A victory for the students here would not yield justice, no matter what the outcome, because schools that elect to decline federal funding would either close or lay off scores of employees, and reduce course offerings.

What student desires that? Alternately, if the school elects to drop its sexuality and relationship policies in order to stay financially afloat, that decision would inject a significant secularizing effect and altering the Christian character of the school. The Plaintiffs' peers would no longer be attending the kind of institution they sought prior to this suit. The third way, of course, is the most prudent one, and it's all about a self-selective imperative: respect the diverse nature of American higher educational options, and thereby allow students to choose the kind of school that fits their own values.

76.     Finally, there is a monumental media-stimulated psychological crisis occurring among youth in general, LGBT and otherwise, that has yielded elevated suicidality rates and poorer mental health among adolescents and young adults. To suggest that Christian colleges and universities are uniquely at fault for a small portion of this massive trend is not simply to miss the primary sources of psychological threats today. It's to reverse course and to place blame on institutions in which students are—on average—more apt to thrive. It is scapegoating.

77.     I have reached my conclusions to a reasonable degree of certainty using the same information and studies relied on by other experts in my field. I make the foregoing statements based on my knowledge, information, belief, and experience, under penalty of perjury.

November 2, 2021

Mark Regnerus

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document was served on all counsel of record in this case by ECF and by email.

DATED this 2nd day of November, 2021.

/s/ Gene C. Schaerr
Gene C. Schaerr
*Counsel for Defendant-Intervenor CCCU*

**EXHIBIT A**

# MARK REGNERUS
(November 2021)

Department of Sociology                          Office: CLA 3.524
The University of Texas at Austin               Phone: (512) 232-6307
Mail Code A1700                                 Email: regnerus@prc.utexas.edu
Austin, TX 78712

## EDUCATION

Ph.D., Sociology, University of North Carolina at Chapel Hill, 2000.

M.A., Sociology, University of North Carolina at Chapel Hill, 1997.

B.A., Sociology, with high honors, Trinity Christian College, 1993.

## PROFESSIONAL APPOINTMENTS

2018–Present: Professor, Department of Sociology, The University of Texas at Austin.

2007–2018: Associate Professor, Department of Sociology, The University of Texas at Austin.

    2002–2014: Faculty Research Associate, Population Research Center, The University of Texas at Austin.

2002–2007: Assistant Professor, Department of Sociology, The University of Texas at Austin.

2001–2002: Assistant Professor of Sociology, Department of Sociology and Social Work, and Director, Center for Social Research, Calvin College.

2000–2001: Postdoctoral Research Associate, Carolina Population Center.

## PUBLICATIONS

### Books

Regnerus, Mark. 2020. *The Future of Christian Marriage*. New York, NY: Oxford University Press. (268 pages)

> Reviewed or discussed in *Journal for the Scientific Study of Religion, Publishers Weekly, National Review, Choice, World, Public Discourse,* and *Christianity Today.*

Regnerus, Mark. 2017. *Cheap Sex: The Transformation of Men, Marriage, and Monogamy*. New York, NY: Oxford University Press. (262 pages)

> Reviewed in *The Atlantic Monthly, Commentary, Washington Post, New York, Humanum, Men & Masculinities, Public Discourse, National Review, Claremont Review of Books, Nevada Appeal, Jet, Contemporary Sociology,* and *The Globe and Mail.*

Regnerus, Mark and Jeremy Uecker. 2011. *Premarital Sex in America: How Young Americans Meet, Mate, and Think about Marrying*. New York, NY: Oxford University Press. (295 pages)

CCCU-SER-227

Reviewed in *American Journal of Sociology*; *BYU Studies Quarterly*; *Commentary*; *Contemporary Sociology*; *Culture, Health & Sexuality*; *First Things; Horizons*; *INTAMS Review*; *Journal of Family Theory & Review*; *Journal of Popular Romance Studies*; *Journal of Youth and Adolescence*; *Mercatornet*; *Public Discourse*; *Sex Roles*; *The New Republic*; and *The New York Times*.

Regnerus, Mark D. 2007. *Forbidden Fruit: Sex and Religion in the Lives of American Teenagers*. New York: Oxford University Press. (304 pages)

Reviewed in *American Journal of Sociology*, *Contemporary Sociology*, *Journal of Youth and Adolescence*, *Journal of Sex Research*, and *The New Yorker*.

## Peer-Reviewed Journal Articles (including Accepted and In Press)

Regnerus, Mark and Brad Vermurlen. 2021. "Attitudes toward Hormonal and/or Surgical Interventions for Adolescents Experiencing Gender Dysphoria." Forthcoming, *Archives of Sexual Behavior*.

Regnerus, Mark. 2020. "Understanding How the Social Scientific Study of Same-Sex Parenting Works," *Annals of Social Science* 12 (3): 43-60.  https://doi.org/10.18290/rns20483-3

Regnerus, Mark, Joseph Price, and David Gordon. 2017. "Masturbation and Partnered Sex: Substitutes or Complements?" *Archives of Sexual Behavior* 46: 2111-2121.

Regnerus, Mark. 2017. "Is Structural Stigma's Effect on the Mortality of Sexual Minorities Robust? A Failure to Replicate the Results of a Published Study." *Social Science & Medicine* 188: 157-165.

Regnerus, Mark, David Gordon, and Joseph Price. 2016. "Documenting Pornography Use in America: A Comparative Analysis of Methodological Approaches." *The Journal of Sex Research* 53(7): 873-881.

Price, Joseph, Rich Patterson, Mark Regnerus, and Jacob Walley. 2016. "How Much More XXX is Generation X Consuming? Evidence of Changing Attitudes and Behaviors Related to Pornography Since 1973." *The Journal of Sex Research* 53(1): 12-20.

Regnerus, Mark. 2012. "How Different are the Adult Children of Parents who have Same-Sex Relationships? Findings from the New Family Structures Study." *Social Science Research* 41: 752-770.

Woodberry, Robert D., Jerry Z. Park, Lyman A. Kellstedt, Mark D. Regnerus, and Brian Steensland. 2012. "The Measure of American Religious Traditions: Theoretical and Measurement Considerations." *Social Forces* 91(1): 65-73.

Uecker, Jeremy E. and Mark D. Regnerus. 2010. "Bare Market: Campus Sex Ratios, Romantic Relationships, and Sexual Behavior." *The Sociological Quarterly* 51: 408-435.

McFarland, Michael J., Jeremy E. Uecker, and Mark D. Regnerus. 2010. "The Role of Religion in Shaping Sexual Frequency and Satisfaction: Evidence from Married and Unmarried Older Adults." *The Journal of Sex Research* 47: 1-12.

Stokes, Charles E. and Mark D. Regnerus. 2009. "When Faith Divides Family: Religious Discord and Adolescent Reports of Parent-Child Relations." *Social Science Research* 38: 155-167.

CCCU-SER-228

Hill, Terrence D., Amy M. Burdette, Mark Regnerus, and Ronald J. Angel. 2008. "Religious Involvement and Attitudes Toward Parenting Among Low-Income Urban Women." *Journal of Family Issues* 29(7): 882-900.

Uecker, Jeremy E., Nicole Angotti, and Mark D. Regnerus. 2008. "Going Most of the Way: 'Technical Virginity' Among American Adolescents." *Social Science Research* 37: 1200-1215.

Uecker, Jeremy E., Mark D. Regnerus, and Margaret L. Vaaler. 2007. "Losing My Religion: The Social Sources of Religious Decline in Early Adulthood." *Social Forces* 85(4): 1-26.

Regnerus, Mark D. and Jeremy E. Uecker. 2007. "Religious Influences on Sensitive Self-Reported Behaviors: The Product of Social Desirability, Deceit, or Embarrassment?" *Sociology of Religion* 68(2): 145-163.

Regnerus, Mark D. and Viviana Salinas. 2007. "Religious Affiliation and AIDS-based Discrimination in Sub-Saharan Africa." *Review of Religious Research* 48(4): 385-401.

Trinitapoli, Jenny and Mark D. Regnerus. 2006. "Religion and HIV Risk Behaviors among Married Men: Initial Results from a Study in Rural Sub-Saharan Africa" *Journal for the Scientific Study of Religion* 45: 505-528.

Regnerus, Mark D. and Jeremy Uecker. 2006. "Finding Faith, Losing Faith: The Prevalence and Context of Religious Transformations during Adolescence." *Review of Religious Research* 47: 217-237.

Regnerus, Mark D. and Amy Burdette. 2006. "Religious Change and Adolescent Family Dynamics." *The Sociological Quarterly* 47: 175-194.

Regnerus, Mark D. and Laura B. Luchies. 2006. "The Parent-Child Relationship and Opportunities for Adolescents' First Sex." *Journal of Family Issues* 27: 159-183.

Regnerus, Mark D. and Christian Smith. 2005. "Selection Effects in Studies of Religious Influence." *Review of Religious Research* 47: 23-50.

Regnerus, Mark D. 2005. "Talking about Sex: Religion and Patterns of Parent-Child Communication about Sex and Contraception." *The Sociological Quarterly* 46: 81-107.

Regnerus, Mark D., Christian Smith, and Brad Smith. 2004. "Social Context in the Development of Adolescent Religiosity." *Applied Developmental Science* 8: 27-38.

Regnerus, Mark D. 2003. "Linked Lives, Faith, and Behavior: An Intergenerational Model of Religious Influence on Adolescent Delinquency." *Journal for the Scientific Study of Religion* 42: 189-203.

Regnerus, Mark D. 2003. "Moral Communities and Adolescent Delinquency: Religious Contexts and Community Social Control." *Sociological Quarterly* 44: 523-554.

Regnerus, Mark D. 2003. "Religion and Positive Adolescent Outcomes: A Review of Research and Theory." *Review of Religious Research* 44: 394-413.

Regnerus, Mark D. and Glen H. Elder, Jr. 2003. "Religion and Vulnerability among Low-Risk

Adolescents." *Social Science Research* 32: 633-658.

Regnerus, Mark D. and Glen H. Elder, Jr. 2003. "Staying on Track in School: Religious Influences in High and Low-Risk Settings." *Journal for the Scientific Study of Religion* 42: 633-649.

Rostosky, Sharon S., Mark D. Regnerus, and Margaret L.C. Wright. 2003. "Coital Debut: The Role of Religiosity and Sex Attitudes in the Add Health Survey." *Journal of Sex Research* 40: 358-367.

Smith, Christian, Robert Faris, Melinda Lundquist Denton, and Mark D. Regnerus. 2003. "Mapping American Adolescent Subjective Religiosity and Attitudes of Alienation Toward Religion: A Research Report." *Sociology of Religion* 64: 111-133.

Regnerus, Mark D. 2002. "Friends' Influence on Adolescent Theft and Minor Delinquency: A Developmental Test of Peer-Reported Effects." *Social Science Research* 31: 681-705.

Smith, Christian, Melinda Denton, Robert Faris, and Mark D. Regnerus. 2002. "Mapping American Adolescent Religious Participation." *Journal for the Scientific Study of Religion* 41: 597-612.

Ge, Xiaojia, Glen H. Elder, Jr., Mark D. Regnerus, and Christine Cox. 2001. "Pubertal Transitions, Overweight Self Perceptions, and Adolescent Psychosomatic Adjustment: Gender and Ethnic Differences." *Social Psychology Quarterly* 64: 363-375.

Regnerus, Mark. 2000. "Shaping Schooling Success: A Multi-level Study of Religious Socialization and Educational Outcomes in Urban Public Schools." *Journal for the Scientific Study of Religion* 39: 363-370.

Steensland, Brian, Jerry Park, Mark Regnerus, Lynn Robinson, Bradford Wilcox, and Robert Woodberry. 2000. "The Measure of American Religion: Toward Improving the State of the Art." *Social Forces* 79: 291-318.

Regnerus, Mark, David Sikkink, and Christian Smith. 1999. "Voting with the Christian Right: Contextual and Individual Patterns of Electoral Influence." *Social Forces* 77 (4): 1375-1401.

Regnerus, Mark and Christian Smith. 1998. "Selective Deprivatization among American Religious Traditions: The Reversal of the Great Reversal." *Social Forces* 76: 1347-72.

Regnerus, Mark, Christian Smith, and David Sikkink. 1998. "Who Gives to the Poor? The Role of Religious Tradition and Political Location on the Personal Generosity of Americans toward the Poor." *Journal for the Scientific Study of Religion* 37: 481-493.

**Peer-Reviewed Book Chapters**

Regnerus, Mark D. 2010. "Religion and Adolescent Sexual Behavior." In *Religion, Families, and Health: Population-Based Research in the United States* (Christopher G. Ellison and Robert A. Hummer, editors), pp 61-85. New Brunswick, NJ: Rutgers University Press.

Regnerus, Mark D. 2005. "Adolescent Delinquency." Pp. 259-276 in Helen Rose Ebaugh (ed.), *Handbook of Religion and Social Institutions*. New York: Kluwer/Plenum.

Sikkink, David and Mark Regnerus. 1996. "For God and the Fatherland: Protestant Symbolic Worlds and the Rise of German National Socialism." Pp. 133-147 in Christian Smith (ed.), *Disruptive Religion: The Force of Faith in Social Movement Activism*. New York: Routledge.

**CCCU-SER-230**

**Non-Peer-Reviewed Journal Articles and Book Chapters**

Regnerus, Mark D. 2020. "Measurement and Analytic Vulnerabilities in the Study of Structural Stigma." (Commentary). *Social Science & Medicine* 244: 112567.

Regnerus, Mark D. 2019. "Sexual Media as Competition in the Heterosexual Relationship Market" (Commentary). *Archives of Sexual Behavior* 48: 2279-2281.

Regnerus, Mark. 2019. "Comment on Barbara Risman's review of Cheap Sex: The Transformation of Men, Marriage, and Monogamy." *Contemporary Sociology* 48: 130-131.

Regnerus, Mark D. 2018. "Reproducing Homes: Intergenerational Transmission of Marriage and Relationship Legacy." In *The Home: Multidisciplinary Reflections* (Antonio Argandoña, editor). Cheltenham, UK: Edward Elgar. 24 pp.

Regnerus, Mark D. 2015. "The Family as First Building Block." In *The Thriving Society: On the Social Conditions of Human Flourishing* (James R. Stoner, Jr. and Harold James, editors), pp 49-66. Princeton, NJ: The Witherspoon Institute.

Regnerus, Mark. 2012. "Contemporary Mating Market Dynamics, Sex-Ratio Imbalances, and Their Consequences." *Society* 49: 500-505.

Regnerus, Mark. 2012. "Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analyses." *Social Science Research* 41: 1367-1377.

Regnerus, Mark D. 2010. "Sexual Behavior in Young Adulthood." The Changing Spirituality of Emerging Adults Project. 16 pp.

Regnerus, Mark D. 2009. "Imitation Sex and the New Middle Class Morality" (chapter 6 of *Forbidden Fruit*), reprinted in *Speaking of Sexuality: Interdisciplinary Readings, 3rd Edition* (Nelwyn B. Moore, J. Kenneth Davidson, and Terri D. Fisher, editors). New York, NY: Oxford University Press.

Regnerus, Mark D. and Jeremy E. Uecker. 2007. "How Corrosive Is College to Religious Faith and Practice?" Social Science Research Council. 6 pp.

- Reprinted as Regnerus, Mark D., and Jeremy E. Uecker. 2008. "College Students Value Religion." *Opposing Viewpoints in Context: America's Youth*. Jamuna Carroll, editor. Farmington Hills, MI: Greenhaven Press. link.galegroup.com/apps/doc/EJ3010300238/OVIC?u=txshracd2598&xid=ea8e31f3. 7 pp.

Regnerus, Mark D., Christian Smith, and Melissa Fritsch. "Religion in the Lives of American Adolescents: A Review of the Literature." A Research Report of the National Study of Youth and Religion, No. 3. Chapel Hill, NC: University of North Carolina, 2003.

Regnerus, Mark D. "Living up to Expectations." Report, Center for Research on Religion and Urban Civil

**CCCU-SER-231**

Society, University of Pennsylvania, 2003.

Regnerus, Mark D. "Making the Grade: The Influence of Religion upon the Academic Performance of Youth in Disadvantaged Communities." Report, Center for Research on Religion and Urban Civil Society, University of Pennsylvania, 2001.

Regnerus, Mark. "Challenges to Liberal Protestant Identity and Diversity Work: a Qualitative Study." *Sociological Analysis* 1998, 1: 139-149.

## Book Reviews

Review of: *Nationalizing Sex: Fertility, Fear, and Power*, Richard Togman (New York: Oxford University Press, 2019). In *Review of Politics* 82: 500-502 (2020).

Review of: *Charitable Choices: Religion, Race, and Poverty in the Post-Welfare Era*, John P. Bartkowski and Helen A. Regis (New York: NYU Press). In *Social Forces* 82: 861-863 (2003).

Review of: *They Still Pick Me Up when I Fall: The Role of Youth Development and Community Life*, Diana Mendley Rauner (New York: Columbia University Press). In *Social Forces* 79: 1545-1547 (2001).

## Select Essays and Op-Eds (all sole-authored)

"Weak Data, Small Samples, and Politicized Conclusions on LGBT Discrimination." *Public Discourse*, January 12, 2020.

"New Data Show 'Gender-Affirming' Surgery Doesn't Really Improve Mental Health. So Why are the Study's Authors Saying It Does?" *Public Discourse*, November 13, 2019.

"Does 'Conversion Therapy' Hurt People who Identify as Transgender? The New JAMA Psychiatry Study Cannot Tell Us." *Public Discourse*, September 18, 2019.

"Queering Science." First Things, December 2018.

"The Death of Eros." *First Things*, October 2017.

"Can Same-Sex Marriage Really Reduce Teen Suicide?" *Public Discourse*, February 24, 2017. 4 pp.

"Hijacking Science: How the 'No Differences' Consensus about Same-Sex Households and Children Works." *Public Discourse*, October 14, 2016. 5 pp.

"Making Differences Disappear: The Evolution of Science on Same-Sex Households." *Public Discourse*, May 12, 2015. 4 pp.

"Minecraft over Marriage." *First Things*, March 31, 2015. 5 pp.

"The Good-Enough Marriage." *First Things*, December 4, 2014. 4 pp.

"The Pornographic Double-Bind." *First Things*, November 11, 2014. 3 pp.

"Diversity as Slogan and Reality." *First Things*, October 9, 2014. 3 pp.

"Resurrecting the Dead in America." *First Things*, September 11, 2014. 4 pp.

"The Government's in Your Bedroom, but This Time It's Okay." *National Review*, July 16, 2014. 3 pp.

"'Right Side of History,' or Primed to Say Yes?" *National Review*, August 20, 2013. 5 pp.

"Assessing the Australian Study." *National Review*, June 6, 2013. 3 pp.

"Sex is Cheap: Why Young Men Have the Upper Hand in Bed, Even When They're Failing in Life." *Slate*, February 25, 2011. (9th-most read *Slate* article of 2011.) 4 pp.

"Freedom to Marry Young." *Washington Post*, April 26, 2009. 2 pp.

## RESEARCH GRANTS

Principal Investigator, "The Relationships in America Survey Project." $328,426 grant from the Austin Institute, January 2014-September 2014. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study." $640,000 grant from the Witherspoon Institute, May 2011-August 2013. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study (supplementary assistance)." $90,000 grant from the Bradley Foundation, Nov 2011-Nov 2012. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study." $55,000 planning grant from the Witherspoon Institute, Oct 2010-June 2011. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Pentecostals and Political and Social Activism." $9,565 grant from the National Science Foundation (Dissertation Improvement Grant, for Nicolette Manglos), 2010-2011. (Approved but returned)

Co-Investigator, "Developing Health Behaviors in Middle Adolescence" (Lynn Rew, PI, The University of Texas at Austin School of Nursing). $1,276,919 grant from the National Institute of Nursing Research, 2006-2011. (Approved, <5% under Regnerus' supervision). R01-NR009856.

Principal Investigator, "Testing Differences: The Transfer and Transformation of HIV Testing from the West to Sub-Saharan Africa." $7,500 grant from the National Science Foundation (Dissertation Improvement Grant, for Nicole Angotti), 2008-2009. (Approved)

Co-Investigator, "Religious Organizations, Local Norms, and HIV in Africa" (Susan Watkins, PI, University of Pennsylvania). $864,000 grant from the National Institute of Child Health and Human Development, June 2005-May 2008. (Regnerus is PI of $279,000 sub-contract to The University of Texas at Austin). R01-HD050142-01.

Seed grant for "Sex and Emotional Health in Emerging Adulthood." $4,000 grant from the Population Research Center and $2,000 grant from the College of Liberal Arts, The University of Texas at Austin, 2007.

## SELECT INVITED PRESENTATIONS

"The Future of Christian Marriage."

- University of Mary, Bismarck, ND, April 2021
- Faulkner University, Montgomery, AL, March 2021

"The Transformation of Men, Marriage, and Monogamy." Universidad Francisco de Vitoria, Madrid, November 2018.

Author meets critics panel on *Cheap Sex: The Transformation of Men, Marriage, and Monogamy*. Society for the Scientific Study of Religion, Las Vegas, NV, October 2018.

"The Transformation of Men, Marriage, and Monogamy." Archdiocese of Denver, September 2018.

Author meets critics panel on *Virgin Nation: Sexual Purity and American Adolescence* (by Sara Moslener, Oxford University Press, 2016). American Academy of Religion, San Antonio, TX, November 2016.

"Intergenerational Transmission of Marriage and Relationship Legacy." Home Renaissance Foundation, London, United Kingdom, November 2015.

"The Future of Marriage and Family in America." University of St. Thomas, Houston, TX, March 2015.

"The New Family Structures Study and the Challenges of Social Science." Brigham Young University, Provo, UT, October 2014.

"Sex in America: Sociological Trends in American Sexuality." Ethics and Religious Liberty Commission, Nashville, TN, April 2014.

"Premarital Sex in America." Department of Sociology, University of North Carolina at Chapel Hill, Chapel Hill, NC, January 2012.

Book discussion session on *Premarital Sex in America*. Society for the Study of Emerging Adulthood, Providence, RI, October 2011.

"The Future of Sex and Marriage in American Evangelicalism." National Association of Evangelicals Advisory Board, Washington, D.C., October 2011.

Heyer Lecture. Austin Presbyterian Theological Seminary, Austin, TX, September 2011.

Thematic session on "The Cultural War and Red/Blue Divide: Re-examining the Debate Demographically and Behaviorally." American Sociological Association, Las Vegas, NV, August 2011.

"Sexual Economics: The Forces Shaping How Young Americans Meet, Mate, and Marry." Heritage Foundation, Washington, D.C., May 2011.

"Marital Realities, Current Mindsets, and Possible Futures." Institute of Marriage and Family Canada, Ottawa, Canada, May 2011.

Panel on "Teen Pregnancy: What Is California Doing Right?" Zócalo Public Square, Los Angeles, CA, December 2010.

"Marriage and Parenthood in the Imagination of Young Adults." Baby Makes Three: Social Scientific Research on Successfully Combining Marriage and Parenthood (seminar), Princeton, NJ, June 2010.

CCCU-SER-234

"Saving Marriage Before It Starts." Q Conference, Lyric Opera, Chicago, IL, April 2010.

"The Price of Sex in Contemporary Heterosexual Relationships." TEDxUT, The University of Texas at Austin, Austin, TX, April 2010.

"Love and Marriage in the Minds of Emerging Adults." Child Trends and Heritage Foundation, Washington, D.C., October 2009.

"Forbidden Fruit? Sex and Religious Faith in the Lives of Young Americans." Baylor University, Waco, TX, September 2007.

"Great Expectations: Culture, Emotion, and Disenchantment in the Sexual Worlds of Young Americans." Bay Area Colloquium on Population, Berkeley, CA, September 2007.

**CONFERENCE PRESENTATIONS**

"The Math Behind Declining Christian Marriage," Society for the Scientific Study of Religion, Las Vegas, NV, October 2018.

"Consent and the Presumption of the Exchange Theory of Relationship Behavior." Paper presented at the annual meeting of the American Political Science Association, Boston, MA, September 2018.

"Is There a Recession in Marriage among Western Christians?" Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Atlanta, GA, October 2016.

"Gender and Heterosexual Sex." Panel discussion at the annual meeting of the American Sociological Association, New York, NY, August 2013.

"The New Family Structures Study: Introduction and Initial Results." Paper presented at the annual meeting of the Population Association of America, San Francisco, CA, May 2012.

"Religious Distinctions in Nonmarital Romantic Relationship Formation" (with Ellyn Arevalo). Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Milwaukee, WI, October 2011.

"Premarital Sexual Initiation and Fertility among Pentecostal Adolescents in Brazil." Paper presented at the annual meeting of the Population Association of America, Washington, D.C., April 2011.

"Red Sex, Blue Sex: Distinguishing Political Culture and Religious Culture in the Sexual Decisions of Young Americans." Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Denver, CO, October 2009.

"Bare Market: Campus Sex Ratios and Romantic Relationships" (with Jeremy Uecker). Paper presented at the annual meeting of the Population Association of America, Detroit, MI, May 2009.

"Religion and Sexual Initiation in Brazil" (with Ana Paula Verona). Paper presented at the annual meeting of the Population Association of America, Detroit, MI, April 2009.

**ADVISING**

Ph.D. Committees in the Department of Sociology (Year Degree Awarded, * Co-Chair/Co-Supervisor, ** Chair/Supervisor)

CCCU-SER-235

2016    Jennifer McMorris
2015    Stanley Kasun
2015    Nina Palmo
2012    Nicolette Manglos **
2012    Catherine McNamee
2011    Charles Stokes
2010    Nicole Angotti **
2010    Georgina Martínez Canizales
2010    Viviana Salinas
2010    Jeremy Uecker **
2010    Ana Paula Verona
2008    Margaret Vaaler
2008    Sara Yeatman
2007    Amy Burdette *
2007    Bryan Shepherd
2007    Jenny Trinitapoli **
2007    Elisa Zhai

M.A. Committees in the Department of Sociology (Year Degree Awarded, * Co-Chair/Co-Supervisor, ** Chair/Supervisor)

2013    Ellyn Arevalo *
2012    Kristen Redford **
2011    David McClendon **
2010    Aida Ramos Wada
2008    Nicolette Manglos **
2007    Andrea Henderson
2006    Jeremy Uecker **

Undergraduate Thesis Supervision for Honors, Plan II, BDP (Year Degree Awarded, * Reader, ** Supervisor)

2019    Clarisa Trevino **
2014    Tiffany Fong *
2011    Mary Lingwall **
2008    Hong Nguyen **

Ph.D. Committees at other universities (Year Degree Awarded)

2018    Yana Mikhaylova, Higher School of Economics, Moscow

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Member, Executive Committee, Department of Sociology, 2012-2014

Member, Graduate Admissions Committee, Department of Sociology, 2012-2014

Member, Promotion and Tenure Committee, Department of Sociology, 2012-2014

10

CCCU-SER-236

Member, Undergraduate Research Award Selection Committee, College of Liberal Arts, 2010-2012

Guest presenter, Peer Educator Sexual Health courses, University Health Services, 2008-2012

Presenter, Orange Jackets' Week of Women, Tejas Club, Spring 2011

Moderator, Thesis Symposium, Plan II Honors Program, 2011

Member, Graduate Steering Committee, Department of Sociology, 2010-2011

Member, Promotion and Tenure Committee, Department of Sociology, 2010-2011

Member, Executive Committee, Department of Sociology, 2009-2011

Presenter, TEDxUT, The University of Texas at Austin, Spring 2010

Member, Governing Board, Population Research Center, 2009-2010

Member, Graduate Admissions Committee, Department of Sociology, 2009-2010

Presenter, Sexual Health Panel, Tejas Club, Fall 2009

Member, Graduate Steering Committee, Department of Sociology, 2007-2009

Participant and presenter, Faculty Fellows Program, The University of Texas at Austin, 2007-2009

Chair, Religion Faculty Search Committee, Department of Sociology, Fall 2008

Member, Population Junior Faculty Search Committee, Department of Sociology, Fall 2007

Member, Speaker Colloquium Committee, Department of Sociology, Fall 2007

**PROFESSIONAL SERVICE AND ORGANIZATIONAL MEMBERSHIP**

Co-organizer and session chair, *The Moynihan Report at 50: Reflections, Realities, and Prospects*.
Princeton University, Princeton, NJ, October 30-31, 2015

Distinguished Article Award Committee member, American Sociological Association (Religion Section),
2010-2011

- Committee chair, 2011

Editorial Board member, *Interdisciplinary Journal of Research on Religion*, 2005–2011

Editorial Board member, *Journal for the Scientific Study of Religion*, 2004–2011

Distinguished Article Award Committee member, Society for the Scientific Study of Religion, 2009-2010

- Committee chair, 2010

Nominating Committee member, Society for the Scientific Study of Religion, 2007-2009

Jack Shand Research Award Committee member, Society for the Scientific Study of Religion, 2005-2007

Council member, American Sociological Association (Religion Section), 2004-2007


Member of:

American Academy of Religion, 2017-2019
Population Association of America, 2004-2018
Society for the Scientific Study of Religion, 1996-present

Ad-hoc reviewer for:

*American Journal of Sociology*, *American Sociological Review*, *Archives of Sexual Behavior*, *Biodemography and Social Biology, Gender & Society, Interdisciplinary Journal of Research on Religion, International Journal of Environmental Research and Public Health, Journal for the Scientific Study of Religion, Journal of Adolescent Health, Journal of Behavioral Addictions, Journal of Family Issues, Journal of Health and Social Behavior, Journal of Homosexuality, Journal of Marriage and Family, Journal of Psychology and Christianity, Pediatrics, Perspectives on Psychological Science, Review of Religious Research, Social Forces, Social Problems, Social Psychology Quarterly, Social Science & Medicine, Social Science Quarterly, Social Science Research, Sociological Forum, Sociological Inquiry, The Sociological Quarterly,* National Institutes of Health (2007), National Science Foundation (2010, one review), Templeton Foundation (2012, 2019)

CCCU-SER-238

Psychology of Sexual Orientation and Gender Diversity
2016, Vol. 3, No. 2, 201–212
© 2016 American Psychological Association
2329-0382/16/$12.00    http://dx.doi.org/10.1037/sgd0000162

# Sexual Minority Students in Non-Affirming Religious Higher Education: Mental Health, Outness, and Identity

Joshua R. Wolff
Adler University

Heather L. Himes
Independent Practice, New York, New York

Sabrina D. Soares
Rhode Island College

Ellen Miller Kwon
Independent Practice, Pasadena, California

Sexual minority (SM) students are vulnerable to increased rates of psychological distress and harassment as a result of stigma and other forms of marginalization in the college environment. However, little research has been conducted on the experiences and psychological functioning among SMs who attend nonaffirming religiously affiliated universities (NARAUs) that enforce restrictive admission and conduct policies toward SM students, and/or view same-sex romantic expressions and identities as sinful. SM students ($N = 213$) attending NARAUs completed the Counseling Center Assessment of Psychological Symptoms (CCAPS), the Outness Inventory (OI), and the Lesbian, Gay and Bisexual Identity Scale (LGBIS). Results indicate that SM students who attend Mormon, Evangelical, and Nondenominational Christian NARAUs had more difficultly coming to terms with their sexual orientation than those in Catholic or Mainline Protestant schools. Furthermore, Mormon students reported significantly more incongruence between their sexual orientation and religious beliefs than other religious groups. Students who were involved with a Gay–Straight Alliance (GSA) had significantly less difficultly with their sexual orientation, less negative identities, and less religious incongruence than those students not involved with a GSA. More than 1 third (37%) reported being bullied or harassed at school because of their sexual orientation. Almost 1 in 5 (17%) reported a mental health professional had attempted to change their sexual orientation. Implications and recommendations for NARAU campus communities and counseling centers are discussed.

*Keywords:* gay, higher education, lesbian, religion, sexual minority

Sexual minorities[1] (SM; a term that encompasses lesbian, gay, bisexual, and queer/questioning [LGBQ] persons) can encounter unique challenges in the college environment, including verbal and sexual harassment, threats, and physical assaults (Rankin, Weber, Blumenfeld, & Frazer, 2010). More subtle forms of marginalization are often overlooked, including anti-LGBQ jokes or slurs, incivility and social rejection, limited access to SM role models, lack of inclusion of LGBQ topics in curriculum, insufficient support services, and poor overall campus climate (Meyer, Oullette, Haile, & McFarlane, 2011; Swim, Pearson, & Johnston, 2007; Woodford, Han, Craig, Lim, & Matney, 2014). Students who have multiple minority identities (e.g., a Black lesbian female) report even higher rates of victimization and marginalization from both SM and non-SM students (Rankin, 2005; Rankin et al., 2010).

SM students who feel marginalized on their campuses are more likely to conceal their identity to avoid harassment, intimidation, and/or being identified as a SM (Pachankis & Goldfried, 2006; Rankin, 2005). Concealment, harassment, and stigma are associated with feeling of isolation, emotional distress, cognitive preoccupation, negative self-esteem, disengagement from academic responsibilities, and lower GPA among SM college students (Pachankis, 2007; Smart & Wegner, 1999; Woodford & Kulick, 2015). Further, SM students are more likely to seek college counseling services, and report significantly higher amounts of depressive symptoms, social anxiety, and eating concerns than their heterosexual peers, particularly among SMs who are questioning

This article was published Online First February 22, 2016.

Joshua R. Wolff, Department of Psychology, Adler University; Heather L. Himes, Independent Practice, New York, New York; Sabrina D. Soares, Department of Psychology, Rhode Island College; Ellen Miller Kwon, Independent Practice, Pasadena, California.

The authors are grateful to the participants and individuals who helped advertise this study. We thank Janet Peters, Jennifer Losardo, and Ashley Fish for their help with study development, recruitment and advertising. We thank Maryka Biaggio for thoughtful comments on the preliminary phases of study development, and Lyuba Bobova for statistical consultation. We gratefully acknowledge the Rhode Island College Alumni Association and the Rhode Island College Association for grant funding of this project.

Correspondence concerning this article should be addressed to Joshua R. Wolff, Adler University, 17 North Dearborn Street, Chicago, IL 60602. E-mail: jwolff@adler.edu

[1] We did not include gender minorities (e.g., transgender, genderqueer persons) in most of this article because a majority of the studies reviewed and measures used (see Method section) were only standardized on sexual minority populations. Data on gender minority students were collected in a separate follow-up study.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

CCCU-SER-239

WOLFF, HIMES, SOARES, AND MILLER KWON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

their sexual orientation (Center for Collegiate Mental Health [CCMH], 2015a; Effrig, Maloch, McAleavey, Locke, & Bieschke, 2014; Maloch, Bieschke, McAleavey, & Locke, 2013; McAleavey, Castonguay, & Locke, 2011; Woodford et al., 2014). Given these disparities, it is unsurprising that past data indicate that SM students are up to 2.6 times more likely to attempt suicide than heterosexual peers (Kisch, Leino, & Silverman, 2005). Recent data suggest that perceived burdensomeness of sexual orientation may be a factor that mediates this increased risk among cisgender SM individuals (Silva, Chu, Monahan, & Joiner, 2015).

These challenges may influence SM students in disproportional ways than heterosexual peers, even at college campuses that promote inclusive and LGBQ-affirming environments (Rankin et al., 2010; Woodford et al., 2014). However, many unanswered questions remain about campus environments that are explicitly nonaffirming or rejecting toward SM students. In particular, almost no data exist on the experiences of SM students who attend nonaffirming religiously affiliated universities (NARAUs). *Affirming* describes religious communities and beliefs that fully welcome SM individuals to all levels of participation (e.g., church membership) and view nonheterosexual identities and relationships as normative (Barnes & Meyer, 2012; Lee, 2012). In contrast, *nonaffirming* religious perspectives and communities maintain that only heteronormative roles and relationships are morally acceptable. As such, the majority of same-sex romantic behaviors and gender nonconforming expressions are viewed as sinful and/or psychologically disordered (Barnes & Meyer, 2012; Lee, 2012). These faith communities often do not allow SM persons to become members, hold positions of leadership or employment, or participate in sacred traditions (e.g., communion; Hatzenbuehler, Pachankis, & Wolff, 2012). As a result, the purpose of this study is to examine the experiences, psychological functioning, sexual identity, and overall outness of SM students who attend NARAUs.

## Religion and Spirituality Among SM Individuals

Religion and spirituality play an important role in identity development and disclosure among SMs. In a sample of strongly religious Christian SM students at three religiously affiliated Evangelical universities, participants reported both positive and negative experiences following initial awareness of same-sex attraction including shame, guilt, fear about their families reaction, or being part of "[God's] diverse Kingdom" (Yarhouse, Stratton, Dean, & Brooke, 2009, p. 100). Only a small proportion had disclosed their sexual identities to family members, a youth pastor, or a teacher, yet more than half had disclosed to a friend. Furthermore, only 14% of the SM sample identified as "gay," and those who did not identify as gay reported greater confusion about their sexual identity. Other findings suggest that greater involvement in nonaffirming religious communities is associated with higher *internalized homophobia*—the extent that a person absorbs negative social and community sentiments toward LGB persons—among SMs (Barnes & Meyer, 2012).

Religion and religious community involvement can be important sources of social and emotional support that can be associated with positive health benefits and decreased psychiatric morbidity (Galek, Flannelly, Ellison, Silton, & Jankowski, 2015; Hamblin & Gross, 2014). Other benefits can include a sense of connection with a higher power to help resolve identity concerns, connection

to others who share similar values, and a general sense of love, hope, grace, forgiveness, support, encouragement, strength, and acceptance (Yarhouse et al., 2009). Additionally, those who experience dissonance with their sexual orientation may also see religion as a means of healing or correcting perceived sinful identities and/or sexual/romantic attractions (Yarhouse et al., 2009). Despite the potential benefits of religious involvement for SM individuals, significantly fewer LGB adults identify as religious when compared to heterosexual adults (Pew Research Center, 2015a).

Evidence remains mixed as to whether benefits associated with religion exist for SM individuals (Rodriguez, 2009; Rosario, Yali, Hunter, & Gwadz, 2006). To examine the ecological impact of religion on LGB youth, Hatzenbuehler, Pachankis, and Wolff (2012) conducted a population-based study of LGB youth in Oregon to assess whether denominational positions on homosexuality and gay rights were predictive of alcohol abuse and sexually transmitted infection (STI) risks (assessed via number of sexual partners). The authors found that LGB youth living in counties that had higher concentrations of nonaffirming faith communities had increased rates of alcohol abuse and more sexual partners than LGB youth who lived in counties with more affirming faith communities. The results remained significant even when controlling for other community factors (e.g., number of gay-straight-alliances in school) and were stronger among LGB youth when compared with a heterosexual control group. Among LGB adults, Meyer, Teylan, and Schwartz (2015) found that seeking treatment from a religious or spiritual advisor was associated with increased odds of attempting suicide, even when controlling for previous mental health diagnoses and multiple suicide attempts. Furthermore, individuals who experience dissonance between their religious beliefs and sexual orientation are often inclined to seek out sexual orientation change efforts (SOCE), such as reparative ("reorientation") therapies (Bradshaw, Dehlin, Crowell, Galliher, & Bradshaw, 2015; Jones & Yarhouse, 2011). Thus, seeking help from a religious resource may worsen health outcomes for many SMs.

A likely moderator that could explain the discrepancies found in the data could be whether faith communities are affirming or nonaffirming. Nonaffirming views are largely (though not always) consistent with official doctrine of faith communities that most Americans belong to: Evangelical Protestants (25.4% of all Americans), Catholics (20.8%), Mainline Protestants (14.7%), Jews (1.9%), and Mormon/LDS (1.6%; Pew Research Center, 2015a). Past studies are helpful to distinguish group differences, noting that Protestants and Catholic LGB adults report more conflict about their sexual orientation than those who are Jewish, atheist, or agnostic (Schuck & Liddle, 2001). A potentially important nuance is that some faiths and religious individuals emphasize same-sex behavior as sinful as opposed to sexual orientation or attraction alone (Rosik, Griffith, & Cruz, 2007). Of note, many SM individuals who perceive rejection from nonaffirming religious communities often leave their religious faith entirely, become spiritual but no longer religious, or reinterpret religious teaching and their own personal theology (Schuck & Liddle, 2001). Further, attending a nonaffirming church is associated with symptoms of anxiety in lesbian and gay adults (Hamblin & Gross, 2013). Nonaffirming communities may also contribute to the perception that one must be less open about their sexual orientation. In a study of Mormon

SEXUAL MINORITY STUDENTS                                                    203

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

adults who experienced same-sex attraction, participants who felt stigmatized by the Church of Jesus Christ of Latter-day Saints (LDS) reported greater concealment of their sexual orientation, which was positively associated with symptoms of anxiety and depression (Grigoriou, 2014).

## SM Student Experiences in Non-Affirming Religious Higher Education

NARAUs include colleges, universities, and seminaries that have a rich and important history of providing students with liberal arts education while also nurturing faith and spiritual development through theological integration, community worship, and a range of other religious activities on campus. Though lacking in recent data, previous estimates indicate that there are over 200 NARAUs in the United States that actively bar admission of openly SM students, maintain behavioral codes that prohibit same-sex romantic expression, and/or limit and prohibit student organizations that affirm SM identities (Soulforce, 2008). Many NARAU's do not hold behavioral policies on campus, yet adhere to teachings that reject SM identities or relationships (e.g., marriage should only be between one man and one woman). Among religious institutions and communities, there is a wide range of beliefs and practices regarding gender and sexuality issues. Further, many faith-leaders and individuals have called for greater compassion and grace toward members of the SM community (e.g., Donadio, 2013) or advocated for civil rights such as legalization of same-sex marriage (Jones, 2015), though such remarks are not always synonymous with full affirmation of SM identities or relationships.

To understand sexual identity and developmental milestones of SM students who attend NARAUs, Stratton, Dean, Yarhouse, and Lastoria (2013) sampled 247 SM students from 19 NARAUs. The authors operationalized SMs as individuals who experienced "same-sex attraction" (SSA), on the grounds that "persons in Christian colleges and universities who experience SSA but would not self-identify as gay, lesbian, bisexual" because of religious conflict with these terms (Yarhouse et al., 2009, p. 99). Results indicated that students who experienced moderate levels of SSA experienced significantly more confusion about their sexual identity than those with a high degree of SSA. Furthermore, the attitude toward one's sexual orientation was moderated by level of SSA, such that students with high amounts of SSA and low amounts of "opposite sex attraction" were less likely to view same-sex relationships and attractions as negative. Another important finding was that among students who reported SSA, an overwhelming majority (79%) still identified as heterosexual. The authors concluded that the decision to identify as heterosexual "may be associated with the influence of the campus culture, religious conviction, or personal choice, but it may also reflect a distinctive of those seeking to develop an identity that engages both the religious and the sexual" (Stratton et al., p. 19).

Data have also explored policies and behavioral standards that restrict LGBQ expressions and carry potential consequences at NARAUs. In a random sample of written student codes of conduct at 20 member institutions of the Council for Christian Colleges and Universities (primarily Evangelical schools), Wolff and Himes (2010) found the following consequences for LGBQ "behavior" (e.g., holding hands, kissing, or any other form of sexual expression): academic probation, mandatory psychological counseling,

on-campus restrictions/limitations of privileges, suspension, and dismissal/expulsion. Further, a flurry of recent media reports show that many NARAUs deny the use of campus space to LGBQ affirming student organizations or clubs, maintain hostile classroom and campus environments for SM students, and endorse SOCE (Eckholm, 2011; Hinch, 2013; Jaschik, 2013; Sieczkowski, 2014). A qualitative study at a Roman Catholic university provided concrete examples of hostilities and harassment on campus, noting that SM students received death threats, saw hate speech (e.g., "God Hates Fags") written on dorm room doors and bathrooms, and encountered other difficulties (Getz & Kirkley, 2006). A recent study at a Roman Catholic college in the Northeast found that half of SM and gender minority undergraduate students reported being harassed or bullied on campus, and that up to 16% experienced violence (Lockhart, 2013). However, students rarely report these incidents because of fears of not being taken seriously and/or treated with disrespect, having to out themselves in an unsupportive environment, and the perception that reporting will only make the situation worse (Lockhart). A majority of these students reported that they regretted coming out while attending that college and made considerable effort to conceal their sexual or gender identity on campus.

Such policies and campus climates create potential difficulties for students wishing to form LGBQ-affirming spaces. McEntarfer (2011) examined the approaches used and subsequent experiences of SM students attempting to create an affirming student group (e.g., Gay-Straight Alliance) at three NARAUs, and found four major strategies used: (a) collaborative (i.e., finding common ground with school administrators); (b) conciliatory (i.e., accepting restrictions of what can be done); (c) assertive (e.g., public, nonviolent protests and rejection of campus policies); and (d) underground/subversive (i.e., promoting change and advocacy via nonidentified students). Regardless of approach, students and allied faculty made diversity a core focus of their efforts, which required significant time and energy (often being stressful). Though some NARAU faculty and staff were visibly supportive of SM students in McEntarfer's study, other research portrays situations in which affirming faculty and staff are much less visible due to fears of job loss, career repercussions, or lack of training (Estanek, 1998; Getz & Kirkley, 2006).

An important limitation of the above research is that much of the current data do not capture more recent student experiences. Social attitudes toward LGBQ individuals and rights are rapidly shifting toward greater acceptance (Pew Research Center, 2015b). Evidence of increasing social acceptance of LGBQ individuals can even be found in traditionally nonaffirming faith communities, though to a much lesser extent (Pew Research Center, 2015c). Given the swiftly changing social trends toward LGBQ rights and the prevalence of nonaffirming faith communities in the United States, current research on the experiences of SM individuals who take part in religious higher education is needed.

## Current Study

No study to date (to the best of our knowledge) has attempted a quantitative investigation of the mental health and psychological functioning of SM students who attend NARAUs. Given the unique environment and potential challenges that SM students can experience in NARAUs, as well as increased media attention and

CCCU-SER-241

204                                    WOLFF, HIMES, SOARES, AND MILLER KWON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

student activism, this is an important and timely topic for further study. Our first aim was to assess the role of campus climate in regard to sexual identity, outness, and mental health (Rankin et al., 2010). SM individuals from nonaffirming faith communities may be more likely to experience rejection and harassment/bullying, and have difficulty forming a Gay–Straight Alliance (GSA) on campus (Lockhart, 2013; McEntarfer, 2011). As a result, we hypothesized:

> *Hypothesis 1:* Sexual minority students who are not involved with a GSA and/or have been bullied at school will be less open about their sexual orientation, have more negative views about their sexual orientation, experience more difficulty coming to terms with their sexual orientation, and experience greater psychological distress.

Data suggest that SM students are more likely to seek mental health services and experience significantly higher amounts of depressive symptoms, social anxiety, and eating concerns than heterosexual peers (Effrig et al., 2014; McAleavey, Castonguay, & Locke, 2011). Other studies indicate greater associations between SM status and general psychopathology and academic concerns (e.g., Woodford & Kulick, 2015). Hence, we hypothesized:

> *Hypothesis 2:* Sexual minority students who attend NARAUs will report psychological distress as evidenced by clinically elevated (high) symptoms of depression, social anxiety, and eating concerns, as well as moderately elevated symptoms of substance abuse, hostility, academic distress, and generalized anxiety.

Belonging to a nonaffirming religious faith may be a predictor of mental health symptoms for SMs who experience dissonance between their orientation/identity and religious beliefs, particularly for Mormons (Grigoriou, 2014). Further, explicit evidence exists that Evangelical NARAUs enforce consequences for SM relationships and expression (Wolff & Himes, 2010). Furthermore, many SM students at NARAUs choose not to disclose their SM status or outwardly identify as heterosexual (Stratton et al., 2013). However, no study to date (to the best of our knowledge) has investigated whether differences are found across different types of religious schools. As a result:

> *Hypothesis 3:* Sexual minority students who identify as Christian or Mormon, or attend an Evangelical or Mormon NARAU will have the most psychological distress, negative views about their sexual orientation, difficulty coming to terms with their sexual orientation, and be the least open about their sexual orientation.

## Method

### Participants

The sample consisted of 213 SM students currently enrolled in various NARAUs. Eligibility criteria were as follows: (a) currently attends a religious college, university, or seminary that holds a nonaffirming view of LGBQ topics and/or does not admit openly LGBQ students and/or prohibits expression of LGBQ identity; (b) identifies as LGBQ and/or is questioning sexual orientation; (c) is

18 years of age or older; and (d) lives in the United States. The exact number of NARAUs represented is unknown because the specific college attended was an optional question in the hope that participants would feel safer (and therefore be more honest) when answering questions. Participants attended NARAUs from all parts of the U.S. The majority of participants identified as White (83%), Christian (62%), undergraduates (78%), and identified as gay/lesbian (56%). The mean age of the sample was 22.5 years ($SD$ = 4.5). The Other Non-Christian (12%) category of personal religion included non-Christian faiths with less than 10 respondents (e.g., Muslim, Jewish, Bahai'i). Mainline Protestant schools (14%) included Lutheran, Presbyterian and Methodist. Other Christian schools (16%) included those that participants did not endorse any of the nominal categories we provided, wrote in their own responses, and had fewer than 10 responses (e.g., Church of Christ, Mennonite, and Quaker). We intentionally allowed individuals who were questioning ($n$ = 11) their sexual orientation to participate even if they did not identify as LGBQ, given that not all SMs use or feel comfortable with LGBQ labels (Yarhouse et al., 2009). We also decided to keep heterosexual-identified ($n$ = 7) students in our analyses in light of data that some highly religious SMs still identify as heterosexual because of potential stigma or congruence with religious beliefs (Stratton et al., 2013), an inherent limitation in SM research (Hamblin & Gross, 2014). Demographics are reported in Table 1.

Table 1
*Sample Demographics (N = 213)*

| Characteristic | $n$ (%) |
| --- | --- |
| Gender | |
| Male | 91 (43) |
| Female | 109 (51) |
| Transgender/other | 12 (6) |
| Ethnicity | |
| Latino/a | 18 (8) |
| Caucasian | 177 (83) |
| Black | 7 (3) |
| Asian/Pacific Islander | 1 (.5) |
| Other | 11 (.5) |
| Current religion | |
| Christian | 133 (62) |
| Agnostic | 27 (13) |
| Atheist | 14 (7) |
| Mormon (LDS) | 14 (7) |
| Other non-Christian | 26 (12) |
| Class standing | |
| Undergraduate | 155 (72) |
| Grad Student | 59 (28) |
| School religious affiliation | |
| Catholic | 60 (28) |
| Mainline Protestant | 30 (14) |
| Evangelical | 28 (13) |
| Non-denominational | 43 (20) |
| Mormon (LDS) | 16 (8) |
| Other Christian | 35 (16) |
| Sexual orientation | |
| Gay or lesbian | 119 (56) |
| Heterosexual | 7 (3) |
| Bisexual | 51 (24) |
| Questioning | 11 (5) |
| Other | 26 (12) |

SEXUAL MINORITY STUDENTS                                                              205

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Procedures

Data were collected online using a secure platform. Participants were recruited through nonrandom purposive sampling techniques via paid social media and newspaper advertisements, e-mailing SM and religious organizations, professional list-serves and colleagues, and contacting SM student groups at religious colleges. This sampling method was similar to other studies that have recruited often difficult to access SM individuals in nonaffirming environments (Grigoriou, 2014). We questioned whether or not to approach NARAU administrators or staff directly to help with recruitment, but were skeptical that we would receive their support given the potential for the results to portray NARAUs negatively, or whether SM students would answer as openly knowing that their school had approved the study. Recruitment messages also stated the opportunity to be entered into a drawing to win one of four small gift cards to increase participation. Participants completed the measures described below.

## Measures

**Lesbian, Gay and Bisexual Identity Scale (LGBIS).** The LGBIS measures both internalized and externalized homonegativity, and how these constructs affect LGB individuals' sexual identity formation (Mohr & Fassinger, 2000). Using a 7-point Likert scale, participants respond to questions about various LGB identity experiences by selecting from 1 (*disagree strongly*) to 7 (*agree strongly*). The LGBIS consists of several subscales (e.g., Identity Confusion, Difficult Process, Need for Acceptance) and one composite score, "Negative Identity." Participants completed the entire LGBIS. However, we only included the Difficult Process subscale (e.g., "admitting to myself that I'm an LGB person has been a very painful process") and composite score in the results as these most pertained to our research hypotheses. For additional analysis, we created a "Religious Incongruence" subscale that included two items ("I'll never be fully accepted by God if I'm in a same-sex relationship," and "I can't be true to my faith and be in a same-sex relationship at the same time"). The subscale demonstrated a modest relationship with the Negative Identity composite scale, $r = .420$, $p < .01$, suggesting concurrent validity yet also distinctness. The interitem correlation was moderate, $r = .565$, $p < .001$, and demonstrated acceptable internal consistency (Cronbach's alpha = .722). This subscale was not included in the composite score.

**Outness Inventory (OI).** The OI focuses on degree of openness ("outness") regarding one's sexual orientation to family, religious community (e.g., rabbi, priest), and employers (Mohr & Fassinger, 2000). The OI is based on the theoretical assumption that LGB individuals will determine their level of outness depending on how accepting they perceive others in their life to be regarding sexual orientation topics. Using a 7-point Likert scale, participants select their response from options ranging from 1 (*the person definitely does NOT know about your sexual orientation status*) to 7 (*the person definitely knows about your sexual orientation status, and it is OPENLY talked about*). The OI contains an "Overall Outness" composite score. For additional analysis, we created an "Out to College" subscale that included items relevant to roommate, professor/faculty, and classmate disclosure. The subscale demonstrated a modest relationship with the Overall Outness scale, $r = .671$, $p < .001$, suggesting concurrent validity

yet also distinctness. Interitem correlations on the Out to College subscale were all moderately positive, $r = .335–.585$, $p < .001$, and demonstrated acceptable internal consistency (Cronbach's alpha = .732). The college subscale was not included in the Overall Outness composite score.

**Counseling Center Assessment of Psychological Symptoms (CCAPS).** The CCAPS is standardized 62-item instrument that assesses mental health symptoms in college students (CCMH, 2015b). The instrument is widely used among students who are obtaining services at college counseling centers (CCMH, 2015b; McAleavey et al., 2012). The CCAPS has been widely validated, has a large standardization sample, and shows moderate to strong concurrent validity with related measures: Beck Depression Inventory & CCAPS Depression subscale, $r = .82$, Eating Attitudes Test-26 & Eating Concerns subscale, $r = .58$, Social Phobia Diagnostic Questionnaire & Social Anxiety subscale, $r = .75$ (McAleavey et al., 2012). Participants indicate how well various statements describe them during the past two weeks on a 0–4 Likert scale (e.g., $0 = $ *not at all like me* to $4 = $ *extremely like me*). The CCAPS consists of several subscales that maintain strong internal consistencies: (a) Depression ($\alpha = .91$), (b) Social Anxiety ($\alpha = .84$), and (c) Eating Concerns ($\alpha = .90$), among others. These three subscales appear to be most relevant to SM students (Effrig et al., 2014; McAleavey, Castonguay, & Locke, 2011). The CCAPS also contains a composite Distress Index, but this was not included due to strong overlap with the Depression subscale in our sample ($r = .93$).

The CCAPS provides numeric "cut points" which are helpful in determining symptom severity (low, moderate, & high) and also provide an estimate of whether individuals are most likely to resemble a clinical (i.e., in treatment) or a nonclinical level of psychological distress (CCMH, 2015b, p. 14). Cut points were validated by comparing college students in treatment, not in treatment, and those in treatment who also met *DSM–IV–TR* diagnostic criteria for more severe psychopathology (McAleavey et al., 2012). Hence, individuals who surpass the cut points (whether moderate or high) are more likely to be experiencing symptoms that are "potentially problematic" (p. 14).

**Experiential and demographic questions.** We also collected data on a range of campus-related experiences and involvement with a gay-straight alliance (GSA). Participants were asked to check whether each of the experiences listed had happened to them or not, and to indicate GSA involvement (yes/no). These items are presented in Table 2.

## Statistical Analyses

To test the first hypotheses about campus experiences and climate, GSA involvement and bullying because of sexual orien-

Table 2
*Student Experiences and Campus Climate (N = 213)*

| Experience | n (%) |
|---|---|
| Involved with a Gay–Straight Alliance that is part of the school | 95 (45) |
| Bullied or harassed at school because of sexual orientation | 78 (37) |
| Mental health professional attempted to change sexual orientation | 36 (17) |
| Mental health professional affirmed LGB sexual orientation | 101 (47) |

206                                    WOLFF, HIMES, SOARES, AND MILLER KWON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

tation were used as categorical (independent) variables, with dependent variables consisting of subscales on the OI (Out to College, Overall Outness), LGBIS (Negative Identity, Difficult Process, Religious Incongruence), and the CCAPS (Depression, Social Anxiety, Eating Concerns). Differences were analyzed using Factorial MANCOVA to control Type I error rates. We used age of participant as a covariate on the first hypothesis only, because older participants may have had more time to acquire campus experiences (bullying, involvement with GSA). Means and standard deviations for all of the CCAPS subscales were calculated and compared with clinical cut points provided by the CCAPS manual to test the second hypothesis using a descriptive comparison. To test the third hypothesis, categorical differences in the dependent variables (Overall Outness, Out to College, Negative Identity, Religious Incongruence, Depression, Social Anxiety, and Eating Concerns) were analyzed using one-way MANOVA with LSD post hoc comparison for each of the independent variables (School Affiliation and Participant Religion). We ran two separate one-way MANOVAs, rather than one Factorial MANOVA, because of inadequate sample sizes in some categories needed to test for interactions.

## Results

To test the first hypothesis, categorical differences on the CCAPS, LGBIS, and OI scales were analyzed by campus climate variables (involvement with a GSA and bullying because of sexual orientation), while controlling for age as a covariate. Box's Test of Equality was significant, Box's $M = 149.16$, $p < .05$, hence unequal variance was assumed using Pillai's trace. Factorial MANCOVA results revealed significant main effects for age, trace $= .127$, $F(8, 179) = 3.261$, $\eta^2 = .127$, $p < .01$, involvement with a GSA, trace $= .142$, $F(8, 179) = 3.711$, $\eta^2 = .142$, $p < .001$, and bullying, trace $= .138$, $F(8, 179) = 3.587$, $\eta^2 = .138$, $p < .01$. An interaction was not significant for bullying $\times$ GSA involvement, trace $= .039$, $F(8, 179) = .914$, $\eta^2 = .039$, $p > .05$. Between-subjects ANCOVAs were calculated as follow-up to the MANCOVA model. Marginal means, standard errors, $F$ values, and effect sizes are presented in Table 3. The age covariate was significant for Out to College, $F(1, 191) = 19.392$, $\eta^2 = .094$, $p < .001$, and Overall Outness, $F(1, 191) = 7.457$, $\eta^2 = .039$, $p < .01$, suggesting that group differences are attributable to age on these scales. Main effects in GSA involvement were found for the Difficult Process, Negative Identity, and Religious Incongruence subscales, indicating that students involved with a GSA had less negative identities, less difficulty with their sexual orientation, and less religious incongruence. A main effect for bullying was found on the Depression subscale, such that students who were bullied because of their sexual orientation at school reported higher levels of depressive symptoms.

To test the second hypothesis, sample means and standard deviations were compared with clinical "cut points" established by the CCAPS manual (CCMH, 2015b). All of the means surpassed the cut point for "moderate" criteria, suggesting that our sample demonstrated a greater likelihood of potential clinical concerns. None of the means surpassed the cut points for "high" clinical concerns. Results are summarized in Table 4.

Regarding the third hypothesis, categorical differences on the Depression, Social Anxiety, Eating Concerns, Negative Identity, Difficult Process, Religious Incongruence, Overall Outness, and

Table 3
*Campus Variables: MANCOVA Model Results (Age as Covariate)*

| Measure | LGBIS | | | OI | | CCAPS | | |
|---|---|---|---|---|---|---|---|---|
| Composite or subscale | Difficult process | Negative identity | Religious incongruence[a] | Overall outness | Out to college[a] | Depression | Social anxiety | Eating concerns |
| **Involved with GSA at school** | $F(\eta^2) = 18.03\,(.09)^{***}$ | $F(\eta^2) = 21.43\,(.10)^{***}$ | $F(\eta^2) = 5.05\,(.03)^{*}$ | $F(\eta^2) = 4.04\,(.02)$ | $F(\eta^2) = 11.34\,(.06)$ | $F(\eta^2) = 3.25\,(.02)$ | $F(\eta^2) = 1.51\,(.01)$ | $F(\eta^2) = 2.92\,(.02)$ |
| Yes, M (SE) | 4.07 (.17) | 3.52 (.12) | 2.23 (.21) | 4.05 (.13) | 4.81 (.21) | 1.35 (.11) | 1.78 (.12) | 1.10 (.11) |
| No, M (SE) | 5.00 (.14) | 4.27 (.10) | 2.85 (.17) | 3.59 (.14) | 3.89 (.17) | 1.62 (.09) | 1.97 (.10) | 1.36 (.10) |
| **Bullied or harassed at school due to sexual orientation** | $F(\eta^2) = .67\,(.00)$ | $F(\eta^2) = .73\,(.00)$ | $F(\eta^2) = .35\,(.00)$ | $F(\eta^2) = 12.96\,(.07)$ | $F(\eta^2) = 8.54\,(.04)$ | $F(\eta^2) = 4.23\,(.02)^{*}$ | $F(\eta^2) = .10\,(.00)$ | $F(\eta^2) = .15\,(.00)$ |
| Yes, M (SE) | 4.45 (.17) | 3.83 (.13) | 2.46 (.21) | 4.21 (.18) | 4.74 (.21) | 1.63 (.11) | 1.90 (.12) | 1.20 (.12) |
| No, M (SE) | 4.62 (.13) | 3.97 (.09) | 2.62 (.16) | 3.42 (.13) | 3.96 (.16) | 1.34 (.08) | 1.85 (.09) | 1.26 (.09) |

*Note.* Higher scores on the LGBIS indicate a more negative view of one's sexual identity. Higher scores on the OI indicate greater amount of openness about sexual orientation. Higher scores on the CCAPS indicate greater levels of psychological distress.
[a] Experimental subscales. Not included in the composite variables.
$^{*} p < .05.$ $^{***} p < .001.$

SEXUAL MINORITY STUDENTS                                                        207

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 4
*CCAPS Risk & Severity Indicators*

| Subscale | M (SD) | Cut point classification | Clinical interpretation |
|---|---|---|---|
| Depression | 1.48 (.93) | Moderate | Potentially problematic |
| Substance use | .77 (.86) | Moderate | Potentially problematic |
| Generalized anxiety | 1.67 (1.00) | Moderate | Potentially problematic |
| Social anxiety | 1.88 (.95) | Moderate | Potentially problematic |
| Eating concerns | 1.26 (.95) | Moderate | Potentially problematic |
| Academic distress | 1.54 (.97) | Moderate | Potentially problematic |
| Hostility | 1.07 (.95) | Moderate | Potentially problematic |
| Family distress | 1.62 (.99) | Moderate | Potentially problematic |
| Distress index | 1.60 (.89) | Moderate | Potentially problematic |

*Note.* Means classified as Low, Moderate, or High per clinical cutoffs. Scores in the Moderate or High category can be "potentially problematic" (CCMH, 2015b).

Out to College scales were analyzed by school religious affiliation and participant religion. The independent variables were analyzed separately because we did not have sufficient sample sizes to test for interactions. Box's Test of Equality was significant, Box's $M = 253.74$, $p < .05$, hence unequal variance was assumed using Pillai's trace for school affiliation. Box's Test of Equality was not significant, Box's $M = 181.47$, $p = .44$, hence equal variance was assumed using Wilk's $\Lambda$ criteria for participant religion. MANOVA results revealed significant main effects for both participant religion, Wilk's $\Lambda = .646$, $F(32, 680) = 2.669$, $\eta^2 = .103$, $p < .001$ and school religious affiliation, trace $= .422$, $F(40, 930) = 2.142$, $\eta^2 = .084$, $p < .001$.

Between-subjects ANOVAs were calculated as follow-up to the MANOVA model. Marginal means, standard errors, *F* values, and effect sizes are presented in Table 5.

For the School Affiliation variable, differences were significant for Difficult Process, Negative Identity, Religious Incongruence, Depression, and Social Anxiety, but not for Overall Outness, Outness to College, or Eating Concerns. Post hoc analyses revealed that SM students who attend Nondenominational, Evangelical, and Mormon NARAUs had significantly more difficult sexual identity processes than students in Catholic and Mainline Protestant schools. SM students attending Other Christian schools also had more difficult processes than those in Catholic NARAUs. SM students in Nondenominational and Mormon NARAUs reported more negative sexual identities than students in Catholic NARAUs. SM students who attend Mormon NARAUs endorsed significantly higher levels of religious incongruence about their sexual orientation than students who attended all other types of NARAUs. Students who attended Other Christian programs reported significantly fewer symptoms of depression and social anxiety than students at Catholic, Mainline Protestant, and Mormon NARAUs.

For the Participant Religion variable, between-subjects ANOVA revealed that differences were significant for the Difficult Process, Negative Identity, and Religious Incongruence scales, but not the other variables. Post hoc analyses revealed that Mormon students reported a more difficult process and negative sexual identity than students who identified as Atheist, Agnostic, or Other Non-Christian. Likewise, Christian students reported a more difficult process and negative sexual identity than students who attended Agnostic and Other

Table 5
*Religion Variables: MANOVA Model Results*

| Measure | LGBIS | | | OI | | | CCAPS | | |
|---|---|---|---|---|---|---|---|---|---|
| Composite or subscale | Difficult process | Negative identity | Religious incongruence[a] | Overall outness | Out to college[a] | Depression | Social anxiety | Eating concerns |
| **Participant religion** | $F(\eta^2) = 6.52(.12)^{***}$ | $F(\eta^2) = 5.26(.10)^{***}$ | $F(\eta^2) = 8.15(.15)^{***}$ | $F(\eta^2) = 1.62(.03)$ | $F(\eta^2) = 1.49(.03)$ | $F(\eta^2) = .38(.01)$ | $F(\eta^2) = .83(.02)$ | $F(\eta^2) = .56(.01)$ |
| Christian, M (SE) | 4.86 (.12) | 4.15 (.09) | 2.39 (.15) | 3.59 (.14) | 4.14 (.16) | 1.44 (.09) | 1.82 (.09) | 1.29 (.09) |
| Agnostic, M (SE) | 4.22 (.28) | 3.59 (.21) | 2.89 (.34) | 3.42 (.31) | 4.05 (.38) | 1.40 (.20) | 2.08 (.20) | 1.31 (.20) |
| Atheist, M (SE) | 4.29 (.38) | 3.66 (.28) | 2.50 (.45) | 4.38 (.41) | 4.39 (.51) | 1.47 (.26) | 1.97 (.26) | .88 (.27) |
| Mormon (LDS), M (SE) | 5.46 (.36) | 4.60 (.27) | 4.89 (.43) | 3.33 (.39) | 3.43 (.49) | 1.65 (.25) | 2.19 (.26) | 1.24 (.26) |
| Other non-Christian, M (SE) | 3.56 (.28) | 3.37 (.21) | 2.13 (.39) | 4.07 (.31) | 4.86 (.38) | 1.60 (.20) | 1.79 (.20) | 1.27 (.20) |
| **School affiliation** | $F(\eta^2) = 5.14(.12)^{***}$ | $F(\eta^2) = 3.09(.08)^{*}$ | $F(\eta^2) = 6.75(.15)^{***}$ | $F(\eta^2) = .74(.02)$ | $F(\eta^2) = 1.12(.03)$ | $F(\eta^2) = 2.36(.06)^{*}$ | $F(\eta^2) = 2.35(.06)^{*}$ | $F(\eta^2) = 1.54(.04)$ |
| Catholic, M (SE) | 4.03 (.19) | 3.59 (.14) | 2.19 (.22) | 3.76 (.20) | 4.49 (.25) | 1.58 (.13) | 1.91 (.13) | 1.35 (.13) |
| Mainline Protestant, M (SE) | 4.26 (.25) | 4.01 (.19) | 2.66 (.30) | 3.61 (.28) | 4.20 (.34) | 1.74 (.17) | 2.18 (.17) | 1.54 (.18) |
| Evangelical, M (SE) | 5.06 (.26) | 4.06 (.20) | 2.23 (.31) | 3.59 (.28) | 4.39 (.35) | 1.34 (.18) | 1.72 (.18) | 1.01 (.18) |
| Nondenominational, M (SE) | 5.22 (.23) | 4.35 (.18) | 2.71 (.27) | 3.28 (.25) | 3.66 (.31) | 1.42 (.15) | 1.87 (.16) | 1.28 (.16) |
| Mormon (LDS), M (SE) | 5.28 (.34) | 4.45 (.26) | 4.75 (.41) | 3.58 (.37) | 3.80 (.46) | 1.75 (.23) | 2.23 (.23) | 1.31 (.24) |
| Other Christian, M (SE) | 4.64 (.24) | 3.92 (.18) | 2.36 (.29) | 3.74 (.26) | 4.20 (.32) | 1.06 (.16) | 1.49 (.16) | .98 (.17) |

*Note.* Higher scores on the LGBIS indicate a more negative view of one's sexual identity. Higher scores on the OI indicate greater amount of openness about sexual orientation. Higher scores on the CCAPS indicate greater levels of psychological distress.
[a] Experimental subscales. Not included in the composite variables.
$^* p < .05$.   $^{***} p < .001$.

208                                          WOLFF, HIMES, SOARES, AND MILLER KWON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Non-Christians. Finally, Mormon SM students endorsed significantly higher levels of religious incongruence about their sexual orientation than all of the other groups.

Supplementary frequency data was collected on the experimental OI "Out to College" subscale. 54% of SM students reported that they have talked about their sexual orientation with a professor or faculty member at least once, 51% have talked about their sexual orientation with a classmate or peer at least one time, and 69% of students who have a roommate have talked about their sexual orientation with their roommate at least once (more than half report that they talk about it openly with their roommate).

## Discussion

Our findings present a complex picture of SM student experiences, sexual identity, outness, and psychological functioning at NARAUs in the United States. We stress that NARAUs are a very diverse group of institutions, and therefore conclusions and results may not apply to all NARAUs.

Our first hypothesis was partially supported in that SM student involvement with a GSA on campus was associated with a more positive view of their sexual identity, less religious incongruence, and less difficulty with their sexual orientation than students not involved with a GSA. This finding is not surprising considering students who know other SM students would have less stigma or shame about their sexual orientation if they know they are not alone, have a place to discuss concerns, and form peer relationships. Another consideration is that NARAUs who allowed a GSA to form on campus may already be more welcoming (or at least less restrictive) campuses to SMs, hence these results may be explained by the campus climate rather than the involvement with a GSA. A possible limitation is selection bias, in which students who join GSA's may already be more socially adept, have less stigma about their sexual orientation, and perhaps have greater baseline wellbeing.

With regard to bullying, our hypothesis was again partially supported in that students who were bullied at school because of their sexual orientation reported more symptoms of depression. Contrary to our expectations, no differences were found on the other variables (social anxiety, negative identity, and outness). Rankin et al.'s 2010 national survey of LGBTQ college students found that 23% of LGBTQ students experienced bullying or harassment on campus, whereas this was even higher among our sample (37%). A possible explanation is that stigma associated with reporting sexual orientation harassment, as well as lack of clear protections for SM students, contribute to this discrepancy at NARAUs, a finding consistent with another study at a Catholic NARAU (Lockhart, 2013). As a result, it is likely that more harassment and bullying of SM students occur at NARAUs, a finding which warrants both concern and further study.

Our second hypothesis aimed to understand whether our SM sample demonstrated potential clinical concerns on a range of mental health indicators; this portion of the hypothesis was supported. All of the subscales on the CCAPS were above the "moderate" cut point, suggesting that SM students in our sample who attend NARAUs are at-risk for potentially significant concerns that could become the focus of clinical attention. However, our hypothesis that students would have elevated ("high") scores on the Depression, Social Anxiety, and Eating Concerns subscales was not supported. This is not to say that

these subscales could not be a clinically significant concern. Yet for our sample as a whole, these symptoms did not rise to the diagnostic threshold for serious psychiatric pathology. We did not assess for whether participants were currently in counseling services, though it would not be surprising if many were because there is evidence that SMs seek out counseling services at higher rates than their heterosexual peers (McAleavey, Castonguay, & Locke, 2011). A self-selection bias could have existed in that SM adults experiencing distress may have been more interested and willing to participate in a study that asked them about those experiences that are associated with distress (Grasser, 2014).

With regard to mental health symptoms, our third hypotheses was partially supported for Mormons, but not Evangelicals. Students who attended Other Christian schools reported significantly fewer symptoms of depression and social anxiety than students at Catholic, Mainline Protestant, and Mormon NARAUs. We did not find any significant differences for personal religion on any of the CCAPS subscales. This is a difficult finding to interpret, given the range of Other Christian affiliations reported (e.g., Mennonite, Quaker, and Church of God). A possible explanation for why Evangelical students did not report more depressive symptoms and social anxiety than those in other schools could be that students who find nonaffirming theological positions and environments congruent with their religious beliefs would likely not be distressed by them (e.g., a student who believes being gay is sinful would not be distressed by a school code of conduct that supports this position). Also, religion may offer a substantial amount of comfort and source of community to many SM individuals who find incongruence with their sexual orientation and their faith (Yarhouse et al., 2009).

With regard to sexual identity and religious incongruence, our hypothesis was largely supported for Mormons, but only partially for Evangelicals. Results indicated that SM students who attend Nondenominational, Evangelical, and Mormon NARAUs had significantly more difficult sexual identity processes than students in Catholic and Mainline Protestant schools, and that SM students attending Other Christian schools had more difficult processes than those in Catholic NARAUs. SM students in Nondenominational and Mormon NARAUs reported more negative sexual identities than students in Catholic NARAUs. Though we did not ascertain the exact theological positions of all of the nondenominational schools, it is likely that many of these programs strongly resemble Evangelical Christian programs. For example, three of the most well-known Evangelical colleges in the U.S. (Wheaton College, Biola University, & Regent University) could be considered nondenominational because they are not affiliated with a specific church. Parallel results indicated that both Mormon and Christian students reported a more difficult process and negative sexual identity than students who identified as Agnostic or Other Non-Christian. These results are consistent with past research in that Protestants (including Evangelicals) and Catholic LGB adults report more conflict about their sexual orientation than those who are Jewish, Atheist, or Agnostic (Schuck & Liddle, 2001).

Our results appear to cast Catholic schools in a different light in comparison with most of the other schools with regard to SM identities and difficulty with one's sexual orientation. We theorize that Catholic schools are different from many of the other NARAUs we assessed because, although Church doctrine may officially condemn LGB relationships, we did not find evidence that they explicitly ban

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

SM students from forming same-sex relationships or attending their schools, unlike many Evangelical, Nondenominational, and Mormon schools (Biaggio, 2014; Lyon, 2007; Wolff & Himes, 2010). Furthermore, without such a ban in place, more Catholic schools may allow GSAs and other SM-themed activities on campus than more restrictive NARAUs. However, data about the exact policies at each school were not collected. Further, a selection bias is again possible in that SM students may choose to attend a school that is less restrictive, hence potentially inflating baseline wellbeing or openness.

A somewhat surprising result was that students who identified as Mormon/LDS or attend Mormon schools were more likely to report incongruence between their sexual orientation and religious faith than all of the other groups. Hence, Mormon students and college environments appear to be unique. This finding may be important to understand in terms of the LDS church's stance on SM issues. For instance, sexual activity between members of the same-sex is grounds for excommunication within the LDS church, a serious consequence (Grigoriou, 2014). Excommunication involves no longer having church membership, ostracism from loved ones, and the belief that the excommunicated individual will be separated from God and family members for eternity (Public Broadcasting System, April, 2007). As such, Mormon students may hold to nonaffirming religious beliefs in especially strong ways in light of severe consequences for violating strict heteronormative rules. Our findings should be interpreted with caution as we did not have many Mormon participants ($n = 16$). However, a much larger study of 634 Mormons supports these conclusions; recent data indicate that sexual identity confusion is correlated with symptoms of depression for SM Mormons, and greater involvement with the LDS church is associated with increased minority stress for SMs (Crowell, Galliher, Dehlin, & Bradshaw, 2015).

Contrary to our third hypothesis, we did not find any differences in students' outness about their sexual orientation across participants' religion or school affiliations. We question whether an individual's perception of openness may be meditated by the presence of having a few individuals they could talk to openly about their orientation regardless of the actual campus environment. This may be supported by our frequency data; more than half of our sample reported having talked to a faculty member or classmate about their sexual orientation, whereas more than two thirds have talked to a roommate. Given the stigma surrounding LGBQ topics on many campuses, it seems reasonable to assume that SM students would not disclose such information unless they felt comfortable sharing it, hence pointing to the likelihood of supportive faculty members, peers, and roommates. However, we did not assess the individual's reactions to their disclosures, and the possibility exists that such disclosures may have been more harmful than helpful if the person reacted in a negative or rejecting manner.

## Helping Sexual Minority Students on Religious Campuses

Our results indicate that involvement with a school GSA was associated with less negative perceptions of sexual identity, less difficulty with one's sexual orientation, and less religious incongruence. As such, allowing students to form GSAs would appear to have potential benefits. However, this could have potential drawbacks in NARAUs as well, given that school administrators may wish to control or monitor content, membership, and so forth. Furthermore, more than a third of students reported being bullied because of their

sexual orientation at school. Rankin and colleagues' 2010 Campus Pride report lays a comprehensive framework for best practices to improve campus climate for SM students, which could in turn reduce bullying and harassment on campus. Steps include: (a) developing LGBTQ inclusive policies; (b) demonstrating institutional commitment to LGBTQ diversity; (c) integrating LGBTQ topics and concerns into curricular and cocurricular education; (d) responding appropriately to anti-LGBTQ harassment, violence, and other incidents; (e) creating "brave spaces" for student dialogue on-campus, especially in dormitories (p. 16); (f) offering comprehensive, culturally appropriate medical and mental health services; and (g) improving recruitment and retention efforts of LGBTQ students. We recognize that several of these recommendations are more difficult to implement than others, though this does not excuse lack of effort to safeguard SM students.

Wolff and Himes (2010) note that NARAUs can improve campus climate for SM students in manners that are consistent with their institutional religious values. For example, most NARAUs have mission statements that strive for virtues such as love, grace, or compassion (e.g., "love thy neighbor"). Furthermore, many NARAUs pride themselves on creating campus climates that allow for spiritual growth through fellowship and community with others. This is a unique and important strength NARAUs possess that could be further enhanced to support SM students who wish to openly discuss their sexual orientation with others. Of note, some Evangelical NARAUs campuses have taken small but important strides to better support this kind of dialogue. For example, Biola University (2014) held an event featuring a gay speaker whose views did not align with the university's official theological position. Given that our results point to higher religious incongruence and difficult processes among Mormon students, similar dialogue could be helpful at Mormon/LDS schools if it were to feature differing perspectives of LGBQ Mormons.

Some NARAUs have made more systemic changes to make campus environments much more welcoming to SM students. Steps include adding sexual orientation as a protected class to antiharassment policies, starting focus groups on campus, and providing administrative support for educational programs and staff training on LGBTQ topics (Getz & Kirkley, 2006). Limited outcome data exist on the benefits of such programming, but suggest increased awareness of social and cultural identity for all students, improved confidence among faculty/staff/students to be resources for SM students, and greater sensitivity and compassion toward SM individuals across the campus community (Getz & Kirkley, 2006). Also, a study of primarily heterosexual Evangelical Christian college students found that when students know someone who is LGB, they have significantly less negative attitudes toward LGB persons (Wolff, Himes, Miller Kwon, & Bollinger, 2012). Therefore, having open, nonjudgmental, and nonpunitive dialogue on campus is likely to have many benefits to students, faculty, staff, and positively affect campus climates. Findings from Eisenberg (2002) on condom use among LGB students on college campuses may have useful parallels to these implications. The study found that the more LGB resources on campus (e.g., having a LGB student group, staff who were implementing LGB diversity, etc.), the more likely sexually active LGB students were to use condoms. Such results are important in that improving campus climate for SM students as a whole may have many other benefits in addition to mental health.

WOLFF, HIMES, SOARES, AND MILLER KWON

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

**Implications for College Counseling Centers**

Findings revealed that nearly a fifth of students (17%) have had a mental health professional attempt to change their sexual orientation, a process referred to as reparative/conversion therapy or sexual orientation change efforts (SOCEs). Of note, we did not assess whether SOCEs occurred on-campus or with an outside provider. However, it seems reasonable to infer that a sizable portion of these respondents have received such services at a university/college counseling center given their ease of access and affordability, or been referred off-campus if these services were not available on-campus.

These findings raise significant concerns. In 2009, a task force of the American Psychological Association concluded that "efforts to change sexual orientation are unlikely to be successful and involve some risk of harm" and are most likely to be sought out by those who are "strongly religious" (American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009, p. v). Furthermore, the American Psychiatric Association declared that SOCEs "represent a significant risk of harm by subjecting individuals to forms of treatment which have not been scientifically validated and by undermining self-esteem when sexual orientation fails to change" (American Psychological Association, 2013). Some SM students, particularly those who experience strong dissonance between their sexual orientation and religious beliefs, may come to counseling with the stated desire for SOCE. As a result, significant staff training is needed in models of psychotherapy that are exceptionally focused on encouraging self-determination, sensitive to religion/spirituality, embrace a developmental view of sexual and gender identity, and have safeguards to protect students from therapist bias and potentially harmful practices.

**Limitations & Future Directions**

External validity may be limited by the nonrandom purposive sampling approach and relatively small sample, though a range of NARAUs were included. Another limitation of this study was the small number of racial/ethnic minority participants, as well as those from non-Christian religious traditions. However, NARAUs are overwhelmingly Christian in the United States. We used standardized inventories and questions focused on sexual minorities. As such, our results cannot be generalized to gender minority students. Another limitation is that we relied solely on participant responses and perceptions, and did not collect parallel objective campus climate data (e.g., reviewing the school's nondiscrimination policy). Hence, we were not able to analyze the potential impact of community-level determinants on mental health independently. Also, we did not collect a representative sample of heterosexual NARAU students or SMs who attend nonreligious schools, which could have served as a comparison group. A qualitative study would likely provide very rich, valuable data to supplement this study's quantitative results.

**Conclusion**

Religiously affiliated colleges, universities, and seminaries are an important, unique part of the American higher education system. Such institutions also maintain strong traditions and practices

central to their campus identity and mission. Efforts aimed at helping SM students who attend such institutions are no easy task. Greater dialogue about sexual orientation issues and development, sensitivity toward diverse populations, compassion and care for SM students, and the use of data to guide interventions may be important steps in promoting campus climates that can be welcoming to SM students at NARAUs.

**References**

American Psychiatric Association. (2013). *Position statement on issues related to homosexuality*. Washington, DC: Author.

American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). *Report of the Task Force on Appropriate Therapeutic Responses to Sexual Orientation*. Washington, DC: American Psychological Association.

Barnes, D. M., & Meyer, I. H. (2012). Religious affiliation, internalized homophobia, and mental health in lesbians, gay men, and bisexuals. *American Journal of Orthopsychiatry, 82,* 505–515. http://dx.doi.org/10.1111/j.1939-0025.2012.01185.x

Biaggio, M. (2014). Do some APA-accredited programs undermine training to serve clients of diverse sexual orientations? *Psychology of Sexual Orientation and Gender Diversity, 1,* 93–95. http://dx.doi.org/10.1037/sgd0000027

Biola University. (2014). *Biola events: How do we love? A thoughtful dialogue on sexual differences*. Retrieved February 5, 2015, from http://now.biola.edu/events/2014/Oct/07/how-do-we-love-thoughtful-dialogue-sexual-differen/

Bradshaw, K., Dehlin, J. P., Crowell, K. A., Galliher, R. V., & Bradshaw, W. S. (2015). Sexual orientation change efforts through psychotherapy for LGBQ individuals affiliated with the Church of Jesus Christ of Latter-days Saints. *Journal of Sex & Marital Therapy, 41,* 391–412. http://dx.doi.org/10.1080/0092623X.2014.915907

Center for Collegiate Mental Health [CCMH]. (2015a). *2014 annual report*. University Park, PA: Author.

Center for Collegiate Mental Health [CCMH]. (2015b). *CCAPS user manual*. University Park, PA: Author.

Crowell, K. A., Galliher, R. V., Dehlin, J., & Bradshaw, W. S. (2015). Specific aspects of minority stress associated with depression among LDS affiliated non-heterosexual adults. *Journal of Homosexuality, 62,* 242–267. http://dx.doi.org/10.1080/00918369.2014.969611

Donadio, R. (2013, July 29). On gay priests, Pope Francis Asks, 'Who am I to judge?' *The New York Times*. Retrieved April 24, 2014, from http://www.nytimes.com/2013/07/30/world/europe/pope-francis-gay-priests.html?pagewanted=all

Eckholm, E. (2011, April 18). Even on religious campuses, students fight for gay identity. *The New York Times*. Retrieved April 24, 2014, from http://www.nytimes.com/2011/04/19/us/19gays.html

Effrig, J. C., Maloch, J. K., McAleavey, A., Locke, B. D., & Bieschke, K. J. (2014). Change in depressive symptoms among treatment-seeking college students who are sexual minorities. *Journal of College Counseling, 17,* 271–285. http://dx.doi.org/10.1002/j.2161-1882.2014.00063.x

Eisenberg, M. E. (2002). The association of campus resources for gay, lesbian, and bisexual students with college students' condom use. *Journal of American College Health, 51,* 109–116. http://dx.doi.org/10.1080/07448480209596338

Estanek, S. M. (1998). Working with gay and lesbian students at Catholic colleges and universities: A student affairs perspective. *Catholic Education: A Journal of Inquiry and Practice, 2,* 151–158.

Galek, K., Flannelly, K. J., Ellison, C. G., Silton, N. R., & Jankowski, K. B. (2015). Religion, meaning and purpose, and mental health. *Psychology of Religion and Spirituality, 7,* 1–12. http://dx.doi.org/10.1037/a0037887

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Getz, C., & Kirkley, E. (2006). Shaking up the status quo: Challenging intolerance of the lesbian, gay and bisexual community at a private Roman Catholic university. *College Student Journal, 40,* 857–869.

Grasser, M. W. (2014). *Research methods: Concepts and connections.* New York, NY: Worth.

Grigoriou, J. A. (2014). Minority stress factors for same-sex attracted Mormon adults. *Psychology of Sexual Orientation and Gender Diversity, 1,* 471–479. http://dx.doi.org/10.1037/sgd0000078

Hamblin, R., & Gross, A. M. (2013). Role of religious attendance and identity conflict in psychological well-being. *Journal of Religion and Health, 52,* 817–827. http://dx.doi.org/10.1007/s10943-011-9514-4

Hamblin, R. J., & Gross, A. M. (2014). Religious faith, homosexuality, and psychological well-being: A theoretical and empirical review. *Journal of Gay & Lesbian Mental Health, 18,* 67–82. http://dx.doi.org/10.1080/19359705.2013.804898

Hatzenbuehler, M. L., Pachankis, J. E., & Wolff, J. (2012). Religious climate and health risk behaviors in sexual minority youths: A population-based study. *American Journal of Public Health, 102,* 657–663. http://dx.doi.org/10.2105/AJPH.2011.300517

Hinch, J. (2013, June 28). Gay students speaking out at Christian schools. *The Orange County Register.* Retrieved April 24, 2014, from http://www.ocregister.com/articles/biola-514884-students-gay.html?p.=1

Jaschik, S. (2013, October 28). Gay Rights and Religious Colleges. *Inside Higher Education.* Retrieved April 24, 2014, from http://www.insidehighered.com/news/2013/10/28/tensions-over-gay-rights-two-religious-colleges

Jones, R. P. (2015, April 28). Religious Americans support gay marriage. *Public Religion Research Institute.* Retrieved May 22, 2015, from http://publicreligion.org/2015/04/in-the-atlantic-religious-americans-support-gay-marriage-2/#.VV-gV0_BzGd

Jones, S. L., & Yarhouse, M. A. (2011). A longitudinal study of attempted religiously mediated sexual orientation change. *Journal of Sex & Marital Therapy, 37,* 404–427. http://dx.doi.org/10.1080/0092623X.2011.607052

Kisch, J., Leino, E. V., & Silverman, M. M. (2005). Aspects of suicidal behavior, depression, and treatment in college students: Results from the spring 2000 national college health assessment survey. *Suicide and Life-Threatening Behavior, 35,* 3–13. http://dx.doi.org/10.1521/suli.35.1.3.59263

Lee, J. (2012). *Torn: Rescuing the Gospel from the gays-vs.-Christians debate.* New York, NY: Jericho.

Lockhart, J. (April 17, 2013). *Sexual & gender minority students speak out: A campus climate survey.* Presentation at the Fordham University Undergraduate Research Symposium.

Lyon, J. (April 17, 2007). BYU changes honor code text about gay students. *The Salt Lake Tribune.* Retrieved July 23, 2015, from http://www.sltrib.com/news/ci_5684555.

Maloch, J. K., Bieschke, K. J., McAleavey, A. A., & Locke, B. D. (2013). Eating concerns in college women across sexual orientation identities. *Journal of College Counseling, 16,* 275–288. http://dx.doi.org/10.1002/j.2161-1882.2013.00042.x

McAleavey, A. A., Castonguay, L. G., & Locke, B. D. (2011). Sexual orientation minorities in college counseling: Prevalence, distress, and symptom profiles. *Journal of College Counseling, 14,* 127–142. http://dx.doi.org/10.1002/j.2161-1882.2011.tb00268.x

McAleavey, A. A., Nordberg, S. S., Hayes, J. A., Castonguay, L. G., Locke, B. D., & Lockard, A. J. (2012). Clinical validity of the counseling center assessment of psychological symptoms-62 (CCAPS-62): Further evaluation and clinical applications. *Journal of Counseling Psychology, 59,* 575–590. http://dx.doi.org/10.1037/a0029855

McEntarfer, H. K. (2011). "Not going away": Approaches used by students, faculty, and staff members to create Gay-Straight Alliances at three religiously affiliated universities. *Journal of LGBT Youth, 8,* 309–331. http://dx.doi.org/10.1080/19361653.2011.607623

Meyer, I. H., Ouellette, S. C., Haile, R., & McFarlane, T. A. (2011). "We'd be free": Narratives of life without homophobia, racism, or sexism. *Sexuality Research & Social Policy, 8,* 204–214. http://dx.doi.org/10.1007/s13178-011-0063-0

Meyer, I. H., Teylan, M., & Schwartz, S. (2015). The role of help-seeking in preventing suicide attempts among lesbians, gay men, and bisexuals. *Suicide and Life-Threatening Behavior, 45,* 25–36.

Mohr, J. J., & Fassinger, R. E. (2000). Measuring dimensions of lesbian and gay male experience. *Measurement and Evaluation in Counseling and Development, 33,* 66–90.

Pachankis, J. E. (2007). The psychological implications of concealing a stigma: A cognitive-affective-behavioral model. *Psychological Bulletin, 133,* 328–345. http://dx.doi.org/10.1037/0033-2909.133.2.328

Pachankis, J. E., & Goldfried, M. R. (2006). Social anxiety in young gay men. *Journal of Anxiety Disorders, 20,* 996–1015. http://dx.doi.org/10.1016/j.janxdis.2006.01.001

Pew Research Center. (2015a). *America's changing religious landscape.* Washington, DC: Author. Retrieved May 22, 2015, from http://www.pewforum.org/files/2015/05/RLS-05-08-full-report.pdf

Pew Research Center. (2015b). *Changing attitudes on gay marriage.* Washington, DC: Author. Retrieved July 15, 2015, from http://www.pewforum.org/2015/06/08/graphics-slideshow-changing-attitudes-on-gay-marriage/

Pew Research Center. (2015c). *Support for same-sex marriage at record high, but key segments remain opposed.* Washington, DC: Author. Retrieved July 15, 2015, from http://www.people-press.org/2015/06/08/support-for-same-sex-marriage-at-record-high-but-key-segments-remain-opposed/

Public Broadcasting System. (April, 2007). The Mormons: FAQs. Retrieved August 28, 2015, from http://www.pbs.org/mormons/faqs/controversies.html

Rankin, S. R. (2005). Campus climate for sexual minorities. *New Directions for Student Services, 2005,* 17–23. http://dx.doi.org/10.1002/ss.170

Rankin, S. R., Weber, G., Blumenfeld, W., & Frazer, S. (2010). *2010 state of higher education for lesbian, gay, bisexual, and transgender people.* Charlotte, NC: Campus Pride.

Rodriguez, E. M. (2009). At the intersection of church and gay: A review of the psychological research on gay and lesbian Christians. *Journal of Homosexuality, 57,* 5–38. http://dx.doi.org/10.1080/00918360903445806

Rosario, M., Yali, A. M., Hunter, J., & Gwadz, M. V. (2006). Religion and health among lesbian, gay, and bisexual youths: An empirical investigation and theoretical explanation. In A. M. Omoto & H. S. Kurtzman (Eds.), *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people.* Washington, DC: APA. http://dx.doi.org/10.1037/11261-006

Rosik, C. H., Griffith, L. K., & Cruz, Z. (2007). Homophobia and conservative religion: Toward a more nuanced understanding. *American Journal of Orthopsychiatry, 77,* 10–19. http://dx.doi.org/10.1037/0002-9432.77.1.10

Schuck, K. D., & Liddle, B. J. (2001). Religious conflicts experienced by lesbian, gay, and bisexual individuals. *Journal of Gay & Lesbian Psychotherapy, 5,* 63–83. http://dx.doi.org/10.1300/J236v05n02_07

Sieczkowski, C. (2014, March 21). Gay student says he was rejected from college after coming out. *The Huffington Post.* Retrieved April 24, 2014, from http://www.huffingtonpost.com/2014/03/21/gay-student-baptist-college_n_5008203.html

Silva, C., Chu, C., Monahan, K. R., & Joiner, T. E. (2015). Suicide risk among Sexual Minority college students: A mediated moderation model of sex and perceived burdensomeness. *Psychology of Sexual Orientation and Gender Diversity, 2,* 22–33. http://dx.doi.org/10.1037/sgd0000086

Smart, L., & Wegner, D. M. (1999). Covering up what can't be seen: Concealable stigma and mental control. *Journal of Personality and Social Psychology, 77,* 474–486. http://dx.doi.org/10.1037/0022-3514.77.3.474

Soulforce. (September, 2008). Soulforce releases route for 2008 equality ride. Retrieved May 22, 2015, from http://www.archives.soulforce.org/2008/09/09/soulforce-releases-route-for-2008-equality-ride/

212                                   WOLFF, HIMES, SOARES, AND MILLER KWON

Stratton, S. P., Dean, J., Yarhouse, M., & Lastoria, M. (2013). Sexual minorities in faith-based higher education: A national survey of attitudes, milestones, identity, and religiosity. *Journal of Psychology and Theology, 41,* 3–23.

Swim, J. K., Pearson, N. B., & Johnston, K. E. (2007). Daily encounters with heterosexism: A week in the life of lesbian, gay, and bisexual individuals. *Journal of Homosexuality, 53,* 31–48. http://dx.doi.org/10.1080/00918360802101179

Wolff, J. R., & Himes, H. L. (2010). The purposeful exclusion of sexual minority youth in religious higher education: The implications of discrimination. *Christian Higher Education, 9,* 439–460. http://dx.doi.org/10.1080/15363759.2010.513630

Wolff, J. R., Himes, H. L., Miller Kwon, E., & Bollinger, R. (2012). Evangelical Christian college students and attitudes toward gay rights: A California university sample. *Journal of LGBT Youth, 9,* 200–224. http://dx.doi.org/10.1080/19361653.2012.652892

Woodford, M. R., Han, Y., Craig, S., Lim, C., & Matney, M. M. (2014). Discrimination and mental health among sexual minority college students: The type and form of discrimination does matter. *Journal of Gay & Lesbian Mental Health, 18,* 142–163. http://dx.doi.org/10.1080/19359705.2013.833882

Woodford, M. R., & Kulick, A. (2015). Academic and social integration on campus among sexual minority students: The impacts of psychological and experiential campus climate. *American Journal of Community Psychology, 55,* 13–24. http://dx.doi.org/10.1007/s10464-014-9683-x

Yarhouse, M. A., Stratton, S. P., Dean, J. B., & Brooke, H. L. (2009). Listening to sexual minorities on Christian college campuses. *Journal of Psychology and Theology, 37,* 96–113.

Received August 31, 2015
Revision received December 29, 2015
Accepted January 6, 2016 ∎

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

CCCU-SER-250

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

ELIZABETH HUNTER, et al.,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF EDUCATION, et al.,

        Defendants,

        v.

COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY,

        Defendants-Intervenors.

No. 6:21-CV-00474-AA

EXPERT DECLARATION OF SHIRLEY HOOGSTRA

I, Shirley Hoogstra, declare that I am an adult of sound mind and make this statement voluntarily, based upon my own personal knowledge, education, and experience.

**OPINION**

1.  I am the president of the Council for Christian Colleges & Universities, and have served in this capacity for seven years. Since 1976, the CCCU has served as the leading national voice of Christian higher education, with 185 campuses across the

globe, including more than 150 in North America. Prior to my role at CCCU, I was Vice President of Student Life for 15 years at a Christian college in the Midwest. In both of these capacities, I have amassed a knowledge base regarding the interaction between Christian educational leadership, students and LGBT+ concerns.

2.   As a Vice President of Student Life, I engaged the topic of faith and LGBT+ students in numerous ways. Under my direction there was a sexuality series that brought in expert speakers for ten years. In addition, I oversaw the school's mental health resources, Campus Security resources, residence life and student handbook content and compliance. I also oversaw the co-curricular religious practices on a campus of 3500+ students. I worked with individual LGBT+ students both as a mentor and as an advisor.

3.   As the president of the CCCU, I have presided over or initiated professional development opportunities to help key leaders understand the needs of LGBT+ students. Under my leadership and direction, CCCU has financially sponsored research on LGBT+ students' beliefs and wellbeing within the Christian college movement. As a Christian administrative educational leader, I have familiarized myself with the experts, resources, and scholarly publications, as well as biblical backgrounds and teachings, that inform policy and decision-making in the important area of Christian college students, gender, and sexuality.  I am also familiar with the policies and practices that our member institutions take in this important area.

4. In my experience, the data and reports I rely upon here are the kind of information relied upon by experts in educational administration and people in leadership positions at educational institutions.

5. Based on the authority and insights of the biblical record, the institutional members of the Council on Christian Colleges & Universities celebrate the goodness of creation (Genesis 1:31), recognize the reality of the Fall (Genesis 3:17-19), and pursue the redemptive work of Jesus Christ in bringing about God's purposes (Romans 8:22-23). Christian faith-based institutions acknowledge and celebrate the goodness of God's gift of sexuality, but also acknowledge that divinely-ordained boundaries have been established around that good gift. The Bible affirms that God created people as male and female (Genesis 1:27-28; Matthew 19:4; Mark 10:6), that the male and female marriage union is set up as the biblical standard for sexual intimacy (Genesis 2:24; Matthew 19:4-6; Mark 10:6-9), and that singleness and celibacy are also set up as an ideal (1 Corinthians 7:7-9; Matthew 19:12, 22:30).

6. Christian educational institutions generally believe that sin and brokenness distort all of creation (Genesis 3; Romans 1:18–3:20; 1 Corinthians 6:7-11). This includes all people's experience of sexuality and gender. These institutions hold that the Bible is clear, however, that any sexual activity outside of marriage between a man and a woman is contrary to God's plan for humanity (Leviticus 18:22; 20:13; Acts 15:28-29, alluding to Leviticus 18; Romans 1:24-27; 1 Corinthians 6:9; 1 Timothy 1:10; Jude 6-7; 2 Peter 2:4, 6-8). Also, they generally hold the view that God created people male and female (Genesis 1:26-27; 2:24) and that it is therefore best

to support the distinction between male and female sexes. (Genesis 17:10-11; Leviticus 12:3; Deuteronomy 22:5;   Matthew 19:4-6). It is accepted, though, by Christian educational leaders that gender dysphoria is real, and efforts are made to address it compassionately.

7.   These positions are rooted deeply in Christian history, back to a time in Greek and Roman history when same-sex activity was culturally and socially acceptable, and have continued unbroken for more than 2,000 years.  They should be understood as positions based on age-old Scriptural teaching, rather than merely manifestations of particular social or cultural biases which could be easily or even with some difficulty modified.  The Supreme Court has recognized this reality, and ruled that beliefs regarding traditional, heterosexual marriage are "based on decent and honorable religious or philosophical premises." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015).   The Court underscored the importance of protecting these traditional religious communities, and their convictions on these matters of marriage and family.  For example: "[I]t must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Id.* at 679.

8.   The leadership of Christian colleges and universities believe that, for students who identify as LGBT+ (as for all students), the admission process, instructional process, and campus life should be welcoming and responsive to student questions, concerns, and needs. For these institutions, the foundational nature of the

**CCCU-SER-254**

university experience is based on a belief in Biblical authority. A Biblical perspective is a standard set for all students, and is generally articulated to each student consistently and clearly. Religious universities generally articulate their beliefs in their welcoming messages to students, and this includes the beliefs and standard expectations for all students, including LGBT+ students, as to the college's standards of sexuality and gender. This would include the review of the Student Behavioral Guidelines or handbook (usually a document available on-line for all students) and the signed agreement for all students indicating their willingness to comply with university guidelines and policy. It would also include guidelines for behavior, including sexual conduct, for all students. These guidelines would be seen by some students, both straight and LGBT+, as counter-cultural.

9. On a religious campus the focus would typically be toward developing a community of believers, faithful to their Biblical perspective, and promoting social and devotional activities, campus organizations, and a dorm life that respectfully honors persons of diversity. Central to a Biblical perspective is the honoring of a person, even when they engage in behaviors that may be counter to the standards of the university. The honoring process is demonstrated most clearly in an act of developing a meaningful relationship, listening before seeking to respond, and loving as Christ has loved each of us – always seeking to help all students, including LGBT+ students, to develop their individual Christian identities in the larger context of the communal Christian fellowship.

6-Declaration of Shirley Hoogstra

10. As noted previously, a Biblical perspective and foundation based on the authority of God's Word is the source for beliefs, decision making and practice for Christian universities. Thus, the ability to practice and carry out policies and practices consistent with the religious belief system of the university is essential to the institution's ability to pursue what it sees as its religious mission. If required to abandon or disavow religious practices, the result would sever the campus from its central identity, and certainly interfere with the development of a full Christian identity among the students. if Plaintiffs are successful in denying LGBT+, minority, and other students access to federal loans and grants to attend religious colleges, these students will be hindered, and perhaps even prevented, from developing the very identities that many of them most urgently seek and value. Many students at religious colleges use the funding they receive to maintain connection and identity with their religious communities. The inability for students of Christian schools to access federal loans and grants would be an unsurmountable financial obstacle to remaining open for many religious universities and colleges, at least in their current configurations. Even more devastating would be the inability for a student to attend a university or college of their choice without amassing untenable personal debt.

11. Traditional beliefs on sexuality and gender at Christian schools do not reflect animus towards LGBT+ identity. Rather, behavior expectations focus on choices and lifestyles that violate the standards and beliefs of traditional religious communities. LGBT+ students are loved and respected on Christian campuses, and their contributions to the campuses they attend are appreciated. A student's LGBT+

7-Declaration of Shirley Hoogstra

identity that requires affirmation of same-sex intimacy will create some inevitable tension when they choose to attend a school that adheres to the traditional sex-related beliefs that the Supreme Court has recognized as legitimate. (The same would be true, of course, if a student wishes the school to affirm other kinds of departures from biblical standards, such as the legitimacy of premarital, heterosexual intimacy.) It is not uncommon for college students to disagree with administrative policy. What is key is that students persist and excel in their academic and social goals regardless of disagreements. This is most likely to occur where all students sense fairness, respect and access to resources to graduate.

12. The findings of the REAP study (College Pulse, 2021) which purports to document greater difficulties faced by LGBT+ students than other students on Christian campuses, are not surprising given what is known about campus culture across all colleges and universities. Among its many weaknesses, including not being peer reviewed, its political origins, and its commercial nature, the REAP study assumes its findings are particular to only religious campuses, yet never considers or compares the experiences of LGBT+ students on secular campuses. Simply, the authors are drawing conclusions that cannot be made without direct comparison, and they failed to do that direct comparison.

13. Despite its limitations, the REAP study's findings (College Pulse, 2021), when taken at face value, can be compared with the results of scholarly studies carried out by professional researchers at major academic institutions. When this is done, the comparisons show that LGBT+ students face challenges at secular

8-Declaration of Shirley Hoogstra

**CCCU-SER-257**

universities that are very similar to the challenges they face at religious ones. These conclusions are revealed in seven national studies of public college campuses, conducted in 2016 and 2017, that were analyzed in the aggregate by researchers at Rutgers University, in collaboration with colleagues at Indiana University, University of Minnesota, and UCLA (Greathouse et al., 2018).

14. A full comparison of these two reports is not practicable in this context, but a fair overview assessment would be that LGBT+ students do measurably worse than their heterosexual/cis-gender peers at *both* religious and secular/public colleges. The studies show that LGBT+ students at Christian colleges share more common experiences with their counterparts at secular/public institutions than has been suggested. Indeed, in some important respects, LGBT+ students appear to do somewhat better at religious colleges than they do at their secular, public counterparts. There can be no absolute comparisons across the REAP report (College Pulse, 2021) and the Rutgers study (Greathouse et al., 2018), as the research questions are not identical. But there are questions that are similar enough to allow some meaningful comparisons. For instance, the REAP report highlights the fact that "four in ten sexual or gender minority students" are "uncomfortable with their sexual identity [or their gender identity] on campus" at religious colleges (College Pulse, p. 4, 6-7). But the Rutgers report indicates that *five* in ten queer-spectrum students and *seven* in ten trans-spectrum students do not feel "respected" on their secular, public campus (Greathouse et al., p. 14-15).

15. Similarly, the REAP report (College Pulse, 2021) asserts that about 64% of "sexual minority students" and 66% of gender minority students reported isolation and loneliness at their religious colleges, about 18% more than "straight" students on the same campuses (College Pulse, p. 13, 9). What the Rutgers study reveals, however, is that just over 79% of queer-spectrum students on public campuses report feeling very lonely in the past year, which is 20% more than their straight peers on their own campuses, and 15% more than their sexual minority peers on religious campuses (Greathouse et al., 2018, p. 23).

16. The reported numbers for depression and suicidal thoughts amongst sexual minority student is almost identical between the two settings. The figures at Christian colleges are 60% (depression) and 20% (suicidal thoughts) and, in the last 12 months, about 60% (depression) and 23.5% (suicidal thoughts) at secular colleges (College Pulse, 2021, p. 13; Greathouse et al., 2018, p. 23). The similarity of these numbers is actually surprising, given that the REAP figures were obtained during the pandemic, where levels of anxiety and depression have been considerably higher than when the Rutgers numbers were obtained in 2016 and 2017. For example, in one study of 2031 college students from a major public university, 71.3% reported increased stress and anxiety during the pandemic with 80.6% experiencing depression, 71.8% experiencing anxiety, and 18.0% experiencing suicidal thoughts (Wang et al., 2020). In another nationwide study of 336,525 adults, rates of depression and anxiety were three times higher than normal during the pandemic (Twenge & Joiner, 2020).

CCCU-SER-259

17.  On more serious questions of the violation of basic personal security, such as physical and sexual assault, it appears that sexual minority students were *more* likely to suffer such affronts on secular/public campuses than on religious campuses. Sexual minority students were more than three times as likely to be physically assaulted (1% versus 3%) or sexually assaulted (16.6% versus 5%) on secular versus religious campuses.  Also, the gap between the physical and sexual safety of straight versus sexual minority students was *greater* on secular than on religious campuses. There was virtually no difference between the physical safety of straight and sexual minority students on religious campuses (1% for each), and a difference on sexual assault of about 2% versus 5%. (College Pulse, 2021, p. 13; Greathouse et al., 2018, p. 25).

18. The relationship between faith and sexual/gender identity on Christian campuses is more complex than many would anticipate. Yes, some LGBT+ students on such campuses, about 1 out of 10, have had difficult experiences and are experiencing psychological distress warranting clinical concern and intervention, but such outcomes are far less common than one might anticipate. Approximately 4 out of 10 LGBT+ students show moderate levels of distress, but still below the threshold of diagnosable psychological disorders. About 1 out of 2 are doing quite well, with little to no distress (Wolff et al., 2016; Yarhouse et al., 2018), which is better than is typically seen across college students in general (CCMH, 2015).

19. One narrative is that Christian colleges and universities are not good places for LGBT+ students because of the faith-based views on sexuality, particularly

religious beliefs and policies, that ask students to put boundaries around any sexual behavior outside marriage between a man and a woman, including any same-sex sexual behavior. While a few LGBT+ students attend these schools because of family, social, and financial pressures, most volitionally choose these schools despite their institutional beliefs and policies regarding sex and sexuality. This choice is made for a variety of reasons, including personal faith, specific educational programs, quality of education, strong communities, opportunity to understand multiple perspectives, and support for managing their sexuality (Yarhouse et al., 2018). It is common knowledge that private schooling, including Christian higher education, is typically more expensive than state schools. It is striking that these students would choose to pay more to attend a school with these policies instead of paying less to attend a school without these policies, if the former were really more difficult for them overall.

20. Further, most of these students make this choice while knowing the institutional policies on sexuality. In a nationwide study of 160 LGB students from 15 Christian colleges and universities (Yarhouse et al., 2018), only about one out of ten claimed to be unaware of the policies on sexuality when they matriculated, suggesting that 9 out of 10 were aware. In fact, 40% indicated they quietly disagreed with the policies, and 19.4% said they were outspoken about their disagreement. However, nearly one out of three (31.3%) said that they came to their university because they agreed with the existing policies. Of the latter group, some reported in interviews that they had had little awareness of how these policies would interact with their sexual identity development later in their college careers, and others

12-Declaration of Shirley Hoogstra

believed these policies helped them steward their sexuality in congruence with their faith.

21. In general, LGBT+ students with higher levels of personal faith tend to agree with institutional policies based on traditional, orthodox Christian views of sexuality (Yarhouse et al., 2009; Stratton et al., 2013; Yarhouse et al., 2017; Yarhouse et al., 2018) as these policies fit with their personal beliefs. As expected then, those LGBT+ students with higher levels of faith reported holding more conservative views about both the causation and nature of same-sex sexual attraction and the morality of same-sex sexual behavior (Yarhouse et al., 2018). Attitudes regarding the moral acceptability of the behavior were more strongly related to faith than were understandings of causality, with the more religious students being less accepting of these behaviors. For this particular subgroup of LGBT+ students, their Christian colleges and universities were a very good "fit" for them in terms of faith and beliefs about sexuality.

22. LGBT+ students of faith are likely to have better outcomes when they are given opportunities to integrate their faith and sexual/gender identities together. Meanley et al. (2016) suggested sexual minorities would psychologically benefit from more attention given to their religious and spiritual needs, particularly through assisting them to navigate these conflicting identities. In fact, most Christian LGBT+ students prefer to find a way to hold their faith and their sexual/gender identities together, rather than rejecting either of them (Yarhouse et al., 2018; Chestna, 2016). Christian colleges and universities are uniquely positioned and resourced to do this

**CCCU-SER-262**

well, especially as these campuses have become better supports for their LGBT+ students (Yarhouse et al., 2018).

23. There is a different story, a different experience, for every individual LGBT+ student of faith (Yarhouse et al., 2009, 2017, 2018; Stratton et al., 2013). There are so many ways in which the individual differences among these students, as well as the unique stage of life and context in which they navigate these concerns, make it difficult to land on one coherent narrative that fits everyone's experience. The sheer breadth of attitudes, beliefs, and experiences, all still "under construction," mitigate against one overarching perspective that will encapsulate every LGBT+ student attending these private liberal arts Christian campuses. The nature of the interaction of sexuality/gender and faith in the context of Christian community requires almost an idiographic approach. The complexities should lead us away from easy answers ("These campuses are harmful to everyone…" or "These campuses are good fits for everyone…") and toward more nuanced reflection on sexuality/gender, human development, and flourishing. The plurality and diversity of colleges and universities allow these students to find the best place for their education, growth, and well-being. Plaintiffs' proposal to end all federal funding for students who desire to attend religious schools would cut off this important option for LGBT+ students who want it and find that it does foster their development.

I make the foregoing statements based on my knowledge, information and belief, under penalty of perjury.

*Shirley Hoogstra*
_____
Shirley Hoogstra, President
Council for Christian Colleges & Universities

DATED this 15th day of October, 2021.

15-Declaration of Shirley Hoogstra

**CCCU-SER-264**

## Appendix A – References

1. Center for Collegiate Mental Health. (2015). CCAPS 2015 technical manual. Penn State University.

2. Chestna, C. M. (2016). Undergraduate Catholic lesbians: The intersection of religious and sexual aspects of identity [ProQuest Information & Learning]. In Dissertation Abstracts International: Section B: The Sciences and Engineering (Vol. 77, Issue 4–B(E)).

3. College Pulse. (2021, March). *The LGBTQ+ student divide: The state of sexual and gender minority students at taxpayer-funded Christian colleges.* A Religious Exemption Accountability Project/College Pulse study. Retrieved from https://www.thereap.org/report.

4. Dean, J. B., Stratton, S. P., & Yarhouse, M. A. (2021). The mediating role of self-acceptance in the psychological distress of sexual minority students on Christian college campuses. *Spirituality in Clinical Practice, 8*(2), 132-148. https://doi.org/10.1037/scp0000253

5. Effrig, J. C., Maloch, J. K., McAleavey, A., Locke, B. D., & Bieschke, K. J. (2014). Change in depressive symptoms among treatment-seeking college students who are sexual minorities. *Journal of College Counseling, 17*(3), 271–285. https://doi.org/10.1002/j.2161-1882.2014.00063.x

6. Greathouse, M., BrckaLorenz, A., Hoban, M., Huesman, R., Rankin, S., & Stolzenberg, E. B. (2018, August). *Queer-spectrum and trans-spectrum student experiences in American higher education: The analyses of national survey findings.*

Rutgers    University,    Tyler    Clementi    Center.    Retrieved    from
https://rucore.libraries.rutgers.edu/rutgers-lib/60802/

7.  Meanley, S., Pingel, E. S., & Bauermeister, J. A. (2016).  Psychological well-being among religious and spiritual-identified young gay and bisexual men. *Sexuality Research & Social Policy: A Journal of the NSRC, 13*(1), 35-45.

8.  Messman, J. B., & Leslie, L. A. (2019). Transgender college students: Academic resilience and striving to cope in the face of marginalized health. *Journal of    American    College    Health,    67,    161    -    173.* https://doi.org/10.1080/07448481.2018.1465060

9.  Oswalt, S. B., & Lederer, A. M. (2017). Beyond depression and suicide: the mental health of transgender college students. *Social Sciences, 6(1),* e1_e8. http://doi.org/f9znz2

10. Pew Research Center (2015, June). *Support for Same-Sex Marriage at Record High, but Key Segments Remain Opposed.* Retrieved from http://www.people-press.org/2015/06/08/support-for-same-sex-marriage-at-record-high-but-key-segments-remain-opposed/.

11. Rankin, S., Garvey, J. C., & Duran, A. (2019). A retrospective of LGBT issues on U.S. college campuses: 1990–2020. *International Sociology, 34*(4), 435–454.https://doi.org/10.1177/0268580919851429

12. Rankin, S., Weber, G., Blumenfeld, W., & Frazer, S. (2010). 2010 state of higher education for lesbian, gay, bisexual, and transgender people. *Campus Pride.*

**CCCU-SER-266**

13. Rosenkrantz, D. E., Rostosky, S. S., Riggle, E. D. B., Cook, J. R. (2016). The positive aspects of intersecting religious/spiritual and LGBTQ identities. Spirituality in Clinical Practice, 3(2), 127–138. http://doi.org/dxzzYarhouse, M. A., Dean, J. B., Stratton, S. P., & Lastoria, M. (2018). *Listening to sexual minorities: A study of faith and sexual identity on Christian college campuses.* Intervarsity Press.

14. Substance Abuse and Mental Health Services Administration. (2019). *The 2019 National Survey on Drug Use and Health.* Retrieved from https://pdas.samhsa.gov/#/survey/N-MHSS-2019-DS0001

15. Stratton, S. P., Dean, J. B., Yarhouse, M. A., & Lastoria, M. (2013). Sexual minorities in faith-based higher education: A national survey of attitudes, milestones, identity, and religiosity. *Journal of Psychology and Theology, 41,* 3-23. http://doi.org/dx2d

16. Twenge, J. M., & Joiner, T. E. (2020). U.S. Census Bureau-assessed prevalence of anxiety and depressive symptoms in 2019 and during the 2020 COVID-19 pandemic. *Depression and Anxiety, 37*(10), 954–956. https://doi.org/10.1002/da.23077

17. Wang X, Hegde S, Son C, Keller B, Smith A, & Sasangohar F (2020). Investigating mental health of us college students during the COVID-19 pandemic: Cross-sectional survey study. *Journal of Medical Internet Research, 22*(9), e22817. http://doi.org/10.2196/22817. Retrieved from https://www.jmir.org/2020/9/e22817

18. Watson, K., Campbell, M., Yarhouse, M. A., & Doolin, H. (2012, March). Occurrence of sexual orientation microaggressions on Christian college campuses

**CCCU-SER-267**

[Poster presentation]. *Christian Association for Psychological Studies annual convention.* Washington, DC.

19. Wentz, J., & Wessel, R. D. (2011). The intersection of gay and Christian identities on Christian college campuses. *Journal of College and Character, 12*, 1–6. https://doi.org/10.2202/1940-1639.1789

20. Wolff, J. R., & Himes, H. L. (2010). The purposeful exclusion of sexual minority youth in religious higher education: The implications of discrimination. *Christian          Higher          Education,          9*,          439–460. https://doi.org/10.1080/15363759.2010.513630

21. Wolff, J. R., Himes, H. L., Soares, S. D., & Miller Kwon, E. (2016). Sexual minority students in nonaffirming religious higher education: Mental health, outness, and identity. *Psychology of Sexual Orientation and Gender Diversity, 3*(2), 201–212. https://doi.org/10.1037/sgd0000162

22. Yarhouse, M. A., Dean, J. B., Stratton, S. P., Keefe, H., & Lastoria, M. (2021). Listening to transgender and gender diverse students on Christian college campuses. *Journal    of    Religion    and    Health.* [Online    publication.] https://doi.org/10.1007/s10943-021-01425-0

23. Yarhouse, M. A., Dean, J. B., Stratton, S. P., Lastoria, M., & Bucher, E. (2017). A survey of sexual minorities who attend faith-based institutions of higher education. *Growth      Journal,      16*,      20-38.      Retrieved      from https://pillars.taylor.edu/acsd_growth/vol16/iss16/3

24. Yarhouse, M. A., Dean, J. B., Stratton, S. P., & Lastoria, M. (2018). Listening to sexual minorities: A study of faith and sexual identity on Christian college campuses. Intervarsity Press.

25. Yarhouse, M. A., Stratton, S. P., Dean, J. B., & Brooke, H. (2009). Listening to Christian sexual minorities on Christian college campuses. *Journal of Psychology and Theology, 37* (2), 96-113. http://doi.org/dx2g

**CCCU-SER-269**

# CCCU Hoogstra Declaration Final3

**Final Audit Report**                                              2021-10-15

| | |
|---|---|
| Created: | 2021-10-15 |
| By: | Joshua Prince (joshuajamesprince@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAwyMCpA-5OxrZEGK_Q79eHaRNis1GVcUl |

## "CCCU Hoogstra Declaration Final3" History

📄 Document created by Joshua Prince (joshuajamesprince@gmail.com)
   2021-10-15 - 4:47:59 PM GMT- IP address: 73.65.188.245

📧 Document emailed to Shirley Hoogstra (shoogstra@cccu.org) for signature
   2021-10-15 - 4:48:32 PM GMT

📄 Email viewed by Shirley Hoogstra (shoogstra@cccu.org)
   2021-10-15 - 5:56:55 PM GMT- IP address: 174.197.132.110

✒️ Document e-signed by Shirley Hoogstra (shoogstra@cccu.org)
   Signature Date: 2021-10-15 - 5:57:28 PM GMT - Time Source: server- IP address: 174.197.132.110

✅ Agreement completed.
   2021-10-15 - 5:57:28 PM GMT

 Adobe Sign